UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NESSA RISLEY, individually<br>and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>    v.<br><br>UNIVERSAL NAVIGATION INC. dba UNISWAP<br>LABS, HAYDEN Z. ADAMS, PARADIGM<br>OPERATIONS LP, AH CAPITAL<br>MANAGEMENT, L.L.C. dba ANDREESSEN<br>HOROWITZ, and UNION SQUARE VENTURES,<br>LLC,<br><br>              Defendants. | No. 22-cv-2780 |

## CLASS ACTION COMPLAINT

## Table of Contents

NATURE OF THE CLAIMS ........................................................................... 1

PARTIES ...................................................................................................... 3

JURISDICTION AND VENUE ...................................................................... 5

FACTUAL BACKGROUND ........................................................................... 6

I.     CRYPTOCURRENCIES ....................................................................... 6

       A.     Ethereum ..................................................................................... 7

       B.     ERC-20 Tokens ........................................................................... 8

       C.     Initial Cryptocurrency Offerings ................................................. 9

II.    THE EXCHANGE ............................................................................... 10

       A.     "Decentralized" Exchanges Take Off, with Uniswap
              Leading the Charge .................................................................. 10

       B.     The Uniswap User Interface ..................................................... 13

       C.     How the Exchange Works .......................................................... 16

III.   UNISWAP'S OWNERSHIP STRUCTURE AND CONTROL
       OF THE EXCHANGE ........................................................................ 22

       A.     Ownership of Uniswap .............................................................. 22

       B.     Paradigm, Andreesen, and USV Helped Develop and Upgrade the
              Exchange Without Any Regard for Safeguards for Users
              of the Exchange ........................................................................ 23

       C.     Uniswap Has Unilateral Control Over the Exchange .................. 27

IV.    UNISWAP AND THE OWNERS HAVE THEIR OWN TOKEN THAT
       TRADES ON THE EXCHANGE ......................................................... 28

V.     UNISWAP ALLOWS THE ISSUANCE OF THOUSANDS
       OF SCAM TOKENS .......................................................................... 30

       A.     Scams Begin, and Continue, to Plague Uniswap ........................ 30

       B.     Uniswap Acknowledges but Continues to Allow Scams .............. 32

VI.    THE EXCHANGE ALLOWS ISSUERS TO SCAM INVESTORS ......... 33

       A.     EthereumMax ........................................................................... 34

              1.     The Rise and Fall of EMAX ............................................. 34

              2.     The EMAX Issuers Made a Fortune to the Detriment of the Class ......... 35

              3.     The EMAX Marketing Campaign ..................................... 36

              4.     The EMAX Issuers' Misrepresentations and Omissions .......... 37

              5.     EMAX Is a Security ........................................................ 39

       B.     Bezoge Earth (BEZOGE) .......................................................... 39

C.  Matrix Samurai (MXS) ........................................................... 42

    1.  MXS Was a Scam Perpetrated in a Single Day ....................................... 42

    2.  MXS Is a Security ........................................................... 45

D.  Alphawolf Finance (AWF) ....................................................... 45

E.  Rocket Bunny (BUNNY) ......................................................... 47

F.  BoomBaby.io (BOOMB) ......................................................... 50

VII. CLASS ALLEGATIONS ........................................................... 51

CAUSES OF ACTION ................................................................. 54

FIRST CAUSE OF ACTION ........................................................... 54

Contracts With an Unregistered Exchange – Violation of
    Sections 5 and 29(b) of the '34 Act  (Against Uniswap) ............................... 54

SECOND CAUSE OF ACTION ......................................................... 55

Unregistered Broker and Dealer – Violation of
    Sections 15(a)(1) and 29(b) of the '34 Act (Against Uniswap) ................... 55

THIRD CAUSE OF ACTION ........................................................... 57

Control Person Liability - Violation of Section 20 of the '34 Act
    (Against Adams, Paradigm, Andreessen, and USV) .................................. 57

FOURTH CAUSE OF ACTION Unregistered Offer and Sale of Securities –
    Violation of Sections 5 and 12(a)(1) ........................................... 58

of the '33 Act (Against Uniswap) .................................................. 58

FIFTH CAUSE OF ACTION Control Person Liability – Violation of
    Sections 5 and 12(a)(1) of the '33 Act (Against Adams, Paradigm,
    Andreessen, and USV) ......................................................... 59

PRAYER FOR RELIEF ............................................................... 61

JURY TRIAL ....................................................................... 62

Plaintiff Nessa Risley, individually and on behalf of all others similarly situated, as and for their complaint against Defendants Universal Navigation Inc. dba Uniswap Labs ("Uniswap"), Hayden Z. Adams ("Adams"), Paradigm Operations LP ("Paradigm"), AH Capital Management, L.L.C. dba Andreessen Horowitz ("Andreessen"), and Union Square Ventures, LLC ("USV") (Uniswap, Adams, Paradigm, Andreessen, and USV collectively referred to herein as "Defendants"), allege on knowledge, information, and belief as follows:

## NATURE OF THE CLAIMS

1.      The Defendants created, own, and manage what they refer to as the "Uniswap Protocol" (the "Exchange"), one of the largest crypto-asset exchanges in the world.  This action arises from their unlawful promotion, offer, and sale of unregistered securities on that exchange, in the form of crypto "tokens".

2.      Uniswap has no barriers to entry for users looking to trade—or "swap"—crypto tokens on the Exchange.  Uniswap requires no verification of an individual's identity, nor does it conduct any "know-your-customer" process.  This combination has led to rampant fraud on the Exchange.

3.      Defendants are well aware of the fraud perpetrated on the Exchange, but have done nothing to stop these activities, even though they could easily do so.  Instead, Defendants encourage fraudulent conduct by guaranteeing fees on all trades to issuers of tokens on the Exchange.  To date, Uniswap has siphoned over $1 billion in fees from its users so that issuers of tokens may continue to profit from their conduct—no matter how fraudulent.

4.      Uniswap has also enriched itself and the other Defendants through a fee structure that they designed, created, and implemented on the Exchange.  Unbeknownst to many users, Uniswap collects fees for issuers on every transaction executed on the Exchange, generating vast

profits for Uniswap's owners, who issued tokens that are traded on the Exchange. Uniswap has failed to disclose this fact in a transparent manner. This is precisely the type of conduct that the securities laws, which Uniswap has continually flouted, are designed to prevent.

5. From April 5, 2021 through the present (the "Class Period"), Uniswap has offered and sold unregistered securities, including EthereumMax, Bezoge Earth, Matrix Samurai, Alphawolf Finance, Rocket Bunny, and BoomBaby.io (collectively, the "Tokens"), throughout the United States on its Exchange, without registering as a national securities exchange or as a broker-dealer, and without there being any registration statements in effect for the Tokens it was selling, all in violation of applicable law. All persons who purchased any Tokens on the Exchange during the Class Period and were harmed thereby are referred to herein as the "Class."

6. Under guidelines promulgated by the Securities and Exchange Commission (the "SEC"),[1] the Tokens are "investment contracts" and therefore "securities" under Section 2(a)(1) of the Securities Act of 1933 (the "'33 Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 (the "'34 Act"). Thus, the issuers of these Tokens (the "Issuers") were required to comply with those and other laws by, specifically but without limitation, filing registration statements for the Tokens. They failed to do so.

7. Had the Tokens been registered as required, Plaintiff and the Class (defined below) members would have received necessary and meaningful disclosures that would have enabled them to reliably assess the representations being made by the Issuers and the riskiness of their investments. Without these disclosures, they were left to fend for themselves.

8. When the Issuers went to sell the Tokens on the Exchange, Uniswap was happy to welcome them with open arms and collect millions of dollars in associated transaction fees. In

---

[1] "Framework For 'Investment Contract' Analysis of Digital Assets, available at https://www.sec.gov/files/dlt-framework.pdf (last accessed April 2, 2022).

doing so, Uniswap failed to register as an exchange or broker-dealer, even as it solicited, offered, and sold the Tokens without filing any registration statements, in open violation of the federal securities laws.

9.  Defendants have profited handsomely from this unlawful activity, as have the Issuers to whom Uniswap paid hidden and exorbitant fees.  Meanwhile, unsuspecting users on the other side of these fraudulent transactions were left holding the bag.

10.  Defendants Adams, Paradigm, Andreesen, and USV, (the "Owners") separately or together participated in, and/or aided and abetted (1) Uniswap's failure to register as an exchange or broker-dealer, (2) Uniswap's offer and sale of securities on an unregistered exchange and operation as an unregistered broker-dealer, and (3) Uniswap's solicitation of securities. Consequently, they owe restitution to the Class.

11.  Accordingly, Plaintiff, on behalf of herself and all others similarly situated, is entitled to damages for the amounts paid for the Tokens, including all fees and charges collected by Uniswap, together with interest and attorneys' fees and costs.

## **PARTIES**

12.  Plaintiff Nessa Risley is an individual and a resident of North Carolina.  Plaintiff purchased each of the Tokens on the Exchange beginning in May 2021.  Plaintiff first used the Exchange in May 2021 and first learned about Uniswap around that time.  Plaintiff incurred substantial losses on her transactions in connection with each of the Tokens.

13.  Defendant Uniswap is a Delaware business corporation duly registered with and doing business in the State of New York, with a principal place of business at 181 N. 11th Street, Suite 307, Brooklyn, New York, and has additional offices in New York City.

14.    Defendant Adams is a citizen and resident of the State of New York, Kings County. Adams is the inventor of the Exchange and its Chief Executive Officer, as well as an equity owner of Uniswap.  During the relevant period, Adams resided and worked in New York City.  Upon information and belief, Adams is a significant liquidity provider for tokens traded on the Exchange.

15.    Defendant Paradigm is a Delaware limited partnership with its principal place of business in California.  Paradigm is an equity owner of Uniswap.  According to Uniswap, it raised a seed round of funding from Paradigm to advance research and development of the Exchange and other decentralized products on the Ethereum blockchain.  Upon information and belief, Paradigm is a significant liquidity provider for tokens traded on the Exchange.

16.    Defendant Andreessen is a Delaware limited liability company with its principal place of business in California.  Andreessen is an equity owner of Uniswap.  According to Uniswap, Andreesen led Uniswaps's Series A funding round, which was designed to add new employees to Uniswap in the United States and to build a new version of the Exchange.  Upon information and belief, Andreesen is a significant liquidity provider for tokens traded on the Exchange.

17.    Defendant USV is a Delaware limited liability company with its principal place of business at 915 Broadway, 19th Floor, New York, New York 10010.  USV is an equity owner of Uniswap.  According to Uniswap, USV participated in Uniswap's Series A funding round, which was designed to add new employees to Uniswap in the United States and to build a new version of the Exchange protocol.  Upon information and belief, USV is a significant liquidity provider for tokens traded on the Exchange.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(d)(2)(A) because the matter in controversy exceeds the value of $5,000,000, exclusive of

interests and costs, and is a class action in which a member of a class of plaintiffs is a citizen of a

different state from a defendant.  The Court also has subject matter jurisdiction pursuant to 28

U.S.C. § 1331 because this matter arises under the '33 and '34 Acts.

19.     This Court has personal jurisdiction over Uniswap as it maintains a place of

business in the State of New York, does significant business within the state and derives significant

profits thereby.  Uniswap has operations and employees in New York City and Uniswap sold the

Tokens to persons in this district.

20.     This Court has personal jurisdiction over Adams, a citizen and resident of the State

of New York.  Upon information and belief, Adams resides in Kings County and works in both

Kings County and New York County.

21.     This Court has personal jurisdiction over USV as it maintains a place of business

in the State of New York, does significant business within the state and derives significant profits

thereby.  USV has operations and employees in New York County.

22.     This Court has personal jurisdiction over Paradigm and Andreesen because they

have engaged in activities targeting New York relating to the subject matter of this action and

giving rise to the claims asserted herein.  Further, Paradigm and Andreesen regularly conduct

substantial business in the State of New York, systematically direct and/or target their business at

consumers in New York and derive substantial revenue from business transactions in New York.

23.     Venue is proper pursuant to 15 U.S.C. §§ 77v(a), 78aa(a), and 28 U.S.C. § 1391(b)

as this is a district where one or more Defendants is found or is an inhabitant or transacts business,

where the offer or sale of the unregistered securities took place, and where a significant portion of the events that are the subject of the claims took place.

## FACTUAL BACKGROUND

### I.   CRYPTOCURRENCIES

24.     A cryptocurrency is a digital currency designed to be a medium of exchange or a store of value.  Cryptocurrencies use cryptography to secure and verify transactions, as well as to control the creation of new units of a cryptocurrency.

25.     Bitcoin, created in 2009, was the world's first cryptocurrency, and remains the largest and most popular today, with a market capitalization of over $800 billion.  Since Bitcoin's creation, many other cryptocurrencies have launched; collectively, cryptocurrencies currently hold a market capitalization of over $2 trillion.

26.     Every cryptocurrency is powered by a decentralized, open software or digital ledger called a blockchain.  Blockchains consist of "blocks" of data that can be traced all the way back to the first-ever transaction on a network.  Each blockchain is subject to different technical rules, but generally speaking, they are all open source and rely on their communities to maintain and develop their underlying code.

27.     The most well-known cryptocurrencies, such as Bitcoin and Ether, are obtained in one of two ways.  The first way is to expend resources to validate transactions on the blockchain in exchange for a reward of newly minted tokens.  This process is called "mining" or "validating."

28.     The second and more common way to obtain cryptocurrencies is to acquire them from someone else.  This often involves using an online cryptocurrency exchange, which, like a traditional stock exchange, is a marketplace matching buyers with sellers of assets.

29.     In a traditional—or centralized—exchange, buyers and sellers are matched on a one-to-one basis through orders.  When the bid of a buyer matches the ask of a seller, a trade occurs.

30.     In contrast, so-called "decentralized" exchanges, such as Uniswap's Exchange, do not use traditional market orders to match buyers and sellers.  Instead, they enable issuers to contribute a pair of tokens to a pool where buyers can trade token "A" in exchange for token "B". Often, in this scenario, token B (*e.g.*, a newly created token by the issuer) has no independent value but token A does have value (*e.g.*, ETH).  Token B will derive its market price from the amount of token A that is placed in the pool (*i.e.*, the liquidity).  As investors place more of their token A in the pool, thereby increasing the liquidity, in exchange for Token B, such transactions drive up the price of Token B.  Someone who places these token pairs in such a liquidity pool is known as a "liquidity provider."

31.     Liquidity is important for decentralized crypto exchanges.  Uniswap, by virtue of its close collaboration with Paradigm, Andreesen, and USV, is able to have ample liquidity for various crypto tokens.  Because Uniswap generates fees on every transaction on its Exchange, Uniswap's liquidity providers are a major component of its business.  According to Adams, "[i]n 2021, Uniswap LPs made $1.6b in revenue."

**A.  Ethereum**

32.     The Ethereum blockchain launched in or around 2015.  The token native to the Ethereum blockchain is called "Ether" or "ETH".  Ether is the second largest cryptocurrency, with a market capitalization at the time of this filing of more than $400 billion.

33.     The Ethereum blockchain allows for the use of derivative "smart contracts."  Smart contracts are self-executing, self-enforcing programs that write the terms of the agreement between the buyer and seller directly into the program's code.

### B. ERC-20 Tokens

34.     To standardize protocols for smart contracts, the Ethereum community utilizes application standards for smart contracts called Ethereum Request for Comments ("ERCs").  ERCs provide uniform transactions and efficient processes.  The most common use of ERCs is to allow for the creation of new crypto tokens.

35.     ERC-20 is an application standard that allows for smart contract tokens to be created on the Ethereum blockchain ("ERC-20 tokens").  ERC-20 tokens, also known as "alt coins," are considered "forks" of Ethereum.  ERC-20 tokens are traded on the Ethereum blockchain.

36.     ERC-20 tokens are relatively simple and easy to deploy.  Anyone with a basic understanding of Ethereum, and not necessarily with any technical expertise, can create their own ERC-20 token, which she can then market to investors.  These issuers, known in the industry as "developers" or "devs," almost never register their new tokens as securities.   In addition, companies, like Uniswap, that run exchanges where these tokens are sold rarely register with the SEC, even though they are required to do so.

37.     The oft-used phrase "Wild West" to describe the cryptocurrency market is particularly apt as to ERC-20 tokens.  Unsuspecting users do not appreciate that their investments could be wiped out in an instant by a variety of schemes.  Unfortunately, this has become a reality for many.

### C. Initial Cryptocurrency Offerings

38.     Recently, and particularly in 2021, interest in cryptocurrencies exploded.  Looking to capitalize on this enthusiasm, many companies and issuers sought to raise funds through "initial coin offerings."  Nearly all these launches were issued using the ERC-20 protocol.  Most of these issuers chose not to register their securities offerings with the SEC and thereby failed to provide investors critical information they would have otherwise received.

39.     These issuers reached potential purchasers through social media sites, promoting active and upcoming launches.  Issuers would usually draft a whitepaper describing the project and the terms of the launch.  These whitepapers lacked elements that a registration statement filed with the SEC would be required to contain, such as: 1) a "plain English" description of the offering; 2) a list of key risk factors; 3) a description of important information and incentives concerning management; 4) warnings about relying on forward-looking statements; and 5) an explanation of how the proceeds from the offering would be used.  The whitepapers also lacked a standardized format that investors could readily follow.

40.     Gary Gensler, the Chairman of the SEC, has noted that "[w]e just don't have enough investor protection in crypto finance, issuance, trading, or lending.  Frankly, at this time, it's more like the Wild West or the old world of 'buyer beware' that existed before the securities laws were enacted.  This asset class is rife with fraud, scams, and abuse in certain applications."

41.     In this case, the Issuers failed to register the Tokens with the SEC and made them available for purchase on the Exchange, which likewise failed to register with the SEC. Registration would have provided crucial risk disclosures to investors, including Plaintiff and the other Class members.

II.     THE EXCHANGE

A.  "Decentralized" Exchanges Take Off, with Uniswap Leading the Charge

42.     Adams first began working with Ethereum in 2017.  As Adams tells it, he had been recently laid off from his first job out of college and a friend encouraged him to learn to write "smart contracts."  Adams asked, "Don't I need to like know how to code?" to which his friend responded, "[n]ot really, coding is easy.  Nobody understands how to write smart contracts yet anyway."  A little more than a year later, Adams and Uniswap launched the Exchange on November 2, 2018.

43.     Uniswap facilitates trades of cryptocurrencies, including the Tokens, by providing a marketplace that uses liquidity pools, where buyers can transact in unregistered securities.  Uniswap promotes the Exchange as "one of the most widely-used platforms on Ethereum."

44.     Shortly after its launch, Uniswap, through its Twitter handle, courted small investors by claiming that its platform "is for many people":



45.     Throughout 2019, Uniswap remained a nascent exchange with a limited number of users and trading volume.  By the start of 2020, Uniswap started making inroads within the crypto community but was still not a mainstream exchange at that point.

46.     By mid-2020—as the Coronavirus pandemic kept people at home—amateur investors flocked to retail investment platforms such as Robinhood.  Shortly thereafter, the "meme" craze began, with social-media users promoting the purchase of stocks based on factors that were unrelated to business fundamentals.  In one example of the "meme" craze, retail investors coordinated their purchase of shares of the struggling GameStop Corp. and, in doing so, artificially inflated its share price from $20 per share to near $500 at one point.

47.     By the end of 2020, the "meme" craze spread to cryptocurrencies, such as Dogecoin (traded on Robinhood), resulting in sudden and substantial price increases.  Amateur retail investors, with little or no investment experience, purchased many of these promoted coins.  By that time, Uniswap, with the robust financial and operational support from the other Defendants, was becoming more recognized within the crypto community, with its daily volume exceeding $1 billion.

48.     By late spring of 2021, Uniswap's growth and name recognition had increased dramatically as it was attracting scores of users that were new to cryptocurrency and/or Uniswap. For example, Uniswap's trading volume shot up to approximately $90 billion in May 2021, a several hundred percent increase as compared to just a few months earlier:



SOURCE: COINGECKO
UPDATED: APR 1, 2022

49.     Looking to capitalize on this investor enthusiasm and the power of the "meme" craze, issuers launched thousands of new tokens on DEXs, including on the Exchange, many of which were priced at only fractions of a cent.  Uniswap was particularly attractive to issuers because Uniswap did not impose any listing fees on issuers.  As a result, by the middle and end of 2021, tens of thousands of people began using the Exchange for the first time, many of whom had likely not even heard of Uniswap before their first use of the Exchange.

50.     The Exchange now averages approximately $1.5 billion per day in trading volume.

51.     As of the filing of this Complaint, total trading volume on the Exchange has surpassed $800 billion, with 92 million trades, and well over 50,000 tokens pairs have been traded on the Exchange.  In contrast, the two largest centralized exchanges, Binance and Coinbase, allow users to trade approximately 600 and 150 tokens, respectively.  Uniswap holds itself out as the leading decentralized exchange with nearly 70% market share.

52.     For its part, Uniswap collects fees on every transaction on the Exchange, and has the right to (and likely does) allocate a portion of each fee to itself.  To date, the total amount of fees collected by Uniswap from its users likely has exceeded $2 billion.

B.     The Uniswap User Interface

53.     Trading on the Exchange is conducted through Uniswap's user interface (the "User Interface").  Uniswap hosts the User Interface on its webserver located in the United States.  To access the User Interface, users must have what is referred to as a "crypto wallet" (a "Wallet"). Wallets are computer applications (usually accessed through a smartphone) that safeguard holders' private keys, which allow them to send, receive, and access cryptocurrencies.  Some of the most popular Wallets include Coinbase Wallet, Metamask, and Trust Wallet.  Anyone with a Wallet can access and use the User Interface without any barriers or restrictions.

54.     Users can access the User Interface through a web browser, such as Google Chrome or Safari, on their smart phone, tablet, or personal computer by navigating to app.uniswap.org or to uniswap.org and clicking the "Launch App" icon, and then clicking "Connect Wallet" (the "Browser Method").

55.     The far more common way for users to access the User Interface is by using browsers native to or imbedded in their Wallets to navigate to app.uniswap.org or to uniswap.org and clicking the "Launch App" (the "Wallet Method").  Plaintiff conducted all of her transactions on the Exchange using the Wallet Method.

56.     Once the Wallet has been connected, users are ready to "swap" tokens.  A user must first select the token she wishes to trade and the token she wishes to receive.  The user can either browse the User Interface to find the token or may search by token name, symbol, or token address.

57.     From there, users can trade by selecting the two tokens they would like to swap, specifying the amount, and then clicking the button "Swap":

13



58.     Typically, before proceeding with the "Swap," a user must set their "slippage tolerance."   Slippage tolerance refers to the amount of price fluctuation the user will tolerate between the time the user confirms the swap and the time the transaction is completed.  If the price changes more than is allowed by the slippage tolerance before the transaction is completed, the proposed swap will not go through.  With extremely volatile tokens, the slippage tolerance usually needs to be set more than 10 or even 20 percent to ensure the completion of a transaction.

59.     The first time that a user trades a token with the Exchange, she needs to "approve" the token.   By "approving" a token, according to Uniswap, "you grant the Uniswap router permission to send that token out of your wallet for the swap."[2]

60.     Users of the User Interface who desire to be liquidity providers may also create or contribute to liquidity pools.

_____

[2] *See* https://help.uniswap.org/en/articles/5391957-how-to-swap-tokens (last accessed April 2, 2022).

61.     As of the filing of this complaint, users who access the User Interface through the Wallet Method are not and have never been presented with any terms of service, any disclaimers, any disclosures, or any information whatsoever about the Exchange.

62.     On or about April 23, 2021, Uniswap posted terms of service (the "Terms of Service") of the User Interface on a page of its website that is not readily accessible from the website's home page.  Uniswap subsequently updated the Terms of Service on or about October 25, 2021.[3]  At some point after April 23, 2021, Uniswap began prompting users accessing the User Interface through the Browser Method with the following when they click "Connect a wallet":



The prompt includes links to webpages for Uniswap's "Terms of Service" and "Protocol Disclaimer."  However, a user (using the Browser Method) does not need to click on the links or check any boxes to connect her Wallet to the User Interface.

---

[3] *See* https://uniswap.org/terms-of-service (last accessed April 2, 2022).

63.     Only a small portion of users access the User Interface through the Browser Method.  Most users access the User Interface through the Wallet Method, and such users have never been presented with—let alone had the opportunity to review and agree to—the Terms of Service and the Protocol Disclaimer.  In any event, the Terms of Service and Protocol Disclaimer are unenforceable against all users of the Exchange.

64.     In addition to being unenforceable and unseen by the vast majority of Uniswap's users, the Terms of Service contain numerous and significant material misrepresentations.  For example, the Terms of Service state that "we [Uniswap] do not broker trading orders on your behalf nor do we collect or earn fees from your trades on the Protocol.  We also do not facilitate the execution or settlement of your trades, which occur entirely on the public distributed Ethereum blockchain."  These statements are patently false.  Uniswap collects fees (and has the ability to keep a portion of those fees for itself) and undoubtedly acts as the broker, facilitator, and seller in connection with all trades on the Exchange.

## C.     How the Exchange Works

65.     Uniswap deployed the original version of the Exchange ("v1") on Ethereum Mainnet (or the main public Ethereum blockchain) on November 2, 2018.  Uniswap launched the second version of the Exchange ("v2") in May 2020.  In the whitepaper for v2 (the "v2 Whitepaper"), Uniswap claims that v2 has "several new highly desirable features. Most significantly, it enables the creation of arbitrary ERC20/ERC20 pairs, rather than supporting only pairs between ERC20 and ETH."

66.     According to Uniswap, the Exchange operates through an "Automated Market Maker" or "AMM," which Uniswap claims replaces the buy and sell orders in an order book market with a liquidity pool of two assets, both valued relative to each other.  As one asset is traded

for the other, the relative prices of the two assets shift, and a new market rate for both is determined. Thus, buyers and sellers do not trade with each other directly but instead do so with Uniswap through liquidity pools Uniswap creates and maintains. The following diagram, from Uniswap's website, demonstrates how v2 of the Exchange works:



67.    In other words, the issuers (or "liquidity providers") deposit two tokens of equal value into a "Uniswap Pool," which is what Uniswap calls it. In the diagram above, Token A often represents ETH and Token B represents the ERC-20 token that the issuer wants to introduce to investors. In return, Uniswap "mints" and issues unique tokens ("Liquidity Tokens," referred to as "Pool Tokens" in the diagram above) to the liquidity providers as follows: "Whenever liquidity is deposited into a pool, unique tokens known as liquidity tokens are minted and sent to the provider's address. These tokens represent a given liquidity provider's contribution to a pool. The proportion of the pool's liquidity provided determines the number of liquidity tokens the provider receives." According to Uniswap, "[a]s liquidity tokens are themselves tradable assets, liquidity providers may sell, transfer, or otherwise use their liquidity tokens in any way they see fit."

68.    Uniswap controls and maintains the liquidity pools by, among other things, (i) holding liquidity provider funds and newly created tokens in Uniswap's proprietary "core contracts," (ii) using routers that Uniswap controls to process all transactions executed by issuers

and users of the Exchange, and (iii) issuing Liquidity Tokens when a pool is created, without which, pools on the Exchange would not function.

69.     According to the v2 Whitepaper, "Uniswap v1 is an on-chain system of smart contracts on the Ethereum blockchain" and "Uniswap v2 is a new implementation based on the same formula." The "whitepaper describes the mechanics of Uniswap v2's 'core' contracts including the pair contract that stores liquidity providers' funds—and the factory contract used to instantiate pair contracts." *See id* at 6 ("One design priority for Uniswap v2 is to minimize the surface area and complexity of the core pair contract—the contract that stores liquidity providers' assets."). When a trade is executed, "the seller sends the asset to the core contract before calling the swap function. Then, the contract measures how much of the asset it has received, by comparing the last recorded balance to its current balance." Uniswap acknowledges that this process "will require calling the pair contract through a 'router' contract that computes the trade or deposit amount and transfers funds to the pair contract." These smart contracts are in the exclusive control of Uniswap.

70.     As a result, Uniswap undoubtedly holds and controls tokens through the use of their smart contracts and as they travel through Uniswap's routers, which are located and/or created in the United States. Thus, when a user swaps one token for another token, she interacts with and obtains such token directly from Uniswap and the pool it controls.

71.     According to Uniswap, the launch price of a new ERC-20 token is determined pursuant to a "constant product" formula, expressed as $x * y = k$, where $x$ and $y$ represent the respective amounts of the two tokens in the liquidity pool. The total liquidity in the pool is represented in the equation by $k$, which Uniswap claims always remains constant. The following diagram demonstrates how the price of the ERC-20 token fluctuates:



72.     In short (and intuitively), the price of a token is a function of the number of tokens investors have purchased.  Put another way, a purchase of a token causes the price to rise, and a sale of a token causes the price to fall.  The formula only captures a snapshot in time.  After each trade in a pool occurs, the formula is rerun in order to rebalance the equation.  Thus, Uniswap's reference to its formula as a "constant product formula" is misleading.

73.     Typically, issuers launch new ERC-20 tokens on the Exchange by placing (i) an extremely large (often more than a trillion or quadrillion) amount of the new tokens in the pool, and (ii) a small amount of ETH, often worth less than $100,000.  As a result, the initial price of the newly launched tokens is usually fractions of a penny.  Given their very low prices and high supply, these tokens are highly unstable and susceptible to wild and rapid price swings; however, none of this is meaningfully disclosed to Uniswap users.

74.     Additionally, there are no barriers or restrictions to anyone issuing a new token on the Exchange.  Uniswap boasts that "anyone can become a liquidity provider" on the Exchange. In fact, the identity of most of the issuers on the Exchange is not disclosed to investors (or even Uniswap).

75.     Defendants' decision to allow complete anonymity, coupled with the lack of any listing fees or requirements, has created and fostered an ideal environment for fraudulent conduct. Of course, Defendants are aware of this reality; the trouble is they choose to profit from its continuance.

76.     Since at least the implementation of v2, Uniswap has charged fees ("User Fees") to users of the Exchange.  For v2, Uniswap charged User Fees in the amount of 30 basis points on each trade, with issuers guaranteed to receive 25 basis points (5/6ths of the fee), and Uniswap reserving the right to receive 5 basis points (1/5th of the fee).  The addition of Uniswap's 5-basis point fee was new to v2 and not a feature of v1.  Uniswap does not disclose these fees to users of the Exchange in a transparent manner.

77.     Uniswap distributes the User Fee to issuers through additional Liquidity Tokens that Uniswap issues to them: "Whenever a trade occurs, a 0.3% fee is charged to the transaction sender.  This fee is distributed pro-rata to all LPs in the pool upon completion of the trade.  To retrieve the underlying liquidity, plus any fees accrued, liquidity providers must 'burn' their liquidity tokens, effectively exchanging them for their portion of the liquidity pool, plus the proportional fee allocation."  *See also* v2 Whitepaper at 5 (noting that "accumulated fees are collected only when liquidity is deposited or withdrawn. The contract computes the accumulated fees, and mints new liquidity tokens to the fee beneficiary, immediately before any tokens are minted or burned.").  Given that liquidity providers can only realize the gains they make through the User Fees by "burning" their Liquidity Tokens, thereby draining the liquidity from the liquidity pools, Uniswap incentivizes liquidity providers to engage in behavior that will cause token values to decline to the detriment of investors.

78.     The fact that Uniswap can decide whether to take its share of the User Fee is notable.  In addition to being part of the ownership of Uniswap, upon information and belief, the Owners are market makers on the Exchange, using it to trade large quantities of valuable tokens, for which they make substantial fees as issuers.  It is not in these issuers' interests for Uniswap to retain its contractually guaranteed share of the User Fees.

79.     In addition to the User Fees, issuers often impose a "tax" on trades ("Trade Taxes"), which typically range from 2 to 10% and can be imposed on both sales and purchases or only upon sales.  The taxed tokens are typically (i) "burned", *i.e.*, removed permanently from the total treasury of the token; (ii) redistributed on a pro-rata basis to the existing holder; and/or (iii) redistributed to issuers.  The Trade Taxes are purportedly to prevent price manipulation and to discourage investors from selling their tokens.  Uniswap does not disclose to users of the Exchange whether Trade Taxes are imposed on the token they are purchasing or selling.  In most cases, a user will only be able to determine the amount of Trade Tax in connection with a transaction by analyzing the Ethereum blockchain *after* Uniswap completes such transaction.

80.     Upon information and belief, Uniswap charges other undisclosed fees to users of the Exchange in addition to the User Fees and Trade Taxes.  The total of such fees is substantial and to determine the actual amount, one would have to analyze thousands, if not millions, of transactions on the Ethereum blockchain.

81.     In May 2021, Uniswap launched the third version of the Exchange ("v3"), which operates in a manner substantially similar to v2, but has additional features.  According to Uniswap, "v3 is based on the same constant product reserves curve as earlier versions but offers several significant new features," including "Flexible Fees," "Protocol Fee Governance," and "Concentrated Liquidity."  With v3, Uniswap now charges User Fees pursuant to tiers.  By default,

there are three tiers, which correspond to User Fees in the amount of 5, 30, or 100 basis points respectively.  Nonetheless, many issuers continue to use v2.

### III.    UNISWAP'S OWNERSHIP STRUCTURE AND CONTROL OF THE EXCHANGE

#### A.    Ownership of Uniswap

82.    Defendants have at all times maintained complete control over the Exchange and the User Interface.  Defendants created and maintained the Exchange and the User Interface in the United States, and they host them both on their own servers in the United States.  In a series of tweets on July 24, 2021, Adams acknowledged that "http://app.uniswap.org = Uniswap Labs owned domain" and that "[d]ecentralization doesn't mean Uniswap Labs lets you do whatever you want on its website.  It means you don't need a single interface instance to access the protocol."

83.    Uniswap is structured and run as a for-profit business, with the Exchange as its primary asset.  In September 2021, shortly after it was announced that the SEC was investigating Uniswap, Chairman Gensler warned that decentralized finance projects, or "DeFi", are under increased scrutiny: "[t]here's still a core group of folks that are not only writing the software, like the open-source software, but they often have governance and fees.  There's some incentive structure for those promoters and sponsors in the middle of this."[4]  Uniswap has a governance structure, collects fees, and has created and enabled an incentive structure for issuers and liquidity providers (including Andreesen, Paradigm, and USV) at all relevant times.

84.    On or about April 12, 2019, Uniswap issued $1.825 million worth of equity shares in the company to two investors: Adams and Paradigm.  Uniswap filed a Form D with the SEC

---

[4] "Crypto's 'DeFi' Projects Aren't Immune to Regulation, SEC's Gensler Says," available at: https://www.wsj.com/articles/cryptos-defi-projects-arent-immune-to-regulation-secs-gensler-says-11629365401# (last accessed April 2, 2022).

reporting this offering.  From on or before April 12, 2019, through on or about June 6, 2020, Adams and Paradigm owned and controlled Uniswap.

85.     On or about June 6, 2020, Uniswap issued an additional $11 million in equity shares and options or warrants in the company to multiple investors.  Uniswap filed a Form D with the SEC reporting this offering.  In a related press release, Uniswap stated that the funding was "led by" Andreessen.  Funding was also provided by other Defendants, including Paradigm and USV, in exchange for an ownership stake in Uniswap.  Since this issuance, Adams, Paradigm, Andreessen, and USV have been the owners and controllers of Uniswap.

86.     Upon information and belief, the Owners also act directly as liquidity providers, and have contributed millions of dollars' worth of tokens to liquidity pools on the Exchange, thus enriching themselves to the tune of millions of dollars in User Fees.  The Owners steered Uniswap to create v2 and v3, which allowed the pairing of unique ERC-20 tokens, so that they could fund large liquidity pools and generate millions of dollars in fees for themselves.  In v1, an ERC-20 token could only be paired with ETH and not another ERC-20, which limited the Owners' ability to monetize the Exchange.

**B.    Paradigm, Andreesen, and USV Helped Develop and Upgrade the Exchange Without Any Regard for Safeguards for Users of the Exchange**

87.     Paradigm is a cryptocurrency hedge fund and Andreesen and USV are venture capital firms.  However, they are not just investment partners to Uniswap; they were and remain intimately involved with the functionality of Uniswap, including but not limited to the development of v2 and v3.

88.     On February 11, 2021, in a series of tweets, Adams specifically named Andreesen, Paradigm, and USV and acknowledged that they were intimately involved in (i) developing and promoting the Exchange, (ii) writing smart contracts (likely for the smart contracts on the

Exchange that enable pool creation and trading), (iii) overseeing Uniswap's operations, (iv) providing crucial funding, (v) "educating regulators," (vi) sharing "insider info," and (vii) "a whole lot more":



89.     Dan Robinson, Head of Research at Paradigm, was instrumental in the development of both v2 and v3, which he discussed in detail in an interview with the website *The Defiant*.[5] Moreover, Robinson and several of his Paradigm colleagues promoted Paradigm's role in upgrading the Exchange on Twitter.

---

[5] "'V3 is Winding Back a Bit of the Uniswap Revolution; It's Going to be Very Influential:' Dan Robinson," available at https://newsletter.thedefiant.io/p/v3-is-winding-back-a-bit-of-the-uniswap (last accessed April 2, 2022).

90.     On May 18, 2021, Paradigm published an article authored by Robinson on its website, titled "Liquidity Mining on Uniswap v3."[6]  In the article, Robinson touts in technical detail how improvements in v3 will benefit liquidity providers.  On June 7, 2021, Paradigm published another article authored by Robinson on its website, titled "Uniswap v3: The Universal AMM."[7]  In the article, Robinson describes in technical detail how the AMM on v3 works. Robinson and Paradigm have such intimate knowledge of the Exchange because they co-created it with Adams.

91.     On July 16, 2021, Matt Huang, co-founder of Paradigm, issued a press release on Paradigm's website titled "Expanding our Research Team."[8]  In the release, Huang stated that Paradigm assembled a "Research team" led by Dan Robinson.  Huang further acknowledged that the research team "work[ed] closely with our investment team and our portfolio on projects like Uniswap v3."  In a tweet announcing the press release, Huang stated "[o]ur Research team at @paradigm started three years ago as an experiment, but it's become a key part of our firm and the crypto community."  Huang's tweet suggests that Paradigm was intimately involved with Adams in co-creating the first version of the Exchange, v1, which launched less than three years before Huang made that statement.

92.     On July 28, 2021, Dave White, a "Research Partner" at Paradigm, tweeted "I've been working on a new type of automated market maker with @danrobinson and @haydenzadams."  White stated "[t]he Time-Weighted Average Market Maker, or TWAMM (pronounced "tee-wham"), helps traders on Ethereum efficiently execute large orders."  He also included a link to a "paper" on Paradigm's website describing TWAMM.[9]  Dave White, Dan

---

[6] *See* https://www.paradigm.xyz/2021/06/uniswap-v3-the-universal-amm (last accessed April 2, 2022).
[7] *See* https://www.paradigm.xyz/2021/06/uniswap-v3-the-universal-amm (last accessed April 2, 2022).
[8] *See* www.paradigm.xyz/2021/07/expanding-our-research-team (last accessed April 2, 2022).
[9] *See* https://paradigm.xyz/2021/07/twamm/ (last accessed April 2, 2022).

Robinson and Hayden Adams are all listed as authors.  In the conclusion, White writes, "[i]f you are interested in working on this or similar problems, you can email dave@paradigm.xyz or DM me on Twitter, or reach out to Uniswap Labs at ideas@uniswap.org."

93.     Paradigm also co-drafted the whitepapers for v2 and v3 with Adams and other Uniswap employees.  Robinson is listed as a co-author of those whitepapers.

94.     Defendants developed and rolled out v2 and v3 unilaterally without input from users or via any governance proposals and solely for the benefit of the Owners.

95.     In addition, the Owners have actively sought to prevent regulatory oversight of the cryptocurrency industry—including the activities that occur on the Exchange.  Specifically, in 2018, Andreesen and USV jointly met with the SEC and argued that crypto tokens do not constitute securities (that would otherwise be subject to regulation), speciously claiming that they only function to access blockchain-based services and networks.  In his tweets on February 11, 2021, Adams confirmed that the Owners attempted "to educate regulators."

96.     The Owners' subsequent promotion of Uniswap as an investment platform and their participation in the creation of the UNI token with governance rights and making themselves a preferred class of token holders (discussed below) belies any self-serving representations that tokens are not subject to regulation.  Small investors continue to suffer from the fraudulent conduct that is endemic to the Exchange, while Defendants continue to encourage them to trade the same tokens that they deny are securities.

97.     It is also clear that the Owners sought to monetize the Exchange to the detriment of everyday users.  Indeed, in April 2021, Paradigm acknowledged that inexperienced users of DEXs, like the Exchange, are constantly taken advantage of: "Every day, thousands of people use a decentralized exchange (DEX) for the first time. However, the idiosyncrasies of a public

blockchain routinely catch newcomers off-guard, even those familiar with trading on more traditional venues. As a result, traders bleed money to arbitrageurs and frontrunners, leading to worse-than-necessary execution."[10]   Nonetheless, Defendants do not meaningfully warn such users of the Exchange or implement simple safeguards to protect them.

### C.   Uniswap Has Unilateral Control Over the Exchange

98.   According to Adams, Uniswap was named by Vitalik Buterin, a co-founder of Ethereum.  Adams had initially wanted to call it Unipeg—a mixture between a Unicorn and a Pegasus.  Uniswap proved a more apt name, as Uniswap (and its Owners) maintains final and *unilateral* control over all business on the Exchange, including the "swaps" of crypto assets.

99.   For example, despite claiming that the Exchange is decentralized, Uniswap has unilaterally delisted tokens from its exchange on multiple occasions.

100.   In July 2021, in response to regulatory pressure, Uniswap unilaterally delisted 100 tokens from its exchange.

101.   On another well-publicized occasion, the launch of a new token caused an error in the protocol's data aggregator.  In response, Uniswap unilaterally removed the token from the Exchange.

102.   Uniswap's power to unilaterally remove tokens from the Exchange further confirms that Uniswap can (and does) exercise complete control over its Exchange.

103.   Uniswap also controls its exchange through a software license.  Uniswap views the Exchange as its intellectual property, and v3 is explicitly subject to a "business source license" from Uniswap and/or the Owners.  The license limits use of the v3 source code under terms and conditions that Uniswap can unilaterally change at any time.

---

[10] *See* https://research.paradigm.xyz/amm-price-impact (last accessed April 2, 2022).

## IV.    UNISWAP AND THE OWNERS HAVE THEIR OWN TOKEN THAT TRADES ON THE EXCHANGE

104.    Not content to simply collect millions of dollars per day in transaction fees, Uniswap issued its own token, UNI.  UNI can be purchased on the Exchange.

105.    According to Uniswap, UNI holders would be granted "immediate ownership" of, *inter alia*, Uniswap governance and the UNI community treasury.

106.    Previously, the company's official Twitter account joked, in response to the admitted "schilling" by a close friend of Adams, that "[i]f we had any tokens we would totally give you some."   Sure enough, after launching UNI, Uniswap allocated 40% of the total supply of UNI to "team members and future employees, investors and advisors" to be distributed over a four-year period, as follows:

- 21.266% to team members and future employees with 4-year vesting [212,660,000 UNI]

- 18.044% to investors with 4-year vesting [180,440,000 UNI]

- 0.69% to advisors with 4-year vesting [6,900,000 UNI]

107.    Most of this group is made up of the Owners, who received or are set to receive millions of UNI.  UNI launched at approximately $3 per token and doubled in price within a day and eventually reached an all-time high of approximately $45 per token.  Thus, by launching UNI, the Owners enriched themselves to the tune of millions of dollars.

108.    Uniswap claims that the remaining 60% of UNI tokens are for the "Uniswap community members," a group which it does not define.  It appears that only 15% of UNI was initially allocated to such "community members," and approximately one third of this amount (5% of UNI) was allocated to "historical liquidity providers," which include the Owners.  Uniswap states that the remaining 10% was "split evenly across all 251,534 historical user addresses."

109.    Of the remaining 45% of UNI, Uniswap stated that the "governance treasury will retain 43% [430,000,000] . . . to distribute on an ongoing basis through contributor grants, community initiatives, liquidity mining, and other programs."  Further, "governance can vote to allocate UNI towards grants, strategic partnerships, governance initiatives, additional liquidity mining pools, and other programs."  In other words, whoever controls Uniswap's governance can allocate the remaining UNI tokens as they see fit.

110.    In summary, the Owners directly received the vast majority of the 40% of UNI earmarked for "team members, investors, and advisors" as well as some or most of another 5% of UNI earmarked for "historical liquidity providers," and indirectly retain and control another 43% of UNI through governance of Uniswap.  Thus, the Owners directly or indirectly control as much as 88% of UNI, while only the remaining 12% of UNI is held by smaller users.

111.    This discrepancy in UNI ownership and control is further amplified by the governance rules of Uniswap.  Under the governance rules, ownership of at least one percent of the total UNI supply is required to submit a governance proposal, and four percent is required to vote "yes" to reach quorum.  Under these parameters and given the allocation of UNI, the Owners have a disproportionate amount of power and effectively control Uniswap's governance—and thereby the Exchange.

112.    Thus, Uniswap's assertion that UNI is a governance token allowing holders to vote on changes to the Exchange and how to allocate funds in the governance treasury is demonstrably false and misleading.

113.    As set forth herein, UNI is a "security" under the standards promulgated by the SEC and the Supreme Court.  Nevertheless, Uniswap failed to register UNI with the SEC as required by the federal securities laws.  That this particular security trades on an exchange that is

owned and operated by the same people who are both the issuers and the owners and controllers of the security—and who also obtain fees from transactions in the security—speaks to the lawless environment at play.

114.   Upon information and belief, UNI was issued to support Defendants' ongoing efforts to develop newer and better versions of its Exchange, while enriching Defendants and consolidating their control over the Exchange through the governance structure.

115.   Moreover, Defendants actively promote both UNI and the Exchange to prospective investors on social media, podcasts, websites, and other media.   Through such promotion, Defendants have misleadingly touted the exchange as a decentralized market with no central operator or administrator, contrasting it with markets that are "designed to take fees."   However, Uniswap does charge fees to users of the Exchange, which directly benefit Defendants.   Defendants have also made false and/or misleading statements about UNI, the Exchange, Uniswap's business and governance.

## V.   UNISWAP ALLOWS THE ISSUANCE OF THOUSANDS OF SCAM TOKENS

### A.   Scams Begin, and Continue, to Plague Uniswap

116.   Scams have always been prevalent in cryptocurrency, as SEC Chairman Gary Gensler has said, cryptocurrency is "the Wild West," rampant with "fraud, scams and abuse."

117.   Thus, it should not have been a surprise to Uniswap or the Owners that scam tokens plagued the Exchange during its growth, particularly in 2021, and continue to run rampant there today.

118.   As Uniswap grew from hundreds to thousands of listings, so did the number of scam tokens.   Uniswap's open issuer policy (with no listing fees, vetting processes, or criteria for issuing tokens), along with the relatively small amount of ETH required to issue a new token, has led to thousands of scam tokens being traded on the Exchange.

119.    Uniswap not only fails to prevent scammers, but—with a fee structure that rewards fraudulent issuers—scammers are encouraged and emboldened to use the Exchange as they profit from their illegal activity without any consequence.  For its part, Uniswap does not return the fees it collects from these fraudulent transactions.

120.    One type of scam that is all too common on the Exchange is a "rug pull."  In this scam, a new issuer puts their tokens into a liquidity pool and receives Liquidity Tokens in exchange.  The issuer then prematurely withdraws their pool tokens, thereby removing all liquidity from the pool and leaving other investors with nothing but now worthless tokens.

121.    Another common scam is a "pump and dump."  Before launching a new token (and before trading begins on the Exchange), issuers send millions or even billions of the new token to themselves, which the issuers rarely disclose to potential investors.  Then, the issuers "pump" or loudly promote their tokens to potential investors, often through social media, and make wild claims (usually misrepresentations if not outright fraud) to entice investors and drive-up demand for their tokens.  With demand at its peak, the issuers "dump" their holdings on the exchange at the highest possible price and abscond with the profits, leaving investors holding worthless tokens.  Pump and dumps can also occur when one or more large-volume traders purchase and hold a large number of tokens, wait for the price to go up, and then sell out, leaving smaller investors holding the bag.  Uniswap does not return the fees it collects from these fraudulent transactions.

122.    Uniswap's structure also incentivizes Ponzi schemes.  At any given time, there is not enough liquidity to pay off all investors if they all were to sell their tokens at the current price.  Thus, when a selloff occurs, the price of the tokens drops dramatically, sometimes by 50% or more within seconds or minutes, creating a race to act where the investors that catch the fall immediately

incur substantial losses.  The problem is exacerbated by the fact that most new tokens are launched with only a small amount of liquidity.

123.    The Exchange is also plagued by malicious traders who use schemes to suck liquidity out of a token.  One such scheme involves using "bots" that are programed to buy large amounts of tokens to briefly drive up its price and then quickly sell tokens to gain an incremental profit.  The process is repeated numerous times, which has the effect of dramatically increasing the profits of the malicious trader at the expense of other investors.

124.    Uniswap does not provide transparent information to investors about these or any other actual or potential fraudulent practices, or about how the structure and governance of the Exchange allow such practices to thrive.

### B.  Uniswap Acknowledges but Continues to Allow Scams

125.    Uniswap is fully aware of the existence and scope of fraudulent activity on the Exchange but has done little to address this.  Although these abuses are extremely detrimental and dangerous to its users, Uniswap intentionally avoids any effort to curb them.  Uniswap incentivizes and encourages anyone, without any restrictions whatsoever, to become an issuer.  Specifically, Uniswap does this by guaranteeing fees to them on every trade, calculated on a percentage basis.

126.    In response to reports that Uniswap was a haven for scam tokens and fraud, Uniswap acknowledged that the Exchange was creating a problem: "As the rate of token issuance accelerates, it has become increasingly difficult for users to filter out high quality, legitimate tokens from scams, fakes, and duplicates."  Uniswap conceded that the trend was something "we expect will only accelerate in the future."

127.    Adams has made various statements demonstrating that, at all relevant times, he understood the risks inherent in his creation, the Exchange; the problem is that Defendants never shared the full extent of these risks with Uniswap's users.

128.    For example, Adams appeared on a webcast with host Bankless, a crypto finance YouTube channel, and Adams described "how easy it was to create liquidity," even for an "obscure asset"—just recruit users to provide that liquidity and pay them fees for the risk of doing so. During the webcast, the host recounted minting his own token "for funsies," gifting them to his friends and thinking it was "absolutely crazy" that he could list any token on Uniswap for sale "without permission."

129.    Defendants have and continue to turn a blind eye to the fraud and do nothing to stop it because those in control of Uniswap profit handsomely from such conduct.  Uniswap is collecting millions of dollars in User Fees, and Paradigm, Andreessen, and USV have contributed millions of dollars to liquidity pools on the Exchange, allowing them to collect substantial fees on all transactions in connection with these pools.  Defendants could easily (and should) implement reasonable safeguards against perpetrators of fraud acting as liquidity providers.  Their failure to do so has harmed its users, including Plaintiff and the Class.

## VI.    THE EXCHANGE ALLOWS ISSUERS TO SCAM INVESTORS

130.    The ease of listing new tokens on Uniswap led to the creation of thousands of digital tokens on the Exchange.  Defendants promoted, offered, and sold the Tokens on their Exchange, without registering as an exchange or a broker-dealer, and without a registration statement in effect for the securities it was selling.  The Tokens all launched in 2021 and by issuers located in the United States.

131.    The assets traded on the Exchange are securities under applicable federal law because their values are derived entirely from the efforts of others, including the Issuers.

132.    Uniswap facilitated these trades, including those involving the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for Uniswap having the ability to charge a fee on every transaction it made possible on its Exchange.

133.    Consequently, the Defendants and the Issuers engaged in countless unlawful transactions by soliciting, offering, and selling securities without registering the Tokens as securities and without Uniswap registering with the SEC as an exchange or broker-dealer.  Thus, Uniswap's users were not informed of the significant risks inherent in these investments, in violation of applicable law.

134.    Uniswap thus sold the following unlawful securities in the form of crypto tokens.

## A.    EthereumMax

### 1.    The Rise and Fall of EMAX

135.    On or about May 14, 2021, the token known as EthereumMax or "EMAX" launched on the Exchange.

136.    The issuers of EMAX (the "EMAX Issuers") heavily promoted the token on social media platforms, including on Twitter, Instagram, Discord, Telegram, and Reddit.

137.    According to EMAX Issuers, the price of the token shot up over 500,000% in the first 24 hours.  After that meteoric rise, EMAX's official Twitter account encouraged more buying: "Am I early or late?  $eMax #NowIsTheTime."

138.    The value of EMAX peaked at approximately $0.000001.  Over the next month, the value of the token dropped substantially.  In the months that followed, EMAX has remained flat:



139.    As of today, EMAX trades at 0.00000001, down 99% from its all-time high.

### 2.    The EMAX Issuers Made a Fortune to the Detriment of the Class

140.    The EMAX Issuers allocated EMAX to themselves around the time of its launch and, to the detriment of the Class, sold their holdings for large profits after the price of EMAX spiked, which substantially contributed to the collapse of the token.

141.    The EMAX Issuers also made millions of dollars in fees from trading of EMAX, including on the Exchange.  For several weeks, the daily trading volume of EMAX was tens of millions of dollars a day.  For several days in the last week of May 2021, the daily trading volume of EMAX was over $100 million a day, generating over $300,000 a day in fees for the EMAX Issuers.

142.    According to CoinGecko ("a price tracking website for cryptoassets," which compiles transactional and other information on the Ethereum blockchain), the total trading volume to date for EMAX is in excess of $900,000,000, resulting in over $2,500,000 dollars in fees for the EMAX Issuers.

143.    In addition, the EMAX Issuers likely profited by millions of dollars by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity pool for the token.

144.    The EMAX Issuers thus enriched themselves at the expense of Plaintiff and the Class.

### 3.    The EMAX Marketing Campaign

145.    While the EMAX Issuers were enriching themselves, they were also engaging in a massive marketing campaign to promote EMAX and convince retail investors that the token was a good investment.

146.    The EMAX Issuers did not warn the investors of the risks of investing in EMAX. Instead, the EMAX Issuers continued to encourage investors to keep purchasing more EMAX tokens, with public statements such as: "Wow!  Still early!  Get in now!"

147.    The EMAX Issuers recruited celebrities, athletes, and influencers to market EMAX, including NBA champion Paul Pierce, boxing champion Floyd Mayweather, boxing champion Tyson Fury, and social media influencer Jake Paul.  Mayweather fought Jake Paul's brother, social media influencer Logan Paul, in a boxing match wearing an "EthereumMax" logo on his trunks.  Upon information and belief, the EMAX Issuers paid Mayweather handsomely for promoting EMAX.  The EMAX Issuers also paid Kim Kardashian West to promote EMAX, with one news outlet reporting that "roughly 1 in 5 U.S. adults heard about Kim Kardashian's promotion of 'Ethereum Max.'"

148.    The EMAX Issuers advertised the token in Times Square, with a tweet showing the advertisement referring to an investor doing "so well with the token."

149.    The EMAX Issuers promoted EMAX as the only cryptocurrency accepted for certain sporting events.  For example, on June 15, 2021, the official twitter account for the token

tweeted "#EthereumMax will be the 1st Crypto coin ever accepted to purchase tickets for a 2nd time at a major fight! WBA Super Lightweight Championship - @gervontaa gervontaa vs. @boxer_barrios PPV event on June 26th!"

150.    The EMAX Issuers held weekly forums on Telegram where they would talk about updates and answer questions from the "eMax community."

151.    The EMAX Issuers also engaged cash giveaways and raffles whereby they would promote small businesses that accepted EMAX as payment.

152.    The EMAX Issuers would also promote the coin when it reached certain milestones. For example, EMAX boasted of its engagement on Reddit: "We just surpassed 6,000 members on Reddit!  Thank you to the EMAX community for continuing to support and believe in our project…. join our growing community!"

### 4.    The EMAX Issuers' Misrepresentations and Omissions

153.    The EMAX Issuers made multiple misrepresentations to retail investors to encourage them to either make additional investments or hold onto their current investments in EMAX, even as the price of the token continued to fall.

154.    In or around the end of May 2021, EMAX Issuers announced that the token would be added to a major exchange within days.  However, that never happened.

155.    The EMAX Issuers also announced on social media that they would be implementing certain "tokenomics" to prevent a selloff from impacting the price of the token. However, the EMAX Issuers never fully implement these protocols.  In any event, the program was a ruse to keep investors from selling their tokens.  The issuers knew that if the program was properly implemented, it would not have prevented the EthereumMax from dropping in value.

156.    The EMAX Twitter account also touted the completion of a "Certik Security Audit" to make investors feel safe.  However, this tweet was misleading and a material omission because it did not disclose to investors the risks associated with the token.

157.    The EMAX Issuers never disclosed to investors that it collects fees on every trade of EMAX on the Exchange.

158.    The EMAX Issuers released a whitepaper (the "EMAX Whitepaper") five months after launching EMAX, in October 2021, which contained several statements that were misleading and contradicted the EMAX Issuers' prior statements.

159.    Directly contradicting prior statements on social media, the EMAX Whitepaper stated price appreciation had not been a goal of EMAX: "EthereumMax aims to create a reserve currency that is backed by crypto assets within its ecosystem which will derive value from growth in the system rather than price appreciation."

160.    Also, directly contradicting prior statements on social media, the EMAX Whitepaper stated that the EMAX Issuers sought the initial volatility: "We are looking for initial volatility to grow the size of our pool.  With the early trading in a newly formed asset, profit and upward price mobility will spur growth.  This may seem counterintuitive to what you would think one would be looking for in a currency long-term with stability, but that will come at a later stage in the lifecycle."

161.    The EMAX Whitepaper also trumpeted EMAX Issuers' marketing accomplishments with celebrities and influencers, and falsely claimed their promotions and advertisements had delivered "a reach that would make most financial advisors drool."

### 5.    EMAX Is a Security

162.    Due to the heavy promotion of EMAX, Plaintiff believed that her holdings of EMAX would increase in value as the token became more widely adopted through the development efforts of the EMAX Issuers.

163.    On May 24, 2021, the EMAX Issuers tweeted about a major announcement—"a technology upgrade to support expanded coin use and exponential growth"—with "numerous benefits for HOLDERS!"  Investors reasonably relied on the EMAX Issuers' representations that they would continue improving the software and platform to grow the token's value.

164.    Indeed, the EMAX Whitepaper laid out EMAX's plan of building "a robust and scalable ecosystem" for its investors—a common enterprise "with benefits that scale and evolve over time."  EMAX launching the token was "the first of many steps to develop an ecosystem that will be a driving force in changing what the world considers to be currency."

165.    The expertise of the EMAX Issuers was critical in building this ecosystem by monitoring EMAX, promoting EMAX, and deploying investor funds.  EMAX claimed that EMAX was different from all other cryptocurrencies because the "various unique specializations and skills of the founding team," in tandem with "top-level marketing and financial experts," set the "project apart from any other initiative in the space."  As the protocol and governance structure were determined before the token's launch, investors in EMAX relied on the managerial efforts of the founding team.

166.    Accordingly, EMAX is a security.

### B.    Bezoge Earth (BEZOGE)

167.    On or about May 18, 2021, the token known as Bezoge Earth or "BEZOGE" launched on the Exchange.

168.    BEZOGE was yet another group that jumped on the growing wave of cryptocurrency awareness to promote their scheme.  Shortly after Tesla CEO Elon Musk appeared on Saturday Night Live and did skits and shorts about Dogecoin, BEZOGE tweeted: "check out @bezoge, the only currency to help rescue doge abandoned by @elonmusk on the moon"; and "Elon dumped Doge on the moon.  Now the worlds wealthy are after the crown.  You have yet to see BEZOGE."

169.    The issuers of BEZOGE (the "BEZOGE Issuers") released a whitepaper (the "BEZOGE Whitepaper") focused not only on memes and marketing, but also on the "community based ecosystem" it was building that was "backed by a strong development team," which included "solidity (smart contract developers), web3, frontend and backend developers…, along with C-level executives, business leaders and experts in various fields."

170.    The "Foundations of Community Wealth and Distribution" section summarized the "tokenomics" of BEZOGE: "50% of the supply has been burnt forever;" "44% of the supply has been put into liquidity;" "3% of token supply for development team;" "3% of supply allocated to the Bezoge Treasury;" "1% Burn!;" and "1% Redistribution."  These percentages aimed to assure retail investors, who know little about cryptocurrencies, that the project was legitimate.

171.    Plaintiff believed that her holdings of BEZOGE would increase in value as the token became more widely adopted through the development efforts of the BEZOGE Issuers.

172.    The BEZOGE Whitepaper was silent as to the regulatory nature of BEZOGE. Instead, in a section it titled "The boring legal stuff," the whitepaper made numerous misrepresentations, including that the "[t]he document does not constitute an offer or solicitation to sell shares or securities" and even attempted to unconscionably disclaim all liability for any of its misrepresentations.

173.     Immediately after its launch, BEZOGE rose to $0.0000000015 per token or at least 10 times its initial value.   Then, within the next three weeks, the token crashed downed to $0.00000000013 per token, a drop in value of 97%.   The price of BEZOGE hovered at the new low for several months, until October 2021.   In another pump of the token, the BEZOGE Issuers made additional attempts to rope in more investors.   In October 2021, the BEZOGE Issuers announced that star NFL wide receiver Antonio Brown would be promoting BEZOGE.   The BEZOGE Issuers also promoted BEZOGE's integration with a low budget video game they were developing called Legends of Bezogia.   As a result of these efforts, the token rose sharply again (nearly 100 times its then value) in October and November 2021, but once again, the Token crashed, causing massive losses to investors:



174.     According to CoinGecko, the total trading volume to date for BEZOGE is in excess of $500,000,000, resulting in over $1.5 million in fees for the BEZOGE Issuers alone.

175.     In addition, the BEZGOE Issuers likely profited by millions of dollars by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity pool for the token.

176.     The BEZGOE Issuers thus enriched themselves at the expense of Plaintiff and the Class.

177.     Accordingly, BEZGOE is a security.

**C.     Matrix Samurai (MXS)**

**1.     MXS Was a Scam Perpetrated in a Single Day**

178.     On or about June 12, 2021, the token known as Matrix Samurai or "MXS" launched on the Exchange.

179.     In the weeks leading up to the launch of MXS, the issuers of MXS (the "MXS Issuers") heavily promoted their token on social media platforms, including Twitter, Discord and Reddit.  In particular, the MXS Issuers promoted how secure MXS would be and emphasized that "Matrix Samurai takes security seriously."

180.     The MXS Issuers released a "whitepaper" (the "MXS Whitepaper") in advance of the launch of MXS.  The MXS Whitepaper was full of misrepresentations and omissions.

181.     According to the MXS Whitepaper, "Matrix Samurai is not a memecoin, a shitcoin, or another version of the same flashy, hyped-up coin which inevitably crashes after its first pump."  The Whitepaper described the MXS Issuers as "an elite group of marketers within the cryptosphere."  The Whitepaper stated that the "fundamentals make Matrix Samurai safe, secure, and lucrative."  The Whitepaper also touting the integrity and security of the project, stating that the issuers were "focused on building a safe and ethical token which holders can feel confident investing in."  None of these statements were true.  The MXS Issuers took to social media and made various statements echoing what they had written in the MXS Whitepaper.

182.     The Whitepaper also touted the "6% tax every transaction" as a form of redistribution and a reward to investors that held onto their investment.  At the same time, the MXS Issuers downplayed how they allocated 15% of the total supply of MXS to themselves and

failed to explain to investors what that meant.  The MXS Issuers also did not disclose to investors the risks associated with the token.

183.    During a discussion on Discord on or about June 10, 2021, to encourage investments in MXS, the MXS Issuers made "three huge changes" to the "tokenomics" of MXS based on "community concerns."  Specifically, the MXS Issuers announced (i) the use of "anti bot software" to "blacklist" and prevent certain investors from using bots or automated software to manipulate prices, (ii) that the starting price would be much lower than originally planned purportedly to give investors "more of a multiplier" and to reward early investors, and (iii) a "burn" of 350 million tokens of the supply of MXS to "help the coin grow bigger" and so that "early investors are going to see your investment pay off."

184.    On June 10, 2021, the MXS Issuers announced on Discord that "#SamuraiLegion is ready to conquer the cryptomarket and rewrite history."  They also stated the launch price of MXS would be $0.0002.

185.    As a result of the MXS Issuers' marketing efforts, there was an incredible amount of interest in MXS.

186.    Plaintiff believed that her holdings of MXS would increase in value as the token became more widely adopted through the development efforts of the MXS Issuers.

187.    When the MXS Issuers launched MXS on v2 of the Exchange on or about June 12, 2021.  The price of MXS shot up sharply immediately.  The demand for MXS was so high that many investors were only able to execute their trades after several tries.  Many investors purchased MXS at or near the high.  Approximately 8,000 people invested in MXS.

188.    MXS turned out to be a fraudulent token.  Within hours of launch, the price of MXS dropped precipitously.  Reports of a fraud were circling on social media.  As a result, many

investors attempted to sell their MXS.  Some investors were able to sell their MXS holdings for far less than they paid for them, while other investors, like Plaintiff, were unable to execute their trades and thus lost their entire investment.

189.    Eventually, all the liquidity in the pool was removed, except for a portion that was locked pursuant to the smart contract for MSX, leaving investors, who were unable to sell their MXS, with worthless tokens.

190.    All told, investors in MXS were scammed out of more than $8 million in a matter of hours.

191.    Later in the day on June 12, 2021, one of the MXS Issuers, who goes by the handle JoeyCrypto on Discord, claimed the smart contract for MXS was "hacked" by a "nefarious agent" that exploited an error in the code.  JoeyCrypto also stated "[o]ur engineer missed it."  On June 13, 2021, JoeyCrypto posted another message on Discord, in which he stated, "yes it was direct incompetence from us with the code."  JoeyCrypto's identity is unknown.

192.    One or more of the MXS Issuers were directly involved in the fraud.  After the MXS fraud, several of the MXS Issuer's social media accounts were deleted or closed.  Certain individuals who were part of the MXS development team refused to disclose the identities of any MXS Issuers or provide additional information regarding the fraud.  When aggrieved investors asked for additional information on Telegram or Discord chat rooms, the MXS Issuers would ban them without explanation.  In addition, certain of the of the MXS Issuers deleted their social media accounts and disappeared.

193.    MXS Issuers' repeated representations that MXS was a "serious project," was "secure" and would not turn into a "pump and dump scheme, letting their owners cash out millions of dollars within minutes at the expense of everyone else," all turned out to be false.  The MXS

Issuers' fraud, misrepresentations, material omissions, recklessness and/or gross negligence directly caused losses for investors in MXS.

### 2. MXS Is a Security

194.    The MXS Whitepaper described the MXS Issuers as having "experience in marketing, developing, content, NFT minting, social media management, writing, influencing, and more." It assured investors the MXS Issuers would be dedicated to the project for the long term: "The Matrix Samurai are here to stay, and we have some compelling reasons for holders to stay, too."

195.    Based on the MXS Issuers' statements to investors on social media and in the MXS Whitepaper, their clear goal was to generate profits for investors from their development and marketing of MXS. The MXS Issuers stated that they wanted to "Build[ ] a Billion Dollar Market Cap," "bring financial freedom to all [investors]" and "add to [the] liquidity pool automatically with the profits made from MXS campaigns."

196.    Investors thus purchased MXS with an expectation of profits, and that those profits would come from the efforts of others and the common enterprise.

197.    Accordingly, MXS is a security.

### D. Alphawolf Finance (AWF)

198.    On or about May 24, 2021, the token known as Alphawolf Finance or "AWF" launched on v2 of the Exchange.

199.    Prior to and around the time of AWF's launch, the issuers of AWF (the "AWF Issuers") promoted AWF on social media, including Reddit, calling the token "a community driven project" and the issuers claimed to have "NFTs under development" and "entertainment and finance utilities in the works." The AWF Issuers also held voice chats on Discord to raise awareness of AWF.

200.    Within days of its launch, the price of AWF skyrocketed from $0.00000006567 to $0.00000042 per token, several times its original value.

201.    According to CoinGecko, the total trading volume for AWF was over $44,000,000, resulting is hundreds of thousands of dollars in fees for the AWF Issuers.

202.    On or about August 28, 2021, the AWF Issuers pulled all the liquidity out of the token.  The AWF Issuers gave less than 24 hours' notice of the forthcoming "rug pull," leaving very little time for investors to sell their holdings and get out.  Thus, many investors in the AWF did not learn about the token's collapse until they lost their entire investment.

203.    On the last day of trading, AWF's price was approximately $0.0000000018 per token, down 97% from its all-time high:



204.    As a result of the collection of fees, pumping and dumping and pulling their Pool tokens out of the liquidity pool, the AWF Issuers likely profited by millions of dollars at the expense of Plaintiff and the Class.

205.    The AWF Issuers represented to investors that one of the main goals of the project was to generate profits for investors.  Even the Whitepaper described the "entertainment and

finance utilities in the works." Thus, investors who purchased AWF reasonably expected to make a profit from their investment.

206. Investors' profits were to be derived from the managerial and entrepreneurial efforts of others—the AWF Issuers and the AWF marketing and development team.

207. Plaintiff believed that her holdings of AWF would increase in value as the token became more widely adopted through the development efforts of the AWF Issuers.

208. Accordingly, AWF is a security.

**E.      Rocket Bunny (BUNNY)**

209. In or around January or February 2021, the token known as Rocket Bunny or "BUNNY" launched on v2 of the Exchange. Shortly after launching, the issuers of BUNNY (the "BUNNY Issuers") tweeted "Rocket Bunny is now live on Uniswap," along with a picture of a bunny riding a rocket, presumably to the moon.

210. The BUNNY Issuers promoted BUNNY heavily prior to and after launching the token. For example, Rocket Bunny established and maintained a Reddit subreddit with 2,500 members. The BUNNY Issuers also released a two page "whitepaper" (the "BUNNY Whitepaper"). Many of the statements the BUNNY Issuers made on social media and in the BUNNY Whitepaper were untrue and misleading.

211. The BUNNY Whitepaper was full of buzzwords seeking to entice amateur investors: "frictionless yield," "most sought after tokenomics across DeFi," "automatic liquidity adds," "compounding yield," "deflationary supply," "liquidity provider rewards," "no staking," "price shock protection," "rewards directly into your wallet," "2x rewards for LP," "automatic & locked liquidity adds," and "whale dump protection." Recognizing the space in which it was operating, the following statement was included at the top of the BUNNY Whitepaper: "No presales - No airdrops - No team tokens - No rugs - 100% Fair launch."

212.    Plaintiff believed that her holdings of BUNNY would increase in value as the token became more widely adopted through the development efforts of the BUNNY Issuers.

213.    The BUNNY Issuers never disclosed to investors that they collect fees for every trade of BUNNY on the Exchange.  The BUNNY Issuers did not disclose to investors the risks associated with BUNNY.

214.    The price of BUNNY at launch was approximately $0.00000000002.  Within weeks of its launch, the price of BUNNY skyrocketed over 500 times its original value.

215.    Upon information and belief, the BUNNY Issuers also allocated BUNNY to themselves around the time of its launch and, to the detriment of Plaintiff and the Class, sold their holdings for large profits after the price of BUNNY spiked, which substantially contributed to the collapse of the token.

216.    The BUNNY Issuers thus enriched themselves at the expense of Plaintiff and the Class.

217.    According to CoinGecko, the total trading volume to date for BUNNY was over $80,000,000, resulting is hundreds of thousands of dollars in fees for the BUNNY Issuers.

218.    In or around October 2021, the BUNNY Issuers, without warning, pulled the liquidity out of BUNNY, thereby enriching themselves at the expense of investors.  After this rug pull, the Bunny Issuers re-lunched BUNNY with a new smart contract.  After complaints from investors, the BUNNY Issuers said they would allow investors in BUNNY through the original smart contract to trade in their tokens for tokens under the new smart contract.  However, the Bunny Issuers gave a very tight deadline for investors to make the trade and investors had to pay mining and gas fees, upwards of $200 or more to swap the tokens, regardless of the amount of the

trade.  As a result, most investors in BUNNY did not trade their holdings and lost their entire investment.

219.    On the last day of trading, BUNNY's price was approximately $0.000000000002 per token, down 99% from its all-time high:



220.    In addition, the BUNNY Issuers likely profited by millions of dollars by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity Pool for the token.

221.    The BUNNY Issuers explicitly represented to investors that they would profit from holding this investment: "the Rocket Bunny supply will become more scarce, your holdings will continue to increase, particularly if you are a liquidity provider earning 2x rewards, and the price floor for Rocket Bunny will continue to rise."  In addition, the BUNNY Issuers stated that "[j]ust for holding $BUNNY, you will earn passive income that is deposited directly into your wallet!" Thus, investors who purchased BUNNY reasonably expected to make a profit from their investment.

222.     Investors' profits were to be derived from the managerial and entrepreneurial efforts of others—the BUNNY Issuers and the BUNNY marketing and development team. Investors in BUNNY relied on these efforts in making their investments.

223.     Accordingly, BUNNY is a security.

**F.     BoomBaby.io (BOOMB)**

224.     On or about June 11, 2021, the token known as BoomBaby.io or "BOOMB" launched on v2 of the Exchange.

225.     Following the launch, the price of BOOMB shot up over several over 500 times its original value from $0.00000000014 to $0.00000009 per token.

226.     As of today, BOOMB trades at 0.0000000003 per token, down 99% from its all-time high:



227.     According to CoinGecko, the total trading volume to date for BOOMB is in excess of $7,000,000, resulting is tens of thousands of dollars in fees for the BOOMB Issuers.

228.     In addition, the BOOMB Issuers likely profited handsomely by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity pool for the token.

229.     The BOOMB Issuers thus enriched themselves at the expense of Plaintiff and the Class.

230.     The BoomBaby.io whitepaper stated that BOOMB is "a community-driven token which aims to be a community for new investors and long-term holders."  Its "Apps to come" page plotted out future developments and listed a number of community-facing applications to be deployed shortly in support of the token and the community: "BOOMB Wiki," "BOOMB Forums," "BOOMB Charts," and "BOOMB Auction."  Investors expected profits to come from the BoomBaby.io team's development of these applications.

231.     The BoomBaby.io whitepaper also emphasized the continuing nature of the token project, evidencing a common enterprise: "long term holders" being a family, the project locking liquidity "for 100 years," and developers supporting the project "on a long-term basis."

232.     Plaintiff believed that her holdings of BoomBaby.io would increase in value as the token became more widely adopted through the development efforts of the BOOMB Issuers.

233.     Accordingly, the BOOMB token is a security.

**VII.    CLASS ALLEGATIONS**

234.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seeks certification of the Class (*i.e.*, all persons who purchased any Tokens on the Exchange between April 5, 2021 and the present and were harmed thereby).  In addition, the Class shall be made up of the following subclasses:

- Subclass 1: All persons who purchased Tokens using the Wallet Method.

- Subclass 2: All persons who purchased Tokens using the Browser Method.

235.   Excluded from the Class are (i) Defendants; (ii) Defendants' affiliates, agents, employees, officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest; (iv) Plaintiff's counsel and Defendants' counsel; and (iii) the judge and the magistrate judge assigned to this matter, as well as their respective staffs and each of their immediate family members.

236.   Plaintiff reserves the right to amend, modify, change, or expand the Class definitions based on the discovery of new information and further investigation.

237.   The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class members is currently unknown to Plaintiff, thought it is likely to be in the tens of thousands.

238.   Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible information and records maintained by Defendants. They may be notified of the pendency of this action by publication and/or electronic mail using a form of notice customarily used in securities class actions.

239.   Plaintiff's claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful and illegal conduct.  Plaintiff has no interest that is in conflict with the interests of the members of the Class.  Plaintiff contests the enforceability of the Terms of Service, and the division of the Class into subclasses should not, in any way, be construed as a waiver of any rights of the Class to challenge the enforceability of such Terms of Service, all of which are expressly reserved.

240. Plaintiff and members of the Class sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

241. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to those of the Class.

242. Common questions of law and fact exist for each cause of action and predominate over any questions solely affecting individual Class members, including but not limited to the following:

- Whether the Tokens are securities under federal law;

- Whether the Exchange should have been registered as a national securities exchange;

- Whether Uniswap operated as an unregistered broker-dealer;

- Whether Uniswap unlawfully failed to register the Tokens as securities under federal law;

- Whether Uniswap offered or sold the Tokens to the Class;

- Whether Uniswap promoted or solicited the sale of the Tokens to the Class;

- Whether the Owners control Uniswap and the Exchange;

- Whether Defendants violated federal and state law;

- Whether members of the Class suffered damages because of Defendants' conduct in violation of federal law;

- Whether members of the Class are entitled to void their purchases of the Tokens and to recover the monies they paid, or value provided thereunder;

- Whether members of the Class are entitled to declaratory and injunctive relief.

243. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages incurred by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.

244.     There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Contracts With an Unregistered Exchange – Violation of Sections 5 and 29(b) of the '34 Act**
**(Against Uniswap)**

245.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if stated fully herein.

246.     Section 5 of the '34 Act makes it unlawful "for any…exchange, directly or indirectly, to make use of…any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security…unless such exchange (i) is registered as a national securities exchange under section 78f of this title, or (ii) is exempted from such registration.  15 U.S.C. § 78e.  An "exchange" is defined as any entity that "constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities."  17 C.F.R. § 240.3b-16.

247.     Throughout the Class Period, Uniswap has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and/or subject to the United States to effect transactions in securities – *i.e.*, the Tokens.  At all relevant times, the Exchange was not (i) registered as a national securities exchange under section 78f without being registered as a national securities exchange under section § 78e, and it was not (ii) exempted from such registration.

54

248.     While operating as an unregistered exchange, Uniswap contracted with the Issuers of the Tokens to list securities on the Exchange through Uniswap's core contracts and router contract and by issuing Liquidity Tokens to the Issuers.  While operating the Exchange, Uniswap also contracted with Plaintiff and members of the Class insofar as (i) Uniswap required its users to buy and sell Tokens through Uniswap's smart contracts (including the core contracts and router contract) in order to complete the transactions, (ii) Plaintiff and the Class members all traded the Tokens on the Exchange, and (iii) the Plaintiff and the Class members paid Uniswap fees for the use of the Exchange.  These contracts were in violation of Section 5 of the '34 Act.

249.     Such contracts are null and void under Section 29(b) of the '34 Act and, as a result, Plaintiff and the Class are entitled to void those contracts and recover recessionary damages with respect to purchases on the Exchange of any of the Tokens (each of which was an unregistered security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with the Tokens, as well as costs, attorneys' fees, and interest.

250.     Plaintiff and Class members have suffered actual damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
**Unregistered Broker and Dealer – Violation of Sections 15(a)(1) and 29(b) of the '34 Act
(Against Uniswap)**

251.     Plaintiff repeats and realleges the allegations contained in the paragraphs above as if stated fully herein.

252.     It is unlawful for a broker or dealer engaged in interstate commerce in using the facility of an exchange, "for any broker or dealer…to make use of…any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security…unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

253.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78(a)(4)(A).  Additionally, an entity is a broker if it assists issuers with structuring a securities offering, identifies a potential purchase, or advertises a securities offering.

254.    Uniswap has operated as a broker during the Class Period by, among other things, facilitating the sale of tokens on the Exchange for compensation (including, through User Fees), facilitating the buying and selling of tokens through liquidity pools that it controls through its core contracts and router contract, marketing the Exchange to users and issuers and providing answers to user questions about transaction details.

255.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that entity's "regular business."

256.    Uniswap has operated as a dealer during the Class Period by acting as a seller of securities on a regular basis, issuing Liquidity Tokens, issuing its own token (*i.e.*, UNI), facilitating the buying and selling of tokens through liquidity pools, having regular customers (*i.e.*, the users), and providing customers with access to services that allow the purchase of tokens.

257.    Uniswap has made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange without being registered as a national securities exchange under §78o, to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security.

258.    While operating as an unregistered exchange, Uniswap contracted with the Issuers of the Tokens to list securities on the Exchange through Uniswap's core contracts and router contract and by issuing Liquidity Tokens to the Issuers.  While operating the Exchange, Uniswap

also contracted with Plaintiff and members of the Class insofar as (i) Uniswap required its users to buy and sell Tokens through Uniswap's smart contracts (including the core contracts and router contract) in order to complete the transactions, (ii) Plaintiff and the Class members all traded the Tokens on the Exchange, and (iii) the Plaintiff and the Class members paid Uniswap fees for the use of the Exchange.  These contracts were in violation of Section 5 of the '34 Act.

259.    Such contracts are null and void under Section 29(b) of the '34 Act and, as a result, Plaintiff and the Class are entitled to void those contracts and recover recessionary damages with respect to purchases on the Exchange of any of the Tokens (each of which was an unregistered security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with the purchase of the Tokens, as well as costs, attorneys' fees, and interest.

### THIRD CAUSE OF ACTION
**Control Person Liability - Violation of Section 20 of the '34 Act**
**(Against Adams, Paradigm, Andreessen, and USV)**

260.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if stated fully herein.

261.    During the relevant period, the Owners controlled Uniswap and were culpable participants in Uniswap's violation of Sections 5 and 15 of the '34 Act, §§ 78e, 78o.

262.    The Owners, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of Uniswap and its employees and the Exchange, and to cause Uniswap to engage in the wrongful conduct detailed herein.

263.    The Owners had the power to direct or cause the direction of the management and policies of Uniswap and the Exchange.

264.    The Owners had sufficient control or influence to have caused Uniswap to register as an exchange and broker-dealer and refrain from effecting the transactions of securities as an unregistered exchange and unregistered broker-dealer.

265.    As a result of the Owners' conduct, they are liable to Plaintiff and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

**FOURTH CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities – Violation of Sections 5 and 12(a)(1)**
**of the '33 Act**
**(Against Uniswap)**

266.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if stated fully herein.

267.    Section 5(a) of the '33 Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

268.    Section 5(c) of the '33 Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  15 U.S.C. § 77e(c).

269.    When issued, the Tokens were securities within the meaning of Section 2(a)(1) of the '33 Act, 15 U.S.C. § 77b(a)(1).

270.    During the Class Period, Uniswap sold, promoted, and/or solicited the Tokens directly to Plaintiff and the Class members.  Uniswap therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

271.    No registration statements have been filed with the SEC or have been in effect with respect to any of the Token offerings.

272.    Section 12(a)(1) of the '33 Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. § 77*l*(a)(1).

273.    Accordingly, Uniswap violated Section 5 of the '33 Act, 15 U.S.C. §§ 77e(a), 77e(c), and is liable under Section 12(a)(1), § 77l(a)(1).

274.    Plaintiff and the Class members who purchased Tokens during the Class Period are entitled to damages and/or remedies at law or in equity for tendering any Tokens still owned, as well as costs, attorneys' fees, and interest.

**FIFTH CAUSE OF ACTION**
**Control Person Liability – Violation of Sections 5 and 12(a)(1) of the '33 Act**
**(Against Adams, Paradigm, Andreessen, and USV)**

275.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if stated fully herein.

59

276.    The Owners, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of Uniswap and its employees and the Exchange, and to cause Uniswap to engage in the wrongful conduct detailed herein.

277.    Owners had the power to direct or cause the direction of the management and policies of Uniswap and the Exchange.

278.    Owners jointly participated in, and/or aided and abetted, Uniswap's sale and solicitation of securities.

279.    As a result of the Owners' conduct, they are liable to Plaintiff and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## **PRAYER FOR RELIEF**

On behalf of herself and the Class, Plaintiff demands a judgment against Defendants as follows:

(a)     Declaring this action is properly maintainable as a class action and certifying Plaintiff as the Class Representative;

(b)     Declaring that Defendants' actions, as set forth above, violate the federal laws set forth above;

(c)     Awarding compensatory, special, consequential, punitive and exemplary damages against Defendants in an amount to be determined at trial;

(d)     Awarding equitable and injunctive relief, including, without limitation, recession, restitution, and disgorgement;

(e)     Awarding reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

(f)     Awarding pre-judgment and post-judgment interest; and

(g)     Granting such other and further relief as the Court deems necessary and proper.

## **JURY TRIAL**

Plaintiff hereby demands a jury trial as to all counts.

Dated:   New York, New York
             April 4, 2022

Respectfully submitted,

KIM & SERRITELLA LLP                    BARTON LLP

By:   /s/ James R. Serritella           By:   /s/ Christopher J. McNamara
      James R. Serritella                     Roger E. Barton
      3 Columbus Circle, 15th Floor           Christopher J. McNamara
      New York, NY 10019                      Michael C. Ward
      212-960-8345                            711 Third Avenue, 14th Floor
      jserritella@kandslaw.com                New York, NY 10017
                                              212-687-6262
                                              rbarton@bartonesq.com
                                              cmcnamara@bartonesq.com
                                              mward@bartonesq.com

      Attorneys for Plaintiff Nessa Risley

## SWORN CERTIFICATION OF NESSA RISLEY

I, Nessa Risley, hereby certify under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the complaint herein (the "Complaint") authorize its filing.

2.      I did not purchase the tokens that are the subject of the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "'33 Act") or the Securities Exchange Act of 1934 (the "'34 Act").

3.      I am willing to serve as a representative party on behalf of the Class (as that term is defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.      During the Class Period (as that term is defined in the Complaint), I purchased and/or sold the following tokens on Uniswap that are the subject of the Complaint: EthereumMax, Bezoge Earth, Matrix Samurai, Alphawolf Finance, Rocket Bunny, and BoomBaby.io (collectively, the "Tokens"). To the best of my knowledge, the attached schedule A lists my transactions in connection with the Tokens.

5.      During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the '33 Act or the '34 Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any possible recovery, except for an award, as ordered by the Court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

Dated:   April 4, 2022

_Nessa Risley_
Nessa Risley

**Schedule A**

**Purchases**

| Date of transaction | Token | Amount Invested | Quantity |
|---|---|---|---|
| 05/15/2021 | Ethereum Max | $31.42 | 2.4 billion |
| 05/15/2021 | Ethereum Max | $141.21 | 3 billion |
| 05/30/2021 | Ethereum Max | $232.16 | 600 million |
| 06/02/2021 | Ethereum Max | $2,438.60 | 5.6 billion |
| 06/03/2021 | Ethereum Max | $486.39 | 3.3 billion |
| 06/16/2021 | Ethereum Max | $519.56 | 3.8 billion |
| 06/29/2021 | Ethereum Max | $1090.52 | 15 billion |
| 06/12/2021 | Matrix Samurai | $1,016.83 | 6,000 |
| 6/12/2021 | Matrix Samurai | $241.18 | 1.500 |
| 6/12/2021 | Matrix Samurai | $216.38 | 2,000 |
| 6/12/2021 | Matrix Samurai | $671.11 | 27,000 |
| 05/18/2021 | Bezoge | $63.89 | 207 billion |
| 05/29/21 | Bezoge | $222.75 | 225 billion |
| 06/01/2021 | Bezoge | $413.35 | 422 billion |
| 07/11/2021 | Bezoge | $217.99 | 825 billion |
| 05/29/21 | Rocket Bunny | $222.63 | 1.9 trillion |
| 06/18/2021 | BoomBaby.io | $73.35 | 1.2 billion |
| 05/31/2021 | Alphawolf Finance | $246.93 | 711 million |

**<u>Sales</u>**

| Date of transaction | Token | Net Proceeds of Sale | Quantity |
|---|---|---|---|
| 06/23/2021 | Ethereum Max | $268.60 | 3.6 billion |
| 06/29/2021 | Ethereum Max | $705.75 | 14.1 billion |
| 07/29/2021 | Ethereum Max | $455.26 | 3.3 billion |
| 06/11/2021 | Bezoge | $116.67 | 433 billion |
| 06/11/2021 | Bezoge | $110.42 | 417 billion |
| 07/25/2021 | Bezoge | $115.45 | 811 billion |
| 06/11/2021 | Rocket Bunny | $95.98 | 1.9 trillion |