UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NESSA RISLEY, JAMES FREELAND, ROBERT SCOTT, ANNIE VENESKY, ANDREW CARDIS, and DEAN MEYERS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNIVERSAL NAVIGATION INC. dba UNISWAP LABS, UNISWAP FOUNDATION, HAYDEN Z. ADAMS, PARADIGM OPERATIONS LP, AH CAPITAL MANAGEMENT, L.L.C. dba ANDREESSEN HOROWITZ, and UNION SQUARE VENTURES, LLC,<br><br>        Defendants. | No. 1:22-cv-2780-KPF |

**FIRST AMENDED CLASS ACTION COMPLAINT**

# Table of Contents

NATURE OF THE CLAIMS ........................................................................... 1

PARTIES ........................................................................................................ 4

JURISDICTION AND VENUE ...................................................................... 6

FACTUAL BACKGROUND .......................................................................... 8

I.   CRYPTO ASSETS AND SO-CALLED DEFI .................................... 8

    A.  Ethereum ...................................................................................... 10

    B.  ERC-20 Tokens ........................................................................... 10

    C.  Initial Crypto Asset Offerings ..................................................... 11

II.  THE PROTOCOL ................................................................................ 12

    A.  "Decentralized" Exchanges Take Off, with
       Uniswap Leading the Charge ........................................................ 12

    B.  The Uniswap Interface ................................................................. 15

    C.  How the Protocol Works .............................................................. 19

III. UNISWAP'S OWNERSHIP STRUCTURE AND
    CONTROL OF THE PROTOCOL ...................................................... 26

    A.  Ownership of Uniswap ................................................................. 26

    B.  Paradigm, Andreesen, and USV Helped Develop and Upgrade the
       Protocol Without Any Regard for Safeguards for Users of the Protocol ........... 28

    C.  Uniswap Has Unilateral Control Over the Protocol ..................... 32

IV.  UNISWAP ISSUED THE OWNER'S UNI TOKENS, WHICH ENABLES THEM
    TO CONTROL THE PROTOCOL ..................................................... 33

    A.  The UNI Token and Uniswap Governance ................................... 33

    B.  Andreessen Holds the Most UNI Tokens ..................................... 36

    C.  Studies Conclude There is Centralized Control of DeFi Platforms ................... 37

    D.  The Uniswap Defense Fund .......................................................... 39

V.   DEFENDANTS CREATED AND CONTROL THE UNISWAP FOUNDATION .. 40

VI.  THE OWNERS LIKELY PROVIDE MILLIONS OF DOLLARS IN
    LIQDUITY TO THE LARGEST POOLS ON UNISWAP, WHICH
    GENERATE MILLIONS OF DOLLARS IN FEES .................................. 43

VII. UNISWAP ALLOWS THE ISSUANCE OF THOUSANDS
    OF SCAM TOKENS ............................................................................ 45

    A.  Scams Begin and Continue to Plague Uniswap ............................ 45

B. Uniswap Acknowledges but Continues to Allow Scams ..................................... 47

VIII. THE PROTOCOL ALLOWS ISSUERS TO SCAM INVESTORS ........................ 50

    A. EthereumMax .................................................................................................... 51

        1. The Rise and Fall of EMAX .................................................................... 51

        2. The EMAX Issuers Made a Fortune to the
           Detriment of Investors in the Token ........................................................ 52

        3. The EMAX Marketing Campaign ............................................................ 52

        4. The EMAX Issuers' Misrepresentations and Omissions ......................... 54

        5. EMAX Is a Security ................................................................................. 55

    B. Akita Inu (AKITA) ............................................................................................ 56

    C. Olympus DAO (OHM) ....................................................................................... 60

    D. Wise Token (WISE) ........................................................................................... 62

    G. Bezoge Earth (BEZOGE) .................................................................................. 70

    H. Matrix Samurai (MXS) ..................................................................................... 73

    1. MXS Was a Scam Perpetrated in a Single Day................................................. 73

    2. MXS Is a Security ............................................................................................. 76

    I. Alphawolf Finance (AWF) ................................................................................. 76

    J. Rocket Bunny (BUNNY) ................................................................................... 78

    K. BoomBaby.io (BOOMB) ................................................................................... 81

    L. Saitama Token (SAITAMA) ............................................................................. 82

    M. Dogelon Mars (ELON) ...................................................................................... 85

    N. Kishu Inu (KISHU) ........................................................................................... 87

    O. Starlink Token (STARL) ................................................................................... 89

    P. Smooth Love Potion (SLP) ............................................................................... 91

    Q. FEGtoken (FEG) ............................................................................................... 94

    R. Verasity (VERA) ............................................................................................... 96

    T. HOGE.finance (HOGE) .................................................................................. 100

    U. Sanshu Inu (SANSHU) ................................................................................... 102

    V. Shih Tzu (SHIH) ............................................................................................. 104

    W. Jupiter Project (JUP) ....................................................................................... 106

    X. Holo Project (HOT)......................................................................................... 108

    Y. Dent (DENT) .................................................................................................. 111

    Z. YFDAI Finance (YFDAI) ............................................................................... 113

AA. Ares Protocol (ARES) ................................................................................... 115

BB. HuskyToken (HUSKY) ................................................................................... 117

CC. Pundi X Labs (PUNDIX) ............................................................................... 119

DD. Kawakami Inu (KAWA) ................................................................................ 121

EE. Cyber Doge (CYBERD) ................................................................................. 123

FF. Lorde Edge (Edgelon) .................................................................................... 125

JJ. Dogg Token (DOGG) ..................................................................................... 135

KK. Mine Token (MINE) ...................................................................................... 137

LL. ArchAngel (ARCHA) ..................................................................................... 140

MM. Stoner Doge Finance Project (STOGE) ....................................................... 142

IX. CLASS ALLEGATIONS ...................................................................................... 144

CAUSES OF ACTION .................................................................................................. 147

FIRST CAUSE OF ACTION .................................................................................. 147

Contracts With an Unregistered Exchange – Violation of Sections 5
and 29(b) of the '34 Act  (Against all Defendants) ........................................... 147

SECOND CAUSE OF ACTION .............................................................................. 149

Unregistered Broker and Dealer – Violation of Sections 15(a)(1)
and 29(b) of the '34 Act (Against all Defendants) ............................................ 149

THIRD CAUSE OF ACTION .................................................................................. 151

Control Person Liability - Violation of Section 20 of the '34 Ac
(Against Adams, Paradigm, Andreessen, and USV) ........................................ 151

FOURTH CAUSE OF ACTION Unregistered Offer and Sale of Securities –
Violation of Sections 5 and 12(a)(1) ................................................................ 152

of the '33 Act (Against all Defendants) .................................................................. 152

FIFTH CAUSE OF ACTION Control Person Liability – Violation of
Sections 5 and 12(a)(1) of the '33 Act
(Against Adams, Paradigm, Andreessen, and USV) ........................................ 154

SIXTH CAUSE OF ACTION
Unregistered Sale of Securities in Violation of I.C. § 30-14-509(b)
(Against all Defendants) ................................................................................... 154

SEVENTH CAUSE OF ACTION
Transacting Business as an Unregistered Broker-Dealer
in Violation of I.C. § 30-14-509(d) (Against all Defendants) ......................... 156

EIGHTH CAUSE OF ACTION
Control Person Liability I.C. § 30-14-509(g) (Against the Owners) ............... 157

iv

NINTH CAUSE OF ACTION
Unregistered Offer and Sale of Securities
N.C. Gen. Stat. Ann. § 78A-56(a) (Against all Defendants)............................ 159

TENTH CAUSE OF ACTION
Transacting Business as an Unregistered Dealer
N.C. Gen. Stat. Ann. § 78A-36 (Against all Defendants) ................................ 160

ELEVENTH CAUSE OF ACTION
Control Person Liability N.C. Gen. Stat. Ann. § 78A-56(c)
(Against the Owners)........................................................................................ 161

TWELFTH CAUSE OF ACTION
Aiding and Abetting Fraud (Against all Defendants) ...................................... 162

THIRTEENTH CAUSE OF ACTION
Aiding and Abetting Negligent Misrepresentation
(Against all Defendants)................................................................................... 163

FOURTEENTH CAUSE OF ACTION
Unjust Enrichment (Against all Defendants) ................................................... 164

PRAYER FOR RELIEF ......................................................................................... 165

JURY TRIAL ......................................................................................................... 166

Plaintiffs Nessa Risley, James Freeland, Robert Scott, Annie Venesky, Andrew Cardis, and Dean Meyers (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, as and for their first amended complaint against Defendants Universal Navigation Inc. dba Uniswap Labs ("Uniswap"), the Uniswap Foundation, Hayden Z. Adams ("Adams"), Paradigm Operations LP ("Paradigm"), AH Capital Management, L.L.C. dba Andreessen Horowitz ("Andreessen"), and Union Square Ventures, LLC ("USV") (Uniswap, the Uniswap Foundation, Adams, Paradigm, Andreessen, and USV collectively referred to herein as "Defendants"), allege on knowledge, information, and belief as follows:

## NATURE OF THE CLAIMS

1.      The Defendants created, own, and manage what they refer to as the "Uniswap Protocol" (the "Protocol"), one of the largest crypto-asset exchanges in the world.  This action arises from their unlawful promotion, offer, and sale of unregistered securities on that exchange, in the form of crypto "tokens" under federal and state law.

2.      Uniswap has no barriers to entry for users looking to trade—or "swap"—crypto tokens on the Protocol.  Nor does Uniswap requires verification of an individual's identity or conduct any "know-your-customer" process.  This combination has led to rampant fraud on the Protocol.

3.      Defendants are fully aware of the fraud perpetrated on the Protocol but have done nothing to stop such activities, even though they could easily do so.  Instead, Defendants maintain a policy of willful blindness and encourage further fraudulent conduct by guaranteeing fees on all trades to issuers of tokens on the Protocol (no matter how fraudulent).  To date, Uniswap has siphoned over $1 billion in fees from its users by allowing issuers of tokens to continue to profit from their misconduct.

1

4.      Uniswap has also enriched itself and the other Defendants through a fee structure that they designed, created, and implemented on the Protocol.  Unbeknownst to many users, Uniswap collects fees for issuers on every transaction executed on the Protocol, generating vast profits for Uniswap's owners, who also act as issuers of tokens that are traded on the Protocol. Uniswap has failed to disclose this fact and its attendant conflicts of interest in a transparent manner.  This is precisely the type of conduct that the securities laws, which Uniswap has continually flouted, are designed to prevent.

5.      From April 5, 2021 through the present (the "Class Period"), Defendants offered and sold unregistered securities, including Alphawolf Finance, Bezoge, BoomBaby.io, Ethereum Max, Matrix Samurai, Rocket Bunny, Akita, Archangel, Ares Protocol, Autz, Cyber Doge, Dent, Dogg Token, Ethereum Chain Token, Ethereum Max, FEGtoken, Goku Inu, Hoge.finance, HoloToken, Jupiter, Kawakami Inu, Kishu Inu, The Official Mine Token, Mononoke Inu, Pundi X Token, Saitama, Sanshu Inu, Smooth Love Potion, StarLink, Stoner Doge, Vera, YfDai.finance, Dogelon, HuskyToken, Lorde Edge, Shih Tzu, Wise Token, Lukso Token, Olympus Dao, and Samsung Metaverse (collectively, the "Tokens"), throughout the United States on its Protocol, without registering as a national securities exchange or as a broker-dealer, and without there being any registration statements in effect for the Tokens it was selling, all in violation of applicable law. All persons who purchased any Tokens on the Protocol during the Class Period and were harmed thereby are referred to herein as the "Class."  Plaintiffs incorporate by reference the certifications they filed in support of their motion for lead plaintiff, Dkt. Nos. 28-1–6.

6.      Under guidelines promulgated by the Securities and Exchange Commission (the "SEC"),[1] the Tokens are "investment contracts" and therefore "securities" under Section 2(a)(1)

---

[1] "Framework For 'Investment Contract' Analysis of Digital Assets, available at https://www.sec.gov/files/dlt-framework.pdf (last accessed September 19, 2022).

of the Securities Act of 1933 (the "'33 Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 (the "'34 Act").  Thus, the issuers of these Tokens (the "Issuers") were required to comply with those and other laws by, specifically and without limitation, filing registration statements for the Tokens.  They failed to do so.

7.      Uniswap was also required to register with the SEC as an exchange; which it did not.  After the launch of Uniswap's own token, known as UNI, and implementation of Uniswap's governance, the Owners (defined below) were also required to register with the SEC as exchanges; they failed to do so.  As SEC Chairman Gary Gensler has made clear, "[n]ot liking a message isn't the same thing as not receiving it."

8.      Had the Tokens been registered as required, Plaintiffs and the Class would have received necessary and meaningful disclosures that would have enabled them to reliably assess the representations being made by the Issuers and the riskiness of their investments.  Without these disclosures, they were left to fend for themselves.

9.      When the Issuers sought to sell the Tokens on the Protocol, Uniswap welcomed them with open arms and collected millions of dollars in associated transaction fees.  In doing so, Uniswap failed to register as an exchange or broker-dealer, as it solicited, offered, and sold the Tokens without filing any registration statements, in open violation of the federal securities laws.

10.     Defendants have profited handsomely from this unlawful activity, as have the Issuers to whom Uniswap paid hidden and exorbitant fees.  Meanwhile, unsuspecting users on the other side of these fraudulent transactions were left holding the bag.

11.     Defendants Adams, Paradigm, Andreesen, and USV, (the "Owners") separately or together, aided and abetted the Issuers' fraudulent activity by having control over the Protocol and failing to enact measures that would have provided meaningful protection for the users of Uniswap.

12.     Consequently, Uniswap and the Owners owe restitution and other relief to the Class.  Plaintiffs and the Class are entitled to damages for the amounts paid for the Tokens, including all fees and charges collected by Uniswap, together with interest and attorneys' fees and costs, as well as other statutory and equitable relief.

## PARTIES

13.     Plaintiff Nessa Risley is an individual and a resident of North Carolina.  Risley purchased certain of the Tokens[2] on the Protocol beginning in May 2021.  Risley first used the Protocol in May 2021 and first learned about Uniswap around that time.  Risley incurred substantial losses on her transactions in connection with certain of the Tokens.

14.     Plaintiff James Freeland is an individual and a resident of Idaho.  Freeland purchased certain of the Tokens[3] on the Protocol beginning in May 2021.  Freeland first used the Protocol in or around May 2021 and first learned about Uniswap around that time.  Freeland incurred substantial losses on his transactions in connection with certain of the Tokens.

15.     Plaintiff Robert Scott is an individual and a resident of New York.  Scott purchased certain of the Tokens[4] on the Protocol beginning in May 2021.  Scott first used the Protocol in or around April 2021 and first learned about Uniswap around that time.  Scott incurred substantial losses on his transactions in connection with certain of the Tokens.

16.     Plaintiff Annie Venesky is an individual and a resident of New York.  Venesky purchased Wise Token on the Protocol beginning in December 2020.  Venesky first used the

---

[2] Risley purchase the following Tokens: Alphawolf Finance, Bezoge, BoomBaby.io, Ethereum Max, Matrix Samurai and Rocket Bunny.

[3] Freeland purchased the following Tokens: Akita, Archangel, Ares Protocol, Autz, Cyber Doge, Dent, Dogg Token, Ethereum Chain Token, Ethereum Max, FEGtoken, Goku Inu, Hoge.finance, HoloToken, Jupiter, Kawakami Inu, Kishu Inu, The Official Mine Token, Mononoke Inu, Pundi X Token, Saitama, Sanshu Inu, Smooth Love Potion, StarLink, Stoner Doge, Vera, and YfDai.finance.

[4] Scott purchased the following Tokens: Dogelon, HuskyToken, Kishu Inu, Lorde Edge and Shih Tzu.

Protocol and first learned about Uniswap around that time.  However, Venesky did not learn about the substantial misrepresentations and issues with the Wise Token and problems with Uniswap until several months later.  Venesky incurred substantial losses on her transactions in connection with the Wise Token.

17.     Plaintiff Andrew Cardis is an individual and a resident of Australia.  Cardis purchased Lukso Token and Olympus Dao on the Protocol in November 2021.  Cardis first used the Protocol and first learned about Uniswap around that time.  Cardis incurred substantial losses on his transactions in connection with these two Tokens.

18.     Plaintiff Dean Meyers is an individual and a resident of North Carolina.  Meyers purchased Samsung Metaverse on the Protocol in March 2022.  Meyers first used the Protocol and first learned about Uniswap around that time.  Meyers incurred substantial losses on his transactions in connection with Samsung Metaverse.

19.     Defendant Uniswap is a Delaware business corporation duly registered with and doing business in the State of New York, with a principal place of business in either Brooklyn, or in New York, New York.  According to Uniswap's website, "[w]e are based out of SoHo in New York."  In addition, Uniswap is currently looking to hire for several open positions in "New York or Remote."

20.     Defendant Uniswap Foundation is a Delaware corporation.  Upon information and belief, the Uniswap Foundation has its principal place of business in New York City.  Given their overlapping control and common purpose, the Uniswap Foundation is an alter ego of Uniswap.

21.     Defendant Adams is a citizen and resident of the State of New York, Kings County.  Adams is the inventor of the Protocol and Uniswap's Chief Executive Officer, as well as an equity owner of Uniswap.  During the relevant period, Adams resided and worked in New York City.

Upon information and belief, Adams is a significant liquidity provider for tokens traded on the Protocol and holds UNI tokens, giving him additional rights to control the Protocol.

22.     Defendant Paradigm is a Delaware limited partnership with its principal place of business in California.  Paradigm is an equity owner of Uniswap.  According to Uniswap, it raised a seed round of funding from Paradigm to advance research and development of the Protocol and other decentralized products on the Ethereum blockchain.  Upon information and belief, Paradigm is a significant liquidity provider for tokens traded on the Protocol and holds UNI tokens, giving it additional rights to control the Protocol.

23.     Defendant Andreessen is a Delaware limited liability company with its principal place of business in California.  Andreessen is an equity owner of Uniswap.  According to Uniswap, Andreesen led Uniswap's Series A funding round, which was designed to add new employees to Uniswap in the United States and to build a new version of the Protocol.  Upon information and belief, Andreesen is a significant liquidity provider for tokens traded on the Protocol and holds UNI tokens, giving it additional rights to control the Protocol.

24.     Defendant USV is a Delaware limited liability company with its principal place of business at 915 Broadway, 19th Floor, New York, New York 10010.  USV is an equity owner of Uniswap.  According to Uniswap, USV participated in Uniswap's Series A funding round, which was designed to add new employees to Uniswap in the United States and to build a new version of the Protocol.  Upon information and belief, USV is a significant liquidity provider for tokens traded on the Protocol and holds UNI tokens, giving it additional rights to control the Protocol.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because the matter in controversy exceeds the value of $5,000,000, exclusive of

interests and costs, and is a class action in which a member of a class of plaintiffs is a citizen of a different state from a defendant.  The Court has subject matter jurisdiction over the '33 Act and '34 Act claims pursuant to 28 U.S.C. § 1331 and the state law claims pursuant to 28 U.S.C. § 1367.

26.     This Court has personal jurisdiction over Uniswap as it maintains a place of business in the State of New York, does significant business within the state and derives significant profits thereby.  Uniswap has operations and employees in New York City and Uniswap sold the Tokens to persons in this district.

27.     This Court has personal jurisdiction over the Uniswap Foundation as it maintains a place of business in the State of New York and does significant business within the state and derives significant profits thereby.

28.     This Court has personal jurisdiction over Adams, a citizen and resident of the State of New York.  Upon information and belief, Adams resides in Kings County and works in both Kings County and New York County.

29.     This Court has personal jurisdiction over USV as it maintains a place of business in the State of New York, does significant business within the state and derives significant profits thereby.  USV has operations and employees in New York County.

30.     This Court has personal jurisdiction over Paradigm because it has engaged in activities targeting New York relating to the subject matter of this action and giving rise to the claims asserted herein.  Upon information and belief, Paradigm regularly conducts substantial business in the State of New York, systematically directs and/or targets its business at consumers in New York and derives substantial revenue from business transactions in New York.

31.     This Court has personal jurisdiction over Andreesen because it has engaged in activities targeting New York relating to the subject matter of this action and giving rise to the

claims asserted herein.  Upon information and belief, Andreesen regularly conducts substantial business in the State of New York, systematically directs and/or targets its business at consumers in New York and derives substantial revenue from business transactions in New York.

32.     Venue is proper pursuant to 15 U.S.C. §§ 77v(a), 78aa(a), and 28 U.S.C. § 1391(b) as this is a district where one or more Defendants is found or is an inhabitant or transacts business, where the offer or sale of the unregistered securities took place, and where a significant portion of the events that are the subject of the claims took place.

## FACTUAL BACKGROUND

### I.     CRYPTO ASSETS AND SO-CALLED DEFI

33.     A "cryptocurrency" or crypto asset is a digital asset designed to be a medium of exchange or a store of value.  Crypto assets use cryptography to secure and verify transactions, as well as to control the creation of new units of a crypto asset.

34.     Bitcoin, created in 2009, was the world's first crypto asset, and remains the largest and most popular today, with a market capitalization of over $350 billion.  Since Bitcoin's creation, many other crypto assets have launched; collectively, crypto assets currently hold a market capitalization of over $900 billion.

35.     Every crypto asset is powered by a decentralized, open software or digital ledger called a blockchain.  Blockchains consist of "blocks" of data that can be traced all the way back to the first-ever transaction on a network.  Each blockchain is subject to different technical rules, but they generally are all open source and rely on their communities to maintain and develop their underlying code.

36.     The most well-known crypto assets, such as Bitcoin and Ether, are obtained in one of two ways.  The first way is to expend resources to validate transactions on the blockchain in exchange for a reward of newly minted tokens.  This process is called "mining" or "validating."

37.     The second and more common way to obtain crypto assets is to acquire them from someone else.  This often involves using an online crypto asset exchange, which, like a traditional stock exchange, matches buyers with sellers of assets.

38.     In a traditional—or centralized—exchange, buyers and sellers are matched on a one-to-one basis through orders.  When the bid of a buyer matches the ask of a seller, a trade occurs.

39.     In contrast, so-called "decentralized" exchanges, such as the Protocol, do not use traditional market orders to match buyers and sellers.  Instead, they enable issuers to contribute a pair of tokens to a pool where buyers can trade token "A" in exchange for token "B".  Often, in this scenario, token B (*e.g.*, a newly created token by the issuer) has no independent value but token A does have value (*e.g.*, ETH).  Token B will derive its market price from the amount of token A that is placed in the pool (*i.e.*, the liquidity).  As investors place more of their token A in the pool, thereby increasing liquidity, in exchange for Token B, such transactions drive up the price of Token B.  Someone who places these token pairs in such a liquidity pool is known as a "liquidity provider."

40.     Liquidity is important for decentralized crypto asset exchanges.  Uniswap, by virtue of its close collaboration with Paradigm, Andreesen, and USV, is able to maintain ample liquidity for various crypto assets.  Because Uniswap generates fees on every transaction on its Protocol, Uniswap's liquidity providers are a major component of its business.  According to Adams, "[i]n 2021, Uniswap LPs made $1.6b in revenue."

### A. Ethereum

41.     The Ethereum blockchain launched in or around 2015.  The token native to the Ethereum blockchain is called "Ether" or "ETH".  Ether is the second largest crypto asset, with a market capitalization at the time of this filing of more than $160 billion.

42.     The Ethereum blockchain allows for the use of derivative "smart contracts."  Smart contracts are self-executing, self-enforcing programs that write the terms of the agreement between the buyer and seller directly into the program's code.

### B. ERC-20 Tokens

43.     To standardize protocols for smart contracts, the Ethereum community utilizes application standards for smart contracts called Ethereum Request for Comments ("ERCs").  ERCs provide uniform transactions and efficient processes.  The most common use of ERCs is to allow for the creation of new crypto tokens.

44.     ERC-20 is an application standard that allows for smart contract tokens to be created on the Ethereum blockchain ("ERC-20 tokens").  ERC-20 tokens, also known as "alt coins," are considered "forks" of Ethereum.  ERC-20 tokens are traded on the Ethereum blockchain.

45.     ERC-20 tokens are relatively simple and easy to deploy.  Anyone with a basic understanding of Ethereum, and not necessarily with any technical expertise, can create their own ERC-20 token, which they can then market to investors.  These issuers, known in the industry as "developers" or "devs," almost never register their new tokens as securities.  In addition, companies, like Uniswap, that run exchanges where these tokens are sold, rarely register with the SEC, even though they are required to do so.

46.     The oft-used phrase "Wild West" to describe the crypto asset market is particularly apt as to ERC-20 tokens.  Unsuspecting users do not appreciate that their investments could be wiped out in an instant by a variety of schemes.  Unfortunately, this has become a reality for many.

### C.  Initial Crypto Asset Offerings

47.     Recently, and particularly in 2021, interest in crypto assets exploded.  Looking to capitalize on this enthusiasm, many companies and issuers sought to raise funds through "initial coin offerings."  Nearly all these launches were issued using the ERC-20 protocol.  Most of these issuers chose not to register their securities offerings with the SEC and thereby failed to provide investors critical information they would have otherwise received.

48.     These issuers reached potential purchasers through social media sites, promoting active and upcoming launches.  Issuers would usually draft a whitepaper describing the project and the terms of the launch.  These whitepapers lacked elements that a registration statement filed with the SEC would be required to contain, such as: (i) a "plain English" description of the offering; (ii) a list of key risk factors; (iii) a description of important information and incentives concerning management; (iv) warnings about relying on forward-looking statements; and (v) an explanation of how the proceeds from the offering would be used.  The whitepapers also lacked a standardized format that investors could readily follow.

49.     Gary Gensler, the Chairman of the SEC, has noted that "[w]e just don't have enough investor protection in crypto finance, issuance, trading, or lending.  Frankly, at this time, it's more like the Wild West or the old world of 'buyer beware' that existed before the securities laws were enacted.  This asset class is rife with fraud, scams, and abuse in certain applications."

50.     On September 15, 2022, Chairman Gensler testified before the Senate Banking Committee that "[o]f the nearly 10,000 tokens in the crypto market, I believe the vast majority are

securities.  Offers and sales of these thousands of crypto security tokens are covered by the securities laws, which require that these transactions be registered or made pursuant to an available exemption."  Gensler continued: "Given that most crypto tokens are securities, it follows that many crypto intermediaries – whether they call themselves centralized or decentralized (e.g., DeFi) – are transacting in securities and have to register with the SEC in some capacity."  He went on to warn of the potential for conflicts of interest when "exchange, broker-dealer, custodial functions, and the like" are combined into the same legal entity.

## II.      THE PROTOCOL

### A.  "Decentralized" Exchanges Take Off, with Uniswap Leading the Charge

51.      Hayden Adams first began working with Ethereum in 2017.  As Adams tells it, he had been recently laid off from his first job out of college and a friend encouraged him to learn to write "smart contracts."  Adams asked, "[d]on't I need to like know how to code?" to which his friend responded, "[n]ot really, coding is easy.  Nobody understands how to write smart contracts yet anyway."  A little more than a year later, Adams and Uniswap launched the Protocol on November 2, 2018.

52.      Adams and colleagues at Uniswap created and developed both the Protocol and the Interface (defined below).  Uniswap facilitates trades of crypto assets, including the Tokens, by operating the Interface, which allows users to access the Protocol, where crypto asset pools are created and maintained.  Uniswap promotes the Protocol as "one of the most widely-used platforms on Ethereum."

53.      Shortly after its launch, Uniswap, through its Twitter handle, courted small investors by claiming that its platform "is for many people":



54.     Throughout 2019, Uniswap remained a nascent exchange with a limited number of users and trading volume.  By the start of 2020, Uniswap started making inroads within the crypto community but was still not a mainstream exchange at that point.

55.     By mid-2020—as the Coronavirus pandemic kept people at home—amateur investors flocked to retail investment platforms such as Robinhood.  Shortly thereafter, the "meme" craze began, with social-media users promoting the purchase of stocks based on factors that were unrelated to business fundamentals.  In one example of the "meme" craze, retail investors coordinated their purchase of shares of the struggling GameStop Corp. and, in doing so, artificially inflated its share price from $20 per share to near $500 at one point.

56.     By the end of 2020, the "meme" craze spread to crypto assets, such as Dogecoin (traded on Robinhood), resulting in sudden and substantial price increases.  Amateur retail investors, with little or no investment experience, purchased many of these promoted coins.  By

that time, Uniswap, with robust financial and operational support provided by Andreesen, Paradigm, and USV, was becoming more recognized within the crypto community, with its daily volume exceeding $1 billion.

57.    By late spring of 2021, Uniswap's growth and name recognition had increased dramatically as it was attracting scores of users who were new to crypto assets and/or Uniswap. For example, Uniswap's trading volume shot up to approximately $90 billion in May 2021, a several hundred percent increase as compared to just a few months earlier:



58.    Looking to capitalize on this investor enthusiasm and the power of the "meme" craze, issuers launched thousands of new tokens on decentralized exchanges ("DEXs"), including on the Protocol, many of which were priced at only fractions of a cent.  As a result, by the middle and end of 2021, tens of thousands of people began using the Protocol for the first time, many of whom had likely not even heard of Uniswap before their first use of the Protocol.

59.    Uniswap was particularly attractive to issuers because Uniswap did not impose any listing fees on issuers or conduct any type of verification or background check, allowing the issuers to operate in an unfettered and anonymous fashion.

60.     The Protocol now averages approximately $1.5 billion per day in trading volume.

61.     As of the filing of this First Amended Complaint, total trading volume on the Protocol has surpassed $1.1 trillion, with over 111 million trades, and well over 50,000 token pairs have been traded on the Protocol.  In contrast, the two largest centralized exchanges, Binance and Coinbase, allow users to trade approximately 1,450 and 500 tokens, respectively.  Uniswap holds itself out as the leading decentralized exchange with nearly 70% market share.

62.     Defendants are fully aware that the overwhelming majority of all tokens traded on the Protocol are scams and/or are fraudulent.

63.     For its part, Uniswap collects fees on every transaction on the Protocol, and has the right to (and likely does) allocate a portion of each fee to itself.  To date, the total amount of fees collected by Uniswap from its users has likely exceeded $2 billion.

**B.     The Uniswap Interface**

64.     Trading on the Protocol is conducted through Uniswap's user interface (the "Interface").  Uniswap controls and hosts the Interface on its webserver located in the United States.  All, or nearly all, investors that trade on the Protocol do so through the Interface.  Plaintiffs purchased the Tokens through the Interface.

65.     To access the Interface, users must have what is referred to as a "crypto wallet" (a "Wallet").  Wallets are computer applications (usually accessed through a smartphone) that safeguard holders' private keys, which allow them to send, receive, and access crypto assets.  Some of the most popular Wallets include Coinbase Wallet, Metamask, and Trust Wallet.  Anyone with a Wallet can access and use the Interface without any barriers or restrictions.

66.     Users can access the Interface through a web browser, such as Google Chrome or Safari, on their smart phone, tablet, or personal computer by navigating to app.uniswap.org or to

uniswap.org and clicking the "Launch App" icon, and then clicking "Connect Wallet" (the "Browser Method").

67.     The far more common way for users to access the Interface is by using browsers native to or imbedded in their Wallets to navigate to app.uniswap.org or to uniswap.org and clicking "Launch App" (the "Wallet Method").  Plaintiffs Risley, Freeland and Meyers conducted all of their transactions on the Protocol using the Wallet Method.

68.     Once the Wallet has been connected, users are ready to "swap" tokens.  A user must first select the token she wishes to trade and the token she wishes to receive.  The user can either browse the Interface to find the token or may search by token name, symbol, or token address.

69.     From there, users can trade by selecting the two tokens they would like to swap, specifying the amount, and then clicking the button "Swap":



70.     Typically, before proceeding with the "Swap," a user must set their "slippage tolerance."  Slippage tolerance refers to the amount of price fluctuation the user will tolerate between the time the user confirms the swap and the time the transaction is completed.  If the price changes more than is allowed by the slippage tolerance before the transaction is completed, the proposed swap will not go through.  With extremely volatile tokens, the slippage tolerance usually needs to be set more than 10% or even 20% to ensure the completion of a transaction.

71.     The first time that a user trades a token with the Protocol, she needs to "approve" the token.  By "approving" a token, according to Uniswap, "[t]his gives the Uniswap Protocol permission to swap that token from your wallet."[5]

72.     Users of the Interface who desire to be liquidity providers may also create or contribute to liquidity pools.

73.     Prior to the filing of this action, users who accessed the Interface through the Wallet Method were never presented with any terms of service, any disclaimers, any disclosures, or any information whatsoever about the Protocol.

74.     On or about April 23, 2021, Uniswap posted terms of service (the "Terms of Service") of the Interface on a page of its website that is not readily accessible from the website's home page.  Uniswap subsequently updated the Terms of Service on or about October 25, 2021.[6] At some point after April 23, 2021, Uniswap began prompting users accessing the Interface through the Browser Method with the following when they click "Connect a wallet":

---

[5] *See* https://support.uniswap.org/hc/en-us/articles/8120520483085 (last accessed September 19, 2022).
[6] *See* https://uniswap.org/terms-of-service (last accessed September 19, 2022).



The prompt includes links to webpages for Uniswap's "Terms of Service" and "Protocol Disclaimer."  However, a user (using the Browser Method) does not need to click on the links or check any boxes to connect her Wallet to the Interface.

75.     Only a small portion of users access the Interface through the Browser Method. Most users access the Interface through the Wallet Method, and such users have never been presented with—let alone had the opportunity to review and agree to—the Terms of Service and the Protocol Disclaimer.  In any event, the Terms of Service and Protocol Disclaimer are legally unenforceable.

76.     In addition to being unenforceable and unseen by the vast majority of Uniswap's users, the Terms of Service contain numerous and significant material misrepresentations.  For example, the Terms of Service state that "we [Uniswap] do not broker trading orders on your behalf nor do we collect or earn fees from your trades on the Protocol.  We also do not facilitate the execution or settlement of your trades, which occur entirely on the publicly distributed

Ethereum blockchain." These statements are patently false. Uniswap collects fees (and can keep a portion of those fees for itself) and undoubtedly acts as the broker, facilitator, and seller in connection with all trades on the Protocol, including, without limitation, through its ownership and operation of the Interface.

### C.    How the Protocol Works

77.    Uniswap deployed the original version of the Protocol ("v1") on Ethereum Mainnet (or the main public Ethereum blockchain) on November 2, 2018. Uniswap launched the second version of the Protocol ("v2") in May 2020. In the whitepaper for v2 (the "v2 Whitepaper"), Uniswap claims that v2 has "several new highly desirable features. Most significantly, it enables the creation of arbitrary ERC20/ERC20 pairs, rather than supporting only pairs between ERC20 and ETH."

78.    According to Uniswap, the Protocol operates through an "Automated Market Maker" or "AMM," which Uniswap claims replaces the buy and sell orders in an order book market with a liquidity pool of two assets, both valued relative to each other. As one asset is traded for the other, the relative prices of the two assets shift, and a new market rate for both is determined. Thus, buyers and sellers do not trade with each other directly but instead do so with Uniswap through liquidity pools Uniswap creates and maintains. The following diagram, from Uniswap's website, demonstrates how v2 of the Protocol works:



79.     In other words, the issuers and/or liquidity providers deposit two tokens of equal value into a "Uniswap Pool," which is what Uniswap calls it.  In the diagram above, Token A often represents ETH[7] and Token B represents the ERC-20 token that the issuer wants to introduce to investors.  In return, Uniswap "mints" and issues unique tokens ("Liquidity Tokens," referred to as "Pool Tokens" in the diagram above) to the liquidity providers as follows: "Whenever liquidity is deposited into a pool, unique tokens known as liquidity tokens are minted and sent to the provider's address.  These tokens represent a given liquidity provider's contribution to a pool.  The proportion of the pool's liquidity provided determines the number of liquidity tokens the provider receives."  According to Uniswap, "[a]s liquidity tokens are themselves tradable assets, liquidity providers may sell, transfer, or otherwise use their liquidity tokens in any way they see fit."

80.     Uniswap controls and maintains the liquidity pools by, among other things, (i) holding liquidity provider funds and newly created tokens in Uniswap's proprietary "core contracts," (ii) using routers that Uniswap controls to process all transactions executed by issuers

---

[7] In actuality, as more fully discussed below, when an issuer creates a new token and pairs it with ETH, the ETH is "wrapped" by Uniswap, which turns the ETH into WETH.  In addition, when users of the Interface trade their ETH for the ERC-20 token, their ETH is wrapped.

and users of the Protocol, and (iii) issuing Liquidity Tokens when a pool is created, without which, pools on the Protocol would not function.

81.     According to the v2 Whitepaper, "Uniswap v1 is an on-chain system of smart contracts on the Ethereum blockchain" and "Uniswap v2 is a new implementation based on the same formula."   The "whitepaper describes the mechanics of Uniswap v2's 'core' contracts including the pair contract that stores liquidity providers' funds—and the factory contract used to instantiate pair contracts."  *See id* at 6 ("One design priority for Uniswap v2 is to minimize the surface area and complexity of the core pair contract—the contract that stores liquidity providers' assets.").  When a trade is executed, "the seller sends the asset to the core contract before calling the swap function. Then, the contract measures how much of the asset it has received, by comparing the last recorded balance to its current balance."   Uniswap acknowledges that this process "will require calling the pair contract through a 'router' contract that computes the trade or deposit amount and transfers funds to the pair contract."   These smart contracts are in the exclusive control of Uniswap and/or the Owners.

82.     In addition, when an issuer creates a new token and pairs it with ETH, the ETH is "wrapped" by Uniswap, turning the ETH into WETH.  When users of the Interface swap their ETH for an ERC-20 token, Uniswap wraps their ETH.  In each instance, the ETH is wrapped through Uniswap's routers and in a separate transaction before the initial transaction is completed. According to CoinMarketCap, "[w]rapped tokens, like WETH or Wrapped Bitcoin, are tokenized versions of cryptocurrencies that are pegged to the value of the original coin and can be unwrapped at any point…. The mechanism of such coins is similar to that of stablecoins. Stablecoins are essentially 'wrapped USD' in the sense that dollar-pegged stablecoins can be redeemed for FIAT dollars at any point."

83.     According to the v2 whitepaper, Uniswap needs to wrap a user's ETH when used to trade on the Protocol:

> Since Uniswap v2 supports arbitrary ERC-20 pairs, it now no longer makes sense to support unwrapped ETH. Adding such support would double the size of the core codebase, and risks fragmentation of liquidity between ETH and WETH pairs. Native ETH needs to be wrapped into WETH before it can be traded on Uniswap v2.

84.     Nearly all users of the Interface trade with ETH and not WETH, and thus, each of their trades requires the use of multiple Uniswap routers and transactions to execute.

85.     As a result of the foregoing, Uniswap undoubtedly holds and controls tokens through the use of their smart contracts and as they travel through Uniswap's routers, which are located and/or created in the United States.  Thus, when a user swaps one token for another token, she interacts with and obtains such token directly from Uniswap and the pool it controls.

86.     According to Uniswap, the launch price of a new ERC-20 token is determined pursuant to a "constant product" formula, expressed as x * y = k, where x and y represent the respective amounts of the two tokens in the liquidity pool.  The total liquidity in the pool is represented in the equation by k, which Uniswap claims always remains constant.  The following diagram demonstrates how the price of the ERC-20 token fluctuates:



87.     In short (and intuitively), the price of a token is a function of the number of tokens investors have purchased.  Put another way, a purchase of a token causes the price to rise, and a sale of a token causes the price to fall.  The formula only captures a snapshot in time.  After each trade in a pool occurs, the formula is rerun in order to rebalance the equation.  Thus, Uniswap's reference to its formula as a "constant product formula" is misleading.

88.     Typically, issuers launch new ERC-20 tokens on the Protocol by placing (i) an extremely large (often more than a trillion or quadrillion) amount of the new tokens in the pool, and (ii) a small amount of ETH, often worth less than $100,000.  As a result, the initial price of the newly launched tokens is usually fractions of a penny.  Given their very low prices and high supply, these tokens are highly unstable and susceptible to wild and rapid price swings; however, none of this is meaningfully disclosed by Uniswap (or the other Defendants) to Uniswap users.

89.     Additionally, there are no barriers or restrictions to anyone issuing a new token on the Protocol.  Uniswap boasts that "anyone can become a liquidity provider" on the Protocol.  In fact, the identity of most of the issuers on the Protocol is not disclosed to investors (or even Uniswap).

90.     Uniswap's initial decision—countenanced by the other Defendants through their control of the Protocol—to allow complete anonymity, coupled with the lack of any listing fees or requirements, has created and fostered an ideal environment for fraudulent conduct.  Uniswap and the other Defendants are aware of this reality; the trouble is they choose to profit from its continuance.

91.     Since at least the implementation of v2, Uniswap has charged fees ("User Fees") to users of the Protocol.  For v2, Uniswap charged User Fees in the amount of 30 basis points on each trade, with issuers guaranteed to receive 25 basis points (5/6ths of the fee), and Uniswap reserving the right to receive 5 basis points (1/5th of the fee).  The addition of Uniswap's 5-basis point fee was new to v2 and not a feature of v1.  Uniswap does not disclose these fees to users of the Protocol in a transparent manner.

92.     Uniswap distributes the User Fee to issuers through additional Liquidity Tokens that Uniswap issues to them: "Whenever a trade occurs, a 0.3% fee is charged to the transaction sender.  This fee is distributed pro-rata to all LPs in the pool upon completion of the trade.  To retrieve the underlying liquidity, plus any fees accrued, liquidity providers must 'burn' their liquidity tokens, effectively exchanging them for their portion of the liquidity pool, plus the proportional fee allocation."  *See also* v2 Whitepaper at 5 (noting that "accumulated fees are collected only when liquidity is deposited or withdrawn. The contract computes the accumulated fees, and mints new liquidity tokens to the fee beneficiary, immediately before any tokens are minted or burned.").  Given that liquidity providers can only realize the gains they make through the User Fees by "burning" their Liquidity Tokens, thereby draining the liquidity from the liquidity pools, Uniswap and the other Defendants have incentivized liquidity providers to engage in behavior that will cause token values to decline to the detriment of investors.

93.     The fact that Uniswap can decide whether to take its share of the User Fee is notable.  In addition to being part of the ownership of Uniswap, upon information and belief, Andreesen, Paradigm, and USV are market makers on the Protocol, using it to trade large quantities of valuable tokens, for which they garner substantial fees as liquidity providers.  It is not in their interests for Uniswap to retain its contractually guaranteed share of the User Fees.

94.     In addition to the User Fees, the liquidity providers often impose a "tax" on trades ("Trade Taxes"), which typically range from 2% to 10% and can be imposed on both sales and purchases or only upon sales.  The taxed tokens are typically (i) "burned", *i.e.*, removed permanently from the total treasury of the token; (ii) redistributed on a pro-rata basis to the existing holders; and/or (iii) redistributed to issuers.  The Trade Taxes are purportedly to prevent price manipulation and to discourage investors from selling their tokens.  Uniswap does not disclose to users of the Interface whether Trade Taxes are imposed on the token they are purchasing or selling. In most cases, a user will only be able to determine the amount of Trade Tax in connection with a transaction by analyzing the Ethereum blockchain *after* Uniswap completes such transaction.

95.     Upon information and belief, Uniswap charges other undisclosed fees to users of the Interface in addition to the User Fees and Trade Taxes.  The total of such fees, given the trading volume, is likely substantial and to determine the actual amount, one would have to analyze thousands, if not millions, of transactions on the Ethereum blockchain.

96.     In May 2021, Uniswap launched the third version of the Protocol ("v3"), which operates in a manner substantially similar to v2, but has additional features.  According to Uniswap, "v3 is based on the same constant product reserves curve as earlier versions but offers several significant new features," including "Flexible Fees," "Protocol Fee Governance," and "Concentrated Liquidity."  With v3, Uniswap now charges User Fees pursuant to tiers.  By default,

there are three tiers, which correspond to User Fees in the amount of 5, 30, or 100 basis points respectively.  Nonetheless, many issuers continue to use v2.

### III.   UNISWAP'S OWNERSHIP STRUCTURE AND CONTROL OF THE PROTOCOL

#### A.   Ownership of Uniswap

97.     Uniswap has at all times, together with the other Defendants and/or individually, maintained complete control over the Protocol and the Interface.  Uniswap created and maintained the Protocol and the Interface in the United States, and it hosts them both on their own servers in the United States.   In a series of tweets on July 24, 2021, Adams acknowledged that "http://app.uniswap.org = Uniswap Labs owned domain" and that "[d]ecentralization doesn't mean Uniswap Labs lets you do whatever you want on its website.  It means you don't need a single interface instance to access the protocol."

98.     Uniswap is structured and run as a for-profit business, with the Interface, the Protocol and UNI as its primary assets.  In September 2021, shortly after it was announced that the SEC was investigating Uniswap, Chairman Gensler warned that decentralized finance projects, or "DeFi", are under increased scrutiny: "[t]here's still a core group of folks that are not only writing the software, like the open-source software, but they often have governance and fees. There's some incentive structure for those promoters and sponsors in the middle of this."[8] Uniswap has a governance structure, collects fees, and has created and enabled an incentive structure for issuers and liquidity providers (including Andreesen, Paradigm, and USV) at all relevant times.

---

[8] "Crypto's 'DeFi' Projects Aren't Immune to Regulation, SEC's Gensler Says," available at: https://www.wsj.com/articles/cryptos-defi-projects-arent-immune-to-regulation-secs-gensler-says-11629365401# (last accessed September 19, 2022).

99.     On or about April 12, 2019, Uniswap issued $1.825 million worth of equity shares in the company to two investors: Adams and Paradigm.  Uniswap filed a Form D with the SEC reporting this offering.  The terms of any agreement between Adams and Paradigm, on the one hand, and Uniswap, on the other hand, are not publicly available. Thus, it is unclear at this time what rights Adams and Paradigm received in connection with the equity acquisition, or how they acquired the same.

100.    On or about June 6, 2020, Uniswap issued an additional $11 million in equity shares and options or warrants in the company to multiple investors.  Uniswap filed a Form D with the SEC reporting this offering.  In a related press release, Uniswap stated that the funding was "led by" Andreessen.  Funding was also provided by other Defendants, including Paradigm and USV, in exchange for an ownership stake in Uniswap.  Upon information and belief, the terms of any agreement between Andreesen or USV, on the one hand, and Uniswap, on the other hand, are not publicly available. Thus, it is unclear at this time what rights Andresen and USV received in connection with the equity acquisition, or how they acquired the same.

101.    Adams, Andreesen, Paradigm, and USV control a significant amount of UNI tokens, thus giving them the ability to control the Protocol, either individually and/or collectively. Upon information and belief, as liquidity providers, they have contributed millions of dollars' worth of tokens to liquidity pools on the Protocol, thus enriching themselves to the tune of millions of dollars in User Fees.

102.    Upon information and belief, Adams, Andreesen, Paradigm and USV (through their equity ownership or otherwise) were incentivized to (and did) steer Uniswap to create v2 and v3, which allowed the pairing of unique ERC-20 tokens, so that they could fund large liquidity pools and generate millions of dollars in fees for themselves.  In v1, an ERC-20 token could only be

paired with ETH and not another ERC-20, which limited the ability of issuers and liquidity providers to yield endless fees.

**B.      Paradigm, Andreesen, and USV Helped Develop and Upgrade the Protocol Without Any Regard for Safeguards for Users of the Protocol**

103.      Paradigm is a crypto asset hedge fund and Andreesen and USV are venture capital firms.   However, they are not merely passive investors in Uniswap; they were and remain intimately involved with the operations of Uniswap, including but not limited to the development of the Protocol.

104.      On February 11, 2021, in a series of tweets, Adams specifically named Andreesen, Paradigm, and USV and acknowledged that they "have been incredibly value additive."  Adams listed the many ways in which they had added value, including: "Advising, sourcing candidates, conducting interviews, making introductions, writing smart contracts, writing whitepapers, reading/explaining other peoples papers/smart contracts, historical analytics, letting me sleep on their couch, proof reading blogposts, insider info…content creation, breakthrough Uniswap-related math research, playing HALO 3, educating regulators and institutions, product design feedback, and a whole lot more…Not to mention providing millions in funding during the depths of a bear market":



105.    Adams acknowledged that "we would not be where we are today without our investors."

106.    Although Adams spotlighted Andreesen, Paradigm, and USV, he did not specify what each of them did specifically (or continue to do).  The terms of their investments are not publicly available information.  However, the available public information shows significant contributions to the development and expansion of Uniswap and the Protocol.

107.    Dan Robinson, Head of Research at Paradigm, was instrumental in the development of both v2 and v3, which he discussed in detail in an interview with the website *The Defiant*.[9] Moreover, Robinson and several of his Paradigm colleagues promoted Paradigm's role in upgrading the Protocol on Twitter.

108.    On May 18, 2021, Paradigm published an article authored by Robinson on its website, entitled "Liquidity Mining on Uniswap v3."[10]  In the article, Robinson touts in technical detail how improvements in v3 will benefit liquidity providers.  On June 7, 2021, Paradigm published another article authored by Robinson on its website, entitled "Uniswap v3: The Universal AMM."[11]  In the article, Robinson describes in technical detail how the AMM on v3 works.  Robinson and Paradigm have such intimate knowledge of the Protocol because they co-created it with Adams.

109.    On July 16, 2021, Matt Huang, co-founder of Paradigm, issued a press release on Paradigm's website, entitled "Expanding our Research Team."[12]  In the release, Huang stated that Paradigm assembled a "Research team" led by Dan Robinson.  Huang further acknowledged that the research team "work[ed] closely with our investment team and our portfolio on projects like Uniswap v3."  In a tweet announcing the press release, Huang stated "[o]ur Research team at @paradigm started three years ago as an experiment, but it's become a key part of our firm and the crypto community."  Huang's tweet suggests that Paradigm was intimately involved with Adams in co-creating the first version of the Protocol, v1, which launched less than three years before Huang made that statement.

---

[9] "'V3 is Winding Back a Bit of the Uniswap Revolution; It's Going to be Very Influential:' Dan Robinson," available at https://newsletter.thedefiant.io/p/v3-is-winding-back-a-bit-of-the-uniswap (last accessed September 19, 2022).
[10] *See* https://www.paradigm.xyz/2021/05/liquidity-mining-on-uniswap-v3 (last accessed September 19, 2022).
[11] *See* https://www.paradigm.xyz/2021/06/uniswap-v3-the-universal-amm (last accessed September 17, 2022).
[12] *See* www.paradigm.xyz/2021/07/expanding-our-research-team (last accessed September 17, 2022).

110.    On July 28, 2021, Dave White, a "Research Partner" at Paradigm, tweeted "I've been working on a new type of automated market maker with @danrobinson and @haydenzadams." White stated "[t]he Time-Weighted Average Market Maker, or TWAMM (pronounced "tee-wham"), helps traders on Ethereum efficiently execute large orders." He also included a link to a "paper" on Paradigm's website describing TWAMM.[13] Dave White, Dan Robinson and Hayden Adams are all listed as authors. In the conclusion, White writes, "[i]f you are interested in working on this or similar problems, you can email dave@paradigm.xyz or DM me on Twitter, or reach out to Uniswap Labs at ideas@uniswap.org."

111.    Paradigm also co-drafted the whitepapers for v2 and v3 with Adams and other Uniswap employees. Robinson is listed as a co-author of those whitepapers.

112.    v2 and v3 were unilaterally developed and rolled out without input from users or via any governance proposals, solely for the benefit of some portion of the Owners.

113.    In his tweets on February 11, 2021, Adams confirmed that the Owners attempted "to educate regulators." In fact, the Owners have actively sought to prevent regulatory oversight of the crypto asset industry—including the activities that occur on the Protocol. Specifically, in 2018, Andreesen and USV jointly met with the SEC and argued that crypto tokens do not constitute securities (that would otherwise be subject to regulation), speciously claiming that they only function to access blockchain-based services and networks.

114.    Andreesen has advocated against crypto regulation since it has been an investor in Uniswap, as referenced by Adams' tweet. For example, on or about April 18, 2022, Andreessen sent a letter to the SEC advocating against a proposed rule, "[a]ssuming that the Proposal does

---

[13] *See* https://paradigm.xyz/2021/07/twamm/ (last accessed September 17, 2022).

reach DeFi systems, it would have significant and adverse consequences for these systems and web3 as a whole."

115.    The Owners' participation in the creation of the UNI token with governance rights and making themselves a preferred class of token holders (discussed below) belies any self-serving representations that tokens are not subject to regulation.  Small investors continue to suffer from the fraudulent conduct that is endemic to the Protocol, while Defendants continue to encourage them to trade the same tokens that they deny are securities.

116.    It is also clear that Defendants sought to monetize the Protocol to the detriment of everyday users.  Indeed, in April 2021, Paradigm acknowledged that inexperienced users of DEXs, like the Protocol, are constantly taken advantage of: "Every day, thousands of people use a decentralized exchange (DEX) for the first time. However, the idiosyncrasies of a public blockchain routinely catch newcomers off-guard, even those familiar with trading on more traditional venues. As a result, traders bleed money to arbitrageurs and frontrunners, leading to worse-than-necessary execution."[14]   Nonetheless, Defendants do not meaningfully warn such users of the Protocol or implement simple safeguards to protect them.

### C.    Uniswap Has Unilateral Control Over the Protocol

117.    According to Adams, Uniswap was named by Vitalik Buterin, a co-founder of Ethereum.  Adams had initially wanted to call it Unipeg—a mixture between a Unicorn and a Pegasus.  Uniswap proved a more apt name, as Uniswap maintains final and *unilateral* control over all business on the Interface, and with the other Defendants, controls the Protocol.

118.    For example, despite claiming that the Protocol is decentralized, Uniswap has unilaterally delisted tokens from its Interface on multiple occasions.

---

[14] *See* https://research.paradigm.xyz/amm-price-impact (last accessed September 19, 2022).

119.    In July 2021, in response to regulatory pressure, Uniswap unilaterally delisted over 100 tokens from its Interface.

120.    On another well-publicized occasion, the launch of a new token caused an error in the protocol's data aggregator.  In response, Uniswap unilaterally removed the token from the Interface.

121.    Uniswap also controls the Protocol through a software license.  Uniswap views the Protocol as its intellectual property, and v3 is explicitly subject to a "business source license" from Uniswap and/or the Owners.  The license limits use of the v3 source code under terms and conditions that Uniswap can unilaterally change at any time.

## IV.    UNISWAP ISSUED THE OWNER'S UNI TOKENS, WHICH ENABLES THEM TO CONTROL THE PROTOCOL

### A.    The UNI Token and Uniswap Governance

122.    On or about September 16, 2020, Uniswap issued its own token, UNI.  UNI can be purchased on the Protocol.

123.    According to Uniswap, UNI holders would be granted "immediate ownership" of, *inter alia*, Uniswap governance (the "Governance") and the UNI community treasury.

124.    Previously, the company's official Twitter account joked, in response to the admitted "schilling" by a close friend of Adams, that "[i]f we had any tokens we would totally give you some."   Sure enough, after launching UNI, Uniswap allocated 40% of the total supply of UNI to "team members and future employees, investors and advisors" to be distributed over a four-year period, as follows:

- 21.266% to team members and future employees with 4-year vesting [212,660,000 UNI];

- 18.044% to investors with 4-year vesting [180,440,000 UNI]; and

- 0.69% to advisors with 4-year vesting [6,900,000 UNI].

125.    Most of this group is made up of Adams (and other employees of Uniswap), Andreesen, Paradigm, and USV, who received or are set to receive millions of UNI.  UNI launched at approximately $3 per token and doubled in price within a day and eventually reached an all-time high of approximately $45 per token.  Thus, by launching UNI, the Defendants enriched themselves to the tune of millions of dollars.

126.    Uniswap claims that the remaining 60% of UNI tokens are for the "Uniswap community members," a group which it does not define.  It appears that only 15% of UNI was initially allocated to such "community members," and approximately one third of this amount (5% of UNI) was allocated to "historical liquidity providers," which include the Defendants.  Uniswap states that the remaining 10% was "split evenly across all 251,534 historical user addresses."

127.    Of the remaining 45% of UNI, Uniswap stated that the "governance treasury will retain 43% [430,000,000] . . . to distribute on an ongoing basis through contributor grants, community initiatives, liquidity mining, and other programs."  Further, "governance can vote to allocate UNI towards grants, strategic partnerships, governance initiatives, additional liquidity mining pools, and other programs."  In other words, whoever controls Uniswap's Governance can allocate the remaining UNI tokens as they see fit.

128.    In summary, Defendants directly received the vast majority of the 40% of UNI earmarked for "team members, investors, and advisors" as well as some or most of another 5% of UNI earmarked for "historical liquidity providers," and indirectly retain and control another 43% of UNI through governance of Uniswap.  Thus, Defendants directly or indirectly control as much as 88% of UNI, while only the remaining 12% of UNI is held by smaller users.

129.    This discrepancy in UNI ownership and control is further amplified by the governance rules of Uniswap.  Under the Governance, ownership of at least one percent of the

total UNI supply is required to submit a governance proposal, and four percent is required to vote "yes" to reach quorum.  Under these parameters and given the allocation of UNI, the Owners have a disproportionate amount of power and effectively control Uniswap's governance—and by extension the Protocol.

130.    Thus, Uniswap's assertion that UNI is a governance token allowing holders to vote on changes to the Protocol and how to allocate funds in the governance treasury is demonstrably false and misleading.

131.    As set forth herein, UNI is a "security" under the standards promulgated by the SEC and the Supreme Court.  Nevertheless, Uniswap failed to register UNI with the SEC as required by the federal securities laws.  That this particular security trades on an exchange that is owned and operated by the same people who are simultaneously the issuers, owners, and controllers of the security—and who also obtain fees from transactions in the security—speaks to the lawless environment created by Defendants.

132.    Upon information and belief, UNI was issued to support Defendants' ongoing efforts to develop newer and better versions of its Protocol, while enriching Defendants and consolidating their control over the Protocol through the Governance, which was created to enable the Owners to control the Protocol.  According to Uniswap, the Protocol is "owned and governed by UNI token holders."

133.    Moreover, Uniswap actively promotes both UNI and the Protocol to prospective investors on social media, podcasts, websites, and other media.  Through such promotion, Uniswap have misleadingly touted the exchange as a decentralized market with no central operator or administrator, contrasting it with markets that are "designed to take fees."  However, Uniswap does charge fees to users of the Protocol, which directly benefits Defendants.  Uniswap has also

made false and/or misleading statements about UNI, the Protocol, as well as Uniswap's business and governance.

134.    The Owners, individually and/or collectively, hold enough UNI tokens to completely control the Governance, and therefore, the Protocol.

135.    The top 100 holders of UNI tokens hold 80% of all UNI tokens currently in supply. The Owners are each likely top 10 holders of UNI tokens.

136.    In addition, even though there are over 300,000 UNI token holders, many of them do not and cannot vote on Governance proposals.  For example, if a UNI token holder purchased her tokens on a different exchange, such as Coinbase, she would not be able to vote in Governance proposals.

**B.    Andreessen Holds the Most UNI Tokens**

137.    Andreesen holds many wallets.

138.    Andreessen holds at least 15 million votes in connection with the governance, amounting to over 6% of "vote weight", traceable to one of Andreessen's wallets, with the following contract address:   0x2B1Ad6184a6B0fac06bD225ed37C2AbC04415fF4 (the "A16z Wallet").

139.    Upon information and belief, Andreessen holds and/or controls UNI tokens in other undisclosed wallets.

140.    Andreessen devised a scheme that it refers to as "delegation services" whereby Andreessen "delegates" its voting rights in the Governance to others.  This has the effect of misleading investors and governance participants into believing that the Protocol is controlled by a community, as opposed to a handful of plutocrats including principally Andreesen.

141.    Andreessen only delegates its Governance rights to other persons or entities that (i) have interests that align with Andreessen and/or (ii) Andreesen can influence or control.

Andreessen has invested in or otherwise given money to some of these governance participants. For example, Andreessen invested millions of dollars' worth of money and/or tokens in Compound Finance, another digital asset exchange, which was founded by Robert Leshner. Upon information belief, Andreessen delegated millions of UNI tokens to Lesner. In fact, Leshner holds 5.5 million UNI tokens and Lesner's voting power ranks in the top 15 of all Governance participants.

142.    Even without Andreessen's hidden wallets and its influence over other Governance participants through its delegation scheme, Andreessen had enough voting power in the A16z Wallet alone to unilaterally propose changes to the Governance and vote affirmatively on such changes, given that under the original Governance parameters, only 0.25% voting rights was required to propose a change and only 4% was needed to reach a quorum.

## C.    Studies Conclude There is Centralized Control of DeFi Platforms

143.    On April 3, 2020, an independent study, titled "Analyzing Voting Power in Decentralized Governance: Who Controls DAOs?" (hereafter, the "DAO Study") was submitted to arXiv (pronounced "archive"). ArXiv is operated by Cornell University and according to arxiv.org, "arXiv is a free distribution service and an open-access archive for 2,131,589 scholarly articles in the fields of physics, mathematics, computer science, quantitative biology, quantitative finance, statistics, electrical engineering and systems science, and economics."

144.    The authors of the DAO Study are Robin Fritsch, Marino Muller, and Roger Wattenhofer. Fritsch and Wattenhofer are affiliated with the Swiss Federal Institute of Technology Zurich and all three authors have written extensively on blockchain technology and so-called DEXs.

145.    According to the DAO Study, the authors conducted an empirical study concerning "the state of three prominent DAO governance systems on the Ethereum blockchain," including Uniswap specifically. The DAO Study examined how "the voting power is distributed in these

systems."  The DAO Study did so by "[u]sing a comprehensive dataset of all governance token holders, delegates, proposals and votes" and "analyz[ing] who holds the voting rights and how they are used to influence governance decisions."

146.    As the DAO Study pointed out that "[i]n general, multiple addresses (holder as well as delegate addresses) can be controlled by the same entity. This makes it difficult to determine who actually holds the power and can make the governance systems seem more decentralized than they actually are."  The DAO Study referred to this as Address Clustering.  The DAO Study examined the A16z Wallet, specifically, and determined that Andreesen likely controls many additional wallets that hold UNI.

147.    The DAO Study concluded that "the governance systems of … Uniswap is extremely centralized and controlled by a very small number of addresses. Their governance systems show similarities with shareholder meetings, where a small number of large investors represent their interests."

148.    In March of 2022, the International Organization of Securities Commissions (the "IOSCO") released a report on "decentralized finance."  According to IOSCO's press release "[t]he IOSCO report offers a comprehensive review of the fast-evolving DeFi market, its new products, services and principal participants."  The press release summarized the report as follows:

> The report casts doubt on a key claim of DeFi innovators that it is a peer-to-peer marketplace with no centralised insiders in control. By looking in detail at how DeFi works, it identifies central actors who, it concludes, often retain control – for example, through the distribution of "governance tokens". It also highlights the important role played by centralised trading platforms who often face substantial conflicts of interest.

149.    The IOSCO Report noted that the "primary participants" to date in funding DeFi development are venture capital firms and investors.  These firms "look to the receipt of governance or other tokens traded on centralized crypto-asset trading platforms for immediate

liquidity to monetize a return on their investments and, for some, giving them the rights to significant voting power and governance."

150.    The Report also noted that early investors "may obtain equity in the company developing a protocol as well as the right to receive future tokens, including governance tokens of the protocol, once the protocol is launched and deployed to a blockchain."  Thus, depending on the DeFi arrangement, "the developers, early investors, and others holding material amounts of governance tokens may continue to influence the development and maintenance of the protocol."

### D.    The Uniswap Defense Fund

151.    In or around February 2021, a Governance proposal (the "Defense Fund Proposal") was submitted to create a so-called "DeFi Education Fund" (hereafter, the "Uniswap Defense Fund"), which was designed to create a legal defense fund to cover all or part of the legal fees of all controller entities of the Protocol, including Defendants, in responding to and defending against enforcement actions by government regulatory bodies, such as the SEC, and lawsuits, such as this action.  Defendants were involved in drafting and promoting the proposal.  Defendants used the word "education" instead of "defense" in the title of the proposal in order to mislead Governance participants and investors of their true intentions of using the fund to pay for their legal fees.  The Defense Fund Proposal can be found here:   https://app.uniswap.org/#/vote/1/1?chain=mainnet (last accessed September 18, 2022).

152.    The first stated goal of the Uniswap Defense Fund is for "challenging misguided regulatory, legal, and political threats to decentralized finance…"  In addition, the Defense Fund Proposal states the money in the fund would be used for "Legal firepower: we need to develop a strong bench of legal advocates in multiple jurisdictions and venues…."

153.    The Defense Fund Proposal called for the creation of a committee (the "Fund Committee") that would oversee the fund.  Three of the seven initial members of the committee

members are general counsel of so-called decentralized exchanges (Compound, dYdX and Uniswap) for which Andreessen is a large investor, owner, and/or controlling stakeholder. These three individuals include Jake Chervinsky (Compound Lab), Marc Boiron (dYdX), and Marvin Ammori (Uniswap). Accordingly, Andreessen either directly or indirectly controls and/or influences the Uniswap Defense Fund.

154.   The Defense Fund Proposal also called for Uniswap allocating one million UNI tokens to the Uniswap Defense Fund.

155.   In or around July 2021, the Defense Fund Proposal passed, with a majority of yes votes coming from four wallets, including the A16z Wallet.

156.   Within days of the passage of the Defense Fund Proposal, the Fund Committee sold 500,000 UNI tokens (half of the allotted tokens), generating over $10 million.

157.   The Uniswap Defense Fund is likely using the proceeds of the sale of 500,000 UNI tokens to defend against regulatory investigations and this very action and to lobby regulatory bodies and politicians. For example, on or about April 18, 2022, just like Andreessen, the Uniswap Defense Fund sent a letter to the SEC desperately trying to convince the agency that a new proposed rule would adversely impact "DeFi Protocols." The letter is full of misinformation and contradictory and false statements. According to the letter, three attorneys from Sullivan & Cromwell LLP, one of the highest priced law firms in the country, are "outside counsel" to the Uniswap Defense Fund.

## V.    DEFENDANTS CREATED AND CONTROL THE UNISWAP FOUNDATION

158.   On June 30, 2022, Defendants created or caused to be a new corporation called the Uniswap Foundation.

159.   Nearly two months later, on or about August 15, 2022, Uniswap's then chief of staff, Devin Walsh, submitted a Governance proposal to "Create the Uniswap Foundation" (the

"UF Proposal") even though, according to the Secretary of State of Delaware, the company was already formed on June 30, 2022. The UF Proposal can be found here: https://app.uniswap.org/#/vote/2/24?chain=mainnet (last accessed September 19, 2022).

160. Ms. Walsh did not even wait for the voting to be completed on the UF Proposal before filing an "Amended and Restated Certificate of Incorporate of Uniswap Foundation" (the ("Amended UF Certificate"). On August 17, 2022, Ms. Walsh signed the Amended UF Certificate as "Executive Director" of the Uniswap Foundation.

161. Voting on the UF Proposal ended on or about August 24, 2022. The UF Proposal passed with 86.3 million votes in favor, and such votes were overwhelmingly cast by 10 wallets.

162. According to the UF Proposal, "there is still work to do to help Uniswap reach its full potential. The governance process has too much friction, the ecosystem is too difficult to navigate, and UGP in its current form is not able to fund the most ambitious and impactful projects." The UF Proposal further stated that "[t]he Uniswap Foundation (UF) will provide grants to builders, researchers, organizers, academics, analysts, and more to grow the Protocol and plan for its future."

163. The stated mission of the Uniswap Foundation is to support "the decentralized growth and sustainability of the Uniswap Protocol and its supporting ecosystem." The proposal also states that one of the main objectives of the Uniswap Foundation will be "Reinvigorating the Uniswap Community Governance Process."

164. In addition, pursuant to the UF Proposal, Uniswap is giving away many of its assets to the Uniswap Foundation: "[t]o succeed, the UF will require the ability to grant v3 BSL license exemptions, to maintain the governance forum, Sybil.org, and Protocol-related developer docs,

and to help facilitate protocol development across many teams.  Labs has given their blessing to this preliminary **proposal for asset transition**." (Emphasis added).

165.    According to the UF Proposal, "Devin Walsh and Ken Ng will serve as the first two Board members of the Uniswap Foundation.  Alongside the UF's Advisors, they will interview and target to hire a third Board member in the first 3 months of operations."  Walsh will also serve as executive director and "will be responsible for setting UF's strategic vision alongside the Board and driving execution to achieve that vision."  Ng will also serve as "Head of Operations" and according to the UF Proposal, "Ken has served the Uniswap ecosystem as Lead of the Uniswap Grants Program for the past 1.5 years."

166.    According to the Amended UF Certificate, the Uniswap Foundation is "a membership corporation and shall have no authority to issue capital stock."  In addition, there is "only one class of members," which are referred to as the "Managing Members" and "consist exclusively of those persons then serving as the directors of the [Uniswap Foundation]."

167.    The UF Proposal proposed for $74 million in UNI tokens would be taken from the "Uniswap Treasury":

   We are requesting the funds in two disbursements:

   1.  **$20M** now to cover operating expenses for the next 2 years and grants for 1 year. Assuming a UNI price of $8.14, this initial request totals to **2,457,002 UNI.**

   2.  **$54M**, to be disbursed by the Uniswap Treasury in 6-12 months once the UF has completed the establishment of its legal entity. The UF will publish a post on the forum notifying the community a week prior to putting forth a formal governance proposal for the remaining funds. In other words, because this proposal approves the full amount of funding, we will not go through an additional the Temperature Check and Consensus Check steps to receive this second disbursement.

168.    In other words, Defendants raided $74 million from Uniswap's treasury of unallocated UNI tokens in order to create a separate spin off company to be run by individuals

under their influence and/or control, all so they could further develop and control the Protocol in a non-transparent manner.  As result of Defendants' shifting of assets and funds from Uniswap to the Uniswap Foundation, this new entity is merely an extension of Uniswap that Defendants control.

## VI.   THE OWNERS LIKELY PROVIDE MILLIONS OF DOLLARS IN LIQDUITY TO THE LARGEST POOLS ON UNISWAP, WHICH GENERATE MILLIONS OF DOLLARS IN FEES

169.   After Uniswap launched UNI, it allocated up to 150 million UNI as rewards to (i) liquidity providers and (ii) "historical users" of the Protocol (capped at 400 UNI per user for this group).  *See* https://uniswap.org/blog/uni (last accessed September 25, 2022).

170.   Uniswap referred to the UNI rewards allocated to liquidity providers as a "liquidity mining program".  According to Uniswap's website, "[a]n initial liquidity mining program will go live September 18, 2020, 12:00am UTC. The initial program will run until November 17, 2020, 12:00am UTC and target the following four pools on Uniswap v2:

> ETH/USDT
> ETH/USDC
> ETH/DAI
> ETH/WBTC"

171.   Upon information and belief, the Owners were the largest contributors to these four pools (the "Mining Pools").  During that time, the Mining Pools are and were some of the top pools on Uniswap in terms of total daily and weekly trading volume.  In other words, by contributing to these pools, the Owners created a marketplace for mainstream tokens for which there is a high demand, such as USDC, USDT, DAI and WBTC (wrapped Bitcoin).  It is highly like that the Owners enriched themselves by earning fees on every transaction in the Mining Pools and millions of dollars' worth of UNI through Uniswap's mining Program.

172.     With the launch of v3 of the Protocol, pools, like these with mainstream tokens,

transitioned to the new version of the Protocol.  Around the time of the filing this First Amended

Complaint, the largest pools on v3 based on 7-day volume are as follows:



173.     For example, the top pool (USDC/ETH) generated $2.46 billion in the last week.

During many weeks in 2022, the number was higher, even eclipsing $7 billion.  Several of the

other top pools generated hundreds of millions of dollars in volume during the past week.  This

means that liquidity providers for these large pools are earning millions of dollars in fees every

day.  Upon information and belief, the Owners are large liquidity providers in these pools.

174.     Liquidity providers in the large Uniswap pools often profit directly from the trading

of scam tokens.  For example, many users of Uniswap often convert their ETH into stablecoins,

such as USDC or USDT, earning fees for the liquidity providers of the pools containing these

tokens.   When a user purchases a fraudulent ERC-20 token, the user's stablecoin first gets converted to ETH, earning a fee for the liquidity provider, and then the ETH is used to execute a trade for the ERC-20 token.  In other words, the more tokens that are available for trading through the Protocol, the more potential fees liquidity providers in the large pools will earn.

## VII.   UNISWAP ALLOWS THE ISSUANCE OF THOUSANDS OF SCAM TOKENS

### A.  Scams Begin and Continue to Plague Uniswap

175.    Scams have always been prevalent in crypto assets; as SEC Chairman Gary Gensler has said, crypto assets are "the Wild West," rampant with "fraud, scams and abuse."

176.    Thus, it should not have been a surprise to Uniswap or the Owners that scam tokens plagued the Protocol during its growth, particularly in 2021, and are still pervasive there today.

177.    As Uniswap grew from hundreds to thousands of listings, so did the number of scam tokens.  Uniswap's open issuer policy (with no listing fees, vetting processes, or criteria for issuing tokens), along with the relatively small amount of ETH required to issue a new token, has led to thousands of scam tokens being traded on the Protocol.

178.    Uniswap not only fails to prevent scammers, but—with a fee structure that rewards fraudulent issuers—scammers are encouraged and emboldened to use the Protocol as they profit from their illegal activity without any consequence.  For its part, Uniswap does not return the fees it collects from these fraudulent transactions.

179.    One type of scam that is all too common on the Protocol is a "rug pull."  In this scam, a new issuer puts their tokens into a liquidity pool and receives Liquidity Tokens in exchange.  The issuer then prematurely withdraws their pool tokens, thereby removing all liquidity from the pool and leaving other investors with nothing but now worthless tokens.

180.    Another common scam is a "pump and dump."  Before launching a new token (and before trading begins on the Protocol), issuers send millions or even billions of the new token to

themselves, which the issuers rarely disclose to potential investors.  Then, the issuers "pump" or loudly promote their tokens to potential investors, often through social media, and make wild claims (usually misrepresentations if not outright fraud) to entice investors and drive up demand for their tokens.  With demand at its peak, the issuers "dump" their holdings on the exchange at the highest possible price and abscond with the profits, leaving investors holding worthless tokens. Pump and dumps can also occur when one or more large-volume traders purchase and hold a large number of tokens, wait for the price to go up, and then sell out, leaving smaller investors holding the bag.  Uniswap does not return the fees it collects from these fraudulent transactions.

181.    Uniswap's structure also incentivizes Ponzi schemes.  At any given time, there is not enough liquidity to pay off all investors if they all were to sell their tokens at the current price. Thus, when a selloff occurs, the price of the tokens drops dramatically, sometimes by 50% or more within seconds or minutes, creating a race to act where the investors that catch the fall immediately incur substantial losses.  The problem is exacerbated by the fact that most new tokens are launched with only a small amount of liquidity.

182.    The Protocol is also plagued by malicious traders who use schemes to suck liquidity out of a token.  One such scheme involves using "bots" that are programed to buy large amounts of tokens to briefly drive up its price and then quickly sell tokens to gain an incremental profit. The process is repeated numerous times, which has the effect of dramatically increasing the profits of the malicious trader at the expense of other investors.

183.    Uniswap does not provide transparent information to investors about these or any other actual or potential fraudulent practices, or about how the structure and governance of the Protocol allow such practices to thrive.

## B.     Uniswap Acknowledges but Continues to Allow Scams

184.    Uniswap is fully aware of the existence and scope of fraudulent activity on the Protocol but has done little to address this.  Although these abuses are extremely detrimental and dangerous to its users, Uniswap intentionally avoids any effort to curb them.  Uniswap incentivizes and encourages anyone, without any restrictions whatsoever, to become an issuer.  Specifically, Uniswap does this by guaranteeing fees to them on every trade, calculated on a percentage basis.

185.    In response to reports that Uniswap was a haven for scam tokens and fraud, Uniswap acknowledged that the Protocol was creating a problem: "As the rate of token issuance accelerates, it has become increasingly difficult for users to filter out high quality, legitimate tokens from scams, fakes, and duplicates."  Uniswap conceded that the trend was something "we expect will only accelerate in the future."

186.    Adams has made various statements demonstrating that, at all relevant times, he understood the risks inherent to his creation, the Protocol; the problem is that he and other Defendants never adequately disclosed these risks to Uniswap's users.

187.    For example, Adams appeared on a webcast with host Bankless, a crypto finance YouTube channel, and Adams described "how easy it was to create liquidity," even for an "obscure asset"—just recruit users to provide that liquidity and pay them fees for the risk of doing so. During the webcast, the host recounted minting his own token "for funsies," gifting them to his friends and thinking it was "absolutely crazy" that he could list any token on Uniswap for sale "without permission."   Indeed, shortly after this action was filed, Plaintiff Nessa Risley was ostracized on social media, and someone launched a token on the Protocol mocking her for serving as a plaintiff in this case.[15]  Uniswap did nothing to stop this deplorable behavior.

---

[15] The token is called "NESSA RISLEY BABY ZOGE SAMURAI MAX FINANCE ROCKET".

188.    In addition, countless users of the Protocol have reached out to Uniswap directly and through social media asking Uniswap to implement security features to make the Protocol safer.  Uniswap has either completely ignored these pleas for help or, in certain instances, has made or endorsed statements on social media, acknowledging that such scams occur on the Protocol.

189.    Uniswap created a Discord channel to, in part, promote its misleading claims of decentralization as to the Interface and the Protocol.  In a discussion that took place on Uniswap's Discord channel on July 20, 2021, a "Tickets" bot, which appears to be under Uniswap's control and a moderator, Crypto_Rachel, addressed a user question as to whether Uniswap planned to implement security measures preventing "scam coins."   The bot responded that it had no such plans and that "no one can prevent scammers from having their scam token traded on Uniswap":



190.    The response to the question on Discord is demonstrably false.  In fact, three days later, on July 23, 2021, Uniswap announced on Twitter that "we have started restricting access to a small number of tokens at http://app.uniswap.org."   Uniswap's tweet included a link (https://uniswap.org/blog/token-access-app) to a page where it appears to have announced that it was de-listing over 140 tokens.

191.    In another notable case, a Uniswap engineer announced on August 20, 2022, that after four months of collaborating with TRM Labs, Uniswap had blacklisted 253 crypto addresses. The engineer explained that "[i]f we offer our services (this website that interacts with the AMM protocol) to sanctioned individuals we are breaking the law and key individuals related to that could go to jail. We choose not to run the risk."

192.    Hundreds of new tokens are launched on the Protocol every day.   The overwhelming majority of these tokens are scams.  Defendants are aware of this fact.

193.    According    to    the    "live    new    pairs"    tracker    on    DEXTools, https://www.dextools.io/app/ether/pool-explorer, approximately 450 new tokens or trading pairs (or 1 - 5 per minute) were launched on the Protocol during the 24 hours leading up to the filing of this First Amended Complaint.  Many of these trading pairs have no liquidity left in them, leading DEXTools to pose the question: "rug pulled?"  Of the trading pairs that still contain liquidity, many of them have very low scores on DEXTools (based on an automatic audit analyzing certain data) and/or unverified contracts, suggesting that their code is malicious.  A large amount of these tokens are considered honeypots (*i.e.*, once purchased, they can never be sold by investors) by https://honeypot.is.

194.    Defendants are aware of the fraudulent activity perpetrated on the Protocol but choose to ignore it because those in control of Uniswap profit handsomely from such misconduct.

Uniswap is collecting millions of dollars in User Fees, and Paradigm, Andreessen, and USV have, upon information and belief, contributed millions of dollars to liquidity pools on the Protocol, allowing them to collect substantial fees on all transactions in connection with these pools. Defendants could easily implement reasonable safeguards against perpetrators of fraud acting as liquidity providers.  Their failure to do so has harmed its users, including Plaintiffs and the Class.

## VIII.   THE PROTOCOL ALLOWS ISSUERS TO SCAM INVESTORS

195.    The ease of listing new tokens on Uniswap led to the creation of thousands of digital tokens on the Protocol.  Defendants promoted, offered, and sold the Tokens on the Protocol, without registering as an exchange or a broker-dealer, and without a registration statement in effect for the securities it was selling.

196.    The assets traded on the Protocol are securities under applicable federal law because their values are derived entirely from the efforts of others, including the Issuers.

197.    Uniswap facilitated these trades, including those involving the Tokens, by providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for Uniswap having the ability to charge a fee on every transaction it made possible on its Protocol.

198.    Consequently, the Defendants and the Issuers engaged in countless unlawful transactions by soliciting, offering, and selling securities without registering the Tokens as securities and without Uniswap registering with the SEC as an exchange or broker-dealer.  Thus, Uniswap's users were not informed of the significant risks inherent in these investments, in violation of applicable law.

199.    Uniswap thus sold the following unlawful securities in the form of crypto tokens, the issuers for many of which are unknown or anonymous.

### A.   EthereumMax

#### 1.   The Rise and Fall of EMAX

200.   On or about May 14, 2021, the token known as EthereumMax or "EMAX" launched on the Protocol.

201.   The issuers of EMAX (the "EMAX Issuers") heavily promoted the token on social media platforms, including on Twitter, Instagram, Discord, Telegram, and Reddit.

202.   According to EMAX Issuers, the price of the token shot up over 500,000% in the first 24 hours.  After that meteoric rise, EMAX's official Twitter account encouraged more buying: "Am I early or late?  $eMax #NowIsTheTime."

203.   The value of EMAX peaked soon after launch at approximately $0.000001.  Over the next month, the value of the token dropped substantially, hitting an all-time low on or about July 15, 2021.  In the months that followed, EMAX has remained flat:



204.   As of today, EMAX trades at 0.00000001, down 99% from its all-time high.

## 2. The EMAX Issuers Made a Fortune to the Detriment of Investors in the Token

205.    The EMAX Issuers allocated EMAX to themselves around the time of its launch and, to the detriment of investors in the token, sold their holdings for large profits after the price of EMAX spiked, which substantially contributed to the collapse of the token.

206.    The EMAX Issuers also made millions of dollars in fees from trading of EMAX, including on the Protocol.  For several weeks, the daily trading volume of EMAX was tens of millions of dollars a day.  For several days in the last week of May 2021, the daily trading volume of EMAX was over $100 million a day, generating over $300,000 a day in fees for the EMAX Issuers.

207.    According to DEXTools ("a price tracking website" for crypto assets," which compiles transactional and other information on the Ethereum blockchain), the total trading volume for EMAX is in excess of $1,000,000,000, resulting in over $2,500,000 dollars in fees for the EMAX Issuers.

208.    In addition, the EMAX Issuers likely profited by millions of dollars by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity pool for the token.

209.    The EMAX Issuers thus enriched themselves at the expense of investors in the token.

## 3. The EMAX Marketing Campaign

210.    While the EMAX Issuers were enriching themselves, they were also engaging in a massive marketing campaign to promote EMAX and convince retail investors that the token was a good investment.

211.    The EMAX Issuers did not warn the investors of the risks of investing in EMAX. Instead, the EMAX Issuers continued to encourage investors to keep purchasing more EMAX tokens, with public statements such as: "Wow!  Still early!  Get in now!"

212.    The EMAX Issuers recruited celebrities, athletes, and influencers to market EMAX, including NBA champion Paul Pierce, boxing champion Floyd Mayweather, boxing champion Tyson Fury, and social media influencer Jake Paul.  Mayweather fought Jake Paul's brother, social media influencer Logan Paul, in a boxing match wearing an "EthereumMax" logo on his trunks.  Upon information and belief, the EMAX Issuers paid Mayweather handsomely for promoting EMAX.  The EMAX Issuers also paid Kim Kardashian West to promote EMAX, with one news outlet reporting that "roughly 1 in 5 U.S. adults heard about Kim Kardashian's promotion of 'Ethereum Max.'"

213.    The EMAX Issuers advertised the token in Times Square, with a tweet showing the advertisement referring to an investor doing "so well with the token."

214.    The EMAX Issuers promoted EMAX as the only crypto asset accepted for certain sporting events.  For example, on June 15, 2021, the official twitter account for the token tweeted "#EthereumMax will be the 1st Crypto coin ever accepted to purchase tickets for a 2nd time at a major fight! WBA Super Lightweight Championship - @gervontaa gervontaa vs. @boxer_barrios PPV event on June 26th!"

215.    The EMAX Issuers held weekly forums on Telegram where they would talk about updates and answer questions from the "eMax community."

216.    The EMAX Issuers also engaged cash giveaways and raffles whereby they would promote small businesses that accepted EMAX as payment.

217.     The EMAX Issuers would also promote the coin when it reached certain milestones. For example, in or around September 2021, EMAX boasted of its engagement on Reddit: "We just surpassed 6,000 members on Reddit!  Thank you to the EMAX community for continuing to support and believe in our project…. join our growing community!"

### 4.     The EMAX Issuers' Misrepresentations and Omissions

218.     The EMAX Issuers made multiple misrepresentations to retail investors to encourage them to either make additional investments or hold onto their current investments in EMAX, even as the price of the token continued to fall.

219.     In or around the end of May 2021, EMAX Issuers announced that the token would be added to a major exchange within days.  However, that never happened.

220.     The EMAX Issuers also announced on social media that they would be implementing certain "tokenomics" to prevent a selloff from impacting the price of the token. However, the EMAX Issuers never fully implemented these protocols.  In any event, the program was a ruse to keep investors from selling their tokens.  The EMAX Issuers knew that even if the program was properly implemented, it would not have prevented the EMAX from dropping in value.

221.     The EMAX Twitter account also touted the completion of a "Certik Security Audit" to make investors feel safe.  However, this tweet was misleading and a material omission because it did not disclose to investors the risks associated with the token.

222.     The EMAX Issuers never disclosed to investors that it collects fees on every trade of EMAX on the Protocol.

223.     The EMAX Issuers released a whitepaper (the "EMAX Whitepaper") five months after launching EMAX, in October 2021, which contained several statements that were misleading and contradicted the EMAX Issuers' prior statements.

224.    Directly contradicting prior statements on social media, the EMAX Whitepaper stated price appreciation had not been a goal of EMAX: "EthereumMax aims to create a reserve currency that is backed by crypto assets within its ecosystem which will derive value from growth in the system rather than price appreciation."

225.    Also, directly contradicting prior statements on social media, the EMAX Whitepaper stated that the EMAX Issuers sought the initial volatility: "We are looking for initial volatility to grow the size of our pool.  With the early trading in a newly formed asset, profit and upward price mobility will spur growth.  This may seem counterintuitive to what you would think one would be looking for in a currency long-term with stability, but that will come at a later stage in the lifecycle."

226.    The EMAX Whitepaper also trumpeted EMAX Issuers' marketing accomplishments with celebrities and influencers, and falsely claimed their promotions and advertisements had delivered "a reach that would make most financial advisors drool."

### 5.    EMAX Is a Security

227.    Due to the heavy promotion of EMAX, investors believed that their holdings of EMAX would increase in value as the token became more widely adopted through the development efforts of the EMAX Issuers.

228.    On May 24, 2021, the EMAX Issuers tweeted about a major announcement—"a technology upgrade to support expanded coin use and exponential growth"—with "numerous benefits for HOLDERS!"  Investors reasonably relied on the EMAX Issuers' representations that they would continue improving the software and platform to grow the token's value.

229.    Indeed, the EMAX Whitepaper laid out EMAX's plan of building "a robust and scalable ecosystem" for its investors—a common enterprise "with benefits that scale and evolve

over time."  EMAX launching the token was "the first of many steps to develop an ecosystem that will be a driving force in changing what the world considers to be currency."

230.    The expertise of the EMAX Issuers was critical in building this ecosystem by monitoring EMAX, promoting EMAX, and deploying investor funds.  EMAX claimed that EMAX was different from all other crypto assets because the "various unique specializations and skills of the founding team," in tandem with "top-level marketing and financial experts," set the "project apart from any other initiative in the space."   As the protocol and governance structure were determined before the token's launch, investors in EMAX relied on the managerial efforts of the founding team.

231.    Accordingly, EMAX is a security.

### B.  Akita Inu (AKITA)

232.    On or about February 1, 2021, the token known as Akita Inu (AKITA) launched on v2 of the Protocol.

233.    According to DEXTools, the total trading volume for AKITA on the Protocol is approximately $1,700,000,000, resulting is exorbitant fees for the issuers of AKITA (the "AKITA Issuers").

234.    AKITA is a "meme token" and after its launch, rose 566% in just 4 hours. A vast selloff then tanked the price. On February 8, the price spiked again before rapidly declining.  After the initial spike and collapses, the process seems to have repeated itself in May 2021, when Akita abruptly rose to its all-time high of $.000029 before crashing within days, to a value near its all-time low. Currently AKITA is down 99.5% from its all-time high:



235.    The AKITA Issuers are anonymous.  Prior to and after AKITA's launch, the AKITA Issuers promoted the token on various social media channels and encouraged investors to both "pump" and "hodl" (slang for "hold on for dear life").  The very first AKITA Instagram post, coinciding with the date of the token's launch, announced "[l]et's go! It's time to take the show over to Ethereum. Let the pump begin [rocket emoji]."

236.    Users who took to Telegram in the early hours of AKITA's launch to warn others of the impending rug-pull reported immediately being banned from the forums by the AKITA Issuers. On the day of the launch, an administrator (account now deleted) of the AKITA Telegram account posted "I just banned 3 people. If you're trying to spread dumb FUD to get back in at a lower price, you don't deserve to be in here sorry."

237.    "FUD" stands for "Fear, Uncertainty, Doubt", often used as a pejorative to ridicule those who display a "lack of faith" in a token's success by expressing doubt and criticism towards a token, warning other investors about potential red flags, or selling their investments in anticipation of a drop rather than "hodling".

238.    After the initial spike and collapse, on March 2021, the AKITA Issuers revived the token.  According to the marketing materials for the revived version of the token, the original

version of AKITA was created by anonymous developers (the AKITA Issuers) who also pulled the rug on the token within hours of its launch on Feb 1, 2021. This origin mythology is essentially identical to that of myriad other tokens that claim to be "community owned."

239.    The AKITA Issuers' claim that community members took over the token after the day one rug-pull is completely false given that the same social media accounts have continued to post and promote AKITA since that date. It is not believable (and likely impossible) that a random, unaffiliated community member would have gotten access to these accounts from the anonymous AKITA Issuers if the Issuers' scheme was to pump the token, pull their profits, and disappear.

240.    On March 3, 2021, "Justin (Relic)" self-professed "project lead for AKITA" posted a transcript of a conversation to the token's Telegram feed. The conversation purported to be between himself and "Shaun Lee", an employee at CoinGecko, showing Relic trying to obtain listing for AKITA. CoinGecko's listings are considered vital for tokens trying to achieve the appearance of legitimacy.

241.    According to Relic, "the original devs [issuers] want to remain anonymous, they wanted to launch a community token and so they did, they did everything they said they would do regarding token distribution. The original devs tokens are locked for 60 days. I will admit the project was basically a rug pull until i took over. I spoke with the original devs and they are willing to give me access to the repository. In the last 72 hours i have put together a roadmap and a rag tag team from the community to actually make a fundamental use case out of this."

242.    Like many other dog-themed meme tokens, including several discussed herein, the AKITA Issuers transferred half of all existing AKITA tokens to the wallet of Ethereum founder Vitalik Buterin. This trend was a widespread publicity stunt among meme tokens, using Buterin as a sort of "burn wallet" to remove tokens from circulation in order to decrease supply and

increase demand.  The stunt banked on the assumption that Buterin would not liquidate the tokens. Buterin expressed his displeasure at the trend and warned token issuers to stop sending him unsolicited tokens.

243.     On May 12, 2021, Buterin dumped around $80 million in "dog tokens", including 49 trillion AKITA, in a spectacular rug-pull that tanked most of the tokens' value within hours. Buterin donated the proceeds directly (without liquidation) to Gitcoin Grants Multisig, an organization dedicated to funding "digital public goods".

244.     Investors had an expectation of profit resulting directly from AKITA Issuers' claims and promises.  On April 26, 2021, AKITA posted its first Instagram update since the launch/rug-pull on February 1, 2021.  The post consisted of a reposted TikTok video showing animated candle charts and rockets, with the words "AKITA IS THE NEXT DOGE COIN !!! WE'RE GOING TO $5000 AND UP! [Line of rocket emojis to signify the price rocketing to the moon]" AKITA's account added the caption "Always thankful for this growing community! Great Tiktok !! [line of space-themed emojis] To the Moon and Beyond!!"

245.     On August 2, 2021, AKITA's Instagram account posted a graphic showing the token's #1 ranking on an app called Lunar Crush, captioned "Very proud to see this. Our team continues to work hard for the community!"

246.     Investors profits were to be derived from the efforts of the AKITA Issuers.  On April 20, 2022, the AKITA twitter account posted "we will be receiving funding streamed to us for the next 5 years. we are building out a new team and a new brand. we will be structuring our approach differently. time to build the future".  On May 12, 2022, the AKITA twitter account posted "if any of you have listened to any Warren Buffett (and i recommend you do).  You know

that you invest in the future of a companies success not only by its numbers but by the companies ability to solve problems."

247.   The AKITA Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the AKITA Issuers created hype among retail investors before engaging in a rug pull scheme that destroyed the value of the token.

248.   Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the AKITA Issuers and AKITA marketing and development team, and AKITA's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the AKITA Issuers.

249.   Accordingly, AKITA is a security.

## C.  Olympus DAO (OHM)

250.   On or about July 19, 2021, the token known as Olympus DAO or "OHM" launched on v3 of the Protocol.

251.   According to DEXTools, the total trading volume for OHM on the Protocol is approximately $1,000,000,000, resulting is exorbitant fees for the issuers of OHM (the "OHM Issuers").

252.   OHM reached an all-time high of approximately $1,632 on or about October 12, 2021, and then dropped to an all-time low of $34.90 on September 19, 2022. OHM is currently down 98% from its all-time high:



253.    The OHM Issuers market OHM as an algorithmic currency protocol (the "DAO Protocol") with the goal of becoming a stable crypto-native currency.  However, unlike more typical stablecoins, Olympus is not pegged to a certain reference asset, such as the U.S. Dollar. Rather, it is backed by assets in the OHM treasury (a "basket of assets", according to OHM's website), with $1 worth of assets corresponding to 1 OHM.  The OHM Issuers failed to meaningful explain this key difference

254.    The OHM Issuers maintain that OHM is run by a decentralized community via smart contracts.  The creators of OHM and the DAO Protocol have never been revealed.

255.    The OHM Issuers promised generous staking rewards through the DAO Protocol to encourage investors to hold OHM, in the hope that this will increase the market price of the token.

256.    OHM is considered a staking token. Staking in crypto finance is similar to certificates of deposit ("CD") or bonds where an investor puts up collateral, or deposits assets with a bank that are locked away for a certain period of time.  In DeFi, digital securities are used as assets or collateral.  Usually, investors have a choice of how long they would like to stake their token.  When an investor stakes her tokens through a DeFi platform, the investor receives yield or interest.  Like a CD, these rates vary based on how long an investor stakes.

257.     The OHM Issuers encouraged investors to stake their OHM tokens through the DAO Protocol, all so that the OHM Issuers could pump the price of the token and then sell off their own tokens in order to profit handsomely.  The OHM Issuers released two different versions of OHM, and after both launches, they pumped the price through their staking scheme, leading to a massive selloffs and losses to investors.

258.     The OHM Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made, or the risks associated with staking on the DAO Protocol.  Instead, the OHM Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

259.     Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the OHM Issuers and OHM's marketing and development team, and OHM's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the OHM Issuers.

260.     Accordingly, OHM is a security.

### D.  Wise Token (WISE)

261.     On or about December 31, 2020, the token known as the Wise Token or "WISE" launched on v2 of the Protocol.

262.     According to DEXTools, the total trading volume for WISE on the Protocol is approximately $500,000,000, resulting is exorbitant fees for the issuers of WISE (the "WISE Issuers").

263.     At the time of launch, WISE was trading at $0.085. WISE rapidly accelerated in price, in less than a month after launch, rising to approximately $0.83 or 10 times its initial price.

264.     During this period, WISE was closing in on $1.00.  By the end of January 2021,

WISE quickly dropped in price, ending the month at approximately $0.46. Over the next year, the

price of WISE was volatile.  In December 2021, the price started to freefall.  WISE is currently

down more than 80% of its all-time value:



265.     The WISE Issuers promoted a 50-day ICO.  The WISE Issuers set up a wallet where

potential investors would send Ether in exchange for Wise.  All the Ethereum sent by investors

was used to fund one of the largest liquidity pools on v2 of the protocol, the WISE token.  The

WISE Issuers began flooding social media with marketing of the ICO for WISE.  Pete Girr, one

of the WISE Issuers posted a video on YouTube coaxing potential investors to participate in the

presale considering that investors would get a preferred price on WISE.

266.     WISE is considered a staking token.  Once an investor creates a WISE stake, the

investor's WISE tokens are converted into separate shares.  According to the WISE Issuers'

muddled whitepaper, "[t]he share price starts at some predetermined value denominated in WISE

per share."  The whitepapers further provides that "[t]he amount of shares a newly opened stake

gets is determined by a global 'share price' tracked in the WISE contract, as well as a percentage

bonus based on the length of the stake.  This share price only increases, hence staking earlier is

better than later." These statements are misleading, confusing and lack clarity in describing the

price determination of shares.  These statements are an obvious effort to confuse and misguide investors to make a swift decision on staking WISE.

267.    If an investor withdraws their investment at any time during the period for her stake, she will incur 90% penalty on their total investment.  No traditional bank in the US penalizes an individual who closes a CD before its maturity more than the interest rate promised for the life of the term.  However, unlike many other ERC-20 tokens, the WISE Issuers marketed WISE as ethical because it offered locked liquidity, meaning the issuers could not readily drain the token of its value or otherwise engage in a rug pull.  However, this turned out to be untrue. The prospect of locked liquidity was a major reason investors flocked to WISE and were willing to stake their tokens notwithstanding the high penalty for early withdrawal.

268.    The Wise Issuers also falsely stated on social media that the price of WISE would track the price of ETH, but with rewards through staking.  The WISE Issuers told investors they should not worry – if ETH goes up, WISE will follow suit.  Many investors relied on this statement to invest as a major reason they invested in WISE.  However, this statement was false.  Indeed, the price of ETH rose and WISE crumbled.

269.    The WISE Issuers also made statements about staking that were false and/or misleading to inexperienced investors, especially those who did not fully understanding the risks of staking, including that "WISE is most similar to a bond, in that it earns relatively high interest, but allows users to withdraw it whenever they want."

270.    Defendant Hayden Adams had direct involvement with the creation of WISE. According to Section 5 of the WISE whitepaper, Adams's was an "instrumental" influence on how to integrate WISE with the Uniswap Exchange.  Upon information and belief, the WISE Issuers compensated Adams for his assistance with the project and Adams and the WISE Issuers took

portions of the burdensome 90% fee that investors unfortunately were forced to pay when withdrawing staked WISE tokens.

271.    The WISE Issuers recommend insurance staking that they offered to reduce the penalty on investors if they chose to withdraw their stake early and the issuers did not offer this option until approximately a month after the launch of WISE, to the detriment to early investors who were not presented with this option.  The cost of the insurance was 10% of the total staked investment, which was to be paid up front when the investor staked her WISE token.  By offering insurance staking to investors, the WISE Issuers took advantage of investors and further guaranteed they would profit from their scheme no matter which option investors chose.

272.    The WISE Issuers also drove up demand for the WISE token since they were taking 10% of the raised liquidity from the public that they raised prior to launching the token.  As a result of the presale, the WISE Issuers pocketed an additional 2,000 Ethereum as payment for creating WISE, which, at the time, was worth more than $2.5 million.

273.    The WISE Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made and the calculation of penalties for withdrawing staked tokens.

274.    As a direct result, the WISE Issuers' managerial and entrepreneurial efforts had a direct impact on the success, or lack thereof, of WISE.  The WISE Issuers used vehicles such as social media, roadmaps, and their written whitepaper to fraudulently influence the public to invest in WISE.  Consequently, dwindling efforts by the Issuers culminated in the collapse of WISE.

275.    Accordingly, WISE is a security.

**E.    Samsung Metaverse ("SAM")**

276.    In or around January 2021, the token known as Samsung Metaverse or "SAM" launched on v2 of the Protocol.

277.    According to DEXTools, the total trading volume for SAM on the Protocol is approximately $9,000,000, resulting is exorbitant fees for the issuers of SAM (the "SAM Issuers"):



278.    The SAM Issuers created a scam known as a "honey pot". The fraudulent SAM Issuers deployed SAM on the protocol but turned off the sell function of the token contract, with the exception of wallets under the control of the SAM Issuers, which had no restrictions on buying or selling SAM.   The SAM Issuers also used their wallets to create fictitious volume, common technique used in honey pot scams to convince potential investors into believing that the trading volume of SAM was organic or legitimate.   SAM investors believed after purchasing the token that their investment was ballooning in value only to find out later, they could not sell their SAM. As a result, SAM Issuers walked away with millions of dollars from their scam.

279.    Once SAM victims became aware of the SAM Issuers actions, they took to social media to warn other possible investors about the fraud occurring on the Protocol. Additionally, some of the wronged SAM investors contacted Uniswap directly through Twitter or via email. Uniswap completely ignored users' pleas to halt trading of SAM on the Protocol.

280.     Plaintiff Dean Meyers ("Meyers") who was financially harmed by the SAM Honey Pot emailed security@uniswap.com multiple times. Meyers reached out in hopes that Uniswap would remove SAM from Uniswap's active token list, which Uniswap indisputably has the ability to do.  Uniswap completely ignored Meyers's emails and did not respond at all.

281.     In an attempt to get Uniswap to respond to him, Mr. Meyers applied for a job on Uniswap's website and when corresponding about the application, he described the fraud being perpetrated by the SAM Issuers.  Uniswap continued to ignore Mr. Meyers's pleas for help and it responded as follows:

> Thank you for your interest in joining the Uniswap Labs team. After closely reviewing your application, we have decided to move forward with other candidates based on our current needs for the Software Engineer role. We'd love to keep in touch in case there are other future opportunities that may be a better fit for your background and qualifications.

282.     As of today, SAM tokens are still being traded on Uniswap

283.     The SAM Issuers marketed the SAM token on the internet, as well as on social media.  The SAM Issuers used copycat tactics to pose as a large company with which the SAM token shares a name.  SAM was one of the largest copycat tokens listed on the Protocol.  When investors became aware of the fraud, SAM Issuers removed all marketing content.

284.     Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the SAM Issuers and SAM's marketing and development team, and SAM's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the SAM Issuers.

285.     Accordingly, SAM is a security.

F.      **LUKSO (LYXe)**

286.    On or about June 2020, the token known as LUKSO or "LYXe" launched on v2 of the Protocol.

287.    According to DEXTools, the total trading volume for LUKSO on the Protocol is approximately $772,000,000, resulting is exorbitant fees for the issuers of LUKSO (the "LUKSO Issuers").

288.    LUKSO reached an all-time high of $41.18 on November 04, 2021.  LUKSO currently trades approximately 90% below the all-time high:



289.    The cryptoasset power-couple at the center of LUKSO are Marjorie Hernandez de Vogelsteller and Fabian Vogelsteller.  Fabian Vogelsteller is the co-creator (alongside Ethereum founder Vitalik Buterin) of the ERC-20 standard.

290.    The LUKSO whitepaper is a ponderous 146-page treatise on the "three key virtues of Identification, Virtualization, and Tokenization."  From the whitepaper: "Tokens are cultural currencies – they attach measurable and transferable value to all socio-creative activity and align economic incentives."  In short, the LUKSO Issuers' rhetoric about "creative communities", "consumer empowerment", and "lifestyle economies" boils down to the total digital commodification (or tokenization) of everything from physical consumer products to corporations

to personal identities. From the whitepaper: "LUKSO now allows influencers to tokenize themselves. This allows them to engage directly and on a monetary basis with their followers."

291.     The LUKSO Issuers roadmap included a LUKSO Blockchain network ("the L16 Mainnet").  On March 29, 2021, LUKSO's twitter account posted "Mainnet coming soon. Stay tuned :)"

292.     As of September 2022, the L16 Mainnet has yet to launch.

293.     On August 11, 2021 the LUKSO twitter account posted "Sneak peek of the Digital Wallet by LUKSO Once you create your Universal Profile on LUKSO, you will be able to access and manage your Digital Collectibles acquired across all the applications on our network - this is what it will look like. Launch in 2021. Stay tuned!"

294.     As of September 2022, the Digital Wallet by LUKSO has yet to launch.

295.     On or around September 26, 2020, the Kucoin exchange was supposedly hacked and around $280 million in crypto assets was stolen from investors, including 622,688 LUKSO, which at the time was worth $460,000 and represented 12% of the circulating supply of LUKSO. The supposed hack resulted in a 30% loss to LUKSO's value.  It is unclear if the "hack" was an insider job and whether any of LUKSO's development team where part of the scheme.

296.     Vast amounts of the stolen coins were dumped by the perpetrators into Uniswap, where they were exchanged for ETH.  By September 30, 2020, nearly $10 million in stolen coins from the hack had been laundered on Uniswap.

297.     In a tweet, LUKSO, stated that it had no way to remove the stolen funds from the hackers' accounts, but stated "[we] encourage to stop the trading of LYXe, especially on DEXes like @UniswapProtocol to not allow the hacker to sell the tokens in the coming days."

Notwithstanding that Uniswap was informed of the fraudulent scheme through Twitter, it did not halt trading of LUKSO.

298.   LUKSO Issuer and ERC-20 founder Fabian Vogelsteller has said on Twitter "Any investment market has good and bad apples [apple emojis] would say 10% of those ICO projects still exist today and have grown in value and function to society by a lot."  On May 20, 2020, the LUKSO twitter account announced the LUKSO token's launch on Kucoin, posting "[t]his will be your only chance to get LYXe at pre-sale price!"

299.   Investors were led to expect profits not only from the performance of their investment in LUKSO but from LUKSO Issuers' efforts to affect the universal adoption of tokenization as a lifestyle and vehicle for building wealth, as well as their considerable visibility and influence as celebrity founders within the crypto space.

300.   The LUKSO "litepaper' and whitepaper contain various statements about  the $LYXe Issuers' efforts to boost the value of LUKSO, including statements such as "[t]he team behind LUKSO has built a large network and advisory board consisting of Brands and Industry leaders.".

301.   The LUKSO Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the LUKSO Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

302.   Accordingly, LUKSO is a security.

### G.  Bezoge Earth (BEZOGE)

303.   On or about May 18, 2021, the token known as Bezoge Earth or "BEZOGE" launched on the Protocol.

304.    BEZOGE was yet another group that jumped on the growing wave of crypto asset awareness to promote their scheme.  Shortly after Tesla CEO Elon Musk appeared on Saturday Night Live and did skits and shorts about Dogecoin, BEZOGE tweeted: "check out @bezoge, the only currency to help rescue doge abandoned by @elonmusk on the moon"; and "Elon dumped Doge on the moon.  Now the worlds wealthy are after the crown.  You have yet to see BEZOGE."

305.    The issuers of BEZOGE (the "BEZOGE Issuers") released a whitepaper (the "BEZOGE Whitepaper") focused not only on memes and marketing, but also on the "community based ecosystem" it was building that was "backed by a strong development team," which included "solidity (smart contract developers), web3, frontend and backend developers…, along with C-level executives, business leaders and experts in various fields."

306.    The "Foundations of Community Wealth and Distribution" section summarized the "tokenomics" of BEZOGE: "50% of the supply has been burnt forever;" "44% of the supply has been put into liquidity;" "3% of token supply for development team;" "3% of supply allocated to the Bezoge Treasury;" "1% Burn!;" and "1% Redistribution."  These percentages aimed to assure retail investors, who know little about crypto assets, that the project was legitimate.

307.    Investors of BEZOGE believed that their holders would increase in value as the token became more widely adopted through the development efforts of the BEZOGE Issuers.

308.    The BEZOGE Whitepaper was silent as to the regulatory nature of BEZOGE. Instead, in a section it titled "The boring legal stuff," the whitepaper made numerous misrepresentations, including that the "[t]he document does not constitute an offer or solicitation to sell shares or securities" and even attempted to unconscionably disclaim all liability for any of its misrepresentations.

309.    Immediately after its launch, BEZOGE rose to $0.0000000015 per token or at least 10 times its initial value.  Then, within the next three weeks, the token crashed downed to $0.00000000013 per token, a drop in value of 97%.  The price of BEZOGE hovered at the new low for several months, until October 2021.  In order to create another pump of the token, the BEZOGE Issuers made additional attempts to rope in more investors.  In October 2021, the BEZOGE Issuers announced that star NFL wide receiver Antonio Brown would be promoting BEZOGE.  The BEZOGE Issuers also promoted BEZOGE's integration with a low budget video game they were developing called Legends of Bezogia.  As a result of these efforts, the token rose sharply again to its all-time high of $0.0000000167 (nearly 100 times its then value) through October and November 2021, but once again, the Token crashed, causing massive losses to investors:



310.    According to DEXTools, the total trading volume for BEZOGE on the Protocol is in excess of $300,000,000, resulting in exorbitant fees for the BEZOGE Issuers alone.

311.    In addition, the BEZOGE Issuers likely profited by millions of dollars by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity pool for the token.

312.    The BEZOGE Issuers thus enriched themselves at the expense of investors in the token.

313.    Accordingly, BEZOGE is a security.

### H.  Matrix Samurai (MXS)

#### 1.    MXS Was a Scam Perpetrated in a Single Day

314.    On or about June 12, 2021, the token known as Matrix Samurai or "MXS" launched on the Protocol.

315.    In the weeks leading up to the launch of MXS, the issuers of MXS (the "MXS Issuers") heavily promoted their token on social media platforms, including Twitter, Discord and Reddit.  In particular, the MXS Issuers promoted how secure MXS would be and emphasized that "Matrix Samurai takes security seriously."

316.    The MXS Issuers released a whitepaper (the "MXS Whitepaper") in advance of the launch of MXS.  The MXS Whitepaper was full of misrepresentations and omissions.

317.    According to the MXS Whitepaper, "Matrix Samurai is not a memecoin, a shitcoin, or another version of the same flashy, hyped-up coin which inevitably crashes after its first pump." The Whitepaper described the MXS Issuers as "an elite group of marketers within the cryptosphere."  The MXS Whitepaper stated that the "fundamentals make Matrix Samurai safe, secure, and lucrative."  It also touted the integrity and security of the project, stating that the issuers were "focused on building a safe and ethical token which holders can feel confident investing in." None of these statements were true.  The MXS Issuers took to social media and made various statements echoing what they had written in the MXS Whitepaper.

318.    The Whitepaper also touted the "6% tax every transaction" as a form of redistribution and a reward to investors that held onto their investment.  At the same time, the MXS Issuers downplayed how they allocated 15% of the total supply of MXS to themselves and failed to explain to investors what that meant.  The MXS Issuers also did not disclose to investors the risks associated with the token.

319.    During a discussion on Discord on or about June 10, 2021, to encourage investments in MXS, the MXS Issuers made "three huge changes" to the "tokenomics" of MXS based on "community concerns."  Specifically, the MXS Issuers announced (i) the use of "anti bot software" to "blacklist" and prevent certain investors from using bots or automated software to manipulate prices, (ii) that the starting price would be much lower than originally planned, purportedly to give investors "more of a multiplier" and to reward early investors, and (iii) a "burn" of 350 million tokens of the supply of MXS to "help the coin grow bigger" and so that "early investors are going to see your investment pay off."

320.    On June 10, 2021, the MXS Issuers announced on Discord that "#SamuraiLegion is ready to conquer the cryptomarket and rewrite history."  They also stated the launch price of MXS would be $0.0002.

321.    As a result of the MXS Issuers' marketing efforts, there was an incredible amount of interest in MXS.

322.    Investors in MXS believed that their holdings would increase in value as the token became more widely adopted through the development efforts of the MXS Issuers.

323.    When the MXS Issuers launched MXS on v2 of the Protocol on or about June 12, 2021, the price of MXS shot up sharply immediately.  The demand for MXS was so high that many

investors were only able to execute their trades after several tries.  Many investors purchased MXS at or near the high.  Approximately 8,000 people invested in MXS.

324.    MXS turned out to be a fraudulent token.  Within hours of launch, the price of MXS dropped precipitously.  Reports of a fraud were circling on social media.  As a result, many investors attempted to sell their MXS tokens.  Some investors were able to sell their MXS holdings for far less than they paid for them, while other investors were unable to execute their trades and thus lost their entire investment in addition to paying gas and mining fees.

325.    Eventually, all the liquidity in the pool was removed, except for a portion that was locked pursuant to the smart contract for MSX, leaving investors, who were unable to sell their MXS, with worthless tokens.

326.    All told, according to DEXTools, the total volume for MXS on the Protocol was approximately $55,000,000.  Accordingly, investors in MXS were scammed out of – millions of dollars in a matter of hours.

327.    Hour after the launch of MXS, on the day on June 12, 2021, one of the MXS Issuers, who goes by the handle JoeyCrypto on Discord, claimed the smart contract for MXS was "hacked" by a "nefarious agent" who exploited an error in the code.  JoeyCrypto also stated "[o]ur engineer missed it."  On June 13, 2021, JoeyCrypto posted another message on Discord, in which he stated, "yes it was direct incompetence from us with the code."  JoeyCrypto's identity is unknown.

328.    One or more of the MXS Issuers were directly involved in the fraud.  After the MXS fraud, several of the MXS Issuer's social media accounts were deleted or closed.  Certain individuals who were part of the MXS development team refused to disclose the identities of any MXS Issuers or provide additional information regarding the fraud.  When aggrieved investors

asked for additional information on Telegram or Discord chat rooms, the MXS Issuers would ban them without explanation.

329.    MXS Issuers' repeated representations that MXS was a "serious project," was "secure" and would not turn into a "pump and dump scheme, letting their owners cash out millions of dollars within minutes at the expense of everyone else," all turned out to be false.  The MXS Issuers' fraud, misrepresentations, material omissions, recklessness and/or gross negligence directly caused losses for investors in MXS.

### 2.    MXS Is a Security

330.    The MXS Whitepaper described the MXS Issuers as having "experience in marketing, developing, content, NFT minting, social media management, writing, influencing, and more."  It assured investors the MXS Issuers would be dedicated to the project for the long term: "The Matrix Samurai are here to stay, and we have some compelling reasons for holders to stay, too."

331.    Based on the MXS Issuers' statements to investors on social media and in the MXS Whitepaper, their clear goal was to generate profits for investors from their development and marketing of MXS.  The MXS Issuers stated that they wanted to "Build[ ] a Billion Dollar Market Cap," "bring financial freedom to all [investors]" and "add to [the] liquidity pool automatically with the profits made from MXS campaigns."

332.    Investors thus purchased MXS with an expectation of profits, and that those profits would come from the efforts of others and the common enterprise.

333.    Accordingly, MXS is a security.

### I.    Alphawolf Finance (AWF)

334.    On or about May 24, 2021, the token known as Alphawolf Finance or "AWF" launched on v2 of the Protocol.

335.    Prior to and around the time of AWF's launch, the issuers of AWF (the "AWF Issuers") promoted AWF on social media, including Reddit, calling the token "a community driven project."  The AWF Issuers claimed to have "NFTs under development" and "entertainment and finance utilities in the works."   The AWF Issuers also held voice chats on Discord to raise awareness of AWF.

336.    Within days of its launch, the price of AWF skyrocketed from $0.00000006567 to $0.00000042 per token, several times its original value.

337.    According CoinGecko, the total trading volume for AWF on the Protocol is over $44,000,000, resulting is hundreds of thousands of dollars in fees for the AWF Issuers.

338.    On or about August 28, 2021, the AWF Issuers pulled all the liquidity out of the token.  The AWF Issuers gave less than 24 hours' notice of the forthcoming "rug pull," leaving very little time for investors to sell their holdings and get out.  Thus, many investors in the AWF did not learn about the token's collapse until they had already lost their entire investment.

339.    On the last day of trading, AWF's price was approximately $0.0000000018 per token, down 97% from its all-time high:



340.     As a result of the collection of fees, pumping and dumping and pulling their Liquidity Tokens out of the liquidity pool, the AWF Issuers likely profited by millions of dollars at the expense of investors in the token.

341.     The AWF Issuers represented to investors that one of the main goals of the project was to generate profits for investors.  Even the whitepaper for AWF described the "entertainment and finance utilities in the works."  Thus, investors who purchased AWF reasonably expected to make a profit from their investment.

342.     Investors' profits were to be derived from the managerial and entrepreneurial efforts of others—the AWF Issuers and the AWF marketing and development team.

343.     Investors in AWF believed that their holdings would increase in value as the token became more widely adopted through the development efforts of the AWF Issuers.

344.     Accordingly, AWF is a security.

**J.  Rocket Bunny (BUNNY)**

345.     In or around January or February 2021, the token known as Rocket Bunny or "BUNNY" launched on v2 of the Protocol.  Shortly after launching, the issuers of BUNNY (the "BUNNY Issuers") tweeted "Rocket Bunny is now live on Uniswap," along with a picture of a bunny riding a rocket, presumably to the moon.

346.     The BUNNY Issuers promoted BUNNY heavily prior to and after launching the token.  For example, Rocket Bunny established and maintained a Reddit subreddit with 2,500 members.  The BUNNY Issuers also released a two page whitepaper (the "BUNNY Whitepaper"). Many of the statements the BUNNY Issuers made on social media and in the BUNNY Whitepaper were untrue and misleading.

347.     The BUNNY Whitepaper was full of buzzwords seeking to entice amateur investors: "frictionless yield," "most sought after tokenomics across DeFi," "automatic liquidity

adds," "compounding yield," "deflationary supply," "liquidity provider rewards," "no staking," "price shock protection," "rewards directly into your wallet," "2x rewards for LP," "automatic & locked liquidity adds," and "whale dump protection."   Recognizing the space in which it was operating, the following statement was included at the top of the BUNNY Whitepaper: "No presales - No airdrops - No team tokens - No rugs - 100% Fair launch."

348.   Investors in BUNNY believed that their holdings would increase in value as the token became more widely adopted through the development efforts of the BUNNY Issuers.

349.   The BUNNY Issuers never disclosed to investors that they collect fees for every trade of BUNNY on the Protocol.  The BUNNY Issuers did not disclose to investors the risks associated with BUNNY.

350.   The price of BUNNY at launch was approximately $0.00000000002.  Within weeks of its launch, the price of BUNNY skyrocketed over 500 times its original value.

351.   Upon information and belief, the BUNNY Issuers also allocated BUNNY to themselves around the time of its launch and, to the detriment of investors in the token, and sold their holdings for large profits after the price of BUNNY spiked, which substantially contributed to the collapse of the token.

352.   The BUNNY Issuers thus enriched themselves at the expense of investors in the token.

353.   According to CoinGecko, the total trading volume for BUNNY on the Protocol is over $80,000,000, resulting in hundreds of thousands of dollars in fees for the BUNNY Issuers.

354.   In or around October 2021, the BUNNY Issuers, without warning, pulled the liquidity out of BUNNY, thereby enriching themselves at the expense of investors.  After this rug pull, the Bunny Issuers re-lunched BUNNY with a new smart contract.  After complaints from

investors, the BUNNY Issuers said they would allow investors in BUNNY's smart contract to trade in their tokens for tokens under the new smart contract.  However, the Bunny Issuers gave a very tight deadline for investors to make the trade and investors had to pay mining and gas fees, upwards of $200 or more to swap the tokens, regardless of the amount of the trade.  As a result, most investors in BUNNY did not trade their holdings and lost their entire investment.

355.    On the last day of trading, BUNNY's price was approximately $0.000000000002 per token, down 99% from its all-time high:



356.    In addition, the BUNNY Issuers likely profited by millions of dollars by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity pool for the token.

357.    The BUNNY Issuers explicitly represented to investors that they would profit from holding this investment: "the Rocket Bunny supply will become more scarce, your holdings will continue to increase, particularly if you are a liquidity provider earning 2x rewards, and the price floor for Rocket Bunny will continue to rise."  In addition, the BUNNY Issuers stated that "[j]ust for holding $BUNNY, you will earn passive income that is deposited directly into your wallet!"

Thus, investors who purchased BUNNY reasonably expected to make a profit from their investment.

358.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others—the BUNNY Issuers and the BUNNY marketing and development team. Investors in BUNNY relied on these efforts in making their investments.

359.    Accordingly, BUNNY is a security.

### K.   BoomBaby.io (BOOMB)

360.    On or about June 11, 2021, the token known as BoomBaby.io or "BOOMB" launched on v2 of the Protocol.

361.    Following the launch, the price of BOOMB shot up over 500 times its original value from $0.00000000014 to $0.00000009 per token.

362.    As of today, BOOMB trades at 0.0000000003 per token, down 99% from its all-time high:



363.     According to DEXTools, the total trading volume for BOOMB on the Protocol is over $33,000,000, resulting in tens of thousands of dollars in fees for the BOOMB Issuers.

364.     In addition, the BOOMB Issuers likely profited handsomely by pumping the price of the token and selling their holdings and/or pulling their Liquidity Tokens out of the liquidity pool for the token.

365.     The BOOMB Issuers thus enriched themselves at the expense of investors in the token.

366.     The BoomBaby.io whitepaper stated that BOOMB is "a community-driven token which aims to be a community for new investors and long-term holders." Its "Apps to come" page plotted out future developments and listed a number of community-facing applications to be deployed shortly in support of the token and the community: "BOOMB Wiki," "BOOMB Forums," "BOOMB Charts," and "BOOMB Auction." Investors expected profits to come from the BoomBaby.io team's development of these applications.

367.     The BoomBaby.io whitepaper also emphasized the continuing nature of the token project, evidencing a common enterprise: "long term holders" being a family, the project locking liquidity "for 100 years," and developers supporting the project "on a long-term basis."

368.     Investors in BoomBaby.io believed their holdings would increase in value as the token became more widely adopted through the development efforts of the BOOMB Issuers.

369.     Accordingly, the BOOMB token is a security.

## L.  Saitama Token (SAITAMA)

370.     On or about May 31, 2021, the token known as Saitama Token or "SAITAMA" launched on v2 of the Protocol.

371.    According to DEXTools, the total trading volume for SAITAMA on the Protocol is approximately $3,400,000,000, resulting is exorbitant fees for the issuers of SAITAMA (the "SAITAMA Issuers").

372.    SAITAMA reached an all-time high of $0.0000001472 on or about November 12, 2021, when its estimated market capitalization reached more than $7.5 billion. SAITAMA's current value is approximately $0.00000000007197, which is over 99.9% a drop from its all-time high:



373.    Prior to and around the time of SAITAMA's launch, the issuers of SAITAMA Issuers promoted the token on social media, with posts and communities on platforms such as Twitter as well as the SAITAMA website.  Company materials boasted that the SAITAMA "[g]rew out of collective social media outlets to 600K+ followers."

374. According to the SAITAMA whitepaper, SAITAMA began with a total maximum supply of 100 billion tokens. One of SAITAMA's most distinguishing features is its manual "hyperburn" event, each of which have contributed over time to a total burn of 55% of all tokens, leaving only 45% of all tokens in circulation. One percent (1%) of all transactions are also burned, while an additional 1% of all transactions are redistributed to holders of the token.

375. These SAITAMA Issuers designed these burn features to systematically decrease the supply of tokens in circulation, thereby applying upward pressure on the value of the tokens. The manual "hyperburns" are efforts of the SAITAMA Issuers to manipulate the price whenever they decide it is in their interest.  The resulting increases in token value, combined with the 1% redistribution of transactions, give investors incentive to purchase and maintain their holdings, which are then expected to generate passive income.

376. The SAITAMA Issuers also promoted educating "millennials and Gen Z" on financial stability.  SAITAMA Issuers stated that they teach them "how to create wealth to suit financial well-being and economic status."  To this end, the SAITAMA Issuers created and published at least 50 videos on YouTube, and these videos combine "education" with self-promotion and encouragement to invest in SAITAMA tokens.

377. The SAITAMA whitepaper highlights the belief that the success of the SAITAMA token is inextricably tied to the efforts of the SAITAMA Issuers.  According to the whitepaper, "[l]ed by a team of professionals with solid backgrounds in different areas, Saitama has grown into a multi-market, global business taking its token to an estimated market capitalization of over 7.5 Billion USD in November 2021…."

378. The SAITAMA Issuers throughout the life of the project fed investors encouragement to invest disguised as "education," and talk of "community" and "charity" to

make investors feel good about buying and holding tokens. The "tokenomics" published by SAITAMA are designed to give investors a false notion of guaranteed profit by investing in SAITAMA. The SAITAMA Issuers' main goal was to try to create hype and excitement, which the Issuers knew would attract individuals to invest.

379. Ultimately, SAITAMA was a pump and dump scheme, where the SAITAMA Issuers misled and made knowing false statements likely profited to tune of millions of dollars at the expense of investors in the token.

380. The SAITAMA Issuers claim to be fully transparent about their company and personnel, but these statements are false. The SAITAMA Issuers do not publish the company's legal status or registration information. The SAITAMA Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made. Instead, the SAITAMA Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

381. Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including SAITAMA Issuers promoting SAITAMA on various social media platforms, including Twitter, Facebook, Telegram, Instagram, Discord, YouTube, Reddit, and TikTok, and by pretending to educate investors on the supposed benefits of SAITAMA and encouraging investment in the token.

382. Accordingly, SAITAMA is a security.

### M. Dogelon Mars (ELON)

383. On or about April 22, 2021, the token known as Dogelon Mars or "ELON" launched on v2 of the Protocol.

384.    According to DEXTools, the total trading volume for ELON on the Protocol is approximately $3,200,000,000, resulting is exorbitant fees for the issuers of ELON (the "ELON Issuers").

385.    After strong initial gains, the value of the token plummeted:



386.    The ELON Issuer capitalized on a hype directed toward retail investors via social media and their website, promoting their token with the reputation of Elon Musk.   Initial advertisements stated: "I am Dogelon.  Dogelon Mars.  Join me and together we will reach the stars."

387.    At launch, 50% of the token supply was transferred to a Vitalik Buterin, the founder of Ethereum, the other 50% of the token supply was locked permanently in the Uniswap liquidity pool.  The developers of the token were not publicized.

388.    The ELON Issuers never provided any meaningful disclosures about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the ELON Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

389.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the ELON Issuers and ELON's marketing and development team, and

ELON's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the ELON Issuers.

390.    Accordingly, ELON is a security.

### N.  Kishu Inu (KISHU)

391.    On or about April 17, 2021, the token known as Kishu Inu launched on v2 of the Protocol.

392.    According to DEXTools, the total trading volume for Kishu Inu on the Protocol is approximately $1,856,000,000, resulting is exorbitant fees for the issuers of Kishu Inu (the "Kishu Inu Issuers").

393.    Kishu Inu reached its peak on May 14, 2021 when the token's price rose to $0.0000000189, which was an increase of almost 10,000 times Kishu's opening price. Shortly after reaching its all-time high, the price plummeted. It is currently down 99%:



394.    The total trading volume of Kishu Inu was over $1.85 billion, resulting in millions of dollars in fees for the Kishu Inu Issuers.

395.    According to the Kishu Inu whitepaper, the token is completely decentralized and ownerless. This statement is false. The wallet that deployed the smart contract for Kishu Inu has

not renounced ownership.  As a result, the Kishu Inu Issuers can alter smart contract at any time, meaning they are still in control of the token.

396.    The issuers also falsely stated that Kishu Inu was a "utility token" in the form of Kishu Crate, Kishu sWAG and Kishu Swap.  The issuers made these statements to persuade investors into believing that the token would increase in value and generate profits for them. However, most of these so-called utilities are severely limited or completely unusable to the holders of Kishu Inu.  Kishu swap is a DEX, which is just an extension of Uniswap.  It added a layer to the interface of the Protocol.  Kishu Crate is described as an NFT marketplace where a user can stake Kishu tokens to receive, "exclusive NFT rewards" but it never materialized.  Kishu sWAG is considered to be an online store where official merchandise of Kishu Inu is sold.  To date, this store does not exist.

397.    The issuers made misstatements about decentralization in the Kishu Inu whitepaper to induce inexperienced retail investors to invest in the token to inflate the price.

398.    Kishu Inu turned out to be both a pump and dump scheme and rug pull, which allowed the Kishu Inu Issuers to enrich themselves at the expense of the investors in the token. The Kishu Inu Issuers profited handsomely by pumping the price of the token, selling their holdings and pulling their Liquidity Tokens out of the liquidity pool for the token.

399.    According to EtherScan, moments just after the creation of the Kishu Inu and prior to launching the token, the deployer of the Kishu Smart contract issued 100 quadrillion tokens, pairing approximately 86 quadrillion with only $2,500 worth of WETH (Wrapped Ethereum).  The deployer sent 11.76 quadrillion between eight different wallet addresses, each wallet receiving 1.47 quadrillion tokens, making makes up almost 12% of Kishu's total supply.  Within a week of Kishu Inu's launch, and after the price of the token skyrocketed, certain of these eight wallets

began selling their holdings, while others dispersed their tokens to many different wallets in an attempt by the wrongdoers to cover their tracks.

400.    In addition, the issuers pulled the liquidity out of Kishu Inu by burning the LP Tokens they received from Uniswap, thereby enriching themselves at the expense of investors. After burning the LP Tokens, the Kishu Inu Issuers received, at the time, over $2 million in Ether and $2 million worth of Kishu Inu.

401.    The Kishu Inu Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the Kishu Inu Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

402.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the Kishu Inu Issuers and Kishu Inu's marketing and development team, and Kishu Inu's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the Kishu Inu Issuers.

403.    Accordingly, Kishu Inu is a security.

**O.  Starlink Token (STARL)**

404.    On or about July 1, 2021, the token known as Starlink or "STARL" launched on v2 of the Protocol.

405.    According to DEXTools, the total trading volume for STARL on the Protocol is approximately $1,500,000,000, resulting is exorbitant fees for the issuers of STARL (the "STARL Issuers").

406.    On or about November 17, 2021, STARL shot up to an all-time high of $0.00008386.  Over the next several months, the price of STARL continued to drop and never recovered. Currently STARL is valued at $0.000003372, down over 96% from its all-time high.

407.    The STARL Issuers stated that STARL was launched "accidentally" on July 1, 2021, and that they had intended instead only to run a test on the token at that time.  The STARL Issuers published a rudimentary website days later, and days after that, published a whitepaper.

408.    On the STARL website and whitepaper, the STARL Issuers promoted STARL and falsely stated that "[t]he STARL metaverse is currently the only truly decentralized metaverse project, and is seeking to merge the concept of the metaverse with a cryptocurrency-based economy."

409.    The STARL Issuers misrepresented to investors the supposed growth of STARL by association with the "metaverse", which would generate profits for investors, and investors who purchased STARL reasonably expected to make a profit from their investment.  The rise in STARL's price is a direct result of its marketing efforts on "Starlink Metaverse", when the unaffiliated division of SpaceX, also called Starlink, gained heightened media attention for its launch of more than 50 Starlink satellites into space. Countless investors found STARL inadvertently when searching for more information on Starlink, the SpaceX division.

410.    Throughout the life of the project, the STARL Issuers provided investors with preview images of it so-called 3D metaverse, where "people can meet, chat, trade NFTs, buy and control their satellites, build their character, match with other players, etc." According to the whitepaper, "STARL will be used as the medium of exchange within the metaverse."  Games in the metaverse are purported to be "play-to-earn," allowing investors to play and earn various in-game assets, which can then be sold to others for profit on the STARL market.  These images and statements were designed to give investors a false notion of guaranteed profit by investing in STARL.  The Issuers' main goal was to try to create hype and excitement, which the Issuers knew would attract individuals to invest in their token.

411.     Ultimately, STARL was a pump and dump scheme.  The STARL Issuers likely profited by millions of dollars, pumping the price of the token by misleading investors into believing that the "metaverse" would increase the token's value and capitalizing on the attention generated by the SpaceX satellite launch.

412.     The of STARL Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.

413.     Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including STARL Issuers promoting STARL on various social media and communication platforms, including Twitter, Telegram, Discord, Medium, Reddit, and GitHub and by encouraging investment in the token.

414.     Accordingly, STARL is a security.

**P.  Smooth Love Potion (SLP)**

415.     On or about July 3, 2020, the token known as the Smooth Love Potion or "SLP" launched on the Protocol.

416.     According to DEXTools, the total trading volume for HOT during the Class Period was in excess of $850,000,000, resulting is exorbitant fees for the issuers of SLP (the "SLP Issuers").

417.     Sky Mavis, the company behind Axie Infinity and SLP, is headed by CEO Trung Nguyen.  SLP tokens are generated within the Axie Infinity game.  In order to accrue SLP in the game, players must win battles.  Players who want to accelerate their progress in Axie Infinity without expending considerable time and effort may buy SLP on the Protocol.

418. On August 26, 2020, SLP was the subject of a CoinDesk article that profiled a number of users who were earning a consistent income by farming SLP in-game, and selling them on the Protocol.

419. On September 17, 2020, Axie COO Aleksander Leonard Lawson posted "[w]hat a glorious morning for all @UniswapProtocol users. Especially excited for the Filipino and Venezuelan @AxieInfinity players. 400 UNI ($1000 at the going rate) is a massive amount to receive out of the blue for trading $SLP! Congrats to all."

420. At the height of COVID-19 lockdowns, the appearance of a novel source of income was alluring to many.  For some, playing Axie Infinity to earn SLP and selling it on the Protocol had become a full-time job.

421. A frenzy of speculation from June to August 2021 that Bloomberg dubbed "Axie frenzy" was fueled by $150 million in investments by venture capital giants like Defendants Andreessen and Paradigm.  By October 2021, these firms were reportedly valuing Sky Maxis at around $3 Billion.

422. Some players found ways to further capitalize on the SLP Issuers' ecosystem, creating "guilds" as a means of farming SLP, and raked in thousands of dollars a month by liquidating SLP on exchanges, such as Uniswap.

423. The continuous generation as an in-game reward, resulted in rampant instability and inflation for SLP.  By January 2022 the pace of SLP creation was consistently outpacing its use, growing over 160x (16,000%) in the preceding 12 months. The influx of new players, many attracted by the prospect of bypassing the prohibitive price of entry by working for the guilds, crashed the Axie Infinity servers.

424. On February 2, 2022, the SLP Issuers posted an update to Substack, announcing changes to the mechanics of the Axie Infinity game that would dramatically decrease the supply of SLP, reportedly by up to 56%. A short-lived rally followed the announcement of changes.

425. In March 2022, hackers breached the private keys of four Sky Mavis and one Axie DAO validator by using fake LinkedIn Job postings, siphoning almost half a billion dollars in ETH and USD in the second largest crypto exploit to date. The massive theft went unnoticed by Sky Mavis for a week and was only discovered when players found themselves unable to withdraw funds.

426. A $150 million bailout by Sky Mavis partners and investors including Binance, Andreessen, and Polygon was to compensate players for their losses.

427. The SLP Issuers' failure to control speculators and bots, or to effectively curb inflation of the token meant that the collapse of SLP proved devastating for many who had believed the SLP Issuers' false statements about t new economies and "play-to-earn" as a viable economic model, the "future of work".

428. Today, SLP is down 96% from the all-time highs reached in July 2021:



429. The SLP Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token, the effect video game farming would have

on the token's price or complete transparency as to the profits the issuers made.  Instead, the SLP Issuers created hype among retail investors and gamers alike that ultimately led to SLP's downfall.

430.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the SLP Issuers and SLP marketing and development team, and SLP's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the SLP Issuers.

431.    Accordingly, SLP is a security.

### Q. FEGtoken (FEG)

432.    In or around January 2021, the token known as FEGtoken or "FEG", which stands for "Feed Every Gorilla", launched on v2 of the Protocol.

433.    According to DEXTools, the total trading volume for FEG on the Protocol is approximately $750,000,000, resulting is exorbitant fees for the issuers of FEG (the "FEG Issuers").

434.    According to CoinMarketCap, FEG reached an all-time high of $0.000000049 in May 2021, a price increase more than 217,000 times its original value of $0.00000000000013. FEG is currently down over 99.9% from its all-time high:



435.    The FEG Issuers touted FEG on social media as a deflationary token, with 1% burn for each transaction, thereby decreasing the supply over time, applying upward pressure to FEG's price, and incentivizing investors to hold.

436.    The FEG Issuers consistently made gimmicky and bullish statements through their website and social media platforms to give investors a false notion of guaranteed profit by investing in FEG.  The FEG Issuer also created a separate website, the Official FEGToken Shop. The website sells merchandise dubbed "FEGwear," which is clothing FEG branding, usually a gorilla wearing sunglasses.

437.    FEG also published a roadmap where investors could see the purported bright future of the project, however, the token turned out to be a pump and dump.  The FEG Issuers' main goal was to try to create hype and excitement, which the Issuers know would attract individuals to invest into their token.

438.    The FEG Issuers also claim to be creating a lending platform called SmartDeFi. They claim that every token listed on the platform will be asset-backed.  If a loan cannot be paid back within the 30-day lending period, a 0.1% fee kicks in at that time.  According to FEG, "FEGtoken is the native token of the FEG ecosystem and provides a source of passive income through staking.  With the APY tied directly to exchange trading volume and SmartDeFi trading volume, return on investment will grow as our ecosystem does."  Another aspect of SmartDeFi is that it is a token generator. An individual will have the ability to create and launch unregistered securities without having any knowledge of programming or coding. With this creation, it will now allow individuals to create scam tokens at an astronomical rate.

439.    After the creation of the token, the deploying wallet of FEG sent large amounts of tokens to other wallets that then sold for large profit.  The deploying wallet also provided liquidity

for FEG, approximately $6,000.  Several days after launch, the deploying wallet pulled around $65,000 of liquidity, demonstrating that the FEG Issuers were attempting profit from the token's initial gains at the expense of investors.  In addition, as the result of the FEG Issuers' promotions and marketing ploys, they were able to pump the token multiple times before raking in massive profits at the expense of investors in FEG.

440.    The FEG Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the FEG Issuers created hype among retail investors before engaging in a pump and dump scheme that destroyed the value of the token.

441.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including FEG Issuers promoting FEG on various social media platforms, including Twitter, Telegram, Discord, Medium, Reddit, Facebook, Instagram, LinkedIn, Stocktwits, and YouTube, and by pretending to educate investors on the supposed benefits of FEG and encouraging investment in the token.

442.    Accordingly, FEG is a security.

**R.  Verasity (VERA)**

443.    On or about February 11, 2021, the token known as Verasity or "VERA" launched on v2 of the Protocol

444.    According to DEXTools, the total trading volume for VERA on the Protocol is approximately $723,000,000, resulting is exorbitant fees for the issuers of Vera (the "VERA Issuers").

445.    By April of 2021, VERA had risen 33 times in value since its launch and was valued at $.05.  By July of 2021, the price of VERA had fallen to $0.01.

446.    This volatility was the result of a pump and dump scheme perpetrated by the VERA Issuers.  In August of 2021, another pump and dump scheme inflated the value of VERA to a record high of $0.09 by October of the same year.  After the conclusion of the pump and dump scheme, the price of VERA fell to $0.004243, a reduction of over 99.99% from its all-time high (and the price of the token continues to fall):



447.    In order to induce investors to endure this volatility, the VERA Issuers marketed the token as part of a scheme to create a decentralized platform for sharing videos, in contrast to mainstream video sharing sites, such as YouTube, where there is central control of the platform. The issuers of the token promoted this and other features on social media sites including Twitter.

448.    The VERA Issuers also offered a service called VeraWallet, which falsely promised an unrealistic 18.25% staking option to investors.

449.    As a result of these actions, the VERA Issuers likely profited by millions of dollars at the expense of investors in the token.  Indeed, the VERA white paper acknowledged that the token was intended to make a profit.

450.    The of VERA Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the

profits the issuers made.  Instead, the VERA Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

451.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the VERA Issuers and VERA's marketing and development team, and VERA's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the VERA Issuers.

452.    Accordingly, VERA is a security.

**S.    Mononoke Inu (MONO)**

453.    On or about September 28, 2021, the token known as Mononoke Inu or MONO launched on v2 of the Protocol.

454.    According to DEXTools, the total trading volume for MONO on the Protocol is approximately $315,000,000, resulting is exorbitant fees paid to the issuers of MONO (the "MONO Issuers").

455.    The MONO Issuers promoted the token via social media and Telegram channels as well as on their own website and via a whitepaper.  Over Telegram and on their website, the MONO Issuers provided "shill" messages to be copied and pasted into posts on social media to further promote the token.  One shill message promised that the token would "take over the Ethereum network by storm" with "nothing" to stop the token from "achieving greatness."

456.    On the token's official account, the MONO Issuers sought to assure investors of the profitability of MONO, "due to recent events in other tokens and the uncertainty that resulted due to it."  The Issuers publicized a Certik evaluation of their token's smart contract (despite the "major issue" flagged by the evaluation) as evidence that their token was backed by "a[n] absolute[ly] safe contract."

457.     At launch, the total supply of MONO token was one quintillion.  During MONO's first full month of existence, the price of the token rose 130,000%.  The following month, November 2021, MONO fell more than 87%.  Nearly two-thirds of MONO's total trading volume was in October and November of 2021.  Since then, MONO is down 99.99% from its all-time high:



458.     The MONO Issuers collected fees from the trading of MONO on the Protocol.  The MONO Issuers did not disclose this to investors.

459.     In addition, the MONO Issuers likely profited by pumping the price of the token and then selling their holdings of the token and/or pulling their Liquidity Tokens out of the MONO pool.  This substantially contributed to the collapse of the token.

460.     In their whitepaper, the MONO Issuers provide no meaningful information on the origin of the project.  It was stated to have been "birthed from the idea of true community focus" while actually being an attempt to rope in as many unsuspecting investors as possible.  The whitepaper identifies the three Issuers behind MONO as "Joe Gorilla," Lead Developer, "Chad," Community Manager, and "Monothrone," Designer and Game Developer.

461.     Although the MONO Issuers' purported purpose for the MONO project was to create a token for use in conjunction with a video game that the MONO Issuers promised to

develop as a common enterprise, no such game, nor any NFTs contemplated as part of the game project, have been produced or released.

462.    Due to the token's promotion, investors in MONO believed that their holdings of MONO would increase in value through the development efforts of the MONO Issuers. MONO was to "take over" the Ethereum networks.  Investors reasonably relied upon the MONO Issuers' representations that investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the MONO Issuers and their marketing and development efforts.

463.     As a result of the MONO Issuers claims about and promotion of the token and their expertise, MONO investors believed that their holdings would be "absolutely clean" and "safe" while the token "achiev[ed] greatness."

464.    Accordingly, MONO is a security.

### T.  HOGE.finance (HOGE)

465.    On or about February 27, 2021, the token known as HOGE.finance or "HOGE" launched on v2 of the Protocol.

466.    According to DEXTools, the total trading volume for HOGE on the Protocol is over $401,000,000, resulting is exorbitant fees paid to the issuers of HOGE (the "HOGE Issuers").

467.    After reaching an all-time high of $0.0009634 on March 15, 2021, the value of HOGE declined by 93.97%:



468.    Around the time of HOGE's launch, the HOGE Issuers promoted the token on social media as well as a dedicated website that included instructions for how to buy the token on the Protocol.  Investors were then enticed to stay by the promise that a tax of one-percent of each transaction was being redistributed among them.

469.    In the whitepaper for HOGE, the HOGE Issuers made false and misleading statements, including that HOGE was supposedly owned entirely by the community and trading exchanges with an average of "80 to 110 developers or significant contributors working on the project at any given time, all working for free."  In addition, HOGE hired J.P. Deese & Associates, LLC, to act as an official lobbyist for the token.

470.    The HOGE Issuers also marketed HOGE by falsely claiming they would use a Swiss non-profit (HOGE Association) to facilitate listing the token on a central exchange, which never happened.  The HOGE Issuers shut down their website and the HOGE social media accounts have been inactive since September 2021.  Additional related ventures such as HOGE University, which contained educational content, and a HOGE merchandise store are also defunct.

471.    Shortly after the HOGE Issuers abandoned the project, the price of HOGE dropped precipitously.  As a result of the collection of investor funds, pumping and dumping, and pulling

their tokens out of the liquidity pool, the HOGE Issuers likely profited by millions of dollars at the expense of investors in the token.

472.    The HOGE Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the HOGE Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

473.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the HOGE Issuers and HOGE's marketing and development team, and HOGE's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the HOGE Issuers.

474.    Accordingly, HOGE is a security.

### U. Sanshu Inu (SANSHU)

475.    On or about April 25, 2021, the token known as Sanshu Inu or "SANSHU" launched on v2 of the Protocol.  Sanshu had a total a total supply of 100 quadrillion (or $1 \times 10^{18}$)!

476.    According to DEXTools, the total trading volume for SANSHU on the Protocol was approximately $152,000,000, resulting is exorbitant fees for the issuers of SANSHU (the "SANSHU Issuers").

477.    On May 12, 2021, SANSHU shot up to an all-time high of $0.000000006015 . Over the next several months, the price of SANSHU continued to drop and never recovered. Currently SANSHU is valued at $0.00000000003293, a decline of nearly 100% from its all-time high:



478.    The SANSHU Issuers made frequent statements promoting the growth of SANSHU , including statements such "$SANSHU is gearing up for moon landing " and "Our hodlers are being rewarded! To the moon, we go", deliberately cultivating an expectation of profits to those holding the token.

479.    The SANSHU Issuers also made statements about planned projects and partnerships.  SANSHU's current website states that the issuers "intend" to recruit staff to explore options.  The SANSHU Issuers also boasted of upcoming NFT collection launches and design updates to its marketing and website.  On  November 21, 2021, the SANSHU twitter account sent a  tweeted that "celebrity ambassador @KarenStrassman" had joined the SANSHU team, further stating "[w]e're happy to have all of you onboard as we reach to accomplish our goals [Rocket Emoji] [Sparkle Emoji]."

480.    On July 4, 2021, a Redditor on the SANSHU subreddit posted that a certain wallet had dumped 40 Ether worth of SANSHU, noting that the size of the wallet and the transaction history indicated that it had been an investor in SANSHU since the token's inception.  On Discord, a SANSHU Issuer acknowledged the wallet belonged to another SANSHU Issuer.  Other users noted  that  along  with  the  large  wallet,  the  top  ten  holders  of  SANSHU  were  unloading

simultaneously.   Most, if not all, of these wallets were likely under the direct control of the SANSHU Issuers.  These large dumps, caused a major sell-off and the token to collapse.

481.    When staked coins associated with SANSHU's "Dog Park" staking platform began to disappear in July and August 2021, investors were unable to unstake or access their investments. Based on discussion on Discord, it appears the SANSHU Issuers scammed investors and attempted to put the blame an unknown third party.

482.    Accordingly, SANSHU turned out to be a classic pump and dump scheme, which allowed the SANSHU Issuers to enriched themselves at the expense of the investors in the token.

483.    The SANSHU Issuers never provided any meaningful disclosures on the token's website or in its marketing materials about the riskiness of the token.

484.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including SANSHU Issuers promoting SANSHU on various social media and communication platforms and by encouraging investment in the token.

485.    Accordingly, SANSHU is a security.

### V.  Shih Tzu (SHIH)

486.    On or about April 18, 2021, the token known as Shih Tzu or "SHIH" launched on v2 of the Protocol.

487.    According to DEXTools, the total trading volume for SHIH on the Protocol approximately $152,000,000, resulting is exorbitant fees for the issuers of SHIH (the "SHIH Issuers").

488.    SHIH was designed to emulate the approach of popular meme tokens such as Dogecoin and Shiba.  A month after its launch, the price of a SHIH token had increased by ten thousand before then declining precipitously.



489.    SHIH encountered difficulties due to the broken promises of its SHIH Issuers. Despite promising governance in its white papers, the SHIH creators never created the necessary structure for it.  Nor did the SHIH Issuers create NFTs or a game that users could play to earn SHIH, which were also promised in the whitepapers.

490.    The SHIH Issuers never offered any disclosures on the token's website or in its whitepapers about the riskiness of the token.  Instead, the SHIH Issuers created hype among retail investors before engaging in a pump and dump scheme that destroyed the value of the token.

491.    As a result of these actions, the SHIH Issuers likely profited by millions of dollars at the expense of investors in the token.

492.    The SHIH Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the SHIH Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

493. Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the SHIH Issuers and SHIH's marketing and development team, and SHIH's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the SHIH Issuers.

494. Accordingly, SHIH is a security.

## W. Jupiter Project (JUP)

495. Jupiter Project ("JUP") is a blockchain created by Sigwo Technologies, LLC ("Sigwo"). Sigwo is a Missouri Limited Liability Company. Jupiter Project is also a company, Jupiter Project PTE. LTD., incorporated in Singapore.

496. On or about August 15, 2020, the token known as Jupiter Project or "JUP" launched on v2 of the Protocol.

497. According to DEXTools, the total trading volume for JUP on the Protocol is approximately $231,000,000, resulting is exorbitant fees for the issuers of JUP (the "JUP Issuers").

498. JUP's initial price was approximately $0.001794. Several months later, the token started to explode in growth, and near the end of March 2021, JUP had grown over 7,400% of its original listing price on Uniswap, to $0.1352. However, this growth was short-lived, dropping in value to $0.007 by the end of July 2021 – a price drop of nearly 95% in just three months. The current value of JUP is approximately $0.008:



499.    The JUP Issuers maintain active and coordinated marketing efforts and engage in a strong social media presence.  Hyperlinks to its Twitter, Reddit, Discord, YouTube, Telegram, GitHub, Facebook, and Instagram accounts are featured prominently on JUP's public website, jup.io, which also contains a link to a periodically updated blog, the author of which is "Sigwo."

500.    The JUP Twitter account, with Twitter handle @JUP_Project publishes tweets on a near-daily basis, sometimes multiple times per day.  These tweets provide updates on the "JUP technology", employment opportunities with JUP, and links to trade JUP tokens.

501.    The JUP Issuers published a 2022 "roadmap" document on or about February 14, 2022 on several of its social media sites.  The roadmap provides a growth plan for JUP through the year 2022.  The JUP Issuers updated the roadmap at least one time, including in July 2022. The roadmap projects growth and expansion of JUP and associated technologies and serves as a marketing effort to draw attention to JUP's blockchain and the products offered by JUP.

502.    The JUP Issuers also published several blog posts that provide an overview to investors in JUP tokens on how they will accumulate tokens by virtue of purchasing and holding tokens, thereby creating the expectation that investment will provide a positive return, including

through a process it refers to as "forging".  According to the JUP Issuers, "THIS allows YOU to get more Jupiter, earn on your holdings and most importantly help secure the Jupiter blockchain!"

503.    On September 2, 2021, the JUP Issuers announced through a blog post titled "Into Juptember we go!" that it would conduct a mainnet burn of its tokens, which would commence in the same month, burning 4.9 billion tokens and leave a total supply of just 1 billion JIP.  Such a burn, which sharply decreases the supply of the JUP token, is a transparent attempt to increase the value of the JUP token by decreasing its supply.

504.    The JUP Issuers likely profited by millions of dollars by pumping the price of the token and carrying out the token burn.  The JUP Issuers thus enriched themselves at the expense of investors in the token.

505.    The JUP Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the JUP Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

506.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the JUP Issuers and JUP's marketing and development team, and JUP's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the JUP Issuers.

507.    Accordingly, JUP is a security.

### X.  Holo Project (HOT)

508.    On or about May 19, 2020, the token known as the Holo Project or "HOT" launched on v2 of the Protocol.

509.    According to DEXTools, the total trading volume for HOT on the Protocol is approximately $166,000,000, resulting is exorbitant fees for the issuers of HOT (the "HOT Issuers").

510.    HOT reached an all-time high of $0.02848 on or about April 4, 2021 and dropped precipitously over the next several weeks.  The current price of HOT hovers around $0.002, a drop of approximately 93% from its all-time high:



511.    According to the HOT Issuers, they "intended to both reward early adoption and support the infrastructure and development needs of Holo as we grow the ecosystem of app developers."

512.    Prior to launching HOT, the HOT Issuers gifted themselves 25% of HOT tokens. In addition, these tokens were not subject to vesting or lock-up periods, meaning the HOT could have and likely did sell many of these tokens after the massive price spike, which greatly contributed to the HOT's sharp price decline

513.    Rather than providing a white paper with plain English and easy to understand terms, the HOT Issuers' whitepaper and "greenpaper" both contain esoteric, confusing, misleading and false statements about HOT.  For example, the so-called greenpaper compares the "Holochain" (created by the Issuers) as similar, yet supposedly better than a typical digital asset blockchain,

such as the Ethereum blockchain.  This is misleading because the HOT Issuers suggest that HOT is on (or about to be on) its own blockchain, when in reality it is no different than any other ERC-20 token traded on the Ethereum blockchain.

514.    It appears that the HOT Issuers created the Holochain as a supposed "bridge" where they would "convert" HOT to another token "in the form of HoloFuel."  According to the HOT website, "HOT is an ERC-20 token sold as an IOU for HoloFuel during our Initial Community Offering (ICO)…."  The HOT Issuers also promoted the supposed superiority of Holochain over the Ethereum Blockchain.  The HOT Issuers engaged in all these efforts in order to get investors to purchase HOT with the expectation of profit.

515.    To date, purchasers of HOT have not been able to "convert" or otherwise "swap" HOT for a token on HoloFuel.

516.    The HOT Issuers have been very active in marketing to draw attention to HOT and the Holo ecosystem. As written in their March 8, 2021 tweet on Twitter, "Delivering #P2P real app development infrastructure and working apps is good for all stakeholders." This tweet is coupled with a graphic showing HOT's return of 20.49 times since the Initial Coin Offering.

517.    The HOT Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the HOT Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

518.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the HOT Issuers and HOT's marketing and development team, and HOT's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the HOT Issuers.

519.    Accordingly, HOT is a security.

**Y.  Dent (DENT)**

520.    On or about June 14, 2020, the token known as Dent or "DENT" launched on v2 of the Protocol.

521.    According to DEXTools, the total trading volume for DENT on the Protocol is approximately $105,000,000, resulting is exorbitant fees for the issuers of DENT (the "DENT Issuers").

522.    The initial coin offering raised $4.2 million.  After DENT reached peak value on or about April 4, 2021, its price has fallen by 99% since that time:



523.    Prior to and around the time of DENT's launch, the issuers of the DENT Issuers promoted the token on social media, with posts and communities on platforms such as Twitter as well as the DENT website.

524.    The DENT whitepaper confirmed this ambition: "With DENT being the token in the mobile data space, the rate of appreciation might follow the size of the mobile data market traded in DENT.  According to GSMA, the size of the mobile data market is predicted to increase, larger market traded in DENT could lead to DENT price increase."   The price of DENT was pitched as a "unique opportunity" to enter the opportunity.

525.    Of the maximum supply of 100 billion DENT tokens, the DENT Issuers kept 30% of the tokens for supposed strategic acquisitions, market seeding, user incentives, salaries, and bonuses.  In other words, the DENT Issuers did so in order drain the liquidity out of the token when the price peaked, thus causing the token to crash and substantial losses to investors.

526.    The DENT Issuers promoted the token's "original vision" in a whitepaper that proposed a tokenized approach to mobile device bandwidth and data, allowing users to freely buy, sell, and donate their mobile data to any other user.  Related services were supposed to be made available in over 140 countries.

527.    However, most of the DENT Issuers' promises never materialized and the DENT Issuers made these false statements to entice investors to invest in DENT, all so that they could collect exorbitant fees and drain the liquidity from the token and run away with millions of dollars of investors' money.

528.    DENT maintained a team of employees, with an HQ that moved from Hong Kong to the British Virgin Islands and a DENT Wireless global operations.

529.    The DENT Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the DENT Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

530.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the DENT Issuers and DENT's marketing and development team, and DENT's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the DENT Issuers.

531.    Accordingly, DENT is a security.

### Z.   YFDAI Finance (YFDAI)

532.    YFDAI Finance is a Singapore based company registered under the name Tejster Technologies PTE LTD.  YFDAI Finance's stated mission is to increase security and accessibility for traders in the crypto space.

533.    The token known as YFDAI Finance launched YfDAI.finance or "YFDAI" on v2 of the Protocol in September 2020.

534.    According to DEXTools, the total trading volume for YFDAI on the Protocol is approximately $263,000,000, resulting is exorbitant fees for the issuers of YFDAI (the "YFDAI Issuers").

535.    YFDAI reached an all-time high of $23,156.98 on March 23, 2021, and then dropped to all-time low of $21.91 on July 3, 2022. YFDAI is currently down 99% from its all-time high:



536.    According to YFDAI's whitepaper, tokens that were allocated to farming and staking would be burned over time, leaving a final total supply of 13,950 YFDAI in circulation, removing a total of 6,150.  The first burn event of 76.5 YFDAI tokens occurred on September 30, 2020.

537.    The YFDAI Issuers offered rewards (in YFDAI, and later in "launchpad tokens") for farming or staking tokens.  One of YFDAI Finance's distinguishing features is the offer of an optional insurance program through a third-party carrier, to help mitigate the risks of trading and interacting with smart contracts, intended for those who have less technical knowledge or more funds at stake.  The offered insurance program was a ploy to conceal the YFDAI Issuers' fraud.

538.    The YFDAI Issuers, throughout the life of the project, fed investors gimmick terms such as "burn" and "farming". These terms were to give investors a false notion of guaranteed profit by investing in YFDAI.  The YFDAI Issuers' ultimate goal was to try to create hype and excitement, which the YFDAI Issuers knew would attract individuals to invest in YFDAI, which turned out to be a rug pull scam.

539.    Late in 2021, The YFDAI Issuers drained the liquidity of YFDAI with the wallet that originally deployed the token on the Protocol.  The YFDAI Issuers also minted YFDAI tokens (*i.e.*, gave tokens to themselves for free) prior to launch, which they sent to other wallets that they control, to sell and enrich themselves at the expense of YFDAI investors.

540.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including YFDAI Issuers promoting YFDAI on various social media platforms, including Twitter, Telegram, Discord, Medium, LinkedIn, Bitcoin Form (bitcointalk.org), and Snapshot and by pretending to educate investors on the supposed benefits of YFDAI and encouraging investment in the token.

541.    The YFDAI Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the YFDAI Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

542. Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the YFDAI Issuers and YFDAI's marketing and development team, and YFDAI's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the YFDAI Issuers.

543. Accordingly, YFDAI is a security.

## AA.      Ares Protocol (ARES)

544. On or about April 25, 2021, the token known as Ares Protocol token or "ARES" launched on v2 of the Protocol. ARES was launched by Ares Foundation LTD, a Singapore public company. The company touts its oracle technology, games, partnerships, and several strategic investors and partners.

545. According to DEXTools, the total trading volume for ARES on the Protocol is approximately $63,000,000, resulting is exorbitant fees for the issuers of ARES (the "ARES Issuers").

546. On or about May 9, 2021, ARES reached an all-time high of $0.2971, and within days, the price dropped precipitously.

547. As of today, ARES is currently trading 99% below its all-time high:



548.    Investors in ARES believed that her holdings in the token would increase in value as the token became more widely adopted through the development efforts of the issuers of ARES.

549.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the ARES Issuers.

550.    In order to induce investors to purchase ARES, the ARES Issuers promoted ARES as the first decentralized oracle service protocol. According to the ARES Issuers, an "oracle" is the link between the blockchain and data from the real world or, in other words, the link between "on chain" and "off chain," respectively.

551.    On the ARES website, the ARES Issuers promoted the professional profiles for its "Team Members," and sought several C-level, marketing, and developer positions.

552.    The ARES Issuers also maintained an active presence on several social media and communication platforms, namely Telegram, Twitter, Medium, Github, Discord, Facebook, and Reddit.  On the official Twitter account for the token, the ARES Issuers sent tweets explicitly calling people who buy tokens "investors."  There are also prominent call-to-action links and buttons on the Twitter account's homepage that encourage investors to purchase ARES.

553.    Through several tweets, ARES Issuers mislead investors into believing that they would earn sizable returns on purchases of ARES.  For example, on March 30, 2022, the ARES Issuers tweeted that purchases of the token could earn "between 26% and 42%" and on November 24, 2021, the ARES Issuers tweeted that purchases could supposedly earn a sizable amount of income through staking, and that the annual percentage yield ("APY") is 521%.  These statements were demonstrably false

554.    On June 18, 2021, a whistleblower used the ARES Twitter account to retweet a user warning of red flags associated with ARES.  Shortly thereafter, likely the same whistleblower,

used the official ARES Medium account to post a long, detailed article claiming that many of the staff listed on the ARES website were fake, that the founder was hoarding and dumping tokens, and that the "oracle" technology the ARES Issuers touted did not exist.  Thus, ARES turned out to be a pump and dump scheme and/or rug pull, which allowed the ARES Issuers thus enriched themselves at the expense of the investors in the token.

555.    The ARES Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the ARES Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

556.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the ARES Issuers and ARES's marketing and development team, and ARES's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the ARES Issuers.

557.    Accordingly, ARES is a security.

**BB.    HuskyToken (HUSKY)**

558.    On or about February 3, 2021, the token known as HuskyToken or "HUSKY" launched on v2 of the Protocol.

559.    According to DEXTools, the total trading volume for HUSKY on the Protocol is $55,000,000, resulting is exorbitant fees for the issuers of HUSKY (the "HUSKY Issuers").

560.    On February 3, 2021 HUSKY reached an all-time high of $0.000000198301, but the price dropped rapidly shortly thereafter. HUSKY is currently down 99% from its all-time high:



561.    The HUSKY Issuers published a roadmap on the HUSKY website that outlined plans for NFTs and Husky farming in mid-2021. The HUSKY Issuers publicized planned "airdrops" of tokens to current holders as an incentive to invest in the token before those planned airdrop dates; the idea being that holders would receive free quantities of tokens, which would increase the total value of their holdings.

562.    HUSKY embraced its identity as a meme token as a means to market itself on this hype in order to attract investors and increase the value of the token.  HUSKY called itself the "Little Brother of Dogecoin" and featured a picture of Elon Musk on its website, where it reads, "Like crypto, memes were born on the internet and have journeyed from the fringes to the mainstream. They're used to drive adoption of cryptocurrency, signal bullishness or bearishness on certain assets or coins by traders and even boost the value of tokens."  This highlights that any perceived success of HUSKY token was inextricably tied to the efforts of the HUSKY Issuers.

563.    The HUSKY Issuers promised investors "airdrops" to give them a false notion of guaranteed profit.

564.    In August 2021, the HUSKY Issuers abandoned the HUSKY project and their Twitter account and Telegram group are no longer active.  The wallet that deployed the token sent

HUSKY tokens to wallets of the HUSKY Issuers and many of the HUSKY Issuers sold off HUSKY tokens to earn profits, which contributed to the collapse of the token.

565.    The HUSKY Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the HUSKY Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

566.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the HUSKY Issuers and HUSKY's marketing and development team, and HUSKY's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the HUSKY Issuers.

567.    Accordingly, HUSKY is a security.

### CC.    Pundi X Labs (PUNDIX)

568.    Pundi X originally registered as a business in the Isle of Man under the name Pundi X Labs Private Limited, and is currently registered as a private company in Singapore with the name Pundi X Labs PTE LTD.  Supposedly, the Pundi X project ("Pundi X") operates globally with physical offices in Jakarta, São Paulo, Seoul, Taipei, Tokyo, and Singapore.  It has over 100 employees across multiple countries as of January 2022, with about half working in research and development.  Pundi X employees regularly participate in conferences and interviews as representatives of the Pundi X brand.  Pundi X maintains multiple brick-and-mortar store locations and crypto exchange kiosks. XPOS, the Pundi Point-of-Sale system, is available in over 30 countries.

569.    The token known as Pundi X Token or PUNDIX launched on v2 of the Protocol on August 8, 2020.

570.    According to DEXTools, the total trading volume for PUNDIX on the Protocol is approximately $151,000,000, resulting is exorbitant fees for the issuers of PUNDIX (the "PUNDIX Issuers").

571.    The value of PUNDIX reached an all-time high of $0.009 on March 31, 2022.  It is currently at $0.001, which is a 89% drop from its all-time high.



572.    Staking is currently disabled for PUNDIX, however tokens can be delegated, earning a reward token, PURSE, which can be spent within the so-called PUNDIX ecosystem.

573.    PUNDIX refers to investors in its tokens as "Pundians." There are prominent call-to-action links and buttons on the project's homepage and social media accounts that encourage investors to purchase PUNDIX.

574.    The PUNDIX Issuers' website features a blog with weekly posts and a front-page roadmap that projects the token's growth through the end of 2022.  PUNDIX has social media accounts that include, Medium, Telegram, Twitter, Facebook, Instagram, and Discord.  Many of PUNDIX Issuers' social media posts contained false information to deceive investors on PUNDIX and to get them to invest in the token, which allowed the PUNDIX Issuers to pull the rug and/or drain the liquidity from PUNDIX.

575. The PUNDIX Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made. Instead, the PUNDIX Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

576. Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the PUNDIX Issuers and PUNDIX's marketing and development team, and PUNDIX's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the PUNDIX Issuers.

577. Accordingly, PUNDIX is a security.

**DD.    Kawakami Inu (KAWA)**

578. The token known as Kawakami or "KAWA" launched on Uniswap V2 in May 2021.

579. According to DEXTools, the total trading volume for KAWA on the Protocol is approximately $35,000,000, resulting is exorbitant fees for the issuers of KAWA (the "KAWA Issuers").

580. The price of KAWA reached an all-time high of $0.00002872 on October 30, 2021 and then for weeks declined 97.0% from its all-time high where it currently remains:



581.     The issuers of KAWA Issuers released a whitepaper, created a website, and engaged in a major branding/marketing campaign to promote $KAWA.  The initial "Litepaper," set out a business plan involving multiple branches of the enterprise, including: KAWA token, Kawa Tools, Kawa Decentralized Autonomous Organization ("KawaDAO"), Kawa NFTs, Kawa Seed, Kawa Farm, Kawa Swap, and Café Kawakami.  The KAWA Issuers used these materials to create a false illusion of stability and growth for investors, who were made to expect a profit from the enterprise.

582.     The KAWA Issuers maintained many active social media accounts including on Reddit, Instagram, Twitter, Telegram, Discord, YouTube, and Medium, all in an attempt to pump the price of KAWA.

583.     In their whitepaper, the KAWA Issuers stated there was full decentralization and a lack of control of the token.   However, such statements were false.   The KAWA Issuers acknowledged that their supposed decentralization via "KawaDAO" was merely another access point for the KAWA issuers to control the KAWA token. The KAWA whitepaper is rife with further contradictions and misleading statements—including the false statement that KAWA has no promoters, marketers, or directors, when, in fact, the whitepaper disclosed that the KAWA project had a marketing director.

584.     The KAWA Issuers executed both a pump and dump scheme and a rug pull scheme. The KAWA Issuers also "forked" KAWA by creating a new contract code, while allowing the old contract code to remain in existence and not shut it down.  This confused potential investors and the KAWA Issuers exploited their confusion.  After investors accidently purchased tokens using the old contract code, the KAWA Issuers where then able to drain the replenished liquidity out of the KAWA tokens by selling large amounts of their old tokens and/or Liquidity Tokens.

585.    The KAWA Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the KAWA Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

586.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the KAWA Issuers' promotion of progress toward roadmap milestones, as well as marketing efforts, software releases, and other technical improvements.

587.    Accordingly, KAWA is a security.

**EE.      Cyber Doge (CYBERD)**

588.    On or about April 27, 2021, the token known as Cyber Doge or "CYBERD" launched on v2 of the Protocol.

589.    According to DEXTools, the total trading volume for CYBERD on the Protocol is approximately $24,000,000, resulting is exorbitant fees for the issuers of CYBERD (the "CYBERD Issuers").



590.    Around the time of CYBERD's launch, the CYBERD Issuers promoted the token on social media, with posts and communities on platforms such as Twitter, Telegram, and Reddit, as well as the CYBERD website.  The original website and whitepaper described the token's origin

as a former rug-pull scheme gone legitimate through community involvement, and posited the need for a crypto token community that was focused on security and helping investors avoid scams. According to the whitepaper, community members would be able to earn CYBERD through a program that would reward them for identifying and preventing scams. In furtherance of these representations of trust and security, 10% of the total supply of CYBERD is locked until 2077 "[t]o ensure community trust and prevent rug pulling."'

591.   The token's website also included "Twitter Shill" language intended for users to copy and share on Twitter to promote the token. The Telegram community had lists of accounts and subreddits where users could post promotions in exchange for CYBERD. The community also posted marketing videos and other promotional materials on behalf of the token.

592.   CYBERD's Twitter account asked investors if they wished they had gotten in "on the ground floor" of more valuable tokens, and added that "YOUR chance is HERE with Cyber Doge!!!" In another tweet, potential investors were told "Don't miss the rocket ship on this one!! We are only going to be on the landing pad for a short time longer [rocket emoji]."

593.   Less than three weeks after its launch, CYBERD reached its all-time high of $0.0003984. The price of the token is currently down 98.5% from its all-time high.

594.   The original version of the token's whitepaper has been taken down, and the various programs that the CYBERD Issuers represented would prevent scams were never implemented.

595.   As a result of the collection of investor funds, pumping and dumping, the CYBERD Issuers likely profited by millions of dollars at the expense of investors in the token.

596.   The CYBERD Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the

profits the issuers made.  Instead, the CYBERD Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

597.    The CYBERD Issuers represented to investors through promises of growth, and expressions like "Don't miss the rocket ship" that the token was intended to and would generate profits for investors, and investors who purchased CYBERD reasonably expected to make a profit from their investment.

598.    Accordingly, CYBERD is a security.

### FF. Lorde Edge (Edgelon)

599.    On or about November 7, 2021, Tesla CEO Elon Musk changed his Twitter handle to "Lorde Edge" without any explanation or apparent reason.

600.    A few hours after this stunt, on or about November 8, 2021, the token known as Lorde Edge or "Edgelon" launched on v2 of the Protocol.  The Edgelon website touted the token as "the first of its kind token celebrating the Dogefather and crypto CEO, Elon Musk!"  It is likely that the name of the token and the timing of its launch fooled (and perhaps were intended to fool) investors into believing that Edgelon was affiliated with Musk in some way, thereby attracting attention and deriving legitimacy.

601.    According to DEXTools, the total trading volume for Edgelon on the Protocol is approximately $23,000,000, resulting is exorbitant fees for the issuers of Edgelon (the "Edgelon Issuers").

602.    Prior to and around the time of Edgelon's launch, the Edgelon Issuers promoted the token on social media, with posts and communities on platforms such as Twitter, Telegram, and YouTube, as well as the Edgelon website.  Edgelon's Twitter account promised profits "to the MOON!"  The developers – three anonymous individuals identified on the website as "Beardo,"

"Chad Honcho," and "Robedge" – promised that 50% of Edgelon would be destroyed ("burned") on creation, which would increase the value of investors' tokens. The developers promised tremendous returns and growth of the token, with publicized projections as far out as January 2022, thereby encouraging investors to purchase and hold the token.

603.     Within days of its launch, the price of Edgelon increased approximately 400% to $0.00004135, its all-time high.

604.     Within two weeks, Edgelon's developers and other insiders had taken all of the token's profits and vanished. By November 23, 2021 – the date of the last tweet from the official Edgelon account – the value of the token had dropped to $0.00000077, down 98% from its all-time high.



605.     The developers had also deleted the token's Telegram community by the end of November 2021

606.     As a result of the collection of investor funds, pumping and dumping, and pulling their tokens out of the liquidity pool, the Edgelon Issuers likely profited by millions of dollars at the expense of investors in the token.

607.     According to DEXTools, the total trading volume for Edgelon on the Protocol was approximately $23,000,000, resulting is exorbitant fees for the issuers of Edgelon.

608.    The Edgelon Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the $Edgelon Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

609.    The Edgelon Issuers represented to investors through projections, promises of growth, and expressions like "to the MOON!" that the token was intended to and would generate profits for investors, and investors who purchased Edgelon reasonably expected to make a profit from their investment.

610.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the Edgelon Issuers and Edgelon's marketing and development team, and Edgelon's investors believed that their holdings would increase in value as the token became more widely adopted through the efforts of the Edgelon Issuers.

611.    Accordingly, Edgelon is a security.

**GG.    Goku Inu (GOKU)**

612.    On or about August 21, 2021, the token known as Goku Inu or "GOKU" launched on v2 of the Protocol, with a total supply of 100 quadrillion.  GOKU reached an all-time high of $0.000000000994200 on November 2, 2021.  Over the following month it underwent a precipitous collapse, dropping 99% from its all-time high where it currently remains:



613.    According to DEXTools, the total trading volume for GOKU on the Protocol is approximately $31,000,000, resulting is exorbitant fees for the issuers of $GOKU (the "GOKU Issuers").

614.    Prior to and after GOKU's launch, the GOKU Issuers heavily promoted the token with posts on platforms like Twitter, Instagram and Telegram.  In a Telegram post, GOKU's Issuer stated "i think Goku is preparing a moonshot - and this is how its done .... we all contribute and HOLD until we achieve our Goals. Goodnight and keep an eye on this page we are creating a very exciting Project, we are working hard behind the scenes!"

615.    GOKU's stated purpose was to create a manga and anime-themed community, where investors would be able to buy and sell anime-themed NFT's with GOKU.

616.    GOKU's whitepaper frames its own story as a quest undertaken by the aforementioned character, and contains such meaningless, inane statements as "the marketing fee helps to achieve the desired goals", and "It is no longer only about the search for the Dragon Balls, but also about establishing his cryptocurrency."  Investors are encouraged to "to support Goku and become part of a new era."

617.    Investors were led to expect a return on their investment. Statements on GOKU's Medium account included "This is how Goku and our devs have created a sustainable deflationary model that will overtime reward all our holders with financial freedom." and "we aim to tackle 2022 with an upward growth chart where the token price will continue to increase as the circulating supply continues to decrease." GOKU's official reddit account (Officialgokuinu) submitted posts titled "GOKU INU OFFICIAL REDDIT – 100X – NEXT MOONSHOT" and "Buy Goku or stay broke [Party Hat Emoji]" Despite these assurances, GOKU never recovered its value.

618.    The GOKU Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the GOKU Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

619.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the GOKU Issuers and team. On April 30th, 2021, long before the official launch of the token, GOKU's telegram account posted "Marketing will be planned strategically and we have a great team with good connections to get things done!" GOKU's official Reddit account posted regular updates with statements like "The DEV is working hard to make this project successful. Launched smooth and growing healthy. This is deffo the next moonshot in this Anime DeFi space."

620.    Accordingly, GOKU is a security.

**HH.    AUTZ**

621.    On or about June 25, 2021, the token known as Autz token ("AUTZ") launched on v2 of the Protocol.

622.     According to DEXTools, the total trading volume for AUTZ on the Protocol is approximately $13,000,000, resulting is exorbitant fees for the issuers of AUTZ (the "AUTZ Issuers").

623.     According to the AUTZ whitepaper and website, AUTZ was "[t]he crypto system designed for sustainable economic development of the Autism Community" and the AUTZ Issuers spoke of their mission to "motivate individuals from any part of the world to help improve [the circumstances of] people with autism spectrum disorder (ASD) using the AUTZ Tokens."

624.     The AUTZ Issuers stated that using a token as a vehicle for philanthropy would enhance trust and donor confidence supposedly due to transparency, lack of fees/delays, and removal of intermediary parties and regulatory pressures.  They also stated that it would motivate the public to participate in "altruistic capital commitments" by providing financial and "psycho-social" incentives in the form of token rewards.

625.     The AUTZ Issuers also stated that they planned to incorporate NFTs into their business model, supposedly to provide individuals affected by ASD with an opportunity to profit from their art which would generate passive income for the artist with every future transaction. The AUTZ Issuers claimed to be "exploring the development of artistic autism centers where affected individuals will be able to participate in expressive mediums of art."

626.     AUTZ's all-time high occurred in just a day and was followed by a series of massive selloffs that the AUTZ Issuers attributed to "a bot."  The malicious act is likely connected to the AUTZ Issuers, in which they sent AUTZ from their deploying wallet to the wallet that used a bot program to drain the token of its liquidity.  The sell-off tanked the value of AUTZ and left investors with worthless tokens:



627.     On Facebook, the AUTZ Issuers reassured investors that they would be launching a second contract, which would benefit all by allowing them to restructure marketing funds and blacklist the bot.   The AUTZ Issuers told Investors that they would need them to send their tokens to the AUTZ Issuers' wallet in order to qualify for an airdrop of equal value after the launch of the second contract.

628.     Requests from investors went AUTZ for more information went unanswered by the AUTZ Issuers. The second token contract launch on July 22, 2021 was accompanied by another sell-off.  The token reached a new low from which it never recovered.  Once again, Investors were extorted by the AUTZ Issuers.

629.     AUTZ's Issuers abandoned the project in late January of 2022. At first, the AUTZ Issuers gave vague answers to questions from investors about promised airdrops and updates, then they completely stopped answering questions.   The AUTZ twitter account has been suspended, and since January 22, 2022, there have been no further posts on AUTZ's Instagram or Telegram accounts.

630.     Although the AUTZ Issuers promoted benefitting the people affected by ASD, the AUTZ whitepaper clarified that 10% of the total token supply would be allocated to the "Charity

Wallet," which would supposedly fund "financial services to organizations and individuals within the Autism community."  The AUTZ Issuers took advantage of sensitivity by investors toward the idea of the project.  AUTZ investors were led to expect a profit on their purchase, not only for their own benefit, but also for the benefit of the ASD community.

631.    Additionally, and sadly, the AUTZ issuers misled investors as to amount of donations and support that they would actually provide to ASD related organizations.  According to AUTZ's website, there was only one donation to charitable causes related to ASD.  Supposedly, on July 22, 2021, $10,000 worth of AUTZ tokens was donated to an organization called I Serve With Joy.

632.    The AUTZ Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the AUTZ Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

633.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the founding members, who would "vet every organization that becomes an AUTZ token partner." AUTZ' Issuers were featured in Forbes and other media outlets, where they promoted their vision of a token that would reward investors for supporting the ASD community and outlined the various strategies they would employ in the pursuit of this vision.

634.    Accordingly, AUTZ is a security.

## II.    Ethereum Chain Token (ECT)

635.    On or about July 20, 2021, the token known as Ethereum Chain Token or "ECT" launched on v2 of the Protocol.

636.    According to DEXTools, the total trading volume for ECT on the Protocol is approximately $9,000,000, resulting in exorbitant fees for the issuers of ECT (the ECT Issuers").

637.    Prior to and after ECT's launch, the ECT issuers heavily promoted the token with posts on platforms like Twitter, Instagram and Telegram.

638.    ECT's logo, a stylized diamond, was indistinguishable from that of the actual Ethereum brand.  This fact, combined with the name "Ethereum Chain Token" and the $ECT ticker's similarity to that of Ethereum Classic ($ETC) may have given investors the mistaken impression that the token was in some way official to the Ethereum network and therefore a reputable investment.

639.    Despite the ECT website's claim that "ECT is 100% transparent", the founders of $ECT were, and still are, anonymous.

640.    On August 1, 2021, ECT reached an all-time high of $0.00024367.  On or about August 23, 2021, the value abruptly collapsed to $0.000001:



641.    ECT was a pump and dump scheme and/or rug pull; the ECT Issuers likely made millions of dollars, leaving investors holding billions of worthless ECT tokens.

642.    The ECT token's trajectory from introduction to abandonment lasted less than two months. The last post on the ECT Twitter account was on August 24, 2021. The ECT website, Instagram account, and Telegram community are all defunct or deleted.

643.    The ECT Issuers made statements on the ECT website and social media accounts to convince investors that they could anticipate sizeable returns and growth on their investment. The ECT Issuers encouraged the public to "[i]nvest with almost more than 10k other people in Community-Driven Token [exclamation mark emoji] Be an early bird and grow your wealth", and opportunities for passive income were promised in the whitepaper and on the website, saying "[h]olders earn passive rewards through static reflection as they watch their balance of ECT grow exponentially."  Many of these and other statements were false.

644.    The ECT Issuers made these false statements so that they could pump the price of the ECT, increasing their fees in the process, and then drain the token's liquidity and/or dump their holdings to make large profits at the expense of investors of ECT.

645.    The ECT Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the ECT Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

646.    Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the ECT Issuers and team.  The ECT Issuers made statements and issued a roadmap intended to give investors the impression that a cohesive marketing campaign, an ECT mobile wallet app, celebrity endorsements, contests, and charity programs were in the

works. There is no evidence that any of the roadmap's more ambitious milestones were achieved. The ECT website, now deactivated and inaccessible, proclaimed "The team has been working day and night to bring you something special that will stand the test of time.  We have raised $500k in funding to get to this stage, and will be implementing a social media campaign endorsed by high profile celebrities."

647.    Accordingly, ECT is a security.

**JJ. Dogg Token (DOGG)**

648.    The token known as Dogg Token or "DOGG" launched on v2 of the Protocol on May 5 2021.

649.    According to DEXTools, the total trading volume for DOGG on the Protocol is approximately $8,000,000, resulting is exorbitant fees for the issuers of DOGG (the "DOGG Issuers").

650.    The price of DOGG spiked up quickly and then dropped abruptly:



651.    The DOGG website boasts of a talented full-time staff and a dedicated development team. After the release of its token on May 5, 2021, its "Follow on Actions" included "Dominate social media presence," "Website launch," "Marketing outreach," "Partnership outreach," and "Establishing trust and forming relationships."

135

652.    The DOGG Issuers managed the project's social media platforms such as, Reddit, Telegram, Discord, Twitter, Instagram, and Facebook. The DOGG Issuers made misleading statements throughout their social media platforms.

653.    During the first few days after launch, the DOGG Issuers began promoting on Reddit with a post that read, "ALL ABOARD THE GAIN TRAIN!!"  In the days that followed, the DOGG Issuers post on Reddit "$DOGG is Pure Fire!!" and "Buy the Dip!!!"  These statements were designed to entice investors to buy and hold DOGG so the value of DOGG would increase, all but guaranteeing profit for the DOGG Issuers.

654.    The DOGG Issuers made similar statements on Twitter, which included tweets like "to the moon."  The Issuers continuously made misleading statements on their social media platforms throughout the early part of the project.

655.    Around the time DOGG launched, the DOGG Issuers minted and sent tokens from the deploying wallet to other wallets they control. The DOGG issuers were methodically waiting to begin selling DOGG to reward themselves.  As the social media influence began to draw in investors, DOGG started a massive upward spike. DOGG's soaring price was only temporary, as the price quickly plummeted as the DOGG Issuers abandoned the project apparently sold off their tokens and/or pulled the liquidity from the token.

656.    On October 11, 2021 the DOGG Issuers announced DOGG would merge with Voxel X Network token ("VXL"). Consequently, DOGG became worthless after depleting the value of the DOGG that resulted from a rug pull. The DOGG Issuers promised investors they airdrop an amount VXL equal in value to DOGG.  Many investors did not receive the airdrop, several of whom of those investors were shunned and banned from the merged project's social media platforms.

657.     The DOGG Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made.  Instead, the DOGG Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

658.     Investors' profits were to be derived from the managerial and entrepreneurial efforts of others, including the DOGG Issuers posting on social media promoting DOGG. the Issuers intended to form relationships with potential partners, also boasting of a talented full-time staff and a dedicated development team on their website.

659.     Accordingly, DOGG was a security

### KK.    Mine Token (MINE)

660.     The token known as Official Mine Token or "MINE" launched on v2 of the Protocol on February 5, 2022.

661.     According to DEXTools, the total trading volume for MINE on the Protocol is approximately $6,500,000, resulting is exorbitant fees for the issuers of MINE (the MINE Issuers").

662.     The price of MINE down at least 98.6% from its all-time high.



663.     The MINE Issuers promoted MINE through their websites and an active presence on social media and communications platforms, including Twitter, Facebook, Instagram,

Telegram, YouTube, and TikTok.  The MINE Issuers posted on these platforms routinely to encourage investors to purchase their token with the promise of earning money from that investment.

664.   For example, a February 15, 2022 tweet on its MINE's Twitter account reads, "What are $MCU $ETH reflections? INTEREST ON STEROIDS! 6% of every buy AND sell reflects back to all holders directly in ETH!" In another example, a February 17, 2022 tweet reads, "$MINE is getting ready for the moon. Are you prepared to come with us? Look at the chart and get your bag today because MINE also gives you 6% #eth reflections from each buy and sell." These misleading statements did not properly disclose to MINE investors that they themselves are being penalized on all buy and sell transactions they perform on the Protocol. The reflections that investors receive are proportional to the amount of MINE they hold.  The more tokens an investor holds, the larger the "reflections" she receives with all trades of the token, including trades from other users. The MINE Issuers received the most reflections given that they control the wallets with the largest amount of MINE.  Given that issuers of tokens, usually have the largest holders, this is a gimmick designed enrich issuers are the expense of the average investor.

665.   MINE's YouTube channel houses twenty-six different videos intended to "educate" investors about crypto assets, Ethereum, MINE, and Uniswap – an education intended to guide them toward investing in MINE.

666.   Prior to launch of the token, the MINE Issuers' promoted and hosted a limited presale of the MINE, referring investors to their roadmap and promising "#passiveincome" with various rocket ship emojis.

667.   On the day of the MINE's launch, the MINE Issuers used Twitter to promote a giveaway of "$100 worth of The Office Mine Token every 10 MINUTES FOR 3 HOURS!!" and

hosted a livestream online to engage with potential investors. The MINE Issuers also provided MINE tokens to social media influencers, including on Instagram.

668.  Investors reasonably relied upon the MINE Issuers representations that the token would increase in price and provide investors with "INTEREST ON STEROIDS" as passive income. Investors reasonably believed the MINE Issuers' representation that $MINE was "scam-free" and immune to rug-pulls.

669.  On the MINE website, the MINE Issuers promised their token to be "scam-free" with "no risk of rug pulls." However, before the launch of MINE, the MINE Issuers minted and distributed MINE to wallets they control by using the deploying wallet of MINE. The MINE Issuers waited for the value of MINE to rise before selling their holding. The rug pull left MINE investors with worthless tokens, while MINE Issuers ran away with their money.

670.  On the MINE's official Reddit page, investors lamented the token's unavailability, regular sell offs at losses, and lack of new holders or investors.

671.  The MINE Issuers never provided any meaningful disclosures on the token's website or in its whitepapers about the riskiness of the token or complete transparency as to the profits the issuers made. Instead, the MINE Issuers created hype among retail investors before engaging in a scheme that destroyed the value of the token.

672.  The MINE's effort to promote MINE through its website, included roadmaps that projected growth of MINE over time. Investors in MINE believed that the efforts of the MINE Issuers and other people working on the project were the driving force behind the "success" of MINE.

673.  Accordingly, MINE is a security.

LL.     ArchAngel (ARCHA)

674.    The token known as ArchAngel or "ARCHA" launched on v2 of the Protocol on December 5 2021.

675.    According to DEXTools, the total trading volume for ARCH on the Protocol is approximately $6,500,000, resulting is exorbitant fees for the issuers of ARCH (the ARCHA Issuers").



676.    The price of ARCHA had remained flat from launch until October 13, 2021, at which time it began to rise sharply.  Its value on October 13, 2021 was $0.000000000207, from which it rose to its all-time high of $0.000000003272 on October 22, 2021 – an increase of over 1,480%. After reaching that all-time high, the value of ARCHA fell sharply and by the end of March 2022 had fallen below its initial value, where it remains today.

677.    The ARCHA Issuers promoted the token online through social media.  On the official Twitter account for the token, the Issuers' first tweet promoted investment in the token as a way to "create generational wealth you can pass on to your children/grandchildren &their [sic] families!"  The ARCHA Issuers represented to investors that the Issuers do not "want [investors] to be rich, we want you to be WEALTHY!"

678.    The Issuers regularly represented that the token would increase in price, retweeting other Twitter users' messages that "the train is bout to head out ALL ABOARD!" and that ARCHA "keeps hitting new ATHs [all-time highs]!"  "Let's keep it pumping…" was the call from the ARCHA Issuers to their community of investors.

679.    The initial supply of ARCHA was 100 quadrillion tokens, with 45% of that token supply to be burned at launch. The ARCHA Issuers promoted the token based off a "staking pool" "so that ARCHA holders [would] receive passive income and native ecosystem tokens from every project within [the] ecosystem."  The ARCHA Issuers' representations sought to incentivize investors purchase of the ARCHA token.  Online, the ARCHA Issuers repeatedly referred to those who bought ARCHA tokens as "investors."

680.    The ARCHA Issuers collected fees from the trading of ARCHA on the Protocol. This was not prominently disclosed to investors.

681.    In addition, the ARCHA Issuers profited by pumping the price of the token and then selling their holdings of the token and pulling their liquidity out of the ARCHA pool.  This substantially contributed to the collapse of the token. After the demise of ARCHA, the ARCHA Issuers forked ARCHA to a new smart contract where they again drained the liquidity and sold ARCHA token they controlled. This resulted in another downward spiral of ARCHA.

682.    According to the project website, the ARCHA Issuers employed an economist, a marketing lead, two graphics artists, six community moderators, and three "Youtubers." The community moderators' responsibility was to share knowledge of ARCHA and expand its reach through its social media and communication platforms, thereby positively influencing investors' opinions of ARCHA. The Youtubers appear to have had a similar responsibility, although confined to the production of videos.

683.     Due to the token's promotion, investors believed that her holdings of ARCHA would increase in value through the development efforts of the ARCHA Issuers.  "Generational wealth" was promised and investors reasonably relied upon the ARCHA Issuers' representations that the token would increase in price as the Issuers' efforts made ARCHA more valuable through the contribution of their unique expertise.

684.     The average ARCHA holder did not have functional involvement in developing the products and technologies associated with ARCHA. Any return on an investor's tokens would have come from work done by the ARCHA leadership and staff, whose efforts to popularize the ARCHA token was the main driver of any potential value to investors.

685.     Accordingly, ARCHA is a security.

### MM.   Stoner Doge Finance Project (STOGE)

686.     On or about April 19, 2021, the Stoner Doge Finance project, otherwise known as "STOGE," was launched v2 of the Protocol.

687.     According to DEXTools, the total trading volume for STOGE on the Protocol is approximately $4,000,000, resulting is exorbitant fees for the issuers of STOGE (the STOGE Issuers"):



688.    The owners, managers, and developers of STOGE all appear to maintain complete anonymity. There is no known whitepaper to describe the project's components or direction. The registration of the domain stoge.finance is anonymous.

689.    STOGE token is supposedly a deflationary meme token that is designed to celebrate marijuana.  The STOGE Issuers purported to use STOGE to support and donate to various programs that will help with the decriminalization of marijuana. The token has a 4.2% redistribution and 4.2% burn on every transaction, each serving as strong incentives for investors to buy and hold the token, as these rates suggest significant passive income and appreciation of the token's value.

690.    According to the STOGE website, the initial supply of STOGE was 420,000,000 tokens, with 238,689,033 currently in circulation on the Ethereum blockchain. Its all-time high value of $0.01320941 was reached in early November 2021, while its all-time low value of $0.00048561 was reached earlier in the year, in July 2021. This all-time low, which occurred just over one month after the token's initial launch, also came soon after the token experienced its highest-ever volume trading – a result of the initial fervor that accompanied the token's launch.

691.    Around the time STOGE launched, the deploying wallet over which the issuers had total control began sending large amounts of STOGE to other wallets, which than sold the received tokens for a substantial profit as the token started to pump.  This shows that the malicious issuers intended to defraud investors out of money.

692.    The STOGE Issuers used social platforms to attract individuals to invest into STOGE. Because of the STOGE Issuers injecting hype on STOGE's Twitter, the price of STOGE started to spike in value. The scam was starting to materialize.

693.     The STOGE Issuers took advantage of the increase of price. They began to sell the STOGE tokens they minted for themselves at the launch of STOGE, which than triggered a panic sell. As a result of the scam, thousands of investors were forced to take substantial losses.

694.     The fraudulent issuers moved fast in their approach. All of the posts to the Instagram account took place on April 19, 2021 – the same day STOGE launched on Uniswap. All of the tweets on the Twitter account took place between April 19 and April 23, 2021, with the vast majority appearing on April 20.  Most of the tweets explicitly or implicitly encouraged investment in STOGE with language describing high growth in the token's value. This was an obvious mirage to instill faith that investors would be rewarded in profits.

695.     Trade volume of STOGE jumped from nearly 0 to almost 250,000, and the token's value nearly quadrupled. The STOGE Issuers stopped their efforts to promote STOGE on April 23, 2021. The trade volume sharply fell, and the token's value followed due to the scam that the STOGE Issuers perpetuated.

696.     Accordingly, STOGE is a security.

## IX.     CLASS ALLEGATIONS

697.     Plaintiffs brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the Class (*i.e.*, all persons who purchased any Tokens on the Protocol, or first learned of the circumstances giving rise to their claims, between April 5, 2021 and the present and were harmed thereby).  In addition, the Class shall be made up of the following subclasses:

- Subclass 1: All persons who purchased Tokens using the Wallet Method, other than persons in Subclasses 3 and 5.

- Subclass 2: All persons who purchased Tokens using the Browser Method, other than persons in Subclasses 4 and 6.

- Subclass 3:  All persons who purchased Tokens using the Wallet Method while in the State of Idaho.

- Subclass 4:  All persons who purchased Tokens using the Browser Method while in the State of Idaho.

- Subclass 5:  All persons who purchased Tokens using the Wallet Method while in the State of North Carolina.

- Subclass 6:  All persons who purchased Tokens using the Browser Method while in the State of North Carolina.

698.    Excluded from the Class are (i) Defendants; (ii) Defendants' affiliates, agents, employees, officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest; (iv) Plaintiffs' counsel and Defendants' counsel; and (iii) the judge and the magistrate judge assigned to this matter, as well as their respective staff and each of their immediate family members.

699.    Plaintiffs reserve the right to amend, modify, change, or expand the Class definitions based on the discovery of new information and further investigation.

700.    The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class members is currently unknown to Plaintiffs, though it is likely to be in the tens of thousands.

701.    Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible information and records maintained by Defendants. They may be notified of the pendency of this action by publication and/or electronic mail using a form of notice customarily used in securities class actions.

702.     Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful and illegal conduct.  Plaintiffs have no interests in conflict with the interests of the members of the Class.  Plaintiffs contest the enforceability of the Terms of Service, and the division of the Class into subclasses should not, in any way, be construed as a waiver of any rights of the Class to challenge the enforceability of such Terms of Service, all of which are expressly reserved.

703.     Plaintiffs and members of the Class sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the Tokens.

704.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to those of the Class.

705.     Common questions of law and fact exist for each cause of action and predominate over any questions solely affecting individual Class members, including but not limited to the following:

- Whether the Tokens are securities under federal law;

- Whether each Defendant should have been registered as a national securities exchange;

- Whether Defendants operated as an unregistered broker-dealer;

- Whether Defendants unlawfully failed to register the Tokens as securities under federal law;

- Whether Defendants offered or sold the Tokens to the Class;

- Whether Defendants promoted or solicited the sale of the Tokens to the Class;

- Whether Defendants control Uniswap and the Protocol;

- Whether Defendants violated federal and state law;

- Whether members of the Class suffered damages because of Defendants' conduct in violation of federal law;

- Whether members of the Class suffered damages because of Defendants' conduct in violation of federal law;

- Whether members of the Class suffered damages because of Defendants' conduct in violation of state law;

- Whether members of the Class are entitled to void their purchases of the Tokens and to recover the monies they paid, or value provided thereunder;

- Whether members of the Class are entitled to declaratory and injunctive relief.

706. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages incurred by some of the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.

707. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Contracts With an Unregistered Exchange – Violation of Sections 5 and 29(b) of the '34 Act**
**(Against all Defendants)**

708. Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

709. Section 5 of the '34 Act makes it unlawful "for any…exchange, directly or indirectly, to make use of…any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security…unless such exchange (i) is registered as a national securities exchange under section 78f of this title, or (ii) is exempted from such registration. 15 U.S.C. §

78e.  An "exchange" is defined as "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities…."  15 USC § 78c(a)(1); *see also* 17 C.F.R. § 240.3b-16.

710.     Throughout the Class Period and currently, Uniswap and the Owners (through their control of the Protocol) made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and/or subject to the United States to effect transactions in securities – *i.e.*, the Tokens.  At all relevant times, Uniswap and the Owners were not (i) registered as national securities exchanges under section 78f without being registered as a national securities exchange under section § 78e, and they were not (ii) exempted from such registration.

711.     While operating as unregistered exchanges, Uniswap and the Owners contracted with the Issuers of the Tokens to list securities on the Protocol through Uniswap's core contracts and router contract and by issuing Liquidity Tokens to the Issuers.  While operating the Protocol, Uniswap and the Owners also contracted with Plaintiffs and members of the Class insofar as (i) the Protocol required its users to buy and sell Tokens through Uniswap's smart contracts (including the core contracts and router contract) in order to complete the transactions, (ii) Plaintiffs and the Class members all traded the Tokens on the Protocol, and (iii) the Plaintiffs and the Class members paid Uniswap fees for the use of the Protocol.  These contracts were in violation of Section 5 of the '34 Act.

712.     Such contracts are null and void under Section 29(b) of the '34 Act and, as a result, Plaintiffs and the Class are entitled to void those contracts and recover recessionary damages with respect to purchases on the Protocol of any of the Tokens (each of which was an unregistered

security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with the Tokens, as well as costs, attorneys' fees, and interest.

713.     Plaintiffs and Class members have suffered actual damages in an amount to be determined at trial.

714.     As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

**<u>SECOND CAUSE OF ACTION</u>**
**Unregistered Broker and Dealer – Violation of Sections 15(a)(1) and 29(b) of the '34 Act**
**(Against all Defendants)**

715.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

716.     It is unlawful for a broker or dealer engaged in interstate commerce in using the facility of an exchange, "for any broker or dealer…to make use of…any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security…unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

717.     A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78(a)(4)(A).  Additionally, an entity is a broker if it assists issuers with structuring a securities offering, identifies a potential purchase, or advertises a securities offering.

718.     Uniswap and the Owners operated as brokers during the Class Period by, among other things, facilitating the sale of tokens on the Protocol for compensation (including, through User Fees), facilitating the buying and selling of tokens through liquidity pools that it controls through its core contracts and router contract, marketing the Protocol to users and issuers and providing answers to user questions about transaction details.

719.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that entity's "regular business."

720.    Uniswap and the Owners operated as dealers during the Class Period by acting as a seller of securities on a regular basis, issuing Liquidity Tokens, issuing its own token (*i.e.*, UNI), facilitating the buying and selling of tokens through liquidity pools, having regular customers (*i.e.*, the users), and providing customers with access to services that allow the purchase of tokens.

721.    Uniswap and the Owners made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange without being registered as national securities exchanges under §78o, to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security.

722.    While operating as unregistered exchanges, Uniswap and the Owners contracted with the Issuers of the Tokens to list securities on the Protocol through Uniswap's core contracts and router contract and by issuing Liquidity Tokens to the Issuers.  While operating the Protocol, Uniswap and the Owners also contracted with Plaintiffs and members of the Class insofar as (i) Uniswap required its users to buy and sell Tokens through Uniswap's smart contracts (including the core contracts and router contract) in order to complete the transactions, (ii) Plaintiffs and the Class members all traded the Tokens on the Protocol, and (iii) the Plaintiffs and the Class members paid Uniswap fees for the use of the Protocol.  These contracts were in violation of Section 5 of the '34 Act.

723.    Such contracts are null and void under Section 29(b) of the '34 Act and, as a result, Plaintiffs and the Class are entitled to void those contracts and recover recessionary damages with respect to purchases on the Protocol of any of the Tokens (each of which was an unregistered

security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with the purchase of the Tokens, as well as costs, attorneys' fees, and interest.

724.     As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

### THIRD CAUSE OF ACTION
**Control Person Liability - Violation of Section 20 of the '34 Act**
**(Against Adams, Paradigm, Andreessen, and USV)**

725.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

726.     During the relevant period, the Owners controlled Uniswap and were culpable participants in Uniswap's violation of Sections 5 and 15 of the '34 Act, § § 78e, 78o.

727.     The Owners, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of Uniswap and its employees and the Protocol, and to cause Uniswap to engage in the wrongful conduct detailed herein.

728.     The Owners had the power to direct or cause the direction of the management and policies of Uniswap and the Protocol.

729.     The Owners had sufficient control or influence to have caused Uniswap to register as an exchange and broker-dealer and refrain from effecting the transactions of securities as an unregistered exchange and unregistered broker-dealer.

730.     As a result of the Owners' conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## FOURTH CAUSE OF ACTION
### Unregistered Offer and Sale of Securities – Violation of Sections 5 and 12(a)(1) of the '33 Act
### (Against all Defendants)

731.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

732.    Section 5(a) of the '33 Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

733.    Section 5(c) of the '33 Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  15 U.S.C. § 77e(c).

734.    When issued, the Tokens were securities within the meaning of Section 2(a)(1) of the '33 Act, 15 U.S.C. § 77b(a)(1).

735.    During the Class Period, Uniswap and the Owners sold, promoted, and/or solicited the Tokens directly to Plaintiffs and the Class members.  Uniswap and the Owners therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

736.    No registration statements have been filed with the SEC or have been in effect with respect to any of the Token offerings.

737.    Section 12(a)(1) of the '33 Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title ⋯ shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. § 77*l*(a)(1).

738.    Accordingly, Uniswap and the Owners violated Section 5 of the '33 Act, 15 U.S.C. §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), § 77l(a)(1).

739.    Plaintiffs and the Class members who purchased Tokens during the Class Period are entitled to damages and/or remedies at law or in equity for tendering any Tokens still owned, as well as costs, attorneys' fees, and interest.

740.    As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

**FIFTH CAUSE OF ACTION**
**Control Person Liability – Violation of Sections 5 and 12(a)(1) of the '33 Act**
**(Against Adams, Paradigm, Andreessen, and USV)**

741.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

742.    The Owners, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of Uniswap and its employees and the Protocol, and to cause Uniswap to engage in the wrongful conduct detailed herein.

743.    Owners had the power to direct or cause the direction of the management and policies of Uniswap and the Protocol.

744.    Owners jointly participated in, and/or aided and abetted, Uniswap's sale and solicitation of securities.

745.    As a result of the Owners' conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

**SIXTH CAUSE OF ACTION**
**Unregistered Sale of Securities in Violation of**
**I.C. § 30-14-509(b)**
**(Against all Defendants)**

746.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

747.    This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

748.    The Idaho Uniform Securities Act forbids the offer or sale of unregistered securities.  I.C. § 30-14-301.

749.  When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act.  *Id.* § 30-14-102(28).

750.  Uniswap and the Owners sold the Tokens to members of the Class in Idaho.

751.  The Tokens were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act.  *Id.* § 30-14-201.

752.  Any person who sells a security in violation of Section 30-14-301 is liable to the purchase for "the consideration paid for the security, less the amount of any income received on the security, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages as provided in subsection (b)(3) of this section."  *Id.* § 30-14-509(b)(1).  The annual rate of interest on judgments is "five percent (5%) plus the base rate in effect at the time of entry of judgment.  The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United States treasury securities adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)."  *Id.* § 28-22-104.

753.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

754.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

755.  As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

**SEVENTH CAUSE OF ACTION**
**Transacting Business as an Unregistered Broker-Dealer**
**in Violation of I.C. § 30-14-509(d)**
**(Against all Defendants)**

756.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

757.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Idaho.

758.   The Idaho Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless she is registered or exempt from registration under Idaho law. I.C. §§ 30-14-401(a), 30-14-402(a).

759.   When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act.  *Id.* § 30-14-102(28).

760.   Uniswap and the Owners transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Idaho.  *Id.* §§ 30-14-102(2), 30-14-102(4).  Uniswap and the Owners were not registered as broker-dealers or agents in Idaho, nor were they subject to any exemption from registration.

761.   A person acting as a broker-dealer or agent that sells or buys a security in violation of section 30-14-401(a) or 30-14-402(a) is liable to the customer.  The customer, if a purchaser, may maintain an action for recovery of actual damages as specified in subsections (b)(1) through (3)."  *Id.* § 30-14-509(d).  Actual damages are defined as "the amount that would be recoverable upon a tender [of the security] less the value of the security when the purchase disposed of it, and interest at the annual rate of interest set forth in section 28-22-104(2), Idaho Code, from the date of the purchase, costs, and reasonable attorneys' fees determined by the court."  *Id.* § 30-14—509(b)(3).  The annual rate of interest on judgments is "five percent (5%) plus the base rate

in effect at the time of entry of judgment.  The base rate shall be determined on July 1 of each year by the Idaho state treasurer and shall be the weekly average yield on United States treasury securities adjusted to a constant maturity of one (1) year and rounded up to the nearest one-eighth percent (1/8%)." *Id.* § 28-22-104.

762.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees, and interest.

763.  Class members who no longer own the Tokens seek damages for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees, and interest.

764.  As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

<u>**EIGHTH CAUSE OF ACTION**</u>
**Control Person Liability**
**I.C. § 30-14-509(g)**
**(Against the Owners)**

765.  Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

766.  This Cause of Action is brought on behalf of the Class members to whom Tokens were sold in Idaho.

767.  Every person who directly or indirectly controls an entity liable under the Idaho Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f), including an individual having a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller, unless the individual sustains

the burden of proof that the individual did not know and, in the exercise of reasonable care, could not have known, of the existence of conduct by reason of which the liability is alleged to exist. I.C. § 30-14-509(g).

768.  When issued, the Tokens were securities within the meaning of the Idaho Uniform Securities Act.  *Id.* § 30-14-102(28).  Uniswap sold the Tokens to members of the Class in Idaho and acted as the broker-dealer or agent for the sale and purchase of those securities.  *Id.* §§ 30-14-102(2), 30-14-102(4).  The Tokens were neither registered under, nor subject to exemption from registration under the Idaho Uniform Securities Act, and Uniswap was not registered as a broker-dealer or agent under Idaho law.  *Id.* §§ 30-14-201, 30-14-202.

769.  Each of the Owners, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to control (directly or indirectly) the management and activities of Uniswap and its employees, and to cause Uniswap to engage in the wrongful conduct complained of herein.

770.  Each of the Owners are jointly and severally liable with and to the same extent as Uniswap as a result of Uniswap's sale of unregistered securities and operation as an unregistered broker-dealer or agent in violation of the Idaho Unform Securities Act.

771.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees, and interest.

772.  Class members who no longer own the Tokens seek damages for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees, and interest.

**NINTH CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**N.C. Gen. Stat. Ann. § 78A-56(a)**
**(Against all Defendants)**

773.  Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

774.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

775.  The North Carolina Securities Act forbids the offer or sale of unregistered securities.  N.C. Gen. Stat. Ann. § 78A-24.  Any person who offers or sells a security in violation of Section 24 is "liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security."  *Id.* §§ 78A-56(a)(1)-(2).

776.  When issued, the Tokens were securities within the meaning of the North Carolina Securities Act.  *Id.* § 78A-2(11).  Uniswap and the Owners offered or sold the Tokens to members of the Class in North Carolina.  The Tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act.  *Id.* § 78A-24.

777.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees, and interest.

778.  Class members who no longer own the Tokens seek damages for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees, and interest.

779.  As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

## TENTH CAUSE OF ACTION
### Transacting Business as an Unregistered Dealer
### N.C. Gen. Stat. Ann. § 78A-36
### (Against all Defendants)

780.  Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

781.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

782.  The North Carolina Securities Act forbids any person from transacting business as a dealer or salesman unless she is registered under North Carolina law. N.C. Gen. Stat. Ann § 78A36(a). Any person who offers or sells a security in violation of Section 36(a) "is liable to the person purchasing the security" who "may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security." *Id.* §§ 78A-56(a)(1)– (2).

783.  When issued, the Tokens were securities within the meaning of the North Carolina Securities Act. Id. § 78A-2 (11).  Uniswap and the Owners transacted business as dealers and/or salesman when it offered or sold the Tokens to members of the Class in North Carolina. *Id.* §§ 78A-2 (2), (9).  Uniswap and the Owners were not registered as dealers and/or salesman in North Carolina, nor were they subject to any exemption from registration.

784.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees, and interest.

785.   Class members who no longer own the Tokens seek damages for any Tokens purchased during the Class Period, including any applicable costs, attorneys' fees and interest.

786.   As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

## ELEVENTH CAUSE OF ACTION
### Control Person Liability
### N.C. Gen. Stat. Ann. § 78A-56(c)
### (Against the Owners)

787.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

788.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Carolina.

789.   Every person who directly or indirectly controls an entity liable under the North Carolina Securities Act for unlawfully offering or selling unregistered securities or for operating as an unregistered dealer or salesman in the sale of those securities, as well as every "partner, officer, or director of the person," "every person occupying a similar status or performing similar functions," as well as "every dealer or salesman who materially aids in the sale" is jointly and severally liable with and to the same extent as the person, unless "able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* §§ 78A-56(c)(1).

790.   When issued, the Tokens were securities within the meaning of the North Carolina Securities Act. Id. § 78A-2 (11). Uniswap offered and sold the Tokens to members of the Class in North Carolina and acted as the dealer or salesman for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the North Carolina Securities Act, and Uniswap was not registered or exempt from registration as a dealer or salesman under North Carolina law.  *Id.* § 78A-24.

791.   Each of the Owners, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Uniswap and its employees, and to cause Uniswap to engage in the wrongful conduct complained of herein. Accordingly, each of the Owners, who directly or indirectly controlled Uniswap, have violated the North Carolina Securities Act through Uniswap's offer or sale of unregistered securities and operation as an unregistered dealer or salesman.

792.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

793.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**TWELFTH CAUSE OF ACTION**
**Aiding and Abetting Fraud**
**(Against all Defendants)**

794.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

795.   The Issuers committed massive fraud, crimes, and scams in connection with the Tokens.

796.  Uniswap and the Owners not only had actual knowledge of the massive fraud and various scams occurring on the Protocol, but they also provided substantial assistance to these perpetrators of fraud on the Protocol.

797.  Rather than taking actions to reduce the prevalence of scam tokens, such as instituting a vetting process and/or implementing criteria for issuing tokens, Uniswap and the Owners implemented a fee structure that rewards fraudulent issuers.  These frauds include various schemes, as alleged above, which the structure of the Protocol heavily incentivized and continues to incentivize.

798.  Uniswap and the Owners are fully aware of the existence of fraudulent and criminal activity on the platform but have allowed it to persist.  Instead of using their control of the Governance to address pervasive fraud, they have instead chosen to turn a blind eye and allow the fraud to continue unchecked.

799.  In doing so, Uniswap and its Owners have aided and abetted the fraudulent conduct of the issuers of scam tokens on the platform.

800.  Uniswap and the Owners' conduct with regard to aiding and abetting fraud on the Protocol was a proximate cause of the Plaintiffs' and the Class's injuries and, as a result of their conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

801.  As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

### THIRTEENTH CAUSE OF ACTION
**Aiding and Abetting Negligent Misrepresentation**
**(Against all Defendants)**

802.  Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

803.  Uniswap and the Owners owed a duty of care to provide accurate information to users of the Protocol about how their transactions would be processed and the susceptibility of tokens issued and traded on the platform to fraudulent conduct.

804.  Uniswap and the Owners breached that duty of care by negligently helping to disseminate and/or failing to prevent the misstatements of issuers of the Tokens to users of the Protocol.

805. Uniswap and the Owners were fully aware of the fraudulent nature of misrepresentations that were made by the Issuers.  Rather than take basic steps to avoid helping to promote such misrepresentations, Uniswap and the Owners chose to ignore and/or turn a blind eye to them.

806.  Investors, including Plaintiffs and the Class, reasonably relied on Uniswap and the controllers of the Protocol to protect them from fraudulent activity on its platform.

807.  As a result of Uniswap and the Owners' conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

808.  As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

## FOURTEENTH CAUSE OF ACTION
### Unjust Enrichment
### (Against all Defendants)

809.  Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

810.  As a result of the misconduct alleged herein, Uniswap and its Owners were enriched at the expense of users of the Uniswap platform who were exposed to violations of the securities laws, outright fraud by issuers of tokens, and negligent misrepresentations.

811.  Uniswap and its Owners directly profited from their decision to subject Plaintiffs and the Class to these harms as they were able to collect substantial fees from trading activity that occurred on the Protocol because of their misconduct.

812.  It is against principles of equity and good conscience for Uniswap and its Owners to keep the profits they gained from their misconduct.

813.  As a result of Uniswap and the Owners' conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

814.  As an alter ego of Uniswap, the Uniswap Foundation shares liability under this cause of action.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, demand a judgment against Defendants as follows:

(a)     Declaring this action is properly maintainable as a class action;

(b)     Declaring that Defendants' actions, as set forth above, violate the federal and state laws set forth above;

(c)     Awarding compensatory, special, consequential, punitive and exemplary damages against Defendants in an amount to be determined at trial;

(d)     Awarding equitable and injunctive relief, including, without limitation, recession, restitution, and disgorgement;

(e)     Awarding statutory relief under federal and state law;

(f)     Awarding reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

(g)     Awarding pre-judgment and post-judgment interest; and

(h)     Granting such other and further relief as the Court deems necessary and proper.

## <u>JURY TRIAL</u>

Plaintiffs hereby demand a jury trial as to all counts.

Dated:   New York, New York
         September 26, 2022

Respectfully submitted,


KIM & SERRITELLA LLP                BARTON LLP

By:   /s/ James R. Serritella       By:   /s/ Christopher J. McNamara
      James R. Serritella                 Roger E. Barton
      Aram M. Boghosian                    Christopher J. McNamara
      110 W. 40th Street, 10th Floor       Michael C. Ward
      New York, NY 10018                   711 Third Avenue, 14th Floor
      212-960-8345                         New York, NY 10017
      jserritella@kandslaw.com             212-687-6262
      aboghosian@kandslaw.com              rbarton@bartonesq.com
                                           cmcnamara@bartonesq.com
                                           mward@bartonesq.com


*Attorneys for Lead Plaintiffs Nessa Risley, James Freeland, Robert Scott, Annie Venesky, Andrew Cardis, and Dean Meyers*