UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NESSA RISLEY, JAMES FREELAND, ROBERT
SCOTT, ANNIE VENESKY, ANDREW
CARDIS, and DEAN MEYERS, individually
and on behalf of all others similarly situated,

    Plaintiffs,

  v.

UNIVERSAL NAVIGATION INC. dba UNISWAP
LABS, UNISWAP FOUNDATION, HAYDEN Z.
ADAMS, PARADIGM OPERATIONS LP, AH
CAPITAL MANAGEMENT, L.L.C. dba
ANDREESSEN HOROWITZ, and UNION
SQUARE VENTURES, LLC,

    Defendants.

No. 1:22-cv-2780-KPF

---

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN
<u>OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND .............................................................................. 4

I.   THE UNISWAP PROTOCOL ................................................................. 4

    A.  Users Access the Protocol Through Uniswap's Interface to Trade
    Crypto Assets ..................................................................................... 4

    B.  The VC Defendants Were Instrumental in Upgrading the Protocol
    to v2 and v3 ....................................................................................... 6

    C.  How the Protocol Works .................................................................... 7

    D.  Users are Charged Fees ..................................................................... 9

II.  OWNERSHIP AND CONTROL OF UNISWAP/PROTOCOL ............... 10

    A.  Uniswap's Ownership on Paper ....................................................... 10

    B.  The Uniswap Governance and Ownership of the Protocol ............... 10

III. IF UNISWAP SHUT DOWN, TRADING ON THE PROTOCOL WOULD
    HALT OR BECOME LIMITED ............................................................ 13

IV.  DEFENDANTS' CREATION OF A LEGAL SLUSH FUND AND THE
    "UNISWAP FOUNDATION" ............................................................... 14

V.   THE PROTOCOL IS A HAVEN FOR FRAUD AND THE DEFENDANTS
    KNOW IT .............................................................................................. 16

LEGAL STANDARD ....................................................................................... 18

ARGUMENT ................................................................................................... 19

I.   PLAINTIFFS STATE A CLAIM UNDER SECTION 29(B) OF
    THE EXCHANGE ACT ......................................................................... 19

    A.  Plaintiffs Plead that Defendants Are an Exchange, Brokers and Dealers .......... 20

    B.  Plaintiffs Plead Contractual Privity with Defendants ......................... 21

        1.  Plaintiffs Contracted with Uniswap by Using the Interface
        Uniswap Owns and Controls ................................................... 22

        2.  Plaintiffs Contracted with Defendants Through the
        Smart Contracts They Wrote .................................................. 22

    C.  The Contracts Between Plaintiffs and Defendants Are in Violation of Sections 5
    and 15 of the Exchange Act and Thus Can be Rescinded ................... 25

II.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT DEFENDANTS
    QUALIFY AS "SELLERS" FOR PURPOSES OF THEIR CLAIM
    PURSUANT TO SECTION 12(A)(1) OF THE SECURITIES ACT ........ 27

A.   Defendants Passed Title of the Tokens to Plaintiffs............................................ 27

B.   Defendants Successfully Solicited Plaintiffs' Trades for
Defendants' Financial Gain ................................................................................. 28

III.   PLAINTIFFS HAVE PROPERLY ALLEGED THEIR CONTROL PERSON
LIABILITY CLAIMS........................................................................................... 31

A.   Plaintiffs Plead Primary Violations ................................................................... 32

B.   Plaintiffs Adequately Allege Control ................................................................ 32

1.   Plaintiffs Have Sufficiently Pled That Adams and the
VC Defendants Control Uniswap ............................................................. 32

2.   Plaintiffs Plead in Detail How Adams and the VC Defendants
Exercised Control Over Uniswap's Securities Violations........................ 35

C.   Plaintiffs Are Not Required to Allege Culpable Participation Here,
But Have Sufficiently Done So Anyway ............................................................ 36

IV.   THE FEDERAL CLAIMS ARE TIMELY................................................................... 38

A.   Relation Back Under Rule 15(c)(1)(B) Is Liberally Given ................................ 38

B.   The Additional Plaintiffs' Claims Arise Out of the Same Conduct
Set Forth in the Original Complaint .................................................................. 40

V.   PLAINTIFFS PLEAD CLAIMS UNDER STATE LAW ........................................... 42

A.   Plaintiffs Thoroughly Pleaded How Defendants Aided and Abetted
the Rampant Fraud on the Protocol .................................................................. 42

1.   Defendants Do Not and Cannot Deny the Existence of Rampant
Fraud on the Protocol............................................................................... 42

2.   Plaintiffs Plead Defendants' Knowledge of the Rampant, Unchecked
Fraud on Protocol..................................................................................... 43

3.   Plaintiffs Plead Defendants Provided Substantial Assistance to the
Commission of Fraud by Taking Almost No Action in Response
to the Scams ............................................................................................. 46

B.   Plaintiffs Plead Their Remaining State Law Claims.......................................... 47

VI.   PLAINTIFFS SUFFICIENTLY ALLEGE THE UNISWAP FOUNDATION
IS AN ALTER EGO OF UNISWAP, ADAMS AND THE VC DEFENDANTS ..... 48

A.   The Alter Ego Test Is Fact-Intensive and Flexible............................................. 48

B.   Plaintiffs Plead Sufficient Facts to Sustain Their Allegations that the Uniswap
Foundation is an Alter Ego of Uniswap, Adams and the VC Defendants .......... 49

CONCLUSION ............................................................................................................. 52

TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Andujar v. Rogowski*,
   113 F.R.D. 151 (S.D.N.Y. 1986) ................................................................................... 39

*Anwar v. Fairfield Greenwich, Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010) ........................................................................ 42

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................... 19

*Baldwin County Welcome Ctr. v. Brown*,
   466 U.S. 147 (1984) ................................................................................................... 39

*Bensinger v. Denbury Res., Inc.*,
   2013 WL 3353975 (E.D.N.Y. July 3, 2013) ............................................................... 39

*Blair v. Infineon Techs. AG*,
   720 F. Supp.2d 462 (D. Del. 2010) ............................................................... 48, 49, 50

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998) ...................................................................................... 20

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) ...................................................................................... 48

*Bullard v. Drug Policy All.*,
   2019 U.S. Dist. LEXIS 222854 (S.D.N.Y. Dec. 30, 2019) ....................................... 19

*Charles W. v. Maul*,
   214 F.3d 350 (2d Cir.2000) ....................................................................................... 18

*CompuDyne Corp. v. Shane*,
   453 F.Supp.2d 807 (S.D.N.Y. 2006) .................................................................... 31, 32

*Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*,
   93 F. Supp. 2d 220 (D. Conn. 2000) .......................................................................... 25

*Dietrich v. Bauer*,
   126 F.Supp.2d 759 (S.D.N.Y. 2001) ................................................................ 31, 32, 33

*EdgePoint Cap. Holdings, LLC v. Apothecare Pharm., LLC*,
   6 F.4th 50 (1st Cir. 2021) ........................................................................................... 25

iv

*Filler v. Hanvit Bank*,
    2003 U.S. Dist. LEXIS 15950  (S.D.N.Y. Sept. 12, 2003) .................................................... 47

*Fogel v. Wal-Mart de Mexico SAB De CV*,
    2017 U.S. Dist. LEXIS 26976 (S.D.N.Y. Feb. 27, 2017)....................................................... 41

*Francisco v. Abengoa, S.A.*,
    559 F.Supp.3d 286 (S.D.N.Y. 2021) ..................................................................................... 36

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) ............................................................................ 42, 46

*Harris v. City of New York*,
    186 F.3d 243 (2d Cir.1999) ................................................................................................... 19

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F.Supp.2d 746 (S.D.N.Y. 2012) ..................................................................................... 36

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
    534 F.Supp.3d 326 (S.D.N.Y. 2021) ..................................................................................... 41

*In re Buckhead Am. Corp.*,
    178 B.R. 956 (D. Del. 1994)................................................................................................... 51

*In re Cannavest Corp. Secs. Litig.*,
    307 F.Supp.3d 222 ................................................................................................................. 32

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
    352 F. Supp.2d 429 (S.D.N.Y. 2005) .................................................................................... 34

*In re Global Crossing, Ltd. Secs. Litig.*, No. 02 Civ. 910
    2005 U.S. Dist. LEXIS 1622 (S.D.N.Y. Nov. 7, 2005)......................................................... 31

*In re Global Crossing, Ltd Securities Litig.*,
    2005 U.S. Dist. LEXIS 16228  (S.D.N.Y. Aug. 5, 2005)....................................................... 37

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
    501 F.Supp.2d 452 (S.D.N.Y. 2006) ..................................................................................... 37

*In re OSG Secs. Litig.*,
    971 F.Supp.2d 387 (S.D.N.Y. 2013) ..................................................................................... 30

*In re Philip Services Corp. Securities Litigation*,
  383 F. Supp.2d 463 (S.D.N.Y. 2004) ...................................................... 32

*In re Tronox, Inc. Sec. Lit.*,
  769 F.Supp.2d 202 (S.D.N.Y. 2011) ............................................... 31, 32

*In re Veon Ltd. Securities Litigation*,
  2018 U.S. Dist. LEXIS 148272 (S.D.N.Y. Aug. 30, 2018)................ 32, 35

*In re Vivendi Universal, S.A.*,
  381 F.Supp.2d 158 (S.D.N.Y. 2003) ...................................................... 38

*In re Wachovia Equity Securities Litigation*,
  753 F.Supp.2d 326 (S.D.N.Y. 2011) ...................................................... 36

*In re WorldCom, Inc. Sec. Litig.*,
  294 F.Supp.2d 392 (S.D.N.Y. 2003) ................................................. 36, 38

*JP Morgan Chase Bank v. Winnick*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005) .................................................... 46

*Kaye v. Grossman*,
  202 F.3d 611 (2d Cir. 2000) ................................................................... 48

*KDH Consulting Group LLC v. Iterative Capital*,
  528 F.Supp.3d 192 (S.D.N.Y. 2021) ...................................................... 38

*Kirschner v. Bennett*,
  648 F. Supp. 2d 525 (S.D.N.Y. 2009) .................................................... 42

*Krys v. Pigott*,
  749 F.3d 117 (2d Cir. 2014) ................................................................... 42

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................... 19

*Lerner v. Fleet Bank,N.A.*,
  459 F.3d 273 (2d Cir. 2006) ................................................................... 42

*Louros v. Cyr*,
  175 F. Supp. 2d 497 ............................................................................... 21

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, No. 12-cv-3723,
  2016 U.S. Dist. LEXIS 135909 (S.D.N.Y. Sep. 29, 2016)..................... 46

*Martin Hilti Family Tr. v. Knoedler Gallery, LLC*,
  137 F. Supp. 3d 430 (S.D.N.Y. 2015) ............................................... 46

*McKenna v. Smart Technologies Inc*, No. 11 Civ. 7673(KF),
  2012 U.S. Dist. LEXIS 118312, (S.D.N.Y. April 3,
  2012)…………………………………………………………...…………37

*Mendali v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) ............................................... 24

*Nat'l Acad. of TV Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,
  551 F. Supp. 3d 408 (S.D.N.Y. 2021) ............................................... 12

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  652 F. Supp. 2d 495 (S.D.N.Y. 2009) ............................................... 42

*Perkins v. S. New Eng. Tel. Co.*, No. 3:07–cv–967, 2009
  U.S. Dist. LEXIS 103833, (D. Conn. Nov. 4, 2009) ...................... 39, 40

*Pino v. Capital*, No. 20-cv-8499, 2021
  U.S. Dist. LEXIS 166042 (C.D. Cal. Apr. 27, 2021)…………………………………………...29

*Pino v. Cardone Cap., LLC*,
  55 F.4th 1253 (9th Cir. 2022) ........................................................... 29

*Pinter v. Dahl*,
  486 U.S. 622 (1988) ........................................................... 27, 28, 30

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*,
  794 F. Supp. 1265 (S.D.N.Y. 1992) ................................................. 19

*Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*,
  752 F.2d 178 (5th Cir. 1985) ........................................................... 25

*Register.com, Inc. v. Verio*, Inc.,
  356 F.3d 393 (2d Cir. 2004) ........................................................... 21

*SEC v. GPL Ventures LLC*,
  U.S. Dist. LEXIS 9056 (S.D.N.Y. Jan. 18, 2022) .............................. 37

*Silvercreek Mgmt. v. Citigroup, Inc.*,
  248 F. Supp. 3d 428 (S.D.N.Y. 2017) ............................................... 46

*Silvercreek Mgmt, Inc. v. Citigroup, Inc.*,
  346 F. Supp. 3d 473 (S.D.N.Y. 2018) ............................................... 47

*Slayton v. Am. Express Co.*,
    460 F.3d 215 (2d Cir. 2006) ........................................................................ 40

*Steed Fin. LDC v. Nomura Secs. Int'l, Inc.*, No. 00cv-8058,
    2001 U.S. Dist. LEXIS 14761 (S.D.N.Y Sept. 20, 2001) ....................... 29

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) .......................................................................... 39

*Transamerica Mortg. Advisors (TAMA) v. Lewis*,
    444 U.S. 11, 100 S. Ct. 242 (1979) ............................................................ 20

*Trustees of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*,
    332 F.3d 188 (3d Cir. 2003) ........................................................................ 48

*Underwood v. Coinbase Global, Inc.*, No. 21-cv08353-PAE,
    2023 U.S. Dist. LEXIS 17201 (S.D.N.Y. Feb. 2, 2023)............................ 26

*United States v. The Baylor Univ. Med. Ctr.*,
    469 F.3d 263 (2d Cir. 2006) ........................................................................ 39

*Vasquez v. H.K. & Shanghai Banking Corp.*, 18-cv 1876,
    2019 U.S. Dist. LEXIS 90716 (S.D.N.Y. May 30, 2019) ........................ 46

*Wells Fargo Bank, N.A. v. Wrights, Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015) ........................................................ 12

*Wildes v. BitConnect Int'l PLC*,
    25 F.4th 1341 (11th Cir. 2022) ................................................................... 30

*Wyo. State Treasurer v. Moody's Inv'rs Serv. (In re Lehman Bros. Mortg.-Backed Sec.*,
    650 F.3d 167 (2d Cir. 2011) ........................................................................ 37

**Statutes**

15 U.S.C. § 78c(a)(1)....................................................................................... 20

15 U.S.C. § 78c(a)(4)(A) ................................................................................. 20

15 U.S.C. § 78c(a)(13)...................................................................................... 25

15 U.S.C. § 78cc .............................................................................................. 19

15 U.S.C. § 78cc(b)........................................................................................... 41

N.C. Gen. Stat. § 78A-56(c)(1)-(2) ................................................................................................ 31


**Other Authorities**

6A Fed. Prac. & Proc. Civ. § 1501 (3d ed.) .................................................................................. 39

JR Gillespie, *The Thin Corporate Line: Loss of Limited Liability Protection*,
    45 N.D. L. Rev. 363, 365 (1969) ............................................................................................ 49

Jane Schlicht, *Piercing the Nonprofit Corporate Veil*,
    66 Marq. L. Rev. 134, 141 (1982) .......................................................................................... 49

Restatement (Second) of Contracts, § 17 (1981) ........................................................................ 21

Plaintiffs Nessa Risley, James Freeland, Robert Scott, Annie Venesky, Andrew Cardis, and Dean Meyers (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, submit this omnibus memorandum of law in opposition to the motions to dismiss of Defendants Universal Navigation Inc. dba Uniswap Labs ("Uniswap"), the Uniswap Foundation, Hayden Z. Adams ("Adams"), Paradigm Operations LP ("Paradigm"), AH Capital Management, L.L.C. dba Andreessen Horowitz ("Andreessen"), and Union Square Ventures, LLC ("USV") (Paradigm, Andreessen, and USV collectively, the "VC Defendants").

## PRELIMINARY STATEMENT

This action arises out of Defendants' lack of concern for Uniswap investors, as well as their hubristic disregard of the securities laws designed to protect them. Defendants own, operate, and control one of the largest crypto-asset exchanges in the world, the Uniswap Protocol (hereafter the "Protocol"). Hundreds of new securities in the form of digital tokens are launched on the Protocol every day, nearly all of them fraudulent, and nearly all by unknown actors. Plaintiffs are just a handful of the countless victims of these scams, having invested in fraudulent tokens (the "Tokens") on the Protocol. Defendants were (and are) required by the Securities Exchange Act of 1934 (the "Exchange Act") to register with the Securities and Exchange Commission (the "SEC") as exchanges and/or broker-dealers, but they failed to do so, a violation for which Plaintiffs seek rescission of their contracts with Defendants for the sale of the Tokens. Defendants also violated the Securities Act of 1933 (the "Securities Act") by selling unregistered securities to Plaintiffs.

Defendants' motions to dismiss are premised almost entirely on the theory that (i) Plaintiffs did not contract with people but with "software"; and (ii) "computer code" (purportedly controlled by no one) held and sold the Tokens to Plaintiffs. As discussed more fully herein, Defendants' theory is contradicted not only by the extensive and detailed allegations in the Plaintiffs' First

Amended Complaint, Dkt. No. 46 (the "FAC") (as well as basic logic and common sense), but Defendants' own statements acknowledging that they control the Protocol and the "Uniswap Pools" (as defined *infra*) through which they sold the Tokens.  Moreover, Defendants are unable to circumvent Plaintiffs' detailed allegations that they control Uniswap and the Protocol through the governance structure they created.  Through the creation of this so-called governance, Defendants effectively issued themselves preferred shares of Uniswap in the form of a token called UNI (which is also an unregistered security), which gives them control over Uniswap and the Protocol.

Defendants' motions must be denied, including for the following reasons:

*First*, Plaintiffs sufficiently plead claims under Section 29(b) of the Exchange Act because they allege that they were in contractual privity with Defendants and that the contracts with Defendants required the performance of illegal acts.  Plaintiffs were in privity with Defendants through their use of Uniswap's web interface (the "Interface") and through the so-called "smart contracts" Defendants created and maintain to conduct trades for the Tokens.  Each such trade and each smart contract established contracts (and contractual privity) between Plaintiffs and Defendants – contracts that are voidable because they each call for the sale of securities through an unregistered exchange and broker-dealer.

*Second*, Plaintiffs sufficiently plead claims under Section 12(a)(1) of the Securities Act. Plaintiffs, like nearly all users of the Protocol, purchased their Tokens through the Interface, which Uniswap controls and hosts on its webserver.  In addition, as discussed herein, Defendants wrote, controlled, and maintained the smart contracts that comprise the Protocol, including the "pair contracts" (through which the Tokens were held in Uniswap Pools) and the "router contracts" (through which the Tokens were transmitted to Plaintiffs) – indeed, Defendants continue to modify

the Protocol through the creation of new smart contracts.  Through these means Defendants held and passed title of the Tokens to Plaintiffs.

*Third*, it is without question that Plaintiffs' federal claims are deemed filed as of the filing of the action because the claims in the FAC relate back under Rule 15(c)(1)(B).  Thus, the federal claims are timely.

*Fourth*, Plaintiffs sufficiently plead that Defendants aided and abetted fraud.  Defendants do not dispute that Plaintiffs plead fraud against the issuers of the Tokens.  And indeed they cannot, as Plaintiffs set forth over 500 paragraphs in the FAC (nearly 100 pages!) of allegations of fraud that occurred on the Protocol.  In addition, Defendants were and continue to be aware that retail investors are being harmed ***by the minute***.  Instead of taking actions to protect them (such as registering as an exchange, as they are legally required to do), Defendants have instead encouraged fraudulent behavior by placing no barriers (including listing requirements, or basic identity verification) to issuers of tokens and guaranteeing fees to any issuer placing their tokens on the Protocol.  If the Token issuers were made to file registration statements with the SEC, they would have needed to disclose crucial information regarding their securities, including such minimal information as their identities, where they are located, and their contact information.  Indeed, it is telling that Uniswap mentions with approval in its brief Satoshi Nakamoto – someone whose true identity, like most of the issuers of the fraudulent Tokens, is unknown.

Defendants created and operate an illegal exchange intentionally designed so that anonymous individuals could issue unregistered securities and scam retail investors for millions, if not billions of dollars.  Now they seek to disclaim control of technology they created, own, maintain, and promote to the public, advancing arguments that not only beggar belief but are belied

by their own statements.  For these reasons and reasons discussed herein, Defendants motions should be denied.

## FACTUAL BACKGROUND

**I.    The Uniswap Protocol**

### A. Users Access the Protocol Through Uniswap's Interface to Trade Crypto Assets

This case concerns trades (or "swaps") of ERC-20 tokens on the Uniswap Protocol.  ERC stands for "Ethereum Request for Comments," ERC-20 is an application standard that allows for new tokens to be created on the Ethereum blockchain, and the Protocol is a platform by which individuals can trade (or swap) one ERC-20 token for another ERC-20 token.  *See* FAC ¶¶ 2, 42, 68-69.  Adams launched the first version ("v1") of the Protocol on November 2, 2018; the second version ("v2") and third version ("v3") of the Protocol were subsequently launched in May 2020 and May 2021, respectively.  *Id.* at ¶¶ 51, 77, 96.

Uniswap facilitates trades of crypto assets, including the Tokens, through the Interface, which is a web interface developed, owned, and maintained by Uniswap on its webserver.  *See id.* at ¶ 64.  The Interface allows users to access the Protocol, where crypto asset pools – each dubbed by Uniswap as a "Uniswap Pool" – are created and maintained according to the smart contracts written by Defendants.  *Id.* at ¶¶ 52, 78-81.

Nearly all individuals (including Plaintiffs) who trade on the Protocol access it through the Interface.  Upon accessing the URL for the Interface[1] through a browser, the user is presented with the following webpage where Uniswap touts the Protocol as enabling users to "trade crypto & NFTs with confidence" and allowing them to "[b]uy, sell, and explore tokens and NFTs.":

---

[1]Available at (https://app.uniswap.org/).  All websites cited herein were last accessed on February 6, 2023, unless noted otherwise.



The user can then "connect" her wallet and select the two ERC-20 tokens she wishes to swap. *See* FAC ¶ 68. Wallets are computer applications that are analogous to traditional wallets in that they allow the wallet holders to send, receive, and access crypto assets. *See id.* at ¶ 65. Anyone can use the Interface by simply connecting her wallet; the user does not need to create an account or login credentials. Whenever a user trades for a specific token on the Protocol, all she needs to do is select the token and the amount, and then click "swap" to execute the trade. Throughout this process, the user interacts directly with Uniswap. *See id.* at ¶ 69. Uniswap has a page on its website describing this process and instructing users on "how to swap tokens."[2] *See* Ex. A.

---

[2] Available at https://support.uniswap.org/hc/en-us/articles/8370549680909-How-to-Swap-Tokens-. Many of the references to Uniswap's website herein are also referenced in the FAC. In any event, Plaintiffs agree with Defendants that the Court may take judicial notice of information publicly available on Defendants' websites. *See* Uniswap Br. at 3, n. 1; VC Brief at 3, n. 2.

### B. The VC Defendants Were Instrumental in Upgrading the Protocol to v2 and v3

Adams publicly spotlighted the three VC Defendants as having been "incredibly value additive." FAC ¶ 104. Adams listed the many ways in which they were involved in upgrading the Protocol: "Advising, sourcing candidates, conducting interviews, making introductions, ***writing smart contracts***, ***writing whitepapers***, reading/explaining other peoples papers/smart contracts, historical analytics, letting me sleep on their couch, proof reading blogposts, insider info…content creation, ***breakthrough Uniswap-related math research***, playing HALO 3, educating regulators and institutions, product design feedback, and a whole lot more…Not to mention ***providing millions in funding*** during the depths of a bear market" (Emphasis added):





Notably, Adams drew no distinction between the VC Defendants' contributions to Uniswap, the Interface, or the Protocol, all of which were clearly understood by him to be part of Uniswap.  In a blog post Adams authored and published on Uniswap's website following the most recent financing round announced days after the FAC was filed, Adams announced that "Uniswap Labs is bringing the powerful simplicity and security that has defined the **Uniswap Protocol** to even more people across the world, by investing in ***our*** web app [*i.e.*, the Interface] and developer tools," and that these investments by Andreessen and Paradigm would support this "growth".[3]

The VC Defendants themselves spoke publicly at length about their contributions to v2 and v3.  Dan Robinson, Head of Research at Paradigm, discussed in detail in an interview with the website *The Defiant* how he and his colleagues were instrumental to the development of both v2 and v3.  *See* FAC ¶¶ 107, 108.  Dave White, a "Research Partner" at Paradigm, acknowledged "I've been working on a new type of automated market maker ***with @danrobinson*** and @haydenzadams."  *Id.* at ¶ 110 (emphasis added).  Matt Huang, co-founder of Paradigm, issued a press release stating that Paradigm assembled a "Research team" led by Dan Robinson that "work[ed] closely with our investment team and our portfolio on projects like Uniswap v3."  *Id.* at ¶ 109.

The VC Defendants, including Paradigm, also authored various "whitepapers" with Adams and others at Uniswap to describe how the different versions of Uniswap worked, and helped "write smart contracts" for v2 and v3.  *Id.* at ¶¶ 77, 80-81, 104, 111; *see also* v2 Whitepaper at 1, Ex 1, Dkt No. 68-1.  These smart contracts are integral to the operation of the Protocol: according to the v2 whitepaper, the "Uniswap v1 is an on-chain system of smart contracts on the Ethereum blockchain," and "Uniswap v2 is a new implementation based on the same formula…."  *Id.* at 1.

---

[3] https://uniswap.org/blog/bringing-web3-to-everyone (emphasis added).

### C.  How the Protocol Works

The Protocol is comprised of a series of smart contracts, which were written by Adams and the VC Defendants.  *See id.* at ¶¶ 80, 81, 104.  According to Investopedia[4], "[a] smart contract is a ***self-executing <u>contract</u>*** with the ***<u>terms</u> of the <u>agreement</u>*** between <u>***buyer***</u> *and* <u>***seller***</u> being directly written into lines of code." (Emphasis added); *see also* FAC ¶42.  Uniswap uses multiple kinds of smart contracts, including the "factory" contract, "core" contracts, and "router" contracts. According to Uniswap, core contracts are "[s]mart contracts that are considered foundational, and are essential for Uniswap to exist."[5]  Uniswap's proprietary factory contract is "a smart contract that deploys a unique smart contract for any ERC20/ERC20 trading pair."  *Id.*

When an issuer or liquidity provider wants to introduce a token to the market, they will deposit two tokens into a "Uniswap Pool":



In the diagram above, Token A often represents Ether or ETH (the token native to the Ethereum blockchain), and Token B represents the ERC-20 token that the issuer wants to introduce to investors.  In return, Uniswap "mints" and issues unique tokens ("Liquidity Tokens," referred to as "Pool Tokens" in the diagram above) to the liquidity providers.  FAC ¶ 79.

---

[4] https://www.investopedia.com/terms/s/smart-contracts.asp ("Investopedia Definition").

[5] https://docs.uniswap.org/concepts/glossary.

When issuers deploy token pairs on the Protocol, they must meet the requirements of Uniswap's smart contracts. *See, e.g.*, v2 Whitepaper at 8-9, Ex 1, Dkt No. 68-1. In turn, users of the Protocol interact with Uniswap's smart contracts when executing trades as demonstrated in the diagram above. According to Uniswap, "Uniswap v2's 'core' contracts [include] *the pair contract that stores liquidity providers' funds*." *Id.* at 1 (emphasis added); *see also* FAC ¶81. In other words, Uniswap acknowledges that it holds the tokens paired together in a "Uniswap Pool" in these pair contracts. To execute a trade, "Uniswap v2 will require calling the pair contract through a 'router' contract that computes the trade or deposit amount and transfers funds to the pair contract." *Id.* at 2. Thus, all trades on the Protocol run through Uniswap's router contracts. According to Uniswap's description of the "Auto Router," "[t]he app fetches the optimal trade route *from a Uniswap Labs server*." (Emphasis added); *see* Ex B.

### D. Users are Charged Fees

Since at least the implementation of v2 – which occurred about a month before Andreessen led the second financing round for Uniswap – Uniswap has charged fees ("User Fees") for trades. FAC ¶¶ 91, 96. The User Fees are collected and distributed by and pursuant to Uniswap's smart contracts. *See id.* at ¶ 92. The User Fees are collected after each transaction and stored in Uniswap Pools in the form of "Pool Tokens." *Id.* The User Fees only get distributed to liquidity providers after they burn their Pool Tokens, *i.e.*, the liquidity providers relinquish them and drain the liquidity from the Uniswap Pools at the expense of investors. *See id.* Contrary to Uniswap's assertion (*see* Dkt. No. 64, Tr. at 14:19 - 15:3), information on the User Fees is not readily accessible on the Ethereum blockchain, as nothing about the User Fees (or the hidden fees that issuers charge) is displayed on common blockchain explorers. As Defendants concede, Uniswap also has the option to charge additional fees for itself if it turns on a fee "switch." Uniswap's

9

memorandum of law, Dkt. No. 67 ("Uniswap Br.") at 7; *see also* "Protocol Fees"[6] ("Uniswap v3 has a protocol fee that can be turned on **by UNI governance**.  Compared to v2, ***UNI governance has more flexibility in choosing the fraction of swap fees that go to the protocol*.**") (Emphasis added).  Moreover, these fees are not Defendants' only means of collecting revenue for themselves. *See* FAC ¶ 91; Dkt. No. 64, Tr. at 14:10-16.

## II.    Ownership and Control of Uniswap/Protocol

### A.  Uniswap's Ownership on Paper

Uniswap is structured and run as a for-profit business, with the Interface/Protocol and UNI as its primary assets.  *See* FAC ¶ 98.  In April 2019, Paradigm became the first investor to initially invest in Uniswap, providing critical seed funding (among the other mission critical tasks that Adams credited to Paradigm, as referenced above).  *See id.* at ¶ 99.  In June 2020, Uniswap issued an additional $11 million in equity shares and options or warrants to multiple investors, including Andreessen (which "led" the financing round), Paradigm, and USV.  *Id.* at ¶ 100.  Shortly following the filing of the FAC, Uniswap announced that it had raised an additional $165 million (based on a reported valuation of $1.66 billion for *Uniswap*) from Andreessen and Paradigm, among others.  *See* Dkt. No. 60 at 2.[7]

### B.  The Uniswap Governance and Ownership of the Protocol

Nearly two years after launching the Protocol, in September 2020, Uniswap created its own ERC-20 token, UNI.  Uniswap announced that it had allocated 40% of the total supply of UNI to "team members and future employees, investors and advisors," most of which was made up of Adams (and other employees of Uniswap), Andreessen, Paradigm, and USV, who received

---

[6] Available at https://docs.uniswap.org/concepts/protocol/fees.

[7] *See also* https://uniswap.org/blog/bringing-web3-to-everyone.

millions of UNI.  FAC ¶¶ 124-125.  Only 12% of UNI has been purchased by "community members".  *Id.* at ¶ 126.  Of the remaining UNI, Uniswap stated that the "governance treasury will retain 43% [430,000,000 UNI] . . . to distribute on an ongoing basis through contributor grants, community initiatives, liquidity mining, and other programs."  *Id.* ¶ 127.  Thus, the VC Defendants and Adams control as much as ***88%*** of UNI.  *Id.* ¶ 128.

Upon receiving UNI, the VC Defendants and Adams were granted "immediate ownership" of, *inter alia*, the "Uniswap governance" (the "Governance"), the "UNI community treasury" and the "protocol fee switch".  *Id.* ¶ 123.[8]  According to Uniswap, "[t]he Uniswap Protocol is… **owned** and **governed** by UNI token holders," and "UNI holders govern the Protocol through an on-chain governance process."[9] (Emphasis in original).  Thus, as part of issuing UNI, Uniswap transferred its main asset (the Protocol) in whole or part to Adams and the VC Defendants.

Adams and the VC Defendants' control over the overwhelming majority of UNI also grants them control of the Governance.  Ownership of at least one percent of the total UNI supply is required to submit a governance proposal, and four percent is required to vote "yes" to reach quorum; under these parameters and given the allocation of UNI, Adams and the VC Defendants have de facto control of the Governance.  *See* FAC ¶ 129.

In their brief, the VC Defendants attempt to minimize their overwhelming control of the Governance to "the power to vote only on a limited set of issues," which by their own admission includes "the use of UNI tokens in the 'Community Treasury,' *i.e.*, 430 million UNI (or 43% of the initial UNI supply)."  As of February 4, 2023, the UNI's current price is $7.06.  Thus, by their own admission the VC Defendants can vote on the disbursement of more than $3 billion.  The VC

---

[8] *See* https://uniswap.org/blog/uni.

[9] *See* https://uniswap.org/governance.

Defendants also admit that they have the power to vote on "***the amount of liquidity provider fees*** for certain liquidity pools; ***whether UNI token holders*** [i.e., themselves] ***will receive fees***; and '***Uniswap governance***,' *i.e.*, ***the rules regarding the passage of governance proposals for the Protocol***."  VC Defendants' memorandum of law, Dkt. No. 70 ("VC Brief") at 6-7 (emphasis added).  In sum, by their own admission, Adams and the VC Defendants control Uniswap's treasury, its income, and its governance.

High-ranking executives at Andreessen have publicly acknowledged that holders of governing token issued by so-called "decentralized autonomous organizations" or "DAOs" control protocols and their smart contracts.  For example, Chris Dixon, general partner of Andreessen and founder and leader of a16z crypto, acknowledged that ownership of UNI translates to control and ownership of the protocol: "Uniswap created the token, ***the token controls the protocol***, it's effectively ***by having a token… you own part of the protocol.***"  (Emphasis added).[10]  In addition, Miles Jennings, General Counsel at Andreessen, co-authored a paper published on Andreessen's website acknowledging that "governance tokens provide decentralized decision-making mechanism for DAO members to interact with the governance protocols ***and control the smart contracts underlying the protocol***." (Emphasis added); *see* A Legal Framework for Decentralized Autonomous Organizations, Ex. C.

Indeed, Andreessen alone holds at least 15 million votes in connection with the Governance, amounting to over 6% of "vote weight," traceable to just one of Andreessen's wallets.

---

[10] *See* https://youtu.be/RXHITeaGB8Q?t=3706.  The Court may take judicial notice of this video.  *Nat'l Acad. of TV Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 418 (S.D.N.Y. 2021) ("The Court also takes judicial notice of the two tweets and two videos… because the tweets and videos are publicly available. (citing *Wells Fargo Bank, N.A. v. Wrights, Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts may take judicial notice of "information publicly announced on certain non-governmental websites")).

*See* FAC ¶ 138.  These holdings alone afford Andreessen enough voting power to unilaterally propose changes to the Governance and vote affirmatively on such changes.  *See id.* at ¶ 142.  This is to say nothing of the other wallets that Andreessen controls, directly or indirectly, or its practice of delegating its voting rights in the Governance to others under its control and/or aligned with its goals.  *See id.* at ¶¶ 139-42, 146-47; *see also* Ex. D at 11 (independent study concluding that "the governance systems of…Uniswap is extremely centralized and controlled by a very small number of addresses.  Their governance systems show similarities with shareholder meetings, where a small number of large investors represent their interests.").

In addition to being owned and controlled through the Governance, the Protocol is explicitly subject to a "business source license" (the "License") held by "Uniswap Lab" as the "Licensor".  FAC ¶ 121; *see* License, Ex. E.[11]  The License limits use of the v3 source code under terms and conditions that either Uniswap and/or Defendants (through the Governance) can unilaterally change at any time.  *Id.*  According to Uniswap, "[l]icense changes must be enacted via the ENS domain uniswap.eth, which is controlled by Uniswap Governance."[12]  Examples of where Defendants have granted Protocol use licenses through the Governance include the following:

- Illusory Systems, Inc.: agreed to pay $2.5 million to the Uniswap Grants Program.
- GnosisDAO and Gnosis LTD: agreed to pay Uniswap up to $10 million.
- Boba Foundation: agreed to pay up to $1 million to Uniswap.[13]

**III.    If Uniswap Shut Down, Trading on the Protocol Would Halt or Become Limited**

---

[11] *See also* https://github.com/Uniswap/v3-core/blob/main/LICENSE.

[12] *See* https://docs.uniswap.org/contracts/v3/guides/governance/liscense-modifications.

[13] *See* Proposals 2.19, 2.20 and 2.30, respectively at https://app.uniswap.org/#/vote.

Uniswap's assertion that the Protocol would remain fully functional if it ceased to exist is demonstrably false and misleading for at least five reasons. *First*, if Uniswap's servers shut down, trading on the Protocol would come to a grinding halt because nearly all of the trading on the Protocol occurs through the Interface, which is hosted on Uniswap's webserver. *See* FAC ¶ 64. For users to access the Protocol without the Interface, they would have to write their own computer code that interacts with the Protocol, which is beyond the capability of most retail investors, or indeed anyone who is not an experienced computer programmer. *Second*, one or more of the smart contracts comprising the Protocol runs on the "Uniswap Labs server." *See* Ex. B. *Third*, as, Andreessen acknowledges, smart contracts can be controlled and altered through Governance. *Fourth*, Uniswap has the ability to add smart contracts to the Protocol. After Plaintiffs file the FAC, Uniswap announced on its website that "Uniswap Labs has released two new smart contracts" on the Protocol, which it referred to as "Permit2" and "Universal Router." *See* Ex. F. Uniswap stated that it added these contracts "to improve our own products, optimizing gas costs, simplifying user transaction flows, and strengthening security." *Id.* *Fifth*, for an institution to make the protocol available to the general public, such institution is required to get a "use license" under which Uniswap is the "licensor," and such license must be approved through the Governance that Defendants control. FAC ¶ 121. Accordingly, if someone had created a gateway to the Protocol without obtaining a license during the relevant period at issue (the "Class Period"), Defendants could have sought an injunction and or other relief.

## IV.   Defendants' Creation of a Legal Slush Fund and the "Uniswap Foundation"

In or around February 2021, a Governance proposal (the "Defense Fund Proposal") was submitted to create a so-called "DeFi Education Fund" designed to create a legal defense fund to cover all or part of the legal fees of all entities controlling the Protocol, including the various

14

Defendants, in responding to and defending against enforcement actions by government regulatory bodies, such as the SEC, and lawsuits, such as this action. FAC ¶ 151. The Defense Fund Proposal included a recommendation for an oversight committee, with three of the seven initial members of this committee general counsel of other crypto exchanges for which Andreessen is a large investor, owner, and/or controlling stakeholder. *See id.* at ¶ 153. Thus, it is unsurprising that the proposal passed, with a majority of "yes" votes coming from four wallets, including the a16z wallet. *See id.* at ¶ 155. Within days of the passage of the Defense Fund Proposal, the committee sold 500,000 UNI tokens (half of the tokens allotted), generating over $10 million. *See* FAC ¶ 156.

On June 30, 2022, the Uniswap Foundation was formed by "Uniswap community members" Devin Walsh and Ken Ng. FAC ¶¶ 158-59. According to the governance proposal calling for the creation of the Uniswap Foundation (the "UF Proposal"), Walsh "recently resigned as Chief of Staff at Uniswap Labs in order to propose the creation of the UF." *Id.* at ¶ 159. Ng was also a Uniswap insider who had previously "helped run the Ethereum Foundation…which gave Hayden [Adams] his initial grant to build Uniswap."[14] It is unclear how many UNI's Walsh and Ng collectively had been gifted by Adams and Uniswap at the time they made the UF Proposal, though the UF Proposal acknowledges that they "both hold UNI tokens" and that Walsh "also holds a small amount of Uniswap Labs equity." *Id.* According to the UF Proposal, Uniswap "built, deployed, and . . . will continue to contribute to and build on the Protocol in the future." *Id.*

The stated mission of the Uniswap Foundation is to support "the decentralized growth and sustainability of the Uniswap protocol and its supporting ecosystem." *Id.* at ¶ 163. In furtherance of that effort, Uniswap has evidently "given their blessing to this preliminary proposal for asset transition." *Id.* at ¶ 164. This would extend to "the ability to grant v3 BSL license exemptions, to

---

[14] *See* https://app.uniswap.org/#/vote/2/24?chain=mainnet.

maintain the governance forum, Sybil.org, and Protocol-related developer docs, and to help facilitate protocol development across many teams." *Id.* The Uniswap Foundation is to be funded from $74 million in UNI tokens taken from the Uniswap Treasury. In other words, Uniswap and its team of insiders have raised $74 million from Uniswap's treasury – which was putatively owned by the holders of UNI tokens – to create a separate spinoff company to be run by individuals under their influence and/or control, all for the benefit of the Protocol and with the continued involvement of Uniswap.

### V.   The Protocol Is a Haven for Fraud and the Defendants Know It

Part of what has made Uniswap one of the most frequented crypto exchanges, and one of the ones most ripe with fraud, is that it has no barriers or restrictions to anyone issuing a new token on Uniswap. *See* FAC ¶ 89. Uniswap boasts that "anyone can become a liquidity provider" – meaning, *anyone* can sell *any* token, even ones they create out of thin air – on Uniswap. *Id.* Uniswap also boasts that, as of the filing of this brief, the total trading volume on the "Uniswap Protocol" has surpassed $1.3 trillion, with over 130 million trades. *See* https://uniswap.org/. Apparently, after Plaintiffs filed the FAC, Uniswap stopped reporting on its home page the amount of token pairs traded to date, but as of the filing of the FAC, that amount exceeded 50,000. *See* FAC ¶ 61.

The initial decision by Adams and Uniswap to allow complete anonymity while failing to (i) charge token issuers any listing fees, (ii) implement a vetting process or (iii) criteria for issuing tokens, fostered an ideal environment for fraudulent conduct. *See id.* at ¶ 90 (and *passim*). Uniswap not only fails to prevent scammers but has established a fee structure that rewards fraudulent issuers, thereby encouraging and emboldening scammers to use Uniswap for illegal activities without any consequence. *See* FAC ¶¶ 178-182. Scam tokens on the Protocol are so

prevalent that a recent study concluded that **97.7% of all tokens on the Protocol** are "rug pull" scams. *See* Ex. G.

Defendants are fully aware of the existence and scope of fraudulent activity on the Protocol, but they have done little to address it. *See* FAC ¶ 184. In response to reports that Uniswap was a haven for scam tokens and fraud, Uniswap acknowledged that the Protocol was creating a problem: "As the rate of token issuance accelerates, it has become increasingly difficult for users to filter out high quality, legitimate tokens from scams, fakes, and duplicates," and conceded that the trend was something "we expect will only accelerate in the future." *Id.* at ¶ 185. Despite admitting their knowledge of the problem, at no point during the Class Period did Uniswap provide transparent information to its users about these scams or any other actual or potential fraudulent practices.

Hayden Adams has made various statements demonstrating that, at all relevant times, they understood the risks inherent to his creation, the Protocol. For example, Adams appeared on a webcast and described "how easy it was to create liquidity," where the host even joked that he minted his own token "for funsies" and thought it was "absolutely crazy" that he could list any token on the Protocol "without permission." FAC ¶ 187. Additionally, countless users have reached out to Uniswap directly and through social media asking Uniswap to implement security features to make the Protocol safer. Uniswap has either completely ignored these pleas for help or, in certain instances, has made or endorsed statements on social media, acknowledging that such scams occur on the Protocol. *See id.* at ¶ 188.

Uniswap created a channel on Discord (a very popular social media app commonly used by the crypto community) to, in part, promote its misleading claims of decentralization as to the Interface and the Protocol. In a discussion that took place on Uniswap's Discord channel on July 20, 2021, a "Tickets" bot, which appears to be under Uniswap's control and a moderator,

Crypto_Rachel, addressed a user question as to whether Uniswap planned to implement security measures preventing "scam coins." FAC ¶ 189. The bot responded that it had no such plans and that "no one can prevent scammers from having their scam token traded on Uniswap." *Id.* Contrary to that false representation, just three days later, Uniswap announced on Twitter that "we have started restricting access to a small number of tokens at http://app.uniswap.org." *Id.* at ¶ 190. That "small number" totaled 140 tokens. *Id.*

In another example of Uniswap's knowledge, a Uniswap engineer announced on August 20, 2022, that after four months of collaborating with TRM Labs, Uniswap had blacklisted 253 crypto addresses. *See* FAC ¶ 191. The engineer explained that "[i]f we offer our services (this website that interacts with the AMM protocol) to sanctioned individuals we are breaking the law and key individuals related to that could go to jail. We choose not to run the risk." *Id.* In sum, Uniswap can and has wielded its control over the Interface to unilaterally determine the securities eligible for trading on the platform.

Defendants are aware that most of the tokens launched every day on Uniswap are scams. In fact, approximately 450 new tokens or trading pairs (or, 1-5 per minute) were launched on the Protocol during the 24 hours leading up to the filing of the First Amended Complaint. *See* FAC ¶ 193. Many of these trading pairs had no liquidity left in them one day later, suggesting they were the subject of rug pulls. *Id.* Of the trading pairs that did still contain liquidity just one day later, many of them contained deficient metrics suggesting malicious code, while many others are likely honeypots (tokens that cannot be resold after being purchased by investors). *Id.*

## LEGAL STANDARD

In considering a motion to dismiss, a court must accept as true all-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *See, e.g., Charles*

*W. v. Maul*, 214 F.3d 350, 356 (2d Cir.2000); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 232 (S.D.N.Y. 2006).  A plaintiff prevails on a motion to dismiss if the complaint "contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bullard v. Drug Policy All.*, 2019 U.S. Dist. LEXIS 222854 at *13-14 (S.D.N.Y. Dec. 30, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A complaint "should only be dismissed where it appears beyond doubt that plaintiff can present no set of facts entitling him to relief"; in making this determination, "[the Court's] charge is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Lapin*, 506 F. Supp. 2d at 232; *see also Harris v. City of New York*, 186 F. 3d 243, 247 (2d Cir.1999).

The recitation of this legal standard is more important than usual here, as Defendants repeatedly attempt to dispute or simply ignore the detailed factual allegations in the FAC in their briefs.  These attempts are improper and must be rejected.

## ARGUMENT

### I.       Plaintiffs State a Claim Under Section 29(b) of the Exchange Act

Section 29(b) of the Exchange Act allows a party to rescind contracts made in violation of any provision of the act:

> Every contract made in violation of any provisions of this title or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violation of, or the continuance of any practice in violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rules or regulations thereunder, shall be void.

15 U.S.C. § 78cc.  In order to rescind a contract under Section 29(b), a plaintiff must "show that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the Act was designed to protect."  *Pompano-Windy City*

*Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (internal quotation marks and citations omitted).  Defendants do not and cannot dispute that (1) Plaintiffs are a class of persons the Exchange Act was designed to protect and (2) that Defendants did not register with the SEC.  Further, Plaintiffs were in contractual privity with Defendants and the contracts between them violated *both* Section 5 and Section 15 of Exchange Act, which prohibit acting as an unregistered exchange, broker, or dealer.  Accordingly, Plaintiffs plead claims under Section 29(b).

## A.  Plaintiffs Plead that Defendants Are an Exchange, Brokers and Dealers

An "exchange" as defined in the Exchange Act is "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities…."  15 U.S.C. § 78c(a)(1).  A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4)(A).  As an initial matter, Defendants do not contest that Plaintiffs sufficiently allege that the Tokens are securities.  Additionally, Plaintiffs undoubtedly plead that Defendants are an exchange or exchanges, brokers and dealers, either individually or collectively, and Defendants appeared to have abandoned their initial argument to the contrary in their pre-motion letters.  *See* Dkt. No. 52 at 2; Uniswap's memorandum of law, Dkt. No. 67 ("Uniswap Br.") at 9, n. 3 (noting that "the Court need not address those issues in order to decide this motion.").[15]

---

[15] In that same footnote, Defendants also concede, as they must, that Plaintiffs have a private right of action under Section 29(b).  *See, e.g.*, *Transamerica Mortg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 18-19, 100 S. Ct. 242, 246 (1979); *Boguslavsky v. Kaplan*, 159 F. 3d 715, 722 n. 6 (2d Cir. 1998) (acknowledging line of authority that violation of Section 15(a)(1) of Exchange Act can form predicate for rescission action under Section 29(b)).

Uniswap and Adams created, own and/or maintain the Interface and the Protocol, which are a marketplace for trading tokens (including the Tokens at issue in this case), *i.e.*, securities. At various times, Uniswap has also repeatedly referred to either itself, the Interface or the Protocol as the "Uniswap Exchange," which was its original Twitter handle. The VC Defendants merely incorporate Uniswap's argument by reference and their attempt to address Plaintiffs' extensive allegations that they are an exchange with eight words ("simply by naming 'the Owners' as an afterthought") is baseless. VC Opp. at 13-14. The FAC contains extensive and detailed allegations that Defendants helped create the Protocol (a marketplace for securities) by writing the smart contracts that comprise the Protocol, and, among other things, and control, maintain, and/or own the Protocol through their control of the Governance. FAC ¶¶ 104-50. Taken as a whole, the allegations in the FAC are more than sufficient to state a claim that these Defendants – Uniswap, Adams, Andreessen, Paradigm, and USV – individually and/or together satisfy the definition of an "exchange." The FAC also contains extensive allegations that Defendants acted as brokers or dealers by, among other things, facilitating the sale of tokens on the Protocol through Uniswap Pools.

### B.  Plaintiffs Plead Contractual Privity with Defendants

The familiar elements of a contract are offer, acceptance, consideration, and mutual assent and intent to be bound. *See, e.g., Register.com, Inc. v. Verio*, Inc., 356 F. 3d 393, 427 (2d Cir. 2004) (quoting *Louros v. Cyr*, 175 F. Supp. 2d 497, 512 n. 5 (S.D.N.Y. 2001); *see generally* Restatement (Second) of Contracts, § 17 (1981). All of these elements are easily met here through Plaintiffs' use of the Interface and interaction with the smart contracts Defendants wrote in order to conduct trades, especially since Uniswap designed it so that each trading pair made available on Uniswap is subject to a unique smart contract.

1. **Plaintiffs Contracted with Uniswap by Using the Interface Uniswap Owns and Controls**

Plaintiffs allege that Defendants are unregistered "exchanges," "brokers" and/or "dealers" as those terms are defined under the Exchange Act.  Uniswap fails to mention the Interface in its discussion on privity, likely because it knows that in using the Interface, Plaintiffs entered into binding contracts with Uniswap to execute the trading of securities.  Plaintiffs then purchased the Tokens by using the Interface, which Uniswap owns, controls, and hosts on its servers.  For each such trade, Plaintiffs agreed to allow Uniswap to remove ETH from their wallets to be contributed to a Uniswap Pool and in exchange, Uniswap agreed to place a certain amount of Tokens in Plaintiffs' wallets (each trade of a Token, a "Trade").  In connection with each of these Trades, Uniswap collected fees from Plaintiffs and stored then in Uniswap Pools for later distribution to issuers and/or liquidity providers.

Contrary to Uniswap's assertions, Plaintiffs do, in fact, allege that there are counterparties to their trades on the Interface; specifically, Uniswap and all Defendants (as discussed below).  Uniswap attempts to obscure the well-pleaded FAC by selectively quoting only a portion of a sentence in paragraph 78 of the FAC (*see* Uniswap Br. at 10) and to twist the allegation to its liking, but the sentence it cites reads in full: "Thus, buyers and sellers do not trade with each other directly but instead ***do so with Uniswap*** *through liquidity pools* ***Uniswap creates and maintains***."  FAC ¶ 78 (emphasis added).[16]  Accordingly, Plaintiffs have alleged privity with Uniswap.

2. **Plaintiffs Contracted with Defendants Through the Smart Contracts They Wrote**

As set forth *supra*, the smart contracts at issue are legally-binding contracts.  Smart contracts are understood within the industry to be "self-executing ***contracts***," with "the ***terms of***

---

[16] Uniswap cited to paragraph 72 of the FAC for this quote, but that appears to be in error.

*the agreement* **between buyer and seller**" written into the code.   Investopedia Definition (emphasis added); *see also* FAC ¶ 42.  IBM, one of the most reputable computer companies in the world, stated that "[smart contracts] typically are used to automate **the execution of an** *agreement* so that all participants can be immediately certain of the outcome, without any intermediary's involvement or time loss."  https://www.ibm.com/topics/smart-contracts (emphasis added).  And Andreessen appears to agree with IBM's description of smart contracts, recently citing to it with approval.  *See* Ex. C.

Indeed, the only significant difference between a traditional contract and a smart contract is that a smart contract is automated, meaning that (in theory) performance is guaranteed.  Uniswap appears to concede as much by acknowledging smart contracts are self-executing and self-enforcing.  However, if (as Uniswap argues) smart contracts are not actually contracts, there would be nothing to execute and nothing to enforce.  There is no such thing as a contract that is not a contract in the "legal sense."  Uniswap made that up and cites no authority for this proposition. Simply put, a contract is a contract.

Contracts cannot be entered into with "software" as Defendants would have this Court believe.  The contract must be entered into with the person or persons that control that software. The series of smart contracts that comprise the Protocol, and which the Defendants wrote, control, and maintain (the "Uniswap Smart Contracts"), were necessary to the execution of every Trade. Plaintiffs executed their Trades pursuant to the Uniswap Smart Contracts, including the router contracts and core contracts.  The router contracts, which appear to be hosted on Uniswap's servers, are necessary to facilitate trades in connection with the Tokens.  *See* FAC ¶ 81; Ex. C.  All tokens traded on the Protocol are stored in the pair contracts (part of the core contracts).  *See id.*

Accordingly, Defendants were counterparties to the Plaintiffs in the Uniswap Smart Contracts for each Trade.

Try as they may, the VC Defendants and Adams cannot evade the well-pleaded allegations and their own statements that they control the smart contracts comprising the Protocol.  As Chris Dixon of Andreessen acknowledged, "Uniswap created the token, **the token controls the protocol**…." (Emphasis added).[17]  Moreover, Andreessen has publicly stated that control of a protocol means control of the smart contracts:



The governance tokens provide decentralized decision-making mechanism for DAO members to interact with the governance protocols and control the smart contracts underlying the protocol (*see* **Chart 3**). Although the functionality of governance tokens and governance smart contracts vary for each DAO, governance tokens generally provide a means in which proposals can be raised and voted on regarding DAO operational decisions and governance smart contracts generally provide a means to alter variants in the smart contracts of the underlying protocol and to manage the DAO treasury.

*See* Ex. C (emphasis added).

As discussed more fully below, the VC Defendants and Adams are alternatively liable under §12(a)(1).  *See Mendali v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 n. 4 (S.D.N.Y. 2016) ("While a defendant ultimately may not be held liable as both a primary violator

---

[17] *See* https://youtu.be/RXHITeaGB8Q?t=3706.

and a controlling person, a plaintiff may plead alternative theories of liability in the complaint.")
(internal quotation marks and citations omitted).

### C.  The Contracts Between Plaintiffs and Defendants Are in Violation of Sections 5 and 15 of the Exchange Act and Thus Can be Rescinded

Each Trade constitutes separate contracts between the user and Uniswap.  As discussed,
users do not create logins or credentials, but instead conduct the Trades by connecting their wallets
to the Interface and executing them.  *See* 15 U.S.C. § 78c(a)(13) (defining "buy" and "purchase"
to "include any contract to buy, purchase, or otherwise acquire").  In addition, the execution of the
Uniswap Smart Contracts was necessary for each Trade in connection with a Token, and thus they
constitute separate contracts.

The Trades and the Uniswap Smart Contracts are either individually or collectively
voidable because they each require Defendants to either (i) effect transactions in a security (in
violation of Section 5) or (ii) "effect any transactions in, or to induce or attempt to induce the
purchase or sale of, any security" (in violation of Section 15(a)).  *See EdgePoint Cap. Holdings,
LLC v. Apothecare Pharm., LLC*, 6 F. 4th 50, 57-59 (1st Cir. 2021) (contract was "voidable under
Section 29(b)" because it "involved a practice in violation of the [Exchange Act], specifically
'induc[ing], or attempt[ing] to induce the purchase or sale of any security as an unregistered
broker") (citations omitted); *Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*, 752 F. 2d
178, 182 (5th Cir. 1985) (holding that a contract was void because the defendant did not register
as a dealer where the defendant "undertook to sell securities for [the plaintiff]."); *Couldock &
Bohan, Inc. v. Société Generale Sec. Corp.*, 93 F. Supp. 2d 220, 231-32 (D. Conn. 2000) (contract
that was "inextricably intertwined with" violation of registration requirement for broker/dealers
was "void and unenforceable" under Section 29(b)).

The cases Uniswap cites are inapposite.  *See* Uniswap Br. at 10.  In each of those cases, there were no predicate violations or no contracts that required the performance of an illegal act.

To the extent that any of the Defendants may attempt to rely in reply on the recent decision *Underwood v. Coinbase Global, Inc.*, No. 21-cv-08353-PAE, 2023 U.S. Dist. LEXIS 17201 (S.D.N.Y. Feb. 2, 2023), that case is readily distinguishable.  There, the court dismissed the Section 29(b) claims based on the court's explicit finding that the amended complaint contained factual allegations that directly contradicted allegations in the initial complaint.  *Id.* at *8-12.  For example, the court found that the plaintiffs in *Coinbase* alleged in the *initial* complaint that they purchased the tokens at issue pursuant to the Coinbase user agreement but attempted to remove all references to the user agreement in their *amended* complaint in order to the plead that they entered into contracts with Coinbase separate and apart from the user agreement.  *See id.* at *19-24.  The Court held that the plaintiffs were stuck with their initial pleading on this issue and that the user agreement did not necessitate illegal acts because the Coinbase platform has other uses beyond trading securities.  *See id.*  In fact, the court suggested that but for the contradictory allegations and the user agreement, Plaintiffs' Section 29(b) claims would have survived:

> By stripping away all reference to the User Agreement, the AC is able to add Exchange Act claims permitting rescission.  But once plaintiffs' earlier allegations in the Complaint as to the same transactions regarding the Tokens are treated as cognizable, the AC's bid to pursue claims for recission based on a course of dealings not involving the User Agreement becomes unsustainable.

*Id.* at *32.  Here, Plaintiffs do not allege that they are subject to any user agreement and Uniswap does not argue otherwise.  As discussed, unlike a so-called centralized exchange like Coinbase, users of Uniswap are not required to create user logins or store assets on the platform.  Thus, Plaintiffs have pleaded that each Trade is a separate contract.  The Uniswap Smart Contracts are also separate contracts.

II.   **PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT DEFENDANTS QUALIFY AS "SELLERS" FOR PURPOSES OF THEIR CLAIM PURSUANT TO SECTION 12(a)(1) OF THE SECURITIES ACT**

Section 12(a)(1) of the Securities Act imposes liability on the person who passed title or other interest in the security to the buyer for value, or on the person who successfully solicits a purchase of securities so long as he is motivated at least in part by a desire to serve his own financial interests or those of the securities owner. *See Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988). The FAC contains detailed factual support for the assertion that Defendants are sellers under Section 12(a)(1).

### A.   Defendants Passed Title of the Tokens to Plaintiffs

Plaintiffs, like nearly all users of the Protocol, purchased their Tokens through the Interface, which Uniswap controls and hosts on its webserver. *See* FAC ¶ 64. In addition, as discussed *supra*, Defendants wrote, controlled, and maintained the Uniswap Smart Contracts that comprise the Protocol, including the pair contracts (which held the Tokens in Uniswap Pools) and the router contracts (which transmitted the Tokens to Plaintiffs). Accordingly, Defendants held and passed title of the Tokens to Plaintiffs.

It is uncontested that other users did not sell the Tokens to Plaintiffs. Instead, Defendants' sole argument seems to be that a computer program (controlled by no one) held and sold the Tokens to Plaintiffs. *See* Uniswap Br. at 12 ("liquidity providers add pairs of tokens to a liquidity pool, and other users interact with the liquidity pool to swap one token for the other."); VC Br. at 5 ("users who trade tokens on the Protocol do not interact directly without users, but rather trade through a 'liquidity pool' for a pair of tokens."). Defendants' arguments are not only contradicted by Plaintiffs' well-pleaded allegations and their own public statements (*See, e.g.*, Ex. C), but defy common sense, and if accepted would amount to allowing creators of automation to avoid compliance with the law by blaming any harm they cause on their creation. Under Defendants'

27

theory, a technology company that creates self-driving cars with flaws leading to harm or death would not be subject to any liability, regardless of whether they were responsible for such flaws. Unfortunately for Defendants, the law is not so rigid, and especially securities laws. *See, e.g.*, Crypto's 'DeFi' Projects Aren't Immune to Regulation, SEC's Gensler Says, *The Wall Street Journal*, Aug. 19, 2021, Ex. H (Chairman Gensler stating "[t]here's still a core group of folks that are not only writing the software, like the open-source software, but they often have governance and fees…. There's some incentive structure for those promoters and sponsors in the middle of this.").

The FAC's allegations that Plaintiffs traded with Defendants directly and not with other users are precisely the type that the in *Coinbase* stated "would ordinarily assist plaintiffs in pleading" that entities such as Defendants are statutory sellers. *Coinbase*, 2023 U.S. Dist. LEXIS 17201 at *17 (dismissing Section 12 claims where amended complaint conflicted with original complaint that contained allegations users could enter into trade agreements with each other and acknowledged users were bound by a user agreement specifying that title of digit assets remained with the users).

**B. Defendants Successfully Solicited Plaintiffs' Trades for Defendants' Financial Gain**

Plaintiffs also allege that Defendants solicited the purchase of the Tokens, motivated by Defendants' own financial gain or that of the issuers. *See Pinter*, 486 U.S. at 647. Defendants induced users to swap Tokens on the Protocol, courting them through social media. *See* FAC ¶¶ 9, 52-53, 133, 198, 735. At the least, Defendants' efforts in increasing usership of the Protocol increased the value of UNI, which they issued to themselves, enriching themselves to the tune of millions of dollars. *See id.* at ¶ 125. Uniswap charges a fee for each trade (which it passes onto issuers/liquidity providers) and reserves the ability to keep a portion of the fee (such decision is in

the hands of Adams and the VC Defendants via their control of the Governance).  *See id.* at ¶ 91.

Even counsel for Uniswap acknowledged that Defendants are earning money from the Protocol.

*See* Dkt. No. 64, Tr. at 14:7-10 ("I don't want to say that there's no revenue from any source,

period, because I don't want to overstate things.").  Defendants' broad solicitation reached, and

successfully induced, Plaintiffs to swap on the Protocol.

Defendants insist that *Pinter*'s second prong requires allegations of "direct contact[]"

between the parties or that Plaintiffs' swaps were "a result of [] active solicitation" by Defendants.

Uniswap Br. at 12.  This is hardly well-settled, as other courts have more recently rejected this

particular understanding of *Pinter*'s requirements.  *Steed Fin. LDC v. Nomura Secs. Int'l, Inc.*, No.

00-cv-8058, 2001 U.S. Dist. LEXIS 14761 (S.D.N.Y Sept. 20, 2001) was cited and relied upon in

*Pino v. Capital*, No. 20-cv-8499, 2021 U.S. Dist. LEXIS 166042 (C.D. Cal. Apr. 27, 2021) ("*Pino

I*"); there the district  court dismissed the plaintiff's Section 12(a)(2) claim as to certain defendants

for failure to allege that those defendants were "directly and actively involved in soliciting

Plaintiff's investment, or that Plaintiff relied on such a solicitation when investing."  *Pino I*, 46-

48.  The Ninth Circuit reversed the dismissal.  *Pino v. Cardone Cap., LLC*, 55 F.4th 1253 (9th Cir.

2022) ("*Pino II*").  Reviewing *Pinter* and a recent Eleventh Circuit case, the Ninth Circuit agreed

that "nothing in section 12 expressly requires that solicitation must be direct or personal to a

particular purchaser to trigger liability under the statute."  *Pino II*, 55 F. 4th at 1258.  "Nor has the

Supreme Court imposed a requirement that solicitation under section 12 requires that a seller

'actively and directly' solicit a plaintiff's investment."  *Id*. at 1259.

The *Pinter* Court recognized that although "the language of § 12 contemplates a buyer-

seller relationship," the meaning of "seller" is interpreted to include more than mere owners to

encompass those who engage in solicitation.  *Id*. at 1259-60.  That Defendants used social media

rather than individually meeting with each Plaintiff to solicit the swaps is of no import: "[i]n fact, if anything, the advertisements at issue in this case – Instagram posts and YouTube videos – are the types of potentially injurious solicitations that are intended to command attention and persuade potential purchasers to invest in the Funds during the 'most critical' first stage of a selling transaction, when the buyer becomes involved." *Id*. at 1260 (*citing Pinter* at 646-647). Thus, Plaintiffs adequately allege that Defendants' use of social media make it such that investors were persuaded to swap Tokens without full and fair information.

The Eleventh Circuit's *Pinter* analysis is similar. In *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022), the court found that the trial court erred in concluding that a person could solicit a purchase only when the seller directed a solicitation to a particular buyer. Online video promotion for the crypto security in that case was found to be solicitation. In analyzing the history of what "solicitation" meant in 1933, the court stated that a sales "approach" did not need to be personal to amount to solicitation or to trigger liability. *Id*. at 1345-46. "Broadly disseminated communications also can convey a solicitation – indeed, they are consistent with the longstanding interpretation of the term." *Id*. at 1346.

Defendants solicited Plaintiffs to purchase fraudulent Tokens on Defendants' exchange using social media to convince Plaintiffs that Uniswap was safe. *See* FAC ¶¶ 9, 133, 198.[18] Defendants collected transaction fees from Plaintiffs for the issuers of these scam Tokens and ultimately profited themselves by, at the least, increasing the value of UNI. *Id*. ¶ 125. This solicitation—for their own financial interests and those of the issuers–makes Defendants liable to the Plaintiffs for their losses. No direct or personal interaction is required between the parties. *See*

---

[18] *See also* https://twitter.com/uniswap/status/1546886731521212416 (Uniswap continued to solicit use of the Protocol after a phishing cam, proclaiming, "[t]he Protocol always was—and remains—secure.")

*In re OSG Secs. Litig.*, 971 F. Supp. 2d 387, 403-405 (S.D.N.Y. 2013) (allegation of solicitation by individual defendants survives motion to dismiss where plaintiffs alleged that individual defendants participated in efforts to market offering to investors beyond simply signing registration statement).

## III.   PLAINTIFFS HAVE PROPERLY ALLEGED THEIR CONTROL PERSON LIABILITY CLAIMS

In addition to the primary violations Plaintiffs have pled against Defendants, Plaintiffs have also alleged in the alternative control-person liability claims against Defendants Adams, Andreessen, Paradigm, and USV under Section 20 of the Exchange Act, Section 15 of the Securities Act, and the Idaho and North Carolina blue sky laws.  *See* FAC ¶¶ 725-30, 741-45, 765-72, 787-93; *see also* Rule 8(d)(2) (a party may plead a cause of action "alternatively or hypothetically, either in a single count or defense or in separate ones").  To state a claim for control-person liability under the Securities Act, plaintiffs must allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator."  *In re Global Crossing, Ltd. Secs. Litig.*, No. 02-cv-910, 2005 U.S. Dist. LEXIS 16228, at *37 (S.D.N.Y. Nov. 7, 2005).  The elements are the same for claims under the Exchange Act, as the VC Defendants acknowledge, and are not materially different for either of the state law causes of action.  *See* VC Br. at 14 n. 7; *see generally* N.C. Gen. Stat. § 78A-56(c)(1)-(2); Idaho Code § 30-14-509(g)(1)-(3).

In the Second Circuit, "the control person provisions are broadly construed as they were meant to expand the scope of liability under the securities laws."  *In re Tronox, Inc. Sec. Lit.,* 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011) (*quoting CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006)); *see also Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001).  Accordingly, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and ***generally***

***should not be resolved on a motion to dismiss***." *CompuDyne*, 453 F. Supp. 2d at 829 (emphasis added).

### A.  Plaintiffs Plead Primary Violations

Here, the first element is satisfied because Plaintiffs have sufficiently alleged violations of the Exchange Act and Securities Act. *See supra* Sections I and II.

### B.  Plaintiffs Adequately Allege Control

"To establish the second element – control – a plaintiff must show that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, ***by*** ***<u>contract</u>, or <u>otherwise</u>***." *In re Philip Services Corp. Securities Litigation*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (internal quotations and citations omitted) (emphasis added).  Plaintiffs must plead "facts demonstrating that [the defendants] had actual control over the transaction in question." *In re Cannavest Corp. Secs. Litig.*, 307 F. Supp. 3d at 253 (citations omitted).  However, "actual control requires only ***the ability to direct the actions of the controlled person***, and not the active exercise thereof." *In re Veon Ltd. Securities Litigation*, 15-cv-08672 (ALC), 2018 U.S. Dist. LEXIS 148272, at *55 (S.D.N.Y. Aug. 30, 2018) (emphasis added) (citing *Tronox*, 769 F. Supp. 2d at 207).  As a result, "control has been construed as 'requiring ***only some indirect means of discipline or influence*** short of actual direction' by the controlling person." *Dietrich*, 126 F. Supp. 2d at 765 (citations omitted).

#### 1.  Plaintiffs Have Sufficiently Pled That Adams and the VC Defendants Control Uniswap

Contrary to Defendants' arguments, Plaintiffs have sufficiently alleged that Adams and each of the VC Defendants have (or had at some point during the relevant period) the ability to control Uniswap.

Everything begins with Adams, who at all relevant times has been the chief executive officer of Uniswap.  *See* FAC ¶ 21.  Adams also created, developed, and monetized the Protocol and the Interface.  *See id.* at ¶¶ 51, 52, 77, 96, 97.  It beggars belief that Adams did not control the company and trading platform he thought up, designed, built, and promoted, or at least that he did not have such control at any point during the Class Period.

Next comes Paradigm and the other VC Defendants.  Paradigm was the first investor for Uniswap.  *See id.* at ¶ 99.  The next financing round was led by Andreessen, with Paradigm and USV joining.  *See id.* at ¶ 100.  As noted above, shortly after the FAC was filed, Adams announced that Uniswap had raised an additional $165 million from Andreessen and Paradigm, among others.  While the exacts terms of these investments are in Defendants' possession and not publicly available, Defendants have publicly stated how "invaluable" Andreessen, Paradigm, and USV have been to Uniswap and Adams, who needed the VC Defendants' "millions in funding," operational experience and resources, technical skills, their ability to write smart contracts and whitepapers, and their "insider info," among other things.  FAC ¶ 104.  In fact, Uniswap is still maintaining the Protocol and developing smart contracts for it with the assistance of the VC Defendants.  *See* Ex. F (in November 2022, announcing two new smart contracts for the Protocol and "thank[ing] Paradigm's transmissions11 for his contributions and feedback on Permit2.").  The VC Defendants' investment of millions of dollars along with the devotion of their other skills and resources necessary to build and operate Uniswap clearly constitutes "some indirect means of discipline or influence" sufficient to establish the control prong.  *Dietrich*, 126 F. Supp. 2d at 765.

Despite the clear influence Adams and the VC Defendants have exerted on Uniswap and the Protocol, they nevertheless attempt to disclaim control.  This argument fails for several reasons, in that the argument as to ownership is both irrelevant (as set forth *supra*, actual control in the form

of indirect means of discipline or influence is the applicable test, not legal ownership) and a matter of disputed fact, for which discovery will be necessary to fully ascertain.

First, it is uncontested that Adams and the VC Defendants owned Uniswap and substantially influenced and controlled upgrading the Protocol through at least September 2020. Accordingly, by Defendants' own reasoning, Adams and the VC Defendants should be liable as control persons for at least the violations prior to this date.

After this date, Defendants maintained ownership of Uniswap while tightening their grip on the Protocol.  In September 2020, a mere three months after its second round of funding, Uniswap announced that it transferred ownership (in whole or part) of the Protocol to the so-called Governance.  However, as discussed in the FAC, contemporaneously with and despite the purported "transfer" of the Protocol to the Governance, Uniswap gave Adams, Andreessen, Paradigm, and USV as much as 88% of UNI and "immediate ownership" and control over the Protocol, which oversees the treasury of UNI, currently worth more than $3 billion.  FAC ¶¶ 123, 128.

In essence, under the guise of the "Governance," Adams and the VC Defendants have restructured Uniswap whereby they effectively issued themselves preferred shares (*i.e.*, UNI) as a means to control the company and its main asset.  *See id.* at ¶¶ 146-147.  And the most obvious reason to proceed in this manner is to obfuscate ownership, avoid compliance with securities and other laws, and shelter themselves from liability.  Defendants' scheme might be creative, but unfortunately for them, the law forbids individuals and entities from using "dummies" to commit acts forbidden by the securities laws.  *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 352 F. Supp. 2d 429, 459 (S.D.N.Y. 2005) ("The 'control person' provisions were included in the federal

securities laws to 'prevent people and entities from using 'dummies' to do the things that they were forbidden to do by the securities laws.'") (Internal citations and quotation marks omitted).

Thus, there are issues of fact as to the extent to which the VC Defendants control Uniswap and Uniswap's role in connection with the Protocol.  Moreover, there are also issues of fact as to the extent to which the Governance controls Uniswap, whether any of these purported transactions have been papered, and so forth.  To the extent these facts are not already known, it is because the information is uniquely within the possession of Defendants, and/or Defendants have intentionally obfuscated Uniswap's ownership and control.  Thus, even if the Court is amenable to the fact arguments improperly being advanced by Defendants, "[g]iven the early pleading stage and flexible pleading standards, it is not implausible that plaintiffs could develop a record that could support a finding of control." *In re Veon Ltd. Securities Litigation*, 2018 U.S. Dist. LEXIS 148272, at *57 (S.D.N.Y. Aug. 30, 2018) (citations omitted).  Accordingly, Plaintiffs have sufficiently pled that Adams and the VC Defendants control Uniswap.

### 2.   Plaintiffs Plead in Detail How Adams and the VC Defendants Exercised Control Over Uniswap's Securities Violations

Contrary to the arguments advanced by Adams and the VC Defendants, the FAC is replete with allegations evincing their liability for the illegal actions taken by Uniswap that give rise to the securities violations at issue.

As set forth *supra*, Adams and the VC Defendants had control over the Protocol – they developed it, built it, financed it, promoted it to the public, and had the ability to de-list tokens, in addition to other elements of control set forth by Plaintiffs in the FAC.  Plaintiffs further allege that despite this control, Adams and the VC Defendants failed to enact measures that would have provided meaningful protection for the users of Uniswap – *i.e.*, by complying with applicable registration requirements.  *See* FAC ¶¶ 11, 708-93.  If Adams, Andreessen, Paradigm, and/or USV

wished to propose that the Protocol be registered as a national securities exchange, for example, or if they wished to devote resources to hiring a compliance team and empowering that team with the ability to block or remove unregistered securities like the Tokens from the Protocol (as opposed to the Interface, which Uniswap already acknowledges that it does), there would be nothing to prevent any of them from making and passing such a proposal. And even though the VC Defendants may balk at this suggestion, it is apparent that <u>Uniswap</u> (which all Defendants hold significant equity stakes in) could take all these steps as to the Interface.

## C.   Plaintiffs Are Not Required to Allege Culpable Participation Here, But Have Sufficiently Done So Anyway

Defendants have also asserted, incorrectly, that Plaintiffs must allege culpable participation to sustain their Section 20 and Section 15 claims. *See* VC Br. at 21-23. However, the claims herein – predicated on violations of the Exchange Act and the Securities Act – against Adams and the VC Defendants do not have underlying scienter that requires proof of culpable participation. *See, e.g., Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 322-23 (S.D.N.Y. 2021) ("Plaintiffs are not required to allege culpable participation – and accordingly, scienter – as part of their claim pursuant to section 15"); *In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 415 (S.D.N.Y. 2011) (noting that "Securities Act plaintiffs need not allege scienter, reliance, or causation"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003) (finding that "plaintiffs need not meet the PSLRA's heightened pleading standard in alleging a violation of Section 20(a), or separately allege culpable participation") (citation omitted).

Accordingly, the majority of cases in the Southern District have agreed that culpable participation is not a requirement for control person liability on Section 15 claims. *See In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (collecting cases and noting that "a majority of judges in this District" have held that culpable

participation is not required under Section 15); *see also SEC v. GPL Ventures LLC*, 2020 U.S. Dist. LEXIS 9056 at *23-24 (S.D.N.Y. Jan. 18, 2022); *McKenna v. Smart Technologies Inc*, No. 11 Civ. 7673(KF), 2012 U.S. Dist. LEXIS 118312, at *9-10 (S.D.N.Y. April 3, 2012); *In re Global Crossing, Ltd Securities Litigation*, 2005 U.S. Dist. LEXIS 16228, at *17-18 (S.D.N.Y. Aug. 5, 2005).

Despite the clear reasoning and overwhelming weight of these cases, Defendants nevertheless assert that courts are "split" on whether culpable participation is a necessary element, and encourage this Court to follow other cases they assert are "better-reasoned." VC Br. at 21 n. 13. However, the primary cases relied on by Defendants are readily distinguishable. In *Lehman Bros.,* the Second Circuit expressly declined to decide whether culpable participation is necessary for Section 15 liability, even as they acknowledged a split within the circuit on the issue. *See Wyo. State Treasurer v. Moody's Inv'rs Serv. (In re Lehman Bros. Mortg.-Backed Sec. Litig.)*, 650 F. 3d 167, 186 (2d Cir. 2011). And in *Marsh*, the cause of action for which the court required culpable participation was a 10(b) claim "premised on allegations of fraud" which contain the scienter requirement not at issue here. *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 493 (S.D.N.Y. 2006). Defendants' reliance on cases where control person liability was predicated on causes of action requiring scienter such as Section 10(b) must be rejected.

However, even if this Court holds that Plaintiffs must plead culpable participation under a cause of action without scienter, Plaintiffs have in fact done so. Here, the Plaintiffs would only need to plead is that Adams and the VC Defendants could have either registered Uniswap with the SEC as an exchange or broker-dealer and/or prevented the sale of securities on the Protocol. And as discussed throughout this brief, the allegations in the FAC easily satisfy this hurdle. And to the extent Plaintiffs might be required to plead that Defendants knew of the fraud being perpetrated

on the Protocol or consciously avoided such knowledge, they have done so, as discussed more fully *infra*. *See, e.g., KDH Consulting Group LLC v. Iterative Capital*, 528 F. Supp. 3d 192, 206 (S.D.N.Y. 2021) ("[k]nowledge of the false or omitted information at issue and a failure to disclose that information can constitute 'conscious misbehavior or recklessness'"). The allegations in the FAC are more than enough to meet any pleading standard for culpable participation under Rule 8. *See, e.g., In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 190 (S.D.N.Y. 2003) (Section 20(a) claims need only be pled "only in accordance with Rule 8(a)"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 415; *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F. 3d 87, 101 (2d Cir. 2001).

## IV.     THE FEDERAL CLAIMS ARE TIMELY

Uniswap concedes that Plaintiff Risley's claims, part of the original complaint filed on April 4, 2022, are timely but argues that certain of the claims of five additional Plaintiffs that joined the action through the filing of the FAC on September 26, 2022[19] are supposedly untimely. Uniswap is wrong. All of Plaintiffs claims in the FAC relate back to the filing of the action under Federal Rule of Procedure 15(c)(1)(B).

### A.  Relation Back Under Rule 15(c)(1)(B) Is Liberally Given

Rule 15(c)(1)(B) provides that amendments to a complaint relate back to the original complaint for purposes of the statute of limitations so long as the amended complaint arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original complaint. The doctrine is based on a belief that one who has notice of litigation concerning a given transaction or events has been provided with all the protection that statutes of limitations are

---

[19] Defendants were on notice that the five additional plaintiffs would be joining the lawsuit when they filed a lead plaintiff motion on June 7, 2022.

designed to afford.  *See, e.g., United States v. The Baylor Univ. Med. Ctr.*, 469 F. 3d 263, 270 (2d Cir. 2006) (citing *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 159 n. 3 (1984)).

In this Circuit, relation back is liberally given, and the central inquiry is a notice requirement, which is "not overly burdensome."  *Perkins v. S. New Eng. Tel. Co.,* No. 3:07–cv–967, 2009 U.S. Dist. LEXIS 103833, at *13 (D. Conn. Nov. 4, 2009); *see also Bensinger v. Denbury Res., Inc.*, No. 10–cv–1917, 2013 U.S. Dist. LEXIS 94223 (E.D.N.Y. July 3, 2013). Importantly, if defendants had sufficient notice from an original pleading to anticipate that new plaintiffs might allege similar claims in a later amendment, defendants cannot be said to be prejudiced or permitted to raise a statute of limitations defense.  *See* 6A Wright & Miller, Federal Practice & Procedure § 1501 ("As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, his ability to protect himself will not be prejudicially affected if a new plaintiff is added, and he should not be permitted to invoke a statute of limitations defense").  "Courts in this Circuit consistently allow relation back of new plaintiffs where defendants had fair notice of the new plaintiffs' claims and would not suffer undue prejudice."  *Bensinger*, 2013 U.S. Dist. LEXIS 94223 at *14 (newly added plaintiffs' claim regarding merger could relate back because defendants had adequate notice that someone who held stock at time of merger would eventually bring Section 14(a) claim).

Furthermore, relation back to add additional plaintiffs is appropriate where "the status of the original plaintiff and a liberal reading of the complaint apprise defendant of the existence of the additional plaintiff's existence and claims, or… if the defendant has had actual notice that additional parties might assert claims arising out of the transaction or occurrence at issue." *Perkins*, 2009 U.S. Dist. LEXIS 103833 at *6-7 (*citing Andujar v. Rogowski*, 113 F.R.D. 151, 154 (S.D.N.Y. 1986)).  In *Perkins*, the court held that the claims of newly-added plaintiffs related back

to a timely original pleading where the original pleading was a FLSA class action – "surely [defendant] was on notice that other parties might be added to the action." *Id*. at *14.

### B. The Additional Plaintiffs' Claims Arise Out of the Same Conduct Set Forth in the Original Complaint

Here there is no question (1) that the FAC arises out of the same conduct set forth in the Plaintiffs' original complaint, and (2) that Defendants were given fair notice of the additional Plaintiffs' claims. *See* VC Defendants' Brief at 1 (noting that the FAC did not make "any material change to the factual allegations in the original complaint"). Plaintiffs did not add new federal claims (the only claims Defendants argue are time-barred), and merely added newly named plaintiffs who, exactly like Plaintiff Risley before them, allege the exact violations of the exact same federal securities laws by the same group of Defendants. Even the VC Defendants acknowledged in their pre-motion letter that there was no "material change in the factual allegations originally levied against the VC Defendants." Dkt. No. 54 at 1. There is also no question that the additional plaintiffs were harmed in the exact same manner as Plaintiff Risley. The circumstances here closely mirror the circumstances in both *Perkins* and *Bensinger*.

Additionally, the three cases Uniswap cites either support Plaintiffs' position or are inapposite:

- *Slayton v. Am. Express Co.*, 460 F. 3d 215, 228 (2d Cir. 2006), was a securities case where both the original and amended pleadings relied on the same statutory authority. The Second Circuit held the claims related back and rejected the defendants' argument that the two pleadings were based on different operative facts and held that the defendants had sufficient notice in the original pleading of claims that, when amplified in the amended pleading, did not require a "leap of imagination to expect." *Id.* at 229.

- In *Fogel v. Wal-Mart de Mexico SAB De CV*, No. 12-cv-2282, 2017 U.S. Dist. LEXIS 26976 (S.D.N.Y. Feb. 27, 2017), the court denied a finding of "relation back" where the original pleading brought claims for liability arising from misstatements made in certain annual financial statements and the amendment added new claims against existing defendants – claims arising from misstatements made in press releases and audit reports. Thus, *Fogel* turned on additional claims arising from an "entirely distinct set" of allegations. *Id.*, at *32-34. That is not the case here.

- *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326 (S.D.N.Y. 2021) is not even remotely on point. There, the court distinguished between different tokens for the purpose of standing, which had nothing to do with relation back.

Thus, Plaintiffs' claims in connection with all Tokens relate back to the original complaint.

As for the Section 29(b) claims of Plaintiff Annie Venesky, or in connection with any Plaintiffs' purchases prior to April 4, 2021, those claims are also timely under the Exchange Act's one-year discovery rule that governs accrual of such claims. *See* 15 U.S.C. § 78cc(b). A reasonable investor could not have known that Defendants were an illegal securities exchange or illegal broker-dealer until it was announced in September 2021 that Uniswap was under investigation by the SEC. *See* FAC ¶ 98. Around that time, Chairman Gensler publicly announced that so-called "DeFi" exchanges are subject to registration requirements, especially considering Defendants' public position that "web3" is immune from SEC regulation. *See, e.g.*, FAC ¶¶ 113-14, 157.

V.    **PLAINTIFFS PLEAD CLAIMS UNDER STATE LAW**

    **A. Plaintiffs Thoroughly Pleaded How Defendants Aided and Abetted the Rampant Fraud on the Protocol**

To plead aiding and abetting fraud under New York law, "plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *Krys v. Pigott*, 749 F. 3d 117, 127 (2d Cir. 2014) (*quoting Lerner v. Fleet Bank, N.A.*, 459 F. 3d 273, 292 (2d Cir. 2006)).  The knowledge prong is "not identical to the scienter required for the underlying fraud." *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) (*quoting Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 502 (S.D.N.Y. 2009)).  To show this knowledge requirement, plaintiffs "must allege a strong inference of actual knowledge or conscious avoidance." *Id.* (*citing Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009).  "The Court will not spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers." *Id.* at 442-43 (*quoting Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007)).

    **1. Defendants Do Not and Cannot Deny the Existence of Rampant Fraud on the Protocol**

The first element of aiding and abetting fraud is not at issue, as Defendants do not (and indeed cannot) challenge that the Protocol was a platform for rampant, unchecked fraud. Plaintiffs have set forth over 500 paragraphs and nearly 100 pages of allegations of fraud that occurred on the Uniswap's platform, and even these allegations do not fully describe every fraudulent token that was launched or fraudulent transaction committed.  *See* FAC ¶¶ 195-696. These frauds began almost as soon as the Protocol was launched, and continued unchecked on a daily basis for over 4 years.

### 2. Plaintiffs Plead Defendants' Knowledge of the Rampant, Unchecked Fraud on Protocol

As they cannot reasonably challenge the fraud allegations, Defendants instead argue that they did not have knowledge of the near minute by minute (*see* FAC ¶ 193) instances of fraud on their platform, and that the allegations in the FAC are insufficient on this point.  However, Plaintiffs have alleged at length in the FAC how Defendants had both actual knowledge of fraud on the Protocol and that they consciously avoided further investigation, to the detriment of Plaintiffs and the class.

First, Plaintiffs repeatedly allege that Defendants have actual knowledge of the fraudulent activity.  Plaintiffs allege in the FAC that "Uniswap is fully aware of the existence and scope of fraudulent activity on the Protocol," that users have informed Defendants of rampant fraud on the Protocol and asked Uniswap to implement security features to stop them, that Uniswap "has made or endorsed statements on social media[] acknowledging that … scams occur on the Protocol," that Uniswap de-listed some tokens because Defendants knew that they were fraudulent, that Defendants are aware that the "overwhelming majority" of hundreds of new tokens launched every day on the Protocol are scams, and that Defendants are "aware of the fraudulent activity perpetrated on the Protocol."  FAC ¶¶ 184, 188, 190-92, 194.

Defendants have also made several statements indicating their knowledge of rampant fraudulent activity on the Protocol:

- "As the rate of token issuance accelerates, it has become increasingly difficult for users to filter out high quality, legitimate tokens from ***scams, fakes, and duplicates***," a problem Uniswap conceded that they "expect will only accelerate in the future."  FAC ¶ 185 (emphasis added).

- In response to a user's request for improved security to prevent fraud, "no one can prevent scammers from **_having their scam token traded on Uniswap._**" FAC ¶ 189.

- "If we offer our services … to sanctioned individuals **_we are breaking the law_**…." FAC ¶ 191 (emphasis added).

- The Protocol allows trades against custom Uniswap exchanges, which "can have different curves, managers, private liquidity pools, **_FOMO-based ponzi schemes_**, *or anything else you can think of*." *See* Ex. I, v1 Whitepaper at 13 (emphasis added).

Adams in particular has made clear on social media and in public appearances that he has personal awareness of the rampant fraud on the Protocol and has chosen not to do anything about it, placing the responsibility for combatting fraud on other institutions or the users themselves. Adams has advised users to "develop and trust your instincts, and think adversarially"[20] in response to scams on his own platform. He has also repeatedly stressed how easy it is for anyone to create a new token on the Protocol and how easy it is, such as the exchange documented in the FAC wherein he and webcast host Bankless joked about the ease of minting a token "for funsies" and without anyone's permission. FAC ¶ 187. Adams has also publicly expressed his thoughts as to how crypto fraud on the Protocol can be stopped: specifically, by everybody else:

---

[20] Tweet available at: https://twitter.com/haydenzadams/status/1492863308818489346.



The allegations in the FAC are sufficient to allege that (i) Defendants had knowledge of the nature and extent of the rampant, unchecked fraud on the Protocol, or at the very least, (ii) Defendants consciously avoided investigating these frauds further or take significant steps to counter them.  Plaintiffs allege multiple instances of users complaining to Defendants about scam tokens, and Defendants refusing to take action or disingenuously claiming that nothing can be done; but the true scale of these communications is beyond the scope of the FAC and this brief, as Plaintiffs cannot begin to document the thousands of instances of such communications on social media, let alone through email or internal communications that Plaintiffs cannot obtain prior to discovery.  The sheer volume of illegal activity on the Protocol, Defendants' knowledge of ongoing illegal activity, Defendants' familiarity with the tokens and the Protocol, and Defendants' refusal in the overwhelming majority of cases to investigate further or take any action to prevent it clearly establishes their conscious avoidance of further incriminating knowledge:

> The Citco Defendants argue that Plaintiffs' allegations relating to knowledge are conclusory and wholly lacking in the specificity required to plead actual knowledge, especially with regard to the aiding and abetting fraud claim, which is subject to Rule 9(b).  The Court finds, however, that Plaintiffs' allegations support a strong inference of conscious avoidance on the part of the Citco Defendants, which is sufficient to satisfy the knowledge requirement of these two causes of action. … ***Given the Citco Defendants' familiarity with the Funds, as well as***

> ***their general experience in providing financial services to funds, and their
> knowledge of these red flags***, the Court finds that Plaintiffs allege a strong
> inference that the Citco Defendants consciously avoided confirming facts that, if
> known, would demonstrate the fraudulent nature of the endeavor they substantially
> furthered.

*Anwar*, 728 F. Supp. 2d at 443 (emphasis added) (quoting *Fraternity Fund*, 479 F. Supp. 2d at
368); *see also Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 443-46 (S.D.N.Y. 2017);
*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, No. 12-cv-3723, 2016 U.S. Dist. LEXIS
135909, at *17 (S.D.N.Y. Sep. 29, 2016).  Defendants were not only repeatedly told of fraud by
users, but as alleged in the FAC and highlighted above, they also knew based on their own
investigations that fraud tokens were trading on the Protocol.  A single allegation of turning a blind
eye to fraud after learning of its likelihood has been held sufficient to defeat a motion to dismiss.
*See Vasquez v. H.K. & Shanghai Banking Corp.*, 18-cv-1876, 2019 U.S. Dist. LEXIS 90716, at
*49 (S.D.N.Y. May 30, 2019).

### 3.  Plaintiffs Plead Defendants Provided Substantial Assistance to the Commission of Fraud by Taking Almost No Action in Response to the Scams

The "substantial assistance" prong is satisfied when a defendant "affirmatively assists,
helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed."
*Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 486 (S.D.N.Y. 2015)
(quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005)).  Plaintiffs
must additionally allege that "the aider and abettor proximately caused the harm on which the
primary liability is predicated"; or put another way, that their injury "was a direct or reasonably
foreseeably result" of the aider and abettor's conduct.  *Id.* (quoting *J.P. Morgan Chase*, 406 F.
Supp. 2d at 256); *see also Fraternity Fund Ltd.*, 479 F. Supp. 2d at 371.

Defendants understandably spill little ink to defend their position that they did not
substantially assist in the perpetuation of fraud against Plaintiffs and the class, but there is no real

question that the thousands of token scams that were allowed to occur on the Protocol were a direct or reasonably foreseeable result of the intentionally lawless environment constructed by Defendants.  *See Silvercreek Mgmt, Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487-88 (S.D.N.Y. 2018) ("An aider and abettor's substantial assistance to a fraud can be considered a proximate cause where a plaintiff's injury was 'a direct or reasonably foreseeable result of the defendant's conduct.'" (quoting *Filler v. Hanvit Bank*, 2003 U.S. Dist. LEXIS 15950, at *6 (S.D.N.Y. Sept. 12, 2003)).  For years, Defendants did everything but hang a sign inviting scammers to commit fraud on their platform.  Defendants made the bar to launching a new token as low as possible, made little to no effort to police the Protocol, did not follow up on reports of constant fraudulent activity, and refused to implement any security measures to prevent further fraudulent activity – indeed, in the v1 whitepaper, Adams **told the public that they could run a Ponzi scheme** on the platform if they wanted to.  There can be no serious dispute that the Plaintiffs Plead Defendants were a proximate cause to the harm caused to Plaintiffs since those injuries were a direct result of Defendants' conduct.

### B.  Plaintiffs Plead Their Remaining State Law Claims

Defendants remaining arguments as to Plaintiffs' state law claims are meritless, as Plaintiffs adequately allege those claims in the FAC.

On the blue sky law claims, Plaintiffs adequately allege that Defendants engaged in relevant conduct in both Idaho and North Carolina.  The FAC contains allegations that several Plaintiffs who made contracts with Defendants are residents of those states. *See* FAC ¶¶ 13-14; 18.  Moreover, it is exceedingly unlikely that the Protocol, which averages over $1.5 billion of trading per day, does not include additional transactions within those two states. *See* FAC ¶ 60.

On the unjust enrichment claim, Plaintiffs adequately allege the required elements.  Under New York law, a claim for unjust enrichment requires a showing that "(1) defendant was enriched,

47

(2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F. 3d 296, 306 (2d Cir. 2004). Additionally, defendant's benefit must be "specific" and "direct." *Kaye v. Grossman*, 202 F. 3d 611, 616 (2d Cir. 2000).

Plaintiffs have alleged in detail how Defendants built a protocol intentionally designed to be lawless, allowed anonymous parties to issue tokens without any oversight, and ignored both their own information and multitudes of complaints from users regarding rampant fraudulent activity. Plaintiffs also specifically plead that Defendants profited from the fraudulent conduct on the Protocol through transaction fees and other methods. *See* FAC ¶¶ 194, 811. Plaintiffs' losses due to this conduct, and Defendants' enrichment through UNI and other "revenue" (*see* Dkt. No. 64, Tr. at 14:7-10) from undisclosed activities, is more than enough to meet the pleading threshold for this equitable cause of action.

## VI. PLAINTIFFS SUFFICIENTLY ALLEGE THE UNISWAP FOUNDATION IS AN ALTER EGO OF UNISWAP, ADAMS AND THE VC DEFENDANTS

### A. The Alter Ego Test Is Fact-Intensive and Flexible

Delaware typically employs an "alter ego" test requiring a showing of operation as a "single entity." *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 471 (D. Del. 2010). Where the underlying cause of action is based on federal law only an additional showing of an element of injustice or fundamental unfairness is required. *See Trustees of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F. 3d 188 (3d Cir. 2003). Uniswap Foundation's hyperbole of an "extremely high bar" is completely unsupported by any authority. Instead, on a motion to dismiss, "[t]he question at bar is not whether plaintiffs' claims will ultimately succeed on their merits, but whether the facts as pled are sufficient to warrant discovery." *Blair*, 720 F. Supp. 2d at 471.

Moreover, the alter ego test is not as black and white as the Uniswap Foundation claims. The test is a balancing of various factors, *including but not limited to* commingling the funds and assets of corporations, undercapitalization, failure to observe corporate formalities, non-payment of dividends, insolvency, siphoning, absence of corporate records, sole ownership of all shares, inequitable conduct, a lack of arm's length transactions and manipulation of corporate assets. *Id.* at 470. The is fact-intensive and the absence of one or two factors is not dispositive; instead, that absence "may be sufficiently outweighed by the other considerations when balanced on whole." *Id.* at 473; *see also Lutyk*, 332 F. 3d at 194 (Third Circuit never meant for factors to be "elements of a rigid test" or "the exclusive approach").

### B.   Plaintiffs Plead Sufficient Facts to Sustain Their Allegations that the Uniswap Foundation is an Alter Ego of Uniswap, Adams and the VC Defendants

*First*, the absence of certain typical factors set forth in the case law should now be held against Plaintiffs. Uniswap Foundation is registered as a "non-profit" organization and under Delaware law and thus some of the typical alter ego factors would not be even applicable, such as non-payment of dividends, lack of stockholders and absence of certain corporate records. *See* Jane Schlicht, *Piercing the Nonprofit Corporate Veil*, 66 Marq. L. Rev. 134, 141 (1982) (noting that the "disregard doctrine" – when a court decides to disregard a corporate entity and pierce the corporate veil– is of an equitable nature that demands it be flexible and adaptable); *see also* JR Gillespie, *The Thin Corporate Line: Loss of Limited Liability Protection*, 45 N.D. L. Rev. 363, 365 (1969).

*Second*, Uniswap Foundation's "directors," which are also its sole owners (on paper), are Uniswap insiders under the control of some or all of Defendants. FAC ¶¶ 159-60, 165.

*Third*, Uniswap Foundation does not have a purpose independent from Uniswap or even one that appears to be non-profit. *Id*. at ¶ 163 (alleging that "[t]he stated mission of the Uniswap

Foundation is to support 'the decentralized growth and sustainability of the Uniswap Protocol and its supporting ecosystem.").  This includes "the ability to grant v3 BSL license exemptions, to maintain the governance forum, Sybil.org, and Protocol-related developer docs, and to help facilitate protocol development across many teams."  *Id.* at ¶164.  The Uniswap Foundation's purpose is not to fill in a gap in society resulting from market or governmental failure but to duplicate the functions and operations of the for-profit companies that created it.  *See Blair*, 720 F. Supp. 2d at 471 (for reasons of public policy, alter ego standard for piercing corporate veil may be more lenient for causes of action arising under federal statutes).  Hayden Adams confirmed as much in a blog post published just weeks after the FAC was filed: "the governance community recently voted to create the Uniswap Foundation, ***which will contribute to the Protocols decentralized development*** and give at least $60 million in grants to community [i.e., Uniswap owners, employees, and users] projects over the next few years."[21]

*Fourth*, the other Defendants transferred $74 million of UNI from the Uniswap Treasury to Uniswap Foundation so that they could further their own interest as stated above.  *See* FAC ¶¶ 167-68.  In exchange for this transfer, Uniswap and the Governance received little or no consideration and thus it appears to be a fraudulent transfer.  The allegations in the FAC support a strong inference that the Owners created Uniswap Foundation for their own benefit through allegations that (i) the Uniswap Foundation was supposedly created through a Governance proposal that passed by a concentration of votes from the 10 largest wallets holding UNI and (ii) the suspicious timing of Uniswap Foundation's formation documents, predating the submission of the governance proposal, which demonstrate that the passage of the proposal was a *fait accompli*.  *See id.* at ¶¶ 160-61.  That is, on June 30, 2022, Uniswap Foundation was created, nearly

---

[21] https://uniswap.org/blog/bringing-web3-to-everyone.

two months before the UF Proposal was even submitted.  *See* FAC ¶¶ 158-9.  Additionally, the UF Proposal sought 2.5 million UNI to "participate in governance," which is "revocable by the DAO at any time."[22]

*Fifth*, equitable remedies look to substance rather than to form.  Uniswap Foundation does not operate or exist as a separate entity from Uniswap – Plaintiffs have pleaded facts sufficient to support a plausible inference that Uniswap, Adams and the VC Defendants *are* the Uniswap Foundation, despite their imposition of Uniswap functionaries as the Uniswap Foundation's members and leadership.  Taking Plaintiffs' allegations as true, this Court can find that Plaintiffs sufficiently allege that Uniswap, Adams, and the VC Defendants misdirected Uniswap funds and assets to the Foundation while exercising control over both Uniswap and the Uniswap Foundation through their UNI holdings (plausibly by gifting Ng and Walsh sufficient UNI to seem autonomous of Uniswap and VC Defendants) and the unbalanced Governance structure.  *See* FAC ¶¶ 158-59, 167-8; *see also In re Buckhead Am. Corp.*, 178 B. R. 956, 975 (D. Del. 1994) (alter ego claim survives motion to dismiss where allegations are that the parties that own and control the parent company's parent exercise domination and control to cause "subsidiary" to make transfers to benefit controlling parties).

For the reasons above, Plaintiffs sufficiently allege that Defendants are a single entity.  At the least, if the Court determines that Plaintiffs have not met the pleading requirement for this claim, it should be dismissed without prejudice.

---

[22] https://gov.uniswap.org/t/governance-proposal-create-the-uniswap-foundation/17499

## <u>CONCLUSION</u>

For the above reasons, Defendants' motions to dismiss should be denied.

Dated: February 6, 2023
New York, New York

KIM & SERRITELLA LLP

By:   /s/ James R. Serritella
     James R. Serritella
     Justin Stone (*Pro Hac Vice*)
     C. Claudio Simpkins
     110 W. 40th Street, 10th Floor
     New York, NY 10018
     212-960-8345
     jserritella@kandslaw.com
     jstone@kandslaw.com
     csimpkins@kandslaw.com

BARTON LLP

By:   /s/ Christopher J. McNamara
     Roger E. Barton
     Christopher J. McNamara
     Michael C. Ward
     711 Third Avenue, 14th Floor
     New York, NY 10017
     212-687-6262
     rbarton@bartonesq.com
     cmcnamara@bartonesq.com
     mward@bartonesq.com