UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NESSA RISLEY, JAMES FREELAND,
ROBERT SCOTT, ANDREW CARDIS, and
DEAN MEYERS, individually and on behalf
of all others similarly situated,

                              Plaintiffs,

      v.

UNIVERSAL NAVIGATION INC. dba
UNISWAP LABS and HAYDEN Z. ADAMS,

                             Defendants.

No. 1:22-cv-2780-KPF

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATEMENT ....................................................................................................................2

    A.    Background ........................................................................................................2

    B.    This Court dismissed the federal claims in the First Amended Complaint, rejecting Plaintiffs' attempt to hold Defendants liable for the actions of others, and the Second Circuit affirmed.............................................................................................6

    C.    The Second Amended Complaint once again seeks to hold Defendants liable for the actions of others. ...............................................................................................8

ARGUMENT ...................................................................................................................10

  I.    Plaintiffs Fail To State Claims For Aiding And Abetting Fraud Or Negligent Misrepresentation (Counts 1 and 2)...............................................................................10

    A.    The Second Amended Complaint Fails To Allege Defendants' Actual Knowledge Of The Relevant Fraud—The Third-Party Fraudsters' Extensive Misrepresentations And Omissions About Their Tokens ........................................................................11

    B.    The Second Amended Complaint Also Fails To Allege That Defendants Substantially Assisted The Relevant Fraud ................................................................13

    C.    The Second Amended Complaint Does Not Allege That Defendants Proximately Caused Plaintiffs' Injuries, But Rather Alleges That The Third-Party Fraudsters' Misrepresentations And Omissions Were The Proximate Cause ...............................15

    D.    The Claim For Aiding And Abetting Negligent Misrepresentation Fails For The Same And Additional Reasons ...................................................................................17

  II.    Plaintiffs Fail To State Claims For Violation Of State Unfair And Deceptive Practices Statutes (Counts 3, 4, and 5) ..........................................................................17

    A.    The Second Amended Complaint fails to allege Defendants made any affirmative misstatements whatsoever, or any deceptive omissions.  (Counts 3-5)....................18

    B.    The Second Amended Complaint fails to allege any act meeting the high standards for unfairness or unconscionability under North Carolina or Idaho law.  (Counts 4-5) ...............................................................................................................20

    C.    The Second Amended Complaint fails to allege that any deceptive, unfair, or unconscionable act of Defendants—as opposed to the conduct of the Issuers— caused their injuries.  (Counts 3-5) ..........................................................................22

  III.    Plaintiffs Fail To State A Claim For Unjust Enrichment (Count 6) Because They Do Not Allege That Defendants Were Enriched At Plaintiffs' Expense............................22

  IV.    Section 230 Of The Communications Decency Act Bars Plaintiffs' Claims ...............23

  V.    All Claims Against Adams Fail Because The Second Amended Complaint's Allegations Do Not Satisfy Delaware Corporate Law's Personal Participation Doctrine ...............................................................................................................26

CONCLUSION.................................................................................................................27

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*BankUnited, N.A. v. Milliman, Inc.*,
No. 8:15-cv-1357-T-33TBM, 2016 WL 8999079 (M.D. Fla. Jan. 15, 2016)....................17

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021).......................................................10, 11, 13, 14, 15

*Braynina v. TJX Cos.*,
No. 15 Civ. 5897 (KPF), 2016 WL 5374134 (S.D.N.Y. Sept. 26, 2016)....................19, 22

*Bumpers v. Cmty. Bank of N. Va.*,
747 S.E.2d 220 (N.C. 2013)...................................................................................20, 22

*Dalton v. Camp*,
548 S.E.2d 704 (N.C. 2001).........................................................................................21

*Diep v. Apple, Inc.*,
No. 21-cv-10063-PJH, 2022 WL 4021776 (N.D. Cal. Sept. 2, 2022), *aff'd
in part, remanded in part on other grounds*, No. 22-16514, 2024 WL
1299995 (9th Cir. Mar. 27, 2024) ...............................................................................22, 25

*Diep v. Apple, Inc.*,
No. 22-16514, 2024 WL 1299995 (9th Cir. Mar. 27, 2024)................................22, 25, 26

*Duspiva v. Fillmore*,
293 P.3d 651 (Idaho 2013)...........................................................................................18

*Edwards v. JPMorgan Chase Bank, N.A.*,
No. 1:20-CV-128, 2020 WL 1814423 (M.D.N.C. Apr. 9, 2020) .........................18, 19, 20

*Exclaim Mktg., LLC v. DirecTV, LLC*,
134 F. Supp. 3d 1011 (E.D.N.C. 2015), *aff'd*, 674 F.App'x 250 (4th Cir.
2016) ........................................................................................................................21

*First Atl. Mgmt. Corp. v. Dunlea Realty Co.*,
507 S.E.2d 56 (N.C. Ct. App. 1998) .............................................................................19

*Foley v. IRBsearch, LLC*,
No. 24 Civ. 1303 (KPF), 2025 WL 950679 (S.D.N.Y. Mar. 28, 2025) ..........................25

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019)......................................................................................24, 26

*Gassis v. Corkery*,
No. 8868-VCG, 2014 WL 3565418 (Del. Ch. July 21, 2014), *aff'd,* 113
A.3d 1080 (Del. 2015) .................................................................................26, 27

*Gildane Bldg. Co. v. Fed. Rsrv. Bank*,
80 F.3d 895 (4th Cir. 1996) ...............................................................................19

*Heinert v. Bank of Am., N.A.*,
410 F. Supp. 3d 544 (W.D.N.Y. 2019), *aff'd,* 835 F. App'x 627 (2d Cir.
2020) ..............................................................................................................10, 13

*Heronemus v. Ulrick*,
No. 97C-03-168-JO, 1997 WL 524127 (Del. Super. July 9, 1997)...................26

*In re Agape Litig.*,
773 F. Supp. 2d 298 (E.D.N.Y. 2011) ................................................12, 13, 14

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
794 F. Supp. 1424 (D. Ariz. 1992) ...................................................................17

*In re Bayou Hedge Funds Inv. Litig.*,
472 F. Supp. 2d 528 (S.D.N.Y. 2007)...............................................................17

*In re Edwards*,
233 B.R. 461 (Bankr. D. Idaho 1999).................................................................20

*Kaye v. Grossman*,
202 F.3d 611 (2d Cir. 2000).................................................................................23

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
863 F. Supp. 2d 288 (S.D.N.Y. 2012), *rev'd in part on other grounds,* No.
09-Civ.-8387, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012) ........................17

*Koehler v. Pulvers*,
606 F. Supp. 164 (S.D. Cal. 1985).....................................................................17

*Kron Med. Corp. v. Collier Cobb & Assocs., Inc.*,
420 S.E.2d 192 (N.C. Ct. App. 1992).................................................................20

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006).................................................................................10

*Litman, Asche & Gioiella, LLP v. Chubb Custom Ins. Co.*,
373 F. Supp. 2d 314 (S.D.N.Y. 2005).................................................................23

*Pickering v. Sanchez*,
544 P.3d 135 (Idaho 2024)...................................................................................22

*Planet Green Cartridges, Inc. v. Amazon.com, Inc.*,
No. CV-23-6647-JFW(KSx), 2023 WL 8943219 (C.D. Cal. Dec. 5, 2023),
*aff'd*, No. 23-4434, 2025 WL 869209 (9th Cir. Mar. 20, 2025).......................................25

*Ratermann v. Pierre Fabre USA, Inc.*,
651 F. Supp. 3d 657 (S.D.N.Y. 2023).............................................................................24

*Ricci v. Teamsters Union Local 456*,
781 F.3d 25 (2d Cir. 2015)............................................................................................24

*Risley v. Universal Navigation Inc.*,
690 F. Supp. 3d 195 (S.D.N.Y. 2023), *aff'd in part, vacated in part,* No.
23-1340-cv, 2025 WL 615185 (2d Cir. Feb. 26, 2025) ...................4, 5, 6, 7, 8, 14, 16, 23

*Risley v. Universal Navigation Inc.*,
No. 23-1340-cv, 2025 WL 615185 (2d Cir. Feb. 26, 2025) ............................................4, 7

*Rogers v. Furlow*,
699 F. Supp. 672 (N.D. Ill. 1988) ..................................................................................17

*Rosner v. Bank of China*,
No. 06-CV-13562, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) ............10, 11, 13, 14, 15

*Saveene Corp. v. Remo*,
No. 21-Civ.-399, 2021 WL 4806380 (S.D.N.Y. Oct. 14, 2021)................................24, 26

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
346 F. Supp. 3d 473 (S.D.N.Y. 2018).......................................................................10, 17

*Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP*,
589 F.Supp.3d 401 (S.D.N.Y. 2022)...............................................................................23

*Tristan v. Bank of Am.*,
No. SA-CV-22-01183-DOC-ADS, 2023 WL 4417271 (C.D. Cal. June 28,
2023), *appeal dismissed sub nom. Tristan v. Bank of Am., N.A.*, No. 24-
6704, 2025 WL 1293081 (9th Cir. Jan. 21, 2025) ...........................................................16

*United States v. EZ Lynk SEZC*,
No. 21-cv-1986 (MKV), 2024 WL 1349224 (S.D.N.Y. Mar. 28, 2024)............... 24-25, 26

*Wash. House Condominium Condo. Ass'n of Unit Owners v. Daystar Sills, Inc.*,
No. N15C-01-108 WCC CCLD, 2017 WL 3412079 (Del. Super. Ct.
Aug. 8, 2017) .........................................................................................................26, 27

*Yuille v. Uphold HQ Inc.*,
686 F. Supp. 3d 323 (S.D.N.Y. 2023).......................................................................18, 19

## STATUTES

47 U.S.C. § 230.................................................................................................2, 23, 24, 25, 26

Class Action Fairness Act ........................................................................................................7

Federal Trade Commission Act ..............................................................................................21

Idaho Code § 48-603 ..............................................................................................................22

Idaho Code § 48-603C .....................................................................................................20, 22

Idaho Code § 48-608 ..............................................................................................................22

Idaho Consumer Protection Act ("ICPA") .........................................................17, 18, 20, 21, 22

N.Y. Gen. Bus. Law § 349 ......................................................................................................17

New York General Business Law ("NYGBL")...............................................17, 18, 19, 20, 22

North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") ...17, 18, 19, 20, 21, 22

## REGULATIONS

Idado Admin. Code r. 4.02.01.030...........................................................................................20

## RULES

Fed. R. Civ. P. 9 .....................................................................................................................10

## OTHER AUTHORITIES

@mud2monarch, *Uniswap Protocol Key Stats (Volume and Swaps)*, Dune,
   https://dune.com/queries/3749558/6306663 ......................................................................5

Coinbase, *What is a DEX?*, https://www.coinbase.com/learn/crypto-basics/what-
   is-a-dex...............................................................................................................................4

Coinbase, *What is DeFi*, https://www.coinbase.com/learn/crypto-basics/what-is-
   defi .....................................................................................................................................4

Uniswap Docs, *Protocol Concepts: Swaps*, https://docs.uniswap.org/concepts/
   protocol/swap .....................................................................................................................5

Uniswap Docs, *The Uniswap Protocol*,
   https://docs.uniswap.org/concepts/uniswap-protocol ...................................................4, 5

Uniswap Labs Blog, *Introducing Token Lists* (Aug. 26, 2020),
   https://blog.uniswap.org/token-lists..................................................................................9

Uniswap Labs Blog, *Uniswap's Year in Review: 2020* (Dec. 31, 2020),
    https://blog.uniswap.org/year-in-review .......................................................................9

Uniswap Labs, *What is Decentralized Finance (DeFi)?*,,
    https://support.uniswap.org/ hc/en-us/articles/20571999964685-What-is-
    Decentralized-Finance-DeFi ..............................................................................4

**INTRODUCTION**

The Second Amended Complaint ("SAC") has the same flawed premise as the First Amended Complaint ("FAC"), which this Court rightly rejected.  Once again Plaintiffs seek to hold Universal Navigation Inc. dba Uniswap Labs ("Labs") and its CEO Hayden Adams liable for the independent misconduct of others when there is no basis in law to do so.  In more than 450 paragraphs that comprise the vast majority of the SAC, Plaintiffs complain about actions that have no connection to Defendants:  Plaintiffs allege that third-party fraudsters issued so-called scam tokens, promoted them with extensive misrepresentations, and, as a result, tricked Plaintiffs and others to trade in the tokens.  Any remedies lie with those third parties alone, and Plaintiffs' misguided efforts to pin liability on Defendants fail as a matter of law yet again.

As this Court knows from the first round of this litigation, Labs provides an Interface that makes it easy for users to swap digital assets on the Uniswap Protocol with the use of their own cryptocurrency wallets.  The Interface is neither a necessary nor the exclusive way to interact with or swap tokens on the Protocol.  The Interface does not recommend tokens.  Nor does the Interface represent to users that trading tokens on the Protocol is risk-free.  To the contrary, Labs cautioned that the markets for those digital assets could be volatile and scam tokens could exist.  The Interface is and was used lawfully by many, swapping billions of dollars of value in legitimate tokens.

There is nothing unlawful about an electronic interface that allows users, entirely at their own discretion, to interact with the Protocol to swap tokens on it.  Unsurprisingly, then, the central focus of the SAC is on persons other than Defendants and on their conduct separate and apart from anything Defendants allegedly did.  Plaintiffs allege that purported fraudsters created 32 scam tokens (not on the Interface), fraudulently promoted the tokens through social media and other channels (not on the Interface), and deployed the tokens through token-pair contracts on the Protocol (not on the Interface).  *See* SAC ¶¶128-582.  Plaintiffs say these acts by third parties

caused their losses, alleging that they "relied" on these fraudsters' misrepresentations, SAC ¶¶600, 619, and that absent those repeated misrepresentations by others, Plaintiffs "would not have purchased" the tokens "and would not have been damaged," SAC ¶¶602, 620.  This has nothing to do with any conduct by Defendants.

Nonetheless, under several flawed theories, Plaintiffs seek to hold Labs—and its CEO—liable for these third-party fraudsters' schemes.  This Court correctly rejected that attempt when Plaintiffs tried it under the federal securities laws, and the Second Circuit affirmed.  Now, when Plaintiffs turn to state law, where their theories find even less support, the Court must again reject Plaintiffs' attempts to blame Defendants for the actions of others.  *First*, each claim against Labs fails on its own merits.  Among its many flaws, the SAC never alleges Labs had any actual knowledge of or substantially assisted the 32 token scams at issue, that Labs made any misstatements leading any Plaintiff to believe swapping tokens on the Protocol would be risk-free, or that any conduct of Labs—as opposed to that of the third-party fraudulent issuers—was the legal cause of Plaintiffs' injuries.  *Second*, though the Court need not reach the defense given the failures of each claim on its own merits, Section 230 of the Communications Decency Act also bars Plaintiffs' attempt to hold Labs liable for enabling third-party content to be available on the Interface, or for not blocking information about certain tokens from the Interface.  *Finally*, the personal liability claims against Labs' CEO fail because the SAC cannot by any stretch satisfy the well-established personal participation doctrine of Delaware corporate law.

## STATEMENT

### A.    Background

Plaintiffs are five individuals who allege they used the Interface to obtain tokens through the Protocol.  Defendants are Labs and Hayden Adams, Labs' Chief Executive Officer.  Like the FAC, the SAC sues Defendants for alleged harms inflicted on Plaintiffs by persons, other than

Defendants, alleged to have fraudulently created and marketed tokens that Plaintiffs obtained through the Protocol.  *See* SAC ¶¶128-582.

### 1.    Cryptocurrency issuers create and market tokens independently from Defendants, the Protocol, and the Interface.

The SAC's story of Plaintiffs' harm begins with the creation of what Plaintiffs characterize as "scam tokens" (e.g., SAC ¶¶88-89) or, when referring to 32 specific tokens they obtained, as simply "the Tokens" (*e.g.*, *id.* ¶3, 125-126).  Defendants did not create the Tokens.  As the SAC acknowledges, they were created on the Ethereum blockchain using an open-source application standard, ERC-20, and "[a]nyone with a basic understanding of Ethereum … can create their own ERC-20 token." SAC ¶27.  Defendants did not promote the Tokens, nor did the Issuers (*id.* ¶126) of the Tokens use Labs' technology to promote their Tokens.  Rather, as the SAC pleads, issuers promote their tokens directly to the public, using social media and whitepapers (*e.g.*, *id.* ¶30), and the Issuers of the Tokens did the same here (*e.g.*, *id.* ¶¶129, 151-154).  Once someone creates a token, they can make it available in various ways, including by direct offer or through centralized or decentralized exchanges.  There are—and were during the 2021-2022 period at issue—many exchanges.  Binance, Coinbase, and Kraken are centralized exchanges, all of which existed in 2021-2022.  SushiSwap, Pancake Swap, and the Protocol are decentralized exchanges, all of which also existed during that period.

### 2.    The Protocol, first deployed years ago, provides a decentralized alternative to centralized exchanges.

In most centralized exchanges, a single entity acts as an intermediary and holds users' assets to facilitate cryptocurrency trading.  In contrast, decentralized exchanges are peer-to-peer systems using public code on blockchains, in which users hold their own assets and interact with

one another, including through smart contracts.[1]  In this respect, decentralized exchanges are one manifestation of decentralized finance, which offers open, digital alternatives to mainstream financial systems.[2]  This case concerns only one decentralized exchange, the Protocol.  This Court's previous order covered the Protocol's operation, so Defendants do not explain it again.  *See Risley v. Universal Navigation Inc.*, 690 F.Supp.3d 195, 202-206 (S.D.N.Y. 2023), *aff'd in part, vacated in part,* No. 23-1340-cv, 2025 WL 615185 (2d Cir. Feb. 26, 2025).

For this Motion, two points bear emphasis:  *First*, the Protocol was first deployed on the Ethereum blockchain years ago and is not subject to control by anyone, including Defendants.  *See id.* at 202, 210.  Notwithstanding Plaintiffs' attempt to confuse things (*e.g.*, SAC ¶¶37, 62), Labs and the Protocol are not the same thing.  The Protocol will operate as long as the Ethereum blockchain exists.[3]  *Second*, anyone can create liquidity on the Protocol through a token pair, and anyone with a cryptocurrency wallet can swap tokens on the Protocol.  This "permissionless" design is fundamental to the Protocol's decentralized-finance objective:  "Permissionless design means that the protocol's services are entirely open for public use, with no ability to selectively restrict who can or cannot use them.  Anyone can swap, provide liquidity, or create new markets at will.  This is a departure from traditional financial services, which typically restrict access based

---

[1] *See*, Coinbase, *What is a DEX?*, https://www.coinbase.com/learn/crypto-basics/what-is-a-dex (last visited June 12, 2025); Uniswap Docs, *The Uniswap Protocol*, https://docs.uniswap.org/concepts/uniswap-protocol (last visited June 12, 2025).  The label "decentralized exchange" does not mean these are exchanges in the traditional sense.  The term, however, distinguishes the technology from centralized exchanges.

[2] *See* Uniswap Labs, *What is Decentralized Finance (DeFi)?*, https://support.uniswap.org/hc/en-us/articles/20571999964685-What-is-Decentralized-Finance-DeFi (last visited June 12, 2025); Coinbase, *What is DeFi*, https://www.coinbase.com/learn/crypto-basics/what-is-defi (last visited June 12, 2025).

[3] *See The Uniswap Protocol*, *supra* n.1.

on geography, wealth status, and age."[4]  The Protocol thus "prioritize[s] censorship resistance," vesting no centralized party with authority to "selectively restrict access."[5]

### 3.    The Interface provides one means for users to easily interact with the Protocol.

While the SAC continues to rely on the Protocol's functionality, Plaintiffs purport to shift their focus to the Interface.  As this Court recognized, there are many ways users can interact with the Protocol to swap tokens.  *See Risley*, 690 F.Supp.3d at 205-207.  The Interface is just one.  *Id.*[6] The Interface populates data concerning token pairs that can be swapped on the Protocol and makes that information available to users.  *See*, *e.g.*, SAC ¶¶32, 44, 53-54.  Users may "browse the Interface" to find tokens to swap "or may search by token name, symbol, or token address."  *Id.* ¶53.  The Interface also enables users to send instructions to the Protocol, using their own wallets, to swap tokens.  *Id.* ¶¶53-54.  The user's swap takes place "with the Protocol"—not with Labs or the Interface.  *Id.* ¶56; *see also id.* ¶44 ("[T]he Interface is '[a] web interface that allows for easy interaction with the Uniswap protocol.'"), ¶45 (referring to "trading on the Protocol").[7]

The Interface thus does just what its name says—enables interaction with the Protocol. Labs neither offers investment advice nor recommends tokens to Interface users.  To the contrary, the Terms of Service—which the SAC acknowledges were available at the time Plaintiffs traded, *see* SAC ¶59—cautioned about the risks of swapping tokens on the Protocol.  The Terms disclosed

---

[4] *Id.*

[5] *Id.*

[6] Though not necessary to this motion, most Protocol swaps do not originate from the Interface.  *See* @mud2monarch, *Uniswap Protocol Key Stats (Volume and Swaps)*, Dune, https://dune.com/queries/3749558/6306663 (percentage of swaps that originated from Labs' interface in year preceding May 20, 2024) (last visited June 12, 2025).

[7] *See also* Uniswap Docs, *Protocol Concepts: Swaps*, https://docs.uniswap.org/concepts/ protocol/swaps ("Swaps are the most common way of interacting with the Uniswap protocol") (last visited June 12, 2025).

that "the markets for digital assets are highly volatile," that users "may suffer loss due to the fluctuation of prices of tokens in a trading pool or liquidity pool," and that "anyone can create a token, including fake versions of existing tokens and tokens that falsely claim to represent projects," among other warnings.[8]  Because the Interface is simply a means for users to interact with the Protocol, while maintaining custody of their digital assets, Interface users neither trade their cryptocurrency with Labs nor deposit their cryptocurrency with Labs to trade on their behalf. *See* SAC ¶¶44-45, 56.  During the class period, when Plaintiffs swapped tokens with the Protocol, Labs earned no fees from Interface users.  As the SAC pleads, the "interface fee" was not charged until October 2023, more than a year after the class period.  *See* SAC ¶¶81, 583.  No Plaintiff alleges they were charged an interface fee.

### B.    This Court dismissed the federal claims in the First Amended Complaint, rejecting Plaintiffs' attempt to hold Defendants liable for the actions of others, and the Second Circuit affirmed.

The FAC sought to recover from Defendants (and others) for losses that Plaintiffs incurred at the hands of others—asserting claims primarily under federal securities laws.  This Court dismissed those federal claims with prejudice.

*First*, the Court recognized the mismatch in Plaintiffs' claims, suing Defendants for losses other parties caused:  "Each of Plaintiffs' claims stems from losses arising out of scams and other misconduct committed by Issuers of the Tokens."  *Risley*, 690 F.Supp.3d at 213.  "This is evidenced," the Court observed, "by Plaintiffs' inclusion of literally hundreds of paragraphs of solicitation claims directed at Parties other than Defendants."  *Id.* at 222.  *Second*, the Court recognized that Plaintiffs' claims against Defendants therefore turned on the theory that Labs

---

[8] *See* Declaration of Jody Pearson, Exh. A.  The SAC incorporates the Terms of Service by reference, so the Court may consider them on this motion.  *See Risley*, 690 F. Supp. 3d at 201 n.1.

"facilitated the trades at issue by providing a marketplace and facilities for bringing together buyers and sellers of [alleged] securities." *Id.* at 213.[9] *Third*, this Court "decline[d] to stretch" the federal securities laws to cover that theory, *id.*, and explained why in several ways.  For example, in addressing Plaintiffs' Securities Exchange Act theory, the Court found "it defies logic that a drafter of computer code underlying a particular software platform could be liable under Section 29(b) for a third-party's misuse of that platform." *Id.* at 215.  That would be "like a suit attempting to hold an application like Venmo or Zelle liable for a drug deal that used the platform to facilitate a fund transfer," a move the Court found Plaintiffs "simply cannot do, at least under the current law." *Id.* at 217.  Similarly, the Court found that Plaintiffs' Securities Act theory would be tantamount to shareholders "su[ing] the NASDAQ and/or New York Stock Exchange as a facilitator of any stock purchase that went awry." *Id.* at 219.

The Second Circuit affirmed the dismissal of Plaintiffs' federal claims. *Risley v. Universal Navigation Inc.*, No. 23-1340-cv, 2025 WL 615185 (2d Cir. Feb. 26, 2025).  The court agreed "that it 'defies logic' that a drafter of a smart contract, a computer code, could be held liable … for a third-party user's misuse of the platform." *Id.* at *4.  The court also agreed that extending liability to one "whose function is solely to execute the trades … would be akin to holding the NASDAQ or the New York Stock Exchange liable as facilitators of any fraudulent stock purchase on their exchanges." *Id.* at *3.  The Second Circuit remanded for this Court to address Plaintiffs' state-law claims, as Plaintiffs had pled Class Action Fairness Act jurisdiction. *Id.* at *4.

---

[9] Unless otherwise indicated, all quotations cited in this brief omit internal quotation marks, internal alterations, and citations.

C.      **The Second Amended Complaint once again seeks to hold Defendants liable for the actions of others.**

The SAC withdraws the FAC's securities law claims, retains three state-law claims pled in the FAC, and adds claims for violation of New York, North Carolina, and Idaho consumer protection statutes.  While the SAC thus shifts its focus away from securities laws, fundamentally Plaintiffs still seek to hold Defendants liable for the wrongs of others.

The SAC's main theory remains one of fraud—namely, the fraud that Issuers of the Tokens allegedly perpetrated on Plaintiffs.  Like this Court observed about the FAC, *see Risley*, 690 F.Supp.3d at 222, the SAC contains over 450 paragraphs reciting a detailed story of persons other than Defendants allegedly issuing and marketing the Tokens, using social media and other marketing (like white papers, Discord, and celebrities) to spread misinformation about the Tokens and employing fraudulent trading to manipulate the Tokens' prices.  *See* SAC ¶¶128-582, 595-599.  Foremost among the trading examples the SAC describes are "rug pulls" and "pump and dump" schemes, in which issuers withdraw liquidity from a pool or dump their token holdings following fraudulent promotional efforts, resulting in the tokens' value crashing.  *Id.* ¶¶92-93.  The SAC is explicit about how and why Plaintiffs were drawn into the Issuers' fraud, alleging that Plaintiffs "relied on the misstatements and omissions *of the Issuers* and were damaged by *their* fraudulent conduct."  *Id.* ¶600 (emphasis added).  The SAC is also explicit about the importance of the third-party fraudsters' actions, alleging that "had *Issuers* not continually misrepresented and omitted material facts concerning the Tokens, Plaintiffs and the Class *would not* have purchased them and *would not* have been damaged."  *Id.* ¶602 (emphasis added).  The SAC does not allege Defendants distributed or actually knew of the Issuers' misrepresentations.

Instead, like the FAC, Plaintiffs' theory is predicated on Defendants having "provid[ed] a marketplace and facilities for bringing together buyers and sellers of Tokens."  SAC ¶125.

Defendants should be liable, the SAC contends, because they "allow[ed]" Plaintiffs to swap scam tokens on the Protocol—something the SAC alternatively frames as a failure to "prevent" the swaps or "de-list" the Tokens. SAC ¶¶606-608; *see also id.* ¶¶623-625, 634, 643, 655. The SAC does not deny that billions of dollars of value were swapped on the Protocol, and through the Interface, in legitimate tokens. The SAC's theory, nonetheless, is that Defendants should have known that fraudsters could use the Protocol to their advantage, and thus Defendants should have foreseen each of the 32 frauds described in SAC ¶¶128-582 and anticipatorily blocked each Token before Plaintiffs could swap it. *See, e.g.*, *id.* ¶¶100, 608, 625. Additionally, ignoring that Labs *did* warn about the risks of swapping tokens on the Protocol—in both the Terms of Service the SAC acknowledges and sources the SAC quotes[10]—the SAC asserts that Defendants should be held liable for failing to warn Interface users of the risks of swapping tokens on the Protocol. *See, e.g.*, *id.* ¶¶98-99. The SAC does not allege, however, that Defendants had some special knowledge of these risks, unknown to the rest of the world. To the contrary, for its central assertion, the SAC relies on a single March 2022 publication that retrospectively analyzed public data, *see* SAC ¶97, and after-the-fact messages from Plaintiffs themselves, *id.* ¶¶106-110.

---

[10] Paragraph 101 of the SAC quotes, without attribution, Uniswap Labs Blog, *Introducing Token Lists* (Aug. 26, 2020), https://uniswap.org/token-lists. The piece, posted on the Uniswap Blog before Plaintiffs swapped tokens, noted that "the success of permissionless innovation" in "the Ethereum ecosystem" had resulted in "exponential growth in the number of ERC20 tokens being issued." This acceleration made it difficult, Labs explained, "for users to filter out high quality, legitimate tokens from scams, fakes, and duplicates." As a result, Labs announced a new standard for the creation of Token Lists—"a community-led initiative to improve discoverability and trust in ERC20 token lists in a manner that is inclusive, transparent, and decentralized." *See also* Uniswap Labs Blog, *Uniswap's Year in Review: 2020* (Dec. 31, 2020), https://blog.uniswap.org/year-in-review (describing same Token Lists effort).

Under these theories, Plaintiffs sue Defendants for aiding and abetting the 32 frauds (Count One), aiding and abetting negligent misrepresentations (Count Two), violating state unfair and deceptive acts statutes (Counts Three, Four, Five), and unjust enrichment (Count Six).

## ARGUMENT

## I. PLAINTIFFS FAIL TO STATE CLAIMS FOR AIDING AND ABETTING FRAUD OR NEGLIGENT MISREPRESENTATION (COUNTS 1 AND 2)

Plaintiffs' aiding and abetting claims should be dismissed because they fail virtually every requirement. A claim for aiding and abetting fraud is subject to Rule 9(b). *See Berdeaux v. OneCoin Ltd.*, 561 F.Supp.3d 379, 411 (S.D.N.Y. 2021). To state a claim, Plaintiffs must satisfactorily plead "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)); *see also, e.g.*, *Heinert v. Bank of Am., N.A.*, 410 F.Supp.3d 544, 549 (W.D.N.Y. 2019) (same), *aff'd,* 835 F.App'x 627 (2d Cir. 2020). The third element—substantial assistance—requires that "the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Berdeaux*, 561 F.Supp.3d at 416 (quoting *Rosner v. Bank of China*, No. 06-CV-13562, 2008 WL 5416380, at *12 (S.D.N.Y. Dec. 18, 2008)); *see also, e.g.*, *Heinert*, 410 F.Supp.3d at 552 (same). The elements of a claim for aiding and abetting a negligent misrepresentation, to the extent the claim exists (*see infra*, Part I.D), are the same. *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 498 (S.D.N.Y. 2018). Plaintiffs' claims fail the knowledge, substantial assistance, and proximate causation elements.

**A.** **The Second Amended Complaint Fails To Allege Defendants' Actual Knowledge Of The Relevant Fraud—The Third-Party Fraudsters' Extensive Misrepresentations And Omissions About Their Tokens**

Nothing in the SAC sufficiently pleads Defendants' knowledge of the relevant fraud. To satisfy this element, "actual knowledge" is required, not "constructive knowledge." *Berdeaux*, 561 F.Supp.3d at 412. And that actual knowledge must be "of the underlying fraud," *id.*—not knowledge of a different, related fraud, *see Rosner*, 2008 WL 5416380, at *8-11, and not knowledge of the mere likelihood of fraud, *Berdeaux*, 561 F.Supp.3d at 413. "Allegations that the defendant should have known of the conduct are insufficient … as are allegations of a [defendant's] failure to identify warning signs of fraudulent activity, even where such signs converge to form a veritable forest of red flags." *Id.* at 412 (cleaned up).

The SAC fails these requirements. It alleges the underlying fraud, in detail, across over 450 paragraphs, alleging the Issuers of the Tokens engaged in widespread fraudulent marketing to drive demand for their Tokens. *See* SAC ¶¶128-582. This fraud is alleged to have occurred on social media, in white papers, and by celebrities. The SAC is explicit that this fraud—the Issuers' misrepresentations and omissions—is what Plaintiffs claim Defendants aided and abetted. Counts One and Two refer to this as the relevant fraud and plead that Plaintiffs reasonably relied upon those misrepresentations to their detriment. *See id.* ¶¶596-602, 617-620. The SAC, however, does not allege that Defendants actually knew of *that* fraud. Apart from two conclusory allegations, the SAC contains not a word about whether Defendants actually knew the Issuers were falsely promoting the Tokens.

The closest the SAC comes is in paragraphs 603 (Count One) and 621 (Count Two). The former contains a vague allegation that "Defendants knew the Issuers were engaging in fraudulent activity in connection with the Tokens," while the latter asserts "Defendants knew the Issuers were making misstatements or material omissions in connection with the Tokens." Both allegations are

11

conclusory. The only facts alleged in either paragraph to support Defendants' knowledge are *after-the-fact* warnings from two Plaintiffs, social media complaints, and "data" about the Protocol and Interface. Neither paragraph explains how Defendants could have been aware, *at the time* Plaintiffs swapped the Tokens, that the Issuers were falsely promoting those Tokens, or even that the Issuers were making statements at all. Nor would the assertion be plausible. There is no reason Defendants would have been aware of every statement in every social media post or white paper made by every issuer of every token available on the Protocol—much less any reason to have been aware when any such statement was false. Rather, the SAC stakes its allegations on what Defendants purportedly *should have known*. That move is legally insufficient, however, especially to support a conclusory assertion of actual knowledge: "Statements alleging that a defendant should have known that something was amiss with transactions, even if pled with conclusory statements that the defendant actually knew something … are insufficient to support an aiding-and-abetting claim under New York law." *In re Agape Litig.*, 773 F.Supp.2d 298, 308 (E.D.N.Y. 2011) (cleaned up).

The SAC also alleges that Defendants "knew" of fraud on the Protocol, and therefore "knew" the Interface "was at risk of" that same fraud. *See* SAC ¶604. For evident reasons, this allegation cannot establish Defendants' actual knowledge of the Issuers' misrepresentations and omissions. To the extent Plaintiffs mean this to be a second aiding-and-abetting theory, it also fails to satisfy the actual knowledge requirement. As the series of aiding-and-abetting cases in the Second Circuit's district courts show, a defendant must have actual knowledge of the specific fraud at issue. Thus, in each case, courts have evaluated a complaint's allegations to evaluate whether

the defendant knew of a specific fraudulent scheme.[11]  Plaintiffs' blunderbuss approach has no such precision, vaguely asserting knowledge of potential token frauds generally.  And, even at that high level, Plaintiffs advance no more than a "red flags" theory, which courts repeatedly reject.  Any theory founded upon Defendants' knowledge of the potential for so-called scam tokens to be offered on the Protocol—even "a veritable forest of red flags," *Berdeaux*, 410 F.Supp.3d at 549-550—is legally insufficient to establish Defendants' actual knowledge of each particular fraudulent scheme as to each Token.  Nor would an allegation of such knowledge be plausible.  The very nature of a "rug pull" or "pump and dump" is that only the fraudster knows of their intent to pull that rug or dump those tokens and the timing of that move.  Nothing in the SAC alleges Defendants knew (or could know) of either fact as to any Token.

**B.      The Second Amended Complaint Also Fails To Allege That Defendants Substantially Assisted The Relevant Fraud**

The SAC also fails to plead substantial assistance, which occurs where "a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed."  *In re Agape Litig.*, 773 F.Supp.2d at 322.  The SAC pleads no such assistance, for three reasons.

First, the SAC's allegations about Defendants' conduct (related to the Interface) again fail to match the relevant fraud (the Issuers' misrepresentations and omissions).  The SAC includes no allegation that Defendants affirmatively assisted the Issuers' fraudulent marketing of the Tokens.  For example, the SAC does not allege Defendants promoted the Tokens.  And, of course,

---

[11] *See Berdeaux*, 561 F.Supp.3d at 412-414 (dismissing complaint for failure to allege actual knowledge "of the OneCoin fraud"); *Heinert*, 410 F.Supp.3d at 549-551 (dismissing complaint for failure to allege actual knowledge of Ponzi scheme); *In re Agape Litig.*, 773 F.Supp.2d at 307-319 (dismissing complaint for failure to allege actual knowledge of Ponzi scheme); *Rosner*, 2008 WL 5416380, at *5-12 (dismissing complaint for failure to allege actual knowledge of foreign currency trading scheme).

Defendants had no control over, or any relationship whatsoever to, the social media and other marketing the Issuers employed.

Second, the SAC's allegations that Defendants "allowed" the Issuers to provide liquidity through the Interface (which funding is not itself alleged anywhere in the SAC) or "allowed" the Tokens to be swapped through the use of the Interface are insufficient. Pleading a defendant's mere provision of ordinary services, of the type made available generally to persons who use them for lawful purposes, is insufficient. *See Berdeaux*, 561 F.Supp.3d at 416 ("provision of routine banking services" "is patently insufficient to plead substantial assistance"); *In re Agape Litig.*, 773 F.Supp.2d at 323 ("conventional banking services" do not suffice); *Rosner*, 2008 WL 5416380, at *12 ("providing … usual banking services to a customer" does not suffice). Yet all the SAC alleges is Defendants' provision of the Interface for users to interact at their discretion with the Protocol, and the SAC does not deny that millions of users do that lawfully with billions of dollars of value traded in legitimate tokens. *Cf. Risley*, 690 F.Supp.3d at 216-217 (finding "the smart contracts here were themselves able to be carried out lawfully," so "were collateral to the Scam Token activity").

Third, as to the SAC's allegations that Defendants failed to take actions—"failing to take steps to prevent the Tokens from being purchased," "to de-list the Tokens on the Interface," and "to provide … warnings," SAC ¶¶624-627—the alleged inaction is also legally insufficient.[12] Substantial assistance requires affirmative conduct: "Inaction … ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Berdeaux*, 561 F.Supp.3d at 416; *see*

---

[12] As noted, *supra*, pp.5-6, 9 n.10, the SAC is wrong that Defendants failed to provide warnings.

*also Rosner*, 2008 WL 5416380, at *5 (same).  The SAC satisfies neither of these rare exceptions.  The SAC does not allege that Defendants allowed the Tokens to be swapped through the Interface with the specific intent to aid the Issuers' fraud.  Indeed, the SAC does not allege that Defendants took any particular action in connection with the Tokens.  And the SAC does not (and could not) plead that Defendants had any independent legal duty to prevent Plaintiffs from swapping the Tokens.  "[I]naction is substantial assistance only when the defendant owes a fiduciary duty directly to the plaintiff."  *Rosner*, 2008 WL 5416380, at *14 n.15; *see also Berdeaux*, 561 F.Supp.3d at 417 (same).  The SAC pleads no such duty.

### C.      The Second Amended Complaint Does Not Allege That Defendants Proximately Caused Plaintiffs' Injuries, But Rather Alleges That The Third-Party Fraudsters' Misrepresentations And Omissions Were The Proximate Cause

Finally, the SAC fails to satisfy the proximate cause requirement.  For a defendant's actions to have been the proximate cause of a plaintiff's injury, that injury must have been "a direct or reasonably foreseeable result of the conduct."  *Berdeaux*, 561 F.Supp.3d at 416.  "[B]ut for causation is not sufficient."  *Rosner*, 2008 WL 5416380, at *12.  The SAC fails this standard.

The SAC explicitly states, in multiple ways, that the proximate cause of Plaintiffs' injuries was the Issuers' fraudulent misrepresentations.  It is those actions that led Plaintiffs to seek the Tokens.  For example, the SAC introduces the over 450 paragraphs about the Issuers' fraud as follows:  "As detailed below, the Issuers engaged in fraudulent actions, making various misrepresentations about the Tokens and omitting material information about them.  Plaintiffs and the Class relied on the Issuer's misrepresentations and material omissions in purchasing the Tokens."  SAC ¶127.  Then, the section on each Token concludes with the same allegation—that purchasers of the Token relied on the Issuers' misrepresentations and "believed that their holdings would increase in value."  *Id.* ¶158; *see also, e.g.*, ¶¶175, 185, 190, 207, 218 (same).  The two

causes of action likewise make explicit that the causes of Plaintiffs' injuries were these same misrepresentations: "Plaintiffs and the Class reasonably relied on the misstatements and omissions of the Issuers and were damaged by their fraudulent conduct." *Id.* ¶¶600, 619. The Counts then leave no doubt that Plaintiffs' injury was not the direct or reasonably foreseeable result of Defendants' conduct: "Had Plaintiffs and the Class known the truth, that is, *had Issuers not continually misrepresented and omitted material facts concerning the Tokens, Plaintiffs and the Class would not have purchased them and would not have been damaged.*" *Id.* ¶602 (emphasis added); *see also id.* ¶620 (same).

The SAC does not allege that Defendants had anything to do with these misrepresentations or omissions. Plaintiffs needed a reason to search for opportunities to trade the Tokens. The reason, as the SAC honestly tells it, was the Issuers' fraud. Absent those misrepresentations and omissions, Plaintiffs "would not have purchased" the Tokens. SAC ¶¶602, 620. Defendants did not promote or recommend the Tokens; rather, Defendants cautioned about the risks of trading tokens on the Protocol. *See supra*, pp.5-6, 9 n.10. Plaintiffs' injury thus cannot have been the direct and foreseeable result of anything Defendants did. Analogous case law confirms the point. This Court used the Zelle network as an example in its order. *See Risley*, 690 F.Supp.3d at 217. In a case arising in that context, involving a scammer requesting payment by Zelle, a federal court rejected the claim on causation grounds: "[T]he immediate cause of [Plaintiffs'] injury was [their] reliance on the fraudulent statements of a scammer … [and] Defendants played no role in this conduct." *Tristan v. Bank of Am.*, No. SA-CV-22-01183-DOC-ADS, 2023 WL 4417271, at *5 (C.D. Cal. June 28, 2023), *appeal dismissed sub nom. Tristan v. Bank of Am., N.A.*, No. 24-6704, 2025 WL 1293081 (9th Cir. Jan. 21, 2025). This Court should reject Plaintiffs' claims for the same reason.

### D.     The Claim For Aiding And Abetting Negligent Misrepresentation Fails For The Same And Additional Reasons

To the extent an aiding-and-abetting-negligent-misrepresentation claim even exists, it has the same elements as an aiding-and-abetting-fraud claim. *See supra*, p.10. Count Two thus must be dismissed for the reasons already discussed. The claim also should be dismissed for two additional reasons. First, the SAC pleads no facts to support it. The SAC's only allegations are about intentional misrepresentations and omissions. Not even Count Two itself alleges any negligent statements or omissions. Second, it is not settled that the claim even exists. While one decision of this Court recognized the claim (ultimately dismissing it at summary judgment), *see Silvercreek*, 346 F.Supp.3d at 498-499, two other decisions of this Court, and decisions of other courts, reject the claim. *See In re Bayou Hedge Funds Inv. Litig.*, 472 F.Supp.2d 528, 532 (S.D.N.Y. 2007) ("Few states recognize aiding and abetting liability predicated on a third party's negligence, and this court is aware of no New York or Connecticut case that has done so."); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F.Supp. 1424, 1439 (D. Ariz. 1992) (finding "concept of secondary liability for negligence to be inherently contradictory"); *see also King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F.Supp.2d 288, 315 (S.D.N.Y. 2012) (declining to recognize claim), *rev'd in part on other grounds,* No. 09-Civ.-8387, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012); *Koehler v. Pulvers*, 606 F.Supp. 164, 173 n.10 (S.D. Cal. 1985) (same); *Rogers v. Furlow*, 699 F. Supp. 672, 675 (N.D. Ill. 1988) (same); *BankUnited, N.A. v. Milliman, Inc.*, No. 8:15-cv-1357-T-33TBM, 2016 WL 8999079, at *5 (M.D. Fla. Jan. 15, 2016) (same).

### II.     PLAINTIFFS FAIL TO STATE CLAIMS FOR VIOLATION OF STATE UNFAIR AND DECEPTIVE PRACTICES STATUTES (COUNTS 3, 4, AND 5)

Plaintiffs' claims under New York General Business Law ("NYGBL") §349, the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), and the Idaho Consumer Protection Act ("ICPA") fail for at least three reasons. First, as to the deception claims pled under

all three statutes, the SAC does not allege Defendants made any affirmative misrepresentations, nor does it allege that any omission was likely to deceive anyone.  Second, as to the two statutes with an unfairness or unconscionability prong, the SAC does not allege any unfair (NCUDTPA) or unconscionable (ICPA) act.  Third, as to all of the claims, the SAC does not allege that any act by Defendants, as opposed to the Issuers' fraudulent actions, caused Plaintiffs' injuries.

### A.    The Second Amended Complaint fails to allege Defendants made any affirmative misstatements whatsoever, or any deceptive omissions.  (Counts 3-5)

The SAC fails to state a claim because (1) it does not plead that Defendants made any affirmative misstatements, and (2) the SAC's allegations that Defendants could, but did not, warn about scam tokens are legally insufficient and contradicted by their own complaint.  Each statute defines a deceptive act slightly differently, but all describe acts likely to mislead a consumer.  Under the NYGBL, "a plaintiff must plead that the defendant's statements were likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Yuille v. Uphold HQ Inc.*, 686 F.Supp.3d 323, 343-344 (S.D.N.Y. 2023).  An act is deceptive under the NCUDTPA and ICPA if it has "the tendency or capacity to mislead" or "deceive consumers."  *Edwards v. JPMorgan Chase Bank, N.A.*, No. 1:20-CV-128, 2020 WL 1814423, at *6 (M.D.N.C. Apr. 9, 2020); *Duspiva v. Fillmore*, 293 P.3d 651, 656 (Idaho 2013).  The SAC does not plead any such acts.

To start, the SAC does not allege any affirmative misstatements, focusing instead on what Defendants allegedly did not say.  *See, e.g.*, SAC ¶¶98-99.  Plaintiffs' deception theory is that "Defendants could provide" information about scam tokens, "but did not do so."  *Id.* ¶99; *see also id.* ¶¶633, 642, 655.  That theory is meritless.  The statutes pled here do not impose freestanding, affirmative disclosure obligations.  Rather, they prohibit deceptive acts.  Thus, an omission violates the statutes only in limited circumstances.  The SAC pleads none.

Under the NYGBL, an omission claim exists "where *the business alone* possesses material information that is relevant to the consumer and fails to provide this information." *Braynina v. TJX Cos.*, No. 15 Civ. 5897 (KPF), 2016 WL 5374134, at *4 (S.D.N.Y. Sept. 26, 2016) (emphasis added); *see also Yuille*, 686 F.Supp.3d at 347 (same). The SAC fails this standard. It does not plead that Defendants alone possessed information "about scam tokens" being available on the Protocol. SAC ¶¶633, 642, 655. The SAC contradicts any such assertion. When it alleges facts about scam tokens on the Protocol, it does not rely on information known to Defendants alone but, rather, on public information. *See, e.g.*, SAC ¶97 (citing article analyzing public data). Indeed, as already explained (*supra*, p.9 n.10), the SAC also relies on Labs' own public statements to its users, on its blog, at a time before Plaintiffs traded. *See id.* ¶101.

These allegations are fatal to Plaintiffs' NYGBL omission theory. As *Yuille* explained in dismissing such a claim, and rejecting the plaintiff's use of a similar article on the defendant's website there: "the article does not establish that [defendant] withheld that information because the article *discloses* that fact to [defendant's] consumers." 686 F.Supp.3d at 348 n.13. The same is true here. Labs' Terms of Service, which the SAC acknowledges were public at a time before Plaintiffs traded, likewise warned of the potentially volatile nature of the assets on the Protocol and of possible losses through trading. *See supra*, pp.5-6.

Under the NCUDTPA, "[a] failure to disclose information can support a [deception] claim when it is 'tantamount to misrepresentation.'" *Edwards*, 2020 WL 1814423, at *6 (quoting *Gildane Bldg. Co. v. Fed. Rsrv. Bank*, 80 F.3d 895, 903 (4th Cir. 1996)). That would be the case only if the omission renders statements a defendant did make, or acts in which a defendant did engage, deceptive. *See id.* at *7 (omission did not render defendant's representations deceptive); *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 507 S.E.2d 56, 59, 64 (N.C. Ct. App. 1998) (provision

of list of accounts to be purchased was deceptive where defendant failed to disclose pending loss of accounts on list). Thus, a "failure to disclose information" is "tantamount to misrepresentation" if "it amounts to an affirmation that a state of things exist which does not." *Kron Med. Corp. v. Collier Cobb & Assocs., Inc.*, 420 S.E.2d 192, 196-197 (N.C. Ct. App. 1992).

The SAC pleads no such thing. It does not allege that any omission amounted to a misrepresentation to Interface users that swapping tokens on the Protocol would be free from risk. In fact, the SAC fails to include a nonconclusory allegation of even the most basic requirement of North Carolina law—that Defendants' alleged omissions misled, or had the tendency to mislead, anyone. *See* SAC ¶¶ 630-662. Nor could the SAC make such an allegation, especially given the statements that Labs did make.[13]

**B.    The Second Amended Complaint fails to allege any act meeting the high standards for unfairness or unconscionability under North Carolina or Idaho law. (Counts 4-5)**

Plaintiffs' NCUDTPA unfairness claim fails because the SAC does not allege any act that "offends established public policy" or "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," nor does it allege any injury that was not reasonably avoidable by consumers. *Edwards*, 2020 WL 1814423, at *6 (quoting *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 228 (N.C. 2013)). Plaintiffs' ICPA claim likewise fails because the SAC does not allege any act deemed "unconscionable" under Idaho Code §48-603C.[14]

---

[13] The ICPA case law is not as developed as NYGBL and NCUDTPA cases, but one court has recognized deception liability where an omission is tantamount to a misrepresentation. The *In re Edwards* court quoted the Idaho Rules of Consumer Protection for the principle that an omission is treated as deception "when such omission, *on the basis of what has been stated or implied*, would have the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances." 233 B.R. 461, 470 (Bankr. D. Idaho 1999) (quoting Rule 4.02.01.030) (emphasis added). The court then found a seller's failure to disclose facts deceptive, given the statements the seller had made. *See id.* at 471.

[14] The NYGBL applies only to deceptive—not unfair—acts.

As to both North Carolina and Idaho law, the SAC challenges Defendants' mere provision of the Interface, or doing so without blocking or removing tokens (according to criteria left unsaid). *See* SAC ¶¶642, 655.  The Interface's purpose, however, is to allow people to more easily interact with the existing Protocol.  Plaintiffs would have this Court wield the NCUDTPA and ICPA either to outlaw the Interface altogether, or else to require any party that provides access to a decentralized exchange to predict and block tokens that might be (but might not be) scams. Whether to require such censorship, and in what circumstances, is a matter for policymakers, not a matter of state consumer protection law.  The provision of the Interface is far from offending any established public policy (Plaintiffs plead none) nor does it rise to the level of immoral, unethical, oppressive, unscrupulous, substantially injurious, or unconscionable.

The NCUDTPA and ICPA claims fail for three additional reasons.  First, as to the NCUDTPA, "some type of egregious or aggravating circumstances must be alleged and proved before the Act's provisions may take effect." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (cleaned up); *see also Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F.Supp.3d 1011, 1022 (E.D.N.C. 2015) (same), *aff'd,* 674 F.App'x 250 (4th Cir. 2016).  Plaintiffs allege none.  Second, the NCUDTPA claim fails because "any unfairness reasonably could have been avoided." *Exclaim Mktg.*, 134 F.Supp.3d at 1024.  Like the Federal Trade Commission Act, "[l]iability for an unfair practice" under the NCUDTPA exists "only where the consumer, as a practical matter, is subjected to the practice by forces beyond its control." *Id.*  That is not the case here.  Plaintiffs made their own decisions whether to trade a Token; nothing in the SAC alleges any conduct by Defendants forcing Plaintiffs to trade.  Third, the ICPA prohibits "unconscionable" acts—not unfair acts—and defines them with reference to four specific circumstances, none of which are at issue here. *See*

Idaho Code §48-603(18) (declaring "unconscionable" acts unlawful "as provided in section 48-603C"); *id.* §48-603C(2) (prescribing four "circumstances" that a court "shall" consider).

C.    **The Second Amended Complaint fails to allege that any deceptive, unfair, or unconscionable act of Defendants—as opposed to the conduct of the Issuers—caused their injuries.  (Counts 3-5)**

For the same reasons the SAC fails to allege proximate causation for Plaintiffs' aiding-and-abetting claims, the SAC fails to satisfactorily plead causation for their NYGBL, NCUDTPA, and ICPA claims.  Each statute requires a plaintiff to plead that the deceptive, unfair, or unconscionable act caused their injury.  *See Braynina*, 2016 WL 5374134, at *9 (cleaned up) (NYGBL: "Plaintiffs must show that they suffered injury as a result of Defendant's materially misleading conduct."); *Bumpers*, 747 S.E.2d at 226 (NCUDTPA: requiring that "the act proximately caused injury to the plaintiff."); *Pickering v. Sanchez*, 544 P.3d 135, 142 (Idaho 2024) (ICPA: requiring that "unfair act(s) or practice(s) caused the consumer to suffer an 'ascertainable loss of money or property'" (quoting Idaho Code §48-608(1))).  The SAC is explicit that the cause of Plaintiffs' injury was the Issuers' fraudulent misrepresentations and omissions, not Defendants' acts.  *See supra*, Part I.C; *see also Diep v. Apple, Inc.*, No. 21-cv-10063-PJH, 2022 WL 4021776, at *7 n.1 (N.D. Cal. Sept. 2, 2022) (observing that consumer protection claims "may … suffer from a lack of proximate cause" given "the intervening fraud of the [app] developers"), *aff'd in part, remanded in part on other grounds*, No. 22-16514, 2024 WL 1299995 (9th Cir. Mar. 27, 2024).  For this reason too, Counts 3-5 should be dismissed.

III.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT (COUNT 6) BECAUSE THEY DO NOT ALLEGE THAT DEFENDANTS WERE ENRICHED AT PLAINTIFFS' EXPENSE**

Plaintiffs' unjust enrichment claim fails for the straightforward reason that the SAC does not allege that Plaintiffs, at their expense, conferred any benefit on Defendants.  "The essence" of an unjust enrichment claim—encapsulated in the claim's first two elements—"is that one party

has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). The benefit "must be both specific and direct"; "conclusory allegations that fail to establish" such a benefit "warrant dismissal." *Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP*, 589 F.Supp.3d 401, 421 (S.D.N.Y. 2022).

The SAC contains no allegations of a specific, direct benefit. The only possible benefits the SAC describes are fees paid to swap tokens on the Protocol, or fees paid to use the Interface to conduct such trades. The first type—"User Fees," SAC ¶74—are paid to liquidity providers, not Labs. *See* SAC ¶43 (fees paid by "users of Protocol … to liquidity providers"), ¶¶74-75 ("User Fees" that are "passed to Issuers"). While the SAC alleges Labs reserved the right to receive part of the User Fee, the SAC does not allege Defendants ever received any. This Court made the same point in its order. *See Risley*, 690 F.Supp.3d at 223 n.17. Meanwhile, the SAC acknowledges the second fee—an "interface fee"—was not charged until October 2023. *See* SAC ¶81. No Plaintiff alleges they paid it. The SAC also alleges that unidentified "users of the Interface" may have been charged "undisclosed fees." *Id.* ¶82. But, again, Plaintiffs do not allege that they paid undisclosed fees, nor would that be plausible. The transactions are recorded on blockchains, which are public, so Plaintiffs know any fees they paid.

"It is … axiomatic that for a plaintiff to recover for unjust enrichment, defendants must in fact be enriched." *Litman, Asche & Gioiella, LLP v. Chubb Custom Ins. Co.*, 373 F.Supp.2d 314, 318 (S.D.N.Y. 2005). The SAC alleges no such enrichment; the claim should be dismissed.

## IV.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT BARS PLAINTIFFS' CLAIMS

While each of the SAC's claims fails on its own merits, Section 230 of the Communications Decency Act ("CDA") also bars them. In the SAC, Plaintiffs purport to have shifted their focus to the Interface, blaming Defendants for the information made available there. At bottom, Plaintiffs' claims seek to require Labs to restrict information on the Interface about tokens that can

be swapped on the Protocol.  The SAC sues Defendants for allowing Interface access to tokens on the Protocol, for failing to remove certain such tokens, and for failing to warn about them.  Section 230 prohibits all of this.

The statute provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).  The defense contains three elements: (1) the defendant is a "provider or user of an interactive computer service"; (2) the claims "treat" the defendant as the "publisher or speaker" of information; and (3) the information is "provided by" an "information content provider" other than the defendant.  *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019) (quoting 47 U.S.C. §§230(c)(1), (f)(2), (f)(3)).  Courts agree that Section 230's text "should be construed broadly in favor of immunity."  *Id.*  All three elements are satisfied.

First, Labs is a provider of an "interactive computer service."  The CDA defines this term "expansively, to include 'any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server.'"  *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 27-28 (2d Cir. 2015) (quoting 47 U.S.C. §230(f)(2)).  Like the Section 230 defense itself, this term is "construed broadly."  *Id.* at 28.  Labs easily qualifies because the Interface provides access by multiple users to servers so that users can see and find information on tokens available to swap on the Protocol.  *See, e.g.*, SAC ¶¶53, 78.  In other contexts, courts have held that providers of "an online trading platform for various stocks," *Saveene Corp. v. Remo*, No. 21-Civ.-399, 2021 WL 4806380, at *3 (S.D.N.Y. Oct. 14, 2021); "websites" on which "third-party products … are available for purchase," *Ratermann v. Pierre Fabre USA, Inc.*, 651 F.Supp.3d 657, 666 (S.D.N.Y. 2023); "a cloud computing platform that hosts software that third-party companies and individuals create," *United States v. EZ Lynk SEZC*, No. 21-cv-1986 (MKV), 2024

WL 1349224, at *9 (S.D.N.Y. Mar. 28, 2024) (cleaned up); and "platforms for accessing and downloading apps," *Diep*, 2022 WL 4021776, at *4, all are interactive computer service providers. Labs is too.

Second, Plaintiffs' claims turn on information generated by content providers other than Labs. In other cases, the information was software. *See, e.g.*, *EZ Lynk*, 2024 WL 1349224, at *10; *Diep*, 2024 WL 1299995, at *1. Here it is information about the tokens available to be swapped on the Protocol. The pairs in which the tokens can be swapped are created through the Protocol. *See* SAC ¶¶32, 44, 125.

Third, Plaintiffs' claims treat Labs as the publisher of the information—*i.e.*, the information about the tokens available to swap on the Protocol. In applying this element, courts "ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher," keeping in mind that the cases support "a capacious conception of what it means to treat a website operator as the publisher of information provided by a third party." *Foley v. IRBsearch, LLC*, No. 24 Civ. 1303 (KPF), 2025 WL 950679, at *12 (S.D.N.Y. Mar. 28, 2025) (cleaned up). Plaintiffs' claims seek to hold Defendants liable for publishing information about tokens available on the Protocol, for not restricting access to certain such information, and for not publishing additional warnings about those tokens. *See* SAC ¶¶604-609, 622-626, 633-634, 642-643, 655, 664. In each respect, the claims treat Labs as the publisher of the information. "[W]hen the accusation is fundamentally that defendants should have monitored and curbed third-party content, courts consistently hold that the defendants are immune under Section 230." *Planet Green Cartridges, Inc. v. Amazon.com, Inc.*, No. CV-23-6647-JFW(KSx), 2023 WL 8943219, at *5 (C.D. Cal. Dec. 5, 2023) (cleaned up), *aff'd*, No. 23-4434, 2025 WL 869209 (9th Cir. Mar. 20, 2025). Thus, courts have held Section 230 bars claims about a defendant

"making … software publicly available," *EZ Lynk*, 2024 WL 1349224, at *10; about Apple's failure to remove an app from its app store, *Diep*, 2024 WL 1299995, at *1; about a defendant's "failure to remove and investigate" information on a securities trading platform, *Saveene*, 2021 WL 4806380, at *3; and about Facebook's "failure to delete content," *Force*, 934 F.3d at 65.  And, although one of those courts declined to apply Section 230 to a claim about the defendant's own affirmative misstatements, *see Diep*, 2024 WL 1299995, at *2, the SAC alleges no such misstatements, focusing on Labs' decision not to publish additional warnings.  *See supra*, Part II.A.  Section 230 bars the SAC's claims.

## V.  ALL CLAIMS AGAINST ADAMS FAIL BECAUSE THE SECOND AMENDED COMPLAINT'S ALLEGATIONS DO NOT SATISFY DELAWARE CORPORATE LAW'S PERSONAL PARTICIPATION DOCTRINE

Finally, all claims against Adams fail because the SAC makes no nonconclusory allegations that he was personally involved in any allegedly wrongful act.  Labs is a Delaware corporation, *see* SAC ¶10, and under Delaware law, "an officer cannot be held liable for the actions of a corporation merely by virtue of his or her corporate position."  *Wash. House Condo. Ass'n of Unit Owners v. Daystar Sills, Inc.*, No. N15C-01-108 WCC CCLD, 2017 WL 3412079, at *14 (Del. Super. Ct. Aug. 8, 2017).  Rather, if an officer is liable, "it must be for acts of their own."  *Gassis v. Corkery*, No. 8868-VCG, 2014 WL 3565418, at *5 (Del. Ch. July 21, 2014), *aff'd*, 113 A.3d 1080 (Del. 2015).  Moreover, "mere knowledge of the tortious act is not enough, and an officer can only be held liable for misfeasance or active negligence and not for nonfeasance or the omission of an act."  *Id.* (cleaned up); *see also Heronemus v. Ulrick*, No. 97C-03-168-JO, 1997 WL 524127, at *1-3 (Del. Super. July 9, 1997) (granting motion to dismiss complaint pleading only omissions).  "[T]o state a claim against an individual, a complaint must, at a minimum, describe affirmative actions taken by that individual directing, ordering, ratifying, approving or consenting to the tort."  *Gassis*, 2014 WL 3565418, at *5.  "Requiring that such actions be

26

specifically identified in the pleadings plays an important role in preserving limited corporate liability." *Id.*

The SAC fails these standards.  While a few allegations reference Adams' early development of the Protocol and Interface (SAC ¶¶31-32), or note statements he made purportedly showing his appreciation of risks of the Protocol (*id.* ¶¶102-104), the only allegations purporting to connect Adams to any of Labs' alleged conduct are in Paragraph 11.  That paragraph alleges Adams invented the Protocol, created the Interface, is Labs' CEO, and—in conclusory fashion— "is and was intimately involved in all the affairs of [Labs]."  These allegations fall far short under the standards above.  Paragraph 11 does not allege Adams directed, ordered, ratified, approved, or consented to any of the misfeasance the SAC alleges.  And, as noted, allegations directed to Labs' omissions cannot support Adams' liability in any respect.

Compare this to *Washington House*.  There, the defendant officer was President, wholly owned, and "possessed significant control over" the corporation and "pretty much [ran] the whole thing."  2017 WL 3412079, at *15.  Yet those facts were insufficient to establish personal liability. *Id.*  Only evidence that he personally approved and directed the relevant acts sufficed to allow personal-liability claims to proceed.  *Id.*  The SAC's allegations pale compared to even those the court found wanting.  Adams should be dismissed.

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

Dated: New York, NY
   June 13, 2025

        Respectfully submitted,

        */s/ Noah A. Levine*
        Noah A. Levine
        WILMER CUTLER PICKERING
         HALE AND DORR LLP
        7 World Trade Center

250 Greenwich Street
New York, NY 10007
(212) 230-8875
noah.levine@wilmerhale.com

Elliot Greenfield
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
egreenfield@debevoise.com

*Attorneys for Defendants Universal*
*Navigation Inc. (d/b/a Uniswap Labs) and*
*Hayden Z. Adams*

## <u>LOCAL RULE 7.1(c) COMPLIANCE CERTIFICATE</u>

I, Noah A. Levine, hereby certify that this Memorandum of Law in support of Motion to

Dismiss Second Amended Class Action Complaint complies with the formatting requirements

imposed by Local Rule 7.1(b) and the length limitation imposed by Local Rule 7.1(c) as follows.

This Memorandum was prepared in Times New Roman size 12 font using Microsoft Word.

The Memorandum contains 8,733 total words.  To count the number of words in the Memorandum,

I used the word-count software in Microsoft Word Version 2501, applied specifically to include

all text—including headings, footnotes, and quotations—except for the text in the caption, table of

contents, table of authorities, and signature block.

Dated: New York, NY
      June 13, 2025

Respectfully submitted,

*/s/ Noah A. Levine*
Noah A. Levine
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8875
noah.levine@wilmerhale.com

*Attorney for Defendants Universal Navigation*
*Inc. (d/b/a Uniswap Labs) and Hayden Z.*
*Adams*