UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NESSA RISLEY, JAMES FREELAND, ROBERT
SCOTT, ANDREW CARDIS, and DEAN MEYERS,
*individually and on behalf of all others similarly
situated*,

Plaintiffs,

-v.-

UNIVERSAL NAVIGATION INC., *doing business as*
UNISWAP LABS, and HAYDEN Z. ADAMS,

Defendants.

---

22 Civ. 2780 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs invested through the Uniswap Protocol trading platform (the

"Protocol"), a decentralized cryptocurrency exchange created and developed by

Universal Navigation Inc., doing business as Uniswap Labs ("Labs"), and its

CEO Hayden Z. Adams ("Adams," and together with Labs, "Defendants").

Plaintiffs claim to have lost money after investing in what turned out to be

various "scam tokens" that were issued and traded on the Protocol (the "Scam

Tokens" or "Tokens").  Because the identities of the Scam Token issuers are

unknown, Plaintiffs have sought to hold Defendants liable instead.

Plaintiffs' early efforts at imputing liability bore no fruit.  This Court

dismissed Plaintiffs' First Amended Complaint (the "FAC") for failing to state a

claim under the federal securities laws, and that dismissal was upheld on

appeal.  *Risley* v. *Universal Navigation Inc.*, 690 F. Supp. 3d 195 (S.D.N.Y.

2023) ("*Risley I*"), *aff'd in part, vacated in part, remanded*, No. 23-1340-cv,

2025 WL 615185 (2d Cir. Feb. 26, 2025) (summary order) ("*Risley II*").

Plaintiffs' Second Amended Complaint (the "SAC"), the operative pleading in this case, focuses on state-law violations, but fares no better. For the reasons that follow, the Court grants Defendants' motion to dismiss for failure to state a claim and dismisses the SAC in full.

**BACKGROUND**[1]

**A.    Factual Background**

The Court previously detailed the underlying facts of this case and assumes familiarity with them here. *See Risley I*, 690 F. Supp. 3d at 201-11. In brief, Defendants created and developed the Protocol, a decentralized exchange that replaces the traditional one-to-one matching of buyers and sellers on a centralized exchange with liquidity pools. (SAC ¶¶ 21-22, 32). Liquidity pools, in turn, allow an issuer to create a new token by contributing a pair of tokens — token A, a preexisting token with some inherent value, and token B, the issuer's new token (often with little to no inherent value) — to a pool where buyers can trade their token A in exchange for the issuer's new token B. (*Id.* ¶¶ 22, 63). The Protocol operates through a system of "smart contracts," which are self-executing, self-enforcing programs that write the

---

[1]    This Opinion draws its facts from the SAC (Dkt. #114), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Jody Pearson ("Pearson Decl., Ex. [ ] (Dkt. #119)), which exhibits are incorporated by reference in the SAC. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference in or integral to a complaint).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss the SAC as "Def. Br." (Dkt. #118); to Plaintiffs' memorandum of law in opposition to the motion to dismiss as "Pl. Opp." (Dkt. #121); and to Defendants' reply memorandum as "Def. Reply" (Dkt. #125).

terms of the agreement between the buyer and seller of tokens directly into the program's code — that is, when a given event occurs, the trade auto-executes, without the need for third-party intervention from banks, lawyers, accountants, or the like. (*Id.* ¶ 24). One way investors access and trade on the Protocol is through a web interface (the "Interface") controlled and hosted by Labs. (*Id.* ¶¶ 32, 38, 41, 44-45).

Plaintiffs Nessa Risley, James Freeland, Robert Scott, Andrew Cardis, and Dean Meyers — residents of North Carolina, Idaho, New York, and Australia — allege that they used the Interface to access the Protocol and subsequently lost money investing in 38 Scam Tokens. (SAC ¶¶ 5-9, 124-582; Pl. Opp. 1). The scams most commonly took the forms of "rug pulls" and "pump and dumps." (SAC ¶¶ 92-93; Pl. Opp. 6).[2] Plaintiffs' losses are alleged

---

[2]    *See Risley I*, 690 F. Supp. 3d at 206:

> In a rug pull, a new issuer deposits their token pair in a liquidity pool and receives liquidity tokens in exchange. ([FAC] ¶ 179). Traders like Plaintiffs then buy that token based on its value at the moment of purchase. In a normal scenario, the issuer and other liquidity providers would continue to provide liquidity, and a trader's just-purchased asset would increase in value. This is good for the traders, who profit from this increased value, and good for the liquidity provider and issuer, who keep the pool afloat and earn fees each time someone buys the token. In a rug pull, however, instead of keeping their underlying liquidity assets in the pool, the issuer prematurely withdraws or "burns" their liquidity tokens, thereby removing all liquidity from the pool and leaving other investors with now-worthless tokens. (*Id.*).

> Separately, a pump and dump scheme occurs when, prior to launching a new token on the Protocol (thereby creating a new pool), an issuer sends millions or more of the new token to themselves, a fact rarely disclosed to potential investors. (FAC ¶ 180). Then, the issuer "pumps," or loudly promotes, their tokens to potential investors, often through social media, making claims to entice investors to drive up demand. (*Id.*). When demand is at its peak, the issuer "dumps" their holdings on the exchange at the

to have occurred from April 5, 2021, through April 4, 2022 (the "Class Period").
(SAC ¶ 3).

## B.    Procedural Background

### 1.    The Initial Complaint and the First Amended Complaint

On April 4, 2022, Risley initiated this action by filing a complaint. (Dkt.
#1). Soon after, the Court appointed lead plaintiffs and co-lead counsel
pursuant to the Private Securities Litigation Reform Act of 1995, and on
September 27, 2022, Plaintiffs filed the FAC. (Dkt. #46). The FAC alleged
fourteen claims against Labs and Adams as well as other Defendants who are
no longer parties to this case. (*See generally* FAC). Plaintiffs sought to certify a
nationwide class of "all persons who purchased any Tokens on the Protocol, or
first learned of the circumstances giving rise to their claims" during the Class
Period "and were harmed thereby." (*Id.* ¶ 697).

Plaintiffs' claims in the FAC fell into two broad categories. The first
comprised claims under the federal securities laws, including claims for
rescission of Plaintiffs' purportedly unlawful "contracts" with Defendants under
Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15
U.S.C. § 78cc, and for Defendants' alleged violation of Section 12(a)(1) of the
Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), (c), 77*l*(a)(1),
as well as control person liability under each Act. (FAC ¶¶ 708-745). The
second comprised state-law claims — namely for securities violations arising

---

highest possible price and cashes out with the profits, again leaving
investors with now-worthless tokens. (*Id.*).

under Idaho and North Carolina blue sky laws (*id.* ¶¶ 746-793), aiding and abetting fraud, aiding and abetting negligent misrepresentation, and unjust enrichment under New York law (*id.* ¶¶ 794-814).

### 2. *Risley I*

Defendants moved to dismiss the FAC, and on August 29, 2023, the Court issued an Opinion and Order granting Defendants' motion to dismiss in full. (Dkt. #90). The Court began with an overarching observation that seems relevant to the instant motion: It found unconvincing Plaintiffs' attempts to hold Defendants liable for losses that arose out of scams and other misconduct committed not by Defendants, but by the Token issuers. *Risley I*, 690 F. Supp. 3d at 213.

The Court recognized that Plaintiffs were unable to pursue the Token issuers themselves because the Protocol's decentralized nature rendered their identities largely unknown. *Risley I*, 690 F. Supp. 3d at 213. That was why, the Court observed, Plaintiffs were left to argue that Labs facilitated the trades at issue by "providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for [Labs] having the ability to charge a fee on every transaction it made possible on the Protocol," and to further argue that through drafting smart contracts that allowed the Protocol to operate and owning UNI governance tokens, Defendants somehow "sold" the Tokens as unregistered broker-dealers. *Id.* (quoting FAC ¶ 199) (internal quotation marks omitted). Ultimately, however, the Court declined "to stretch the federal securities laws to cover the conduct alleged, and conclude[d] that Plaintiffs'

concerns [were] better addressed to Congress than to this Court." *Id.*  In particular, it rejected Plaintiffs' efforts to predicate liability on Defendants' mere provision of a platform on which others could perpetrate fraudulent acts.  *See, e.g.*, *id.* at 215 ("[I]t defies logic that a drafter of computer code underlying a particular software platform could be liable under Section 29(b) for a third-party's misuse of that platform."); *id.* at 222 ("After all, no plaintiff would sue the New York Stock Exchange or NASDAQ for tweeting that its exchange was a safe place to trade after that plaintiff had lost money due to an issuer's fraudulent schemes.").  And with Plaintiffs' federal claims dismissed, the Court declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims. *Id.* at 223-24.

### 3.  *Risley II*

On September 28, 2023, Plaintiffs filed a notice of appeal.  (Dkt. #93). On February 26, 2025, the Second Circuit affirmed the judgment of the Court in part and vacated and remanded it in part.  (Dkt. #95).  *Risley II*, 2025 WL 615185.  The Second Circuit agreed with the Court that the "threshold issue in this case is whether the developers of automated computer codes that facilitate the transfer of cryptocurrency on a decentralized exchange may be held liable under federal securities laws for the alleged fraudulent conduct of third parties on that exchange."  *Id.* at *1.  Finding that such liability did not attach, the Second Circuit affirmed the Court's dismissal of Plaintiffs' federal securities claims.  *Id.* at *2-4.  However, finding that this Court had misperceived its

jurisdiction to consider Plaintiffs' state-law claims, the Second Circuit remanded them to this Court for consideration in the first instance. *Id.* at *4.

### 4.    The Remand and the SAC

Upon remand, Plaintiffs sought leave to amend the FAC. (Dkt. #96, 99). Defendants opposed and asked the Court to resolve Plaintiffs' remaining state-law claims as pleaded in the FAC and already briefed in the previously filed motion to dismiss papers. (Dkt. #101). The Court scheduled a pre-motion conference to discuss Plaintiffs' request to amend (Dkt. #102), and separately entered a stipulation of voluntary dismissal dismissing all Defendants from the case but Labs and Adams (Dkt. #105). The Court held the pre-motion conference on April 10, 2025 (April 10, 2025 Minute Entry), and on April 14, 2025, granted Plaintiffs leave to amend and set a schedule for the filing of the SAC and Defendants' contemplated second motion to dismiss (Dkt. #110).

Plaintiffs filed their SAC on May 14, 2025. (Dkt. #114). On June 13, 2025, Defendants moved to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6). (Dkt. #117-119). On July 11, 2025, Plaintiffs filed their opposition papers. (Dkt. #121-122). On July 25, 2025, Plaintiffs submitted their reply. (Dkt. #125).

The SAC withdraws the FAC's securities law claims, retains its three state-law claims, and adds claims for violations of New York, North Carolina, and Idaho consumer protection statutes. (SAC ¶¶ 594-669). The SAC also seeks to certify a nationwide class of "all persons who purchased any Tokens

through the Interface between April 5, 2021 and April 4, 2022 and were harmed thereby." (*Id.* ¶ 583).

While the SAC thus shifts its focus away from federal securities laws, Plaintiffs still seek to hold Defendants liable for the wrongs of others. As in the FAC, the SAC includes over 450 paragraphs alleging fraud committed not by Defendants, but by unknown Token issuers. (SAC ¶¶ 126-582). *Risley I*, 690 F. Supp. 3d at 222 (explaining that Plaintiffs included in the FAC "literally hundreds of paragraphs of solicitation claims directed at parties other than Defendants"). Also as before, the SAC describes rug pulls and pump and dump schemes perpetrated by Token issuers (SAC ¶¶ 92-93), and recognizes that the third-party issuers' conduct caused their losses (*see id.* ¶ 600 ("Plaintiffs and the Class reasonably relied on the misstatements and omissions *of the Issuers* and were damaged by *their* fraudulent conduct." (emphases added)); *id.* ¶ 602 ("[H]ad *Issuers* not continually misrepresented and omitted material facts concerning the Tokens, Plaintiffs and the Class *would not* have purchased them and *would not* have been damaged." (emphases added))).

## DISCUSSION

### A.    Applicable Law

Defendants seek dismissal of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to

relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)).  Plaintiffs are entitled to relief if they allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" (alteration in original) (quoting *Twombly*, 550 U.S. at 570)).

A court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith* v. *Loc. 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (alteration in original) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009))).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for

all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th

85, 106 (2d Cir. 2021).

### B.    Analysis

Despite three chances to get it right, Plaintiffs remain unable to allege

plausible claims.  Plaintiffs' theories of liability are still predicated on

Defendants having "facilitated" the scam trades "by providing a marketplace

and facilities for bringing together buyers and sellers of Tokens[.]"  (SAC ¶ 125).

Though the claims have changed, the result is the same:  Plaintiffs cannot hold

Defendants liable for the misconduct of the unidentified third-party issuers.

### 1.    Plaintiffs Fail to State a Claim for Aiding and Abetting Fraud (Count I)

Count I alleges that Defendants aided and abetted the fraudulent actions

of the Token issuers.  (SAC ¶¶ 594-615).  "To establish liability for aiding and

abetting fraud under New York law, 'the plaintiffs must show [i] the existence of

a fraud; [ii] [the] defendant's knowledge of the fraud; and [iii] that the defendant

provided substantial assistance to advance the fraud's commission.'"  *Krys* v.

*Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (alteration in original) (quoting *Lerner*

v. *Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)).[3]  Such a claim is subject

---

[3]    The parties do not dispute that New York law governs their common-law claims.  (*See, e.g.*,  Def. Br. 12 (discussing aiding and abetting claims under New York law), Pl. Opp. 9-10 (same)).  The parties' "implied consent … is sufficient to establish choice of law."  *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Tehran-Berkeley Civil & Env't Eng'rs* v. *Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)); *see also Valentini* v. *Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) ("The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law."), *aff'd*, No. 22-157, 2023 WL 2027273 (2d Cir. Feb. 16, 2023) (summary order).

to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.
*Berdeaux* v. *OneCoin Ltd.*, 561 F. Supp. 3d 379, 411-12 (S.D.N.Y. 2021)
(explaining that a plaintiff must "state with particularity 'the circumstances
constituting the fraud,'" including by alleging "facts that give rise to a strong
inference of fraudulent intent" (internal quotation marks omitted) (first quoting
Fed. R. Civ. P. 9(b); then quoting *Lerner*, 459 F.3d at 290)). Here, the Court
holds that the SAC fails to adequately allege the second and third elements —
that Defendants had knowledge of the fraud and substantially assisted in its
commission.

### a. Plaintiffs Fail to Adequately Allege Defendants' Knowledge of the Fraud

Beginning with the knowledge requirement, Plaintiffs fail to plead
particularized facts raising a strong inference that Defendants had knowledge
of the underlying fraud. This element requires Plaintiffs to allege that
Defendants had "actual knowledge" of the fraud. *Lerner*, 459 F.3d at 292;
*Krys*, 749 F.3d at 127. Constructive knowledge is not enough, "nor is 'a lower
standard such as recklessness or willful blindness.'" *Berdeaux*, 561 F. Supp.
3d at 412 (quoting *Heinert* v. *Bank of Am., N.A.*, 410 F. Supp. 3d 544, 549
(W.D.N.Y. 2019), *aff'd*, 835 F. App'x 627 (2d Cir. 2020) (summary order)); *see
also Krys*, 749 F.3d at 127.

Nor is it sufficient to allege knowledge of the mere likelihood of fraud.
That is, allegations that the defendant "should have known of the conduct" are
insufficient to raise an inference of actual knowledge. *Anwar* v. *Fairfield
Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010). So too, "failure to

identify warning signs of fraudulent activity, such as atypical transactions —
even where such signs converge to form a veritable forest of red flags — is
insufficient to impute actual knowledge of ongoing fraud." *Heinert*, 410 F.
Supp. 3d at 549-50 (internal quotation marks omitted) (collecting cases).
"Under New York law, if a defendant is under no independent duty, allegations
that the defendant ignored obvious warning signs of fraud are not sufficient to
allege 'actual knowledge.'" *Berdeaux*, 561 F. Supp. 3d at 412 (quoting
*Chemtex, LLC* v. *St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 547 (S.D.N.Y.
2007)).

As an initial matter, the parties disagree about what constitutes the
relevant fraud of which Defendants must have had actual knowledge.
Defendants ask the Court to focus specifically on the "misrepresentations and
omissions" the issuers made while "engaged in widespread fraudulent
marketing to drive demand for their Tokens." (Def. Br. 11). Plaintiffs counter
that such a narrow focus on the issuers' misrepresentations and omissions is
unnecessary; alleging Defendants' knowledge of the "primary violation" — "the
Issuers' defrauding of investors, which they consummated by selling scam
Tokens through the Interface" — will do. (Pl. Opp. 10).

The Court disagrees with Plaintiffs' proffered distinction, but finds the
parties' dispute in this regard to be largely academic. The "primary violation" is
the fraud committed by the issuers, but that fraud requires "a representation
of material fact ... [and] falsity of the representation." *Fraternity Fund Ltd.* v.
*Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 361 (S.D.N.Y. 2007)

(quoting *Lerner,* 459 F.3d at 291).  Thus, it is the misrepresentations and omissions made by the issuers in promoting their Tokens that make the sales of the Tokens fraudulent.  (*See* Def. Reply 4 ("Plaintiffs allege that certain swaps conducted via the Interface were unlawful *because of* the Issuer's fraudulent promotion of the Tokens.  That is the fraud, as the SAC alleges across some 450 paragraphs.")).

In other words, while Plaintiffs are correct that the issuers' sales of Scam Tokens constitute fraud, Defendants are also correct that those sales constitute fraud because of the issuers' misrepresentations and omissions.  Indeed, the SAC recognizes this relationship between the fraud and the issuers' misrepresentations and omissions:  Count I alleges that "Plaintiffs and the Class reasonably relied on the misstatements and omissions of the Issuers and were damaged by their fraudulent conduct."  (SAC ¶ 600; *see also id.* ¶¶ 597-598, 601-602, 611, 613 (Count I repeatedly focusing on the issuers' misrepresentations and omissions)).

Returning to the question of actual knowledge, the Court finds that the SAC does not adequately allege that Defendants had actual knowledge of the claimed fraud, *i.e.,* the issuers' sales of tokens, which sales were fraudulent because of the misrepresentations and omissions the issuers made about the tokens.  On this point, the SAC alleges that (i) Defendants received *ex post*

notifications that fraud had occurred and (ii) for various other reasons, Defendants should have known about the fraud.  Neither theory suffices.[4]

Beginning with the warnings, Plaintiffs emphasize that Named Plaintiffs Meyers and Risley both emailed Labs about fraud in connection with certain Tokens.  (Pl. Opp. 13 (citing SAC ¶¶ 107-111)).  But Meyers and Risley sent those emails after they had already purchased the tokens (SAC ¶¶ 107, 110), so they could not have supplied Defendants with actual knowledge of the fraud at the time it was happening to them.  *See In re Jeweled Objects LLC*, No. 10-11831 (RDD), 2012 WL 3638006, at *11 (Bankr. S.D.N.Y. Aug. 22, 2012) ("[O]ne cannot affirmatively, help conceal or fail to stop the commission of a tort that one knows nothing about."), *aff'd*, No. 12 Civ. 8559 (KBF), 2013 WL 5229792 (S.D.N.Y. Sept. 17, 2013), *vacated on other grounds*, No. 12 Civ. 8559 (KBF), 2013 WL 6017902 (S.D.N.Y. Nov. 1, 2013).[5]

---

[4]    In the SAC, Plaintiffs also cite a snippet from an early "whitepaper," or pitch document, for the Protocol in which Defendant Adams observed that "Custom exchanges can have different curves, managers, private liquidity pools, FOMO [fear of missing out]-based ponzi schemes, or anything else you can think of."  (SAC ¶ 104 (alteration in original) (quoting v1 Whitepaper)).  This statement, while glib, was also accurate.  In no way can it be seen as either a "call to arms" for would-be crypto fraudsters or a prescient acknowledgment of specific frauds that would later be perpetrated on the Protocol.  If anything, it was yet another warning to prospective users of risks inhering in the Protocol.

[5]    To the extent that Plaintiffs' argument is that these emails sufficed to demonstrate contemporaneous knowledge by Defendants of specific frauds alleged in the SAC, the argument fails.  In addition to overlooking the sheer volume of transactions undertaken through the Interface that were effectuated by smart contracts in which Defendants had no involvement, Plaintiffs' argument also overlooks the ephemeral nature of the fraudulent schemes alleged.  *See supra* n.2 (discussing rug pulls and pump and dump schemes).  By the time Plaintiffs (and other Scam Token purchasers) learned that they had been defrauded, the malefactors had already moved on to another token.  Advising Defendants of a particular Scam Token fraud was thus unlikely to afford them knowledge or opportunity to prevent others from being defrauded in connection with that Scam Token.

Plaintiffs also allege that victims of the scams "took to social media to warn other possible investors about the fraud" (SAC ¶ 106; *see also id.* ¶ 112), but as the SAC explicitly pleads, those warnings were directed to other possible investors, not Defendants.  Plaintiffs are therefore left to argue that Defendants should have been aware of the risk of fraud due to those general social media warnings.  But that is insufficient.  *See In re Agape Litig.*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011) ("Statements alleging that a defendant 'should have known that something was amiss with [ ] transactions,' even if pled with conclusory statements that the defendant 'actually knew something notwithstanding ... [are] insufficient to support an aiding-and-abetting claim under New York law.'" (alterations in original) (quoting *Rosner* v. *Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009) (summary order))).

Plaintiffs also make much of a report from March 2022 that found that 97.7% of tokens "launched on the Protocol from April 2020 through March 9, 2021" were "rug pulls" or "scams."  (SAC ¶ 97 & n.8; *see also id.* ¶ 604; Pl. Opp. 13).  Of course, a report issued one month before the end of a thirteen-month Class Period is hardly illuminative of Defendants' contemporaneous knowledge.  In any event, this report says nothing specific about the 38 Scam Tokens discussed in the SAC, and thus it cannot support a strong inference that Defendants had actual knowledge of those particular frauds, as required to support aiding and abetting liability.  *See Berdeaux*, 561 F. Supp. 3d at 412.

---

At most, Plaintiffs have alleged facts demonstrating Defendants' knowledge of fraud in connection with the SAM and MXS tokens alone.  Even those claims, however, fail on the substantial assistance prong, as described *infra*.

Nor does the SAC contain factual allegations as to the volume of transactions on the Protocol those tokens comprised. For example, if those fraudulent tokens constituted only 1% of overall business transacted on the Protocol, it would not be reasonable to infer that Defendants should have known — let alone actually did know — that the frauds alleged by Plaintiffs were ongoing. (*See* Def. Reply 5 n.6 (arguing that the March 2022 study "refers to *tokens* on the Protocol (not the Interface), and not the number or value of *transactions*")).

Relatedly, the SAC alleges that because Defendants knew there was fraud on the Protocol, they therefore knew the Interface was at risk of the same fraud. (SAC ¶ 604). But Plaintiffs ask for too great an inferential leap, particularly in light of Plaintiffs' pleading obligations under Rule 9(b). Allegations about fraud on the Protocol broadly do *not* support a strong inference that Defendants had actual knowledge of the specific frauds Plaintiffs encountered on the Interface. *See Risley I*, 690 F. Supp. 3d at 205-06 (explaining that the Interface is but "[o]ne" of "a variety of methods" "to interact with the Protocol"); *see also Berman* v. *Morgan Keegan & Co.*, No. 10 Civ. 5866 (PKC), 2011 WL 1002683, at *10 (S.D.N.Y. Mar. 14, 2011) ("While actual knowledge of the underlying fraud may be averred generally under Rule 9(b), the plaintiff must accompany the general allegation with allegations of specific 'facts giving rise to a strong inference of actual knowledge regarding the underlying fraud.'" (quoting *JP Morgan Chase Bank* v. *Winnick*, 406 F. Supp. 2d 247, 253 (S.D.N.Y. 2005)) (citing *Lerner*, 459 F.3d at 293), *aff'd*, 455 F. App'x 92 (2d Cir. 2012) (summary order).

As a fallback position to their actual knowledge arguments, Plaintiffs contend that the SAC alleges Defendants' conscious avoidance of knowledge of the fraud — which Plaintiffs say also suffices to state a claim. (Pl. Opp. 12). Plaintiffs admit that "it is unclear whether a claim of aiding and abetting under New York law is sustainable on a basis not of actual knowledge but of conscious avoidance of knowledge." (*Id.* (internal quotation marks omitted) (quoting *Krys*, 749 F.3d at 131)). However, "[c]ourts have generally held that allegations of conscious avoidance, where adequately pled, can satisfy the actual knowledge requirement in the context of an aiding and abetting claim." *Vasquez* v. *Hong Kong & Shanghai Banking Corp. Ltd.*, No. 18 Civ. 1876 (PAE), 2019 WL 2327810, at *15 (S.D.N.Y. May 30, 2019) (citing *Agape*, 773 F. Supp. 2d at 309).

Nevertheless, conscious avoidance "is distinct from constructive knowledge," *Vasquez*, 2019 WL 2327810, at *15, and is difficult to plead: "Plausibly alleging actual knowledge through conscious avoidance is a very high bar[.]" *Agape*, 773 F. Supp. 2d at 319. Conscious avoidance "occurs when 'it can almost be said that the defendant actually knew' because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368 (quoting *United States* v. *Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006)). Conscious avoidance is thus not an appreciably easier scienter for Plaintiffs to plead here, and for the same reasons that Plaintiffs have not

adequately pleaded Defendants' actual knowledge of the fraud, they have not adequately pleaded Defendants' conscious avoidance of that fraud either.

### b.     Plaintiffs Fail to Adequately Allege That Defendants Substantially Assisted the Fraud

Even if Plaintiffs had adequately alleged Defendants' actual knowledge, their claim would still fail because they have not alleged that Defendants provided substantial assistance to the issuers' fraud.  To plead substantial assistance, Plaintiffs must allege facts from which the Court can infer that (i) Defendants affirmatively assisted, helped conceal, or by virtue of failing to act when required to do so enabled the fraud to proceed, and (ii) Defendants' aiding and abetting proximately caused the harm on which the primary liability is predicated.  *Agape*, 773 F. Supp. 2d at 322; *Berdeaux*, 561 F. Supp. 3d at 416; *Rosner* v. *Bank of China*, No. 06 Civ. 13562 (VM), 2008 WL 5416380, at *12 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009) (summary order).  Plaintiffs have not met their pleading burden.

The thrust of Plaintiffs' substantial assistance argument is that Defendants "facilitated" the scam trades and "allow[ed]" the issuers' fraud to occur "by providing a marketplace and facilities for bringing together buyers and sellers of Tokens[.]"  (SAC ¶¶ 125, 605-606).  More specifically, Plaintiffs allege that Defendants substantially assisted the fraud by launching the Interface (through which Plaintiffs purchased their Tokens), making it available to the public (when nothing like it had existed before), and taking affirmative steps to incentivize issuers to sell Scam Tokens (including by showing them how to do it and providing liquidity for their transactions).  (Pl. Opp. 15 (citing

SAC ¶¶ 3, 5-9, 47, 72-75, 77-78, 89-91)).  Further, Plaintiffs argue, Defendants "created an atmosphere where fraud was rampant, failed to de-list more than just some tokens, legitimized the scam Tokens, and failed to warn users that the Tokens were fraudulent when they easily could have."  (*Id.* (citing SAC ¶¶ 83-86, 101, 115-116, 120-122, 605-606, 610-612)).

But merely creating an environment where fraud could exist is not the same as affirmatively assisting in its perpetration.  Nor is simply "allowing" the fraud to occur.  (SAC ¶¶ 605-606).  And as relevant here, it does not constitute substantial assistance to create a marketplace where millions of users could interact legitimately with the Protocol through the Interface, even if a subset of bad actors could, and did, abuse that marketplace for their own gains.  (*See* Def. Reply 5).  No matter how they try to dress up their allegations, Plaintiffs are basically alleging that Defendants substantially assisted fraud by providing ordinary services that anyone could use for lawful purposes, but that some used for unlawful purposes.  Such an argument fails for the same reasons why a bank does not substantially assist a money launderer who washes his cash through the bank's accounts, and why WhatsApp does not substantially assist a drug dealer who coordinates a sale on its messaging service:  Simply providing the platform on which a fraud takes place is not the same as substantially assisting that fraud.  *See Twitter, Inc.* v. *Taamneh*, 598 U.S. 471, 503 (2023) ("The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts."); *Berman,*

455 F. App'x at 96 ("It is well-established that '[t]he mere fact that participants in a fraudulent scheme use accounts at [a financial institution] to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance.'" (alterations in original) (quoting *SEC* v. *Lee*, 720 F. Supp. 2d 305, 330 (S.D.N.Y. 2010))).  Indeed, both this Court and the Second Circuit rejected strikingly similar arguments that such conduct merited liability for Defendants under the federal securities laws.  *See Risley I*, 690 F. Supp. 3d at 219-23; *Risley II*, 2025 WL 615185, at *3-4.  There is no reason to conclude differently with respect to Plaintiffs' aiding and abetting claims.

Further, the SAC does not contain allegations that Defendants assisted the issuers in making misrepresentations and omissions while fraudulently marketing the Tokens.  In fact, the SAC does not allege that Defendants promoted the Tokens at all.  And Plaintiffs' allegations about the things Defendants did not do — "failing to take steps to prevent the Tokens from being purchased on the Interface," "failing to de-list or remove the Tokens from the Interface," and "failing to provide Plaintiffs and the Class with disclosures and warnings during the Class Period" (SAC ¶¶ 607-609) — are likewise insufficient.  Substantial assistance ordinarily requires action.  *See Berdeaux*, 561 F. Supp. 3d at 416.  Inaction only suffices "when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act."  *Id.*  But Plaintiffs do not satisfy either exception here.  The SAC does not allege that Defendants allowed the Tokens to be swapped through the Interface with the specific intent to aid the issuers' fraud,

and it does not plead that Defendants had any independent legal duty to prevent Plaintiffs from swapping the Tokens. Accordingly, the Court holds that the SAC fails to adequately allege Defendants' substantial assistance, and dismisses Count I on this independent basis as well.[6]

### 2. Plaintiffs Fail to State a Claim for Aiding and Abetting Negligent Misrepresentation (Count II)

Count II alleges that Defendants aided and abetted the issuers' negligent misrepresentations. (SAC ¶¶ 616-629). The parties vigorously debate whether such a claim even exists. (*Compare* Def. Br. 17 (citing *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007) (dismissing an aiding and abetting negligence claim because "[f]ew states recognize aiding and abetting liability predicated on a third party's negligence, and this court is aware of no New York or Connecticut case that has done so")), *with* Pl. Opp. 17-18 (citing *Silvercreek Mgmt., Inc.* v. *Citigroup, Inc.*, 248 F. Supp. 3d 428, 455 (S.D.N.Y. 2017) (concluding that "the tort of aiding and abetting negligent misrepresentation exists" under New York law))). Ultimately, the Court need not decide whether aiding and abetting negligent misrepresentation is a claim that exists under New York law because, assuming *arguendo* that it does, Plaintiffs fail to adequately plead it.

---

[6]    Because the Court finds that Defendants did not substantially assist the fraud, it likewise finds that Defendants did not proximately cause Plaintiffs' injuries. *See, e.g.*, *Berdeaux* v. *OneCoin Ltd.*, 561 F. Supp. 3d 379, 416 (S.D.N.Y. 2021) (explaining that substantial assistance requires Defendants' aiding and abetting to have proximately caused the harm on which the primary liability is predicated). Rather, the proximate cause of Plaintiffs' injuries was the issuers' fraudulent misrepresentations, which led Plaintiffs to obtain the Tokens.

The parties agree that an aiding and abetting negligent misrepresentation claim has the same elements as an aiding and abetting fraud claim, except of course that the underlying violation is not fraud but a negligent misrepresentation.  (Def. Br. 17; Pl. Opp. 18).  *See ADPA Holdings LTD* v. *Cohen*, No. 24 Civ. 6029 (CS), 2025 WL 3458749, at *17 (S.D.N.Y. Dec. 2, 2025) ("Where, as here, negligent misrepresentation claims sound in fraud, they are subject to the heightened pleading requirements of Rule 9(b).") (collecting cases).  But while the underlying violation might be easier to prove, inasmuch as it requires negligence instead of intentional misconduct, the aiding and abetting elements are unchanged.  And because the SAC fails to sufficiently allege an aiding and abetting fraud claim, it also fails to sufficiently allege an aiding and abetting negligent misrepresentation claim.  Defendants did not have actual knowledge of the issuers' negligent misrepresentations, nor did Defendants substantially assist those misrepresentations.  The Court therefore dismisses Count II.

### 3. Plaintiffs Fail to State Claims Under the State Unfair and Deceptive Practices Statutes (Counts III-V)

In Counts III through V, Plaintiffs allege violations of three states' unfair and deceptive practices statutes.  Specifically, Count III alleges violations of New York General Business Law ("NY GBL") § 349.  (SAC ¶¶ 630-638).  Count IV alleges violations of the North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA").  (*Id.* ¶¶ 639-651).  And Count V alleges violations of the Idaho Consumer Protection Act ("ID CPA").  (*Id.* ¶¶ 652-662).  As explained

herein, these claims fail because Plaintiffs do not adequately allege the necessary elements of (i) deception, (ii) causation, or (iii) unconscionability.

*First*, though each statute is different, all three bar deceptive acts likely to mislead a consumer.  To state a claim under NY GBL § 349, "a plaintiff must allege that a defendant has engaged in [i] consumer-oriented conduct that is [ii] materially misleading and that [iii] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander* v. *Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Koch* v. *Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012)).  Deceptive or misleading conduct can take the form of either affirmative acts or omissions.  *See In re Lindt & Sprungli (USA), Inc., Dark Chocolate Litig.*, No. 23 Civ. 1186 (AMD), 2024 WL 4107244, at *4-6 (E.D.N.Y. Sept. 6, 2024).  "To establish that conduct was deceptive or misleading under [NY GBL § 349], a plaintiff must plausibly allege that the defendant's conduct was 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Kyszenia* v. *Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 359 (E.D.N.Y. 2022) (quoting *Mantikas* v. *Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018)).  And an act is deceptive under the NC UDTPA and ID CPA if it has the tendency or capacity to mislead or deceive consumers. *Edwards* v. *JPMorgan Chase Bank, N.A.*, No. 20 Civ. 128 (CCE), 2020 WL 1814423, at *6 (M.D.N.C. Apr. 9, 2020); *Duspiva* v. *Fillmore*, 293 P.3d 651, 656 (Idaho 2013) (quoting *State ex rel. Kidwell* v. *Master Distribs., Inc.*, 615 P.2d 116, 123 (Idaho 1980)).

The SAC does not allege any affirmative misstatements on the part of Defendants.  In their brief, Plaintiffs devote only one sentence to arguing otherwise:  They contend that they alleged affirmative misstatements by pleading that "Defendants falsely told users they could not do anything to protect them from fraud and conflated the Interface with the Protocol."  (Pl. Opp. 19 (citing SAC ¶¶ 114-116)).  But what the SAC actually alleges is that in a discussion on Labs's Discord channel (an online messaging and streaming platform), a "bot, which appears to be under [Labs's] control" stated that Labs did not plan "to implement security measures to prevent the issuance of 'scam coins'" because "no one can prevent scammers from having their scam token traded on Uniswap."  (SAC ¶ 114).  The SAC therefore concludes that the bot's response was "demonstrably false" because Labs later restricted "a small number of tokens" and "crypto addresses."  (*Id.* ¶¶ 115-116).

These allegations do not demonstrate falsity, much less that consumers were misled.  For starters, the allegations depend on a "bot" whose link to Defendants is uncertain at best.  Even attributing the bot to Defendants, the allegations in paragraphs 115 and 116 do not suggest that the bot's statements were false.  The bot made no statements regarding Labs's ability to restrict tokens, or its future plans regarding same, but rather merely communicated Labs's then-present disinclination to restrict them.  (*See* SAC ¶ 114 ("[Labs] is a censorship resistant system.  This means that no one can prevent someone from using it.  This includes both the good and the bad kind of censorship.")).  Finally, the proffered reason for that disinclination was not misleading:  Even if

Labs could restrict access to some problematic tokens, it could not *ex ante* prevent all scammers from trading on the platform.  After all, traders are banned or suspended from the NASDAQ and New York Stock Exchange every year, and yet fraud on those exchanges persists.

The SAC also does not plead omissions on the part of Defendants sufficient to support Plaintiffs' claims.  A "plaintiff bringing an omission-based claim for [NY GBL] § 349 liability must show that 'the business alone possesses material information that is relevant to the consumer and fail[ed] to provide this information,' or that plaintiffs could not 'reasonably have obtained the relevant information they now claim the [defendant] failed to provide.'" *Paradowski* v. *Champion Petfoods USA, Inc.*, No. 22-962-cv, 2023 WL 3829559, at *2 (2d Cir. June 6, 2023) (summary order) (alterations in original) (quoting *Oswego Laborers' Loc. 214 Pension Fund* v. *Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26-27 (1995)).

Plaintiffs argue that they plausibly pleaded an omission theory by alleging that Defendants had "unique knowledge of fraudulent activity" (Pl. Opp. 20); "received user complaints of fraud in connection with the Tokens" (*id.* (citing SAC ¶¶ 107-116)); "had the underlying data, and the ability to analyze the data, to quantify the rampant scam Tokens sold on the Interface" (*id.* (citing SAC ¶¶ 45-50, 87, 97, 117-119, 632)); "knew the Protocol and Interface better than anyone else" (*id.* (citing SAC ¶¶ 102-104)); and "failed to include any warnings about fraudulent or problematic Tokens, which they could have done, evidenced by the fact that they are doing so now" (*id.* (citing SAC ¶¶ 120-122,

632-634)).  But these alleged omissions do not demonstrate Defendants'
liability.

The user complaints were submitted by Plaintiffs themselves or posted by
other users to publicly-accessible Reddit channels (*see* SAC ¶¶ 106-112), which
means they were equally available to Plaintiffs and other Protocol consumers.
And Plaintiffs admit in the SAC that Defendants acknowledged in a public blog
post created during the Class Period "that the Protocol, via the almost
nonexistent barriers to entry of the Interface, was creating a problem."  (*Id.*
¶ 101).  Specifically, the SAC quotes a Labs blog post from August 26, 2020,
which states, "'As the rate of token issuance accelerates, it has become
increasingly difficult for users to filter out high quality, legitimate tokens from
scams, fakes, and duplicates.'"  (*Id.* (quoting Uniswap Labs Blog, *Introducing
Token Lists* (Aug. 26, 2020), https://blog.uniswap.org/token-lists)).  This blog
post was the opposite of an omission.  It was an admission and a warning to
consumers that transacting on the Protocol carried risks.

Further still, a more explicit version of the blog post's warning also
appeared in Labs's Terms of Service (Pearson Decl., Ex. A), which Terms the
SAC acknowledges were available to Plaintiffs during the Class Period (SAC
¶ 59).  And finally, the March 2022 study on which the SAC relies analyzed
public data, which only confirms that the risk of scam activity was known and
knowable.  (*See id.* ¶ 97 & n.8).  For these reasons, the SAC does not
adequately plead omissions on the part of Defendants sufficient to support
deception claims under any of the three state laws.  None of this information

26

was uniquely in Defendants' possession and not reasonably obtainable by Plaintiffs.  *See Paradowski*, 2023 WL 3829559, at *2.  Because Defendants did not fail to disclose this information, they did not make omissions that had the tendency or capacity to mislead or deceive consumers.  *See Edwards*, 2020 WL 1814423, at *6; *Duspiva*, 293 P.3d at 656.

*Second*, the SAC fails to sufficiently allege that Defendants' acts caused Plaintiffs' injuries.  All three state laws — NY GBL § 349, NC UDTPA, and ID CPA — require Plaintiffs to plead that the deceptive, unfair, or unconscionable act caused their injury. *See Braynina* v. *TJX Cos.*, No. 15 Civ. 5897 (KPF), 2016 WL 5374134, at *9 (S.D.N.Y. Sept. 26, 2016); *Bumpers* v. *Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013)); *Pickering* v. *Sanchez*, 544 P.3d 135, 142 (Idaho 2024).  But as discussed above, the SAC repeatedly ties Plaintiffs' injuries to the issuers' fraudulent misrepresentations and omissions, and not Defendants' acts.  *See supra*, Background B.4; Analysis B.1; *see also Diep* v. *Apple, Inc.*, No. 21 Civ. 10063 (PJH), 2022 WL 4021776, at *7 n.1 (N.D. Cal. Sept. 2, 2022) (observing that consumer protection claims "may ... suffer from a lack of proximate cause" given "the intervening fraud of the [app] developers"), *aff'd in part, remanded in part on other grounds*, No. 22-16514, 2024 WL 1299995 (9th Cir. Mar. 27, 2024) (memorandum disposition).  For this reason too, the SAC fails to state claims for Counts III through V.

*Third*, with particular respect to the NC UDTPA and the ID CPA, the SAC does not allege any unfair or unconscionable act.  The NC UDTPA supports a claim for relief if an act "offends established public policy" or "is immoral,

unethical, oppressive, unscrupulous, or substantially injurious to consumers."

*Edwards*, 2020 WL 1814423, at *6 (quoting *Bumpers*, 747 S.E.2d at 228).  And

the ID CPA permits claims for "unconscionable" acts.  Idaho Code § 48-603C.

But there is nothing violative of public policy, and nothing immoral, unethical,

oppressive, unscrupulous, substantially injurious, or unconscionable, about

creating a platform to access a marketplace where millions of users can

lawfully swap tokens, even if fraud might occur on that marketplace.  Just as

the NASDAQ and the New York Stock Exchange are not "liable as facilitators of

any fraudulent stock purchase on their exchanges," *Risley II*, 2025 WL 615185,

at *3 (citing *Risley I*, 690 F. Supp. 3d at 219-20), neither is Labs liable for

creating access to an exchange that facilitates cryptocurrency token trades.[7]

For all of these reasons, the Court dismisses Counts III, IV, and V.

### 4.    Plaintiffs Fail to State a Claim for Unjust Enrichment (Count VI)

Count VI alleges that Defendants were unjustly enriched at Plaintiffs'

expense.  (SAC ¶¶ 663-669).  "To prevail on a claim for unjust enrichment in

New York, a plaintiff must establish [i] that the defendant benefitted; [ii] at the

plaintiff's expense; and [iii] that 'equity and good conscience' require

restitution."  *Kaye* v. *Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting

---

[7]    Plaintiffs' NC UDTPA claims fail for two additional reasons.  *First*, the SAC does not allege "egregious or aggravating circumstances."  *Dalton* v. *Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (quoting *Allied Distribs., Inc.* v. *Latrobe Brewing Co.,* 847 F. Supp. 376, 379 (E.D.N.C. 1993)).  *Second*, "any unfairness reasonably could have been avoided" because Plaintiffs could have chosen to heed the warnings of Defendants and others and not transacted on a novel decentralized cryptocurrency trading platform.  *Exclaim Mktg., LLC* v. *DirecTV, LLC*, 134 F. Supp. 3d 1011, 1024 (E.D.N.C. 2015), *aff'd,* 674 F. App'x 250 (4th Cir. 2016).

*Dolmetta* v. *Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)).  The "essence" of

an unjust enrichment claim "is that one party has received money or a benefit

at the expense of another."  *Id.* (quoting *City of Syracuse* v. *R.A.C. Holding, Inc.*,

685 N.Y.S.2d 381, 382 (4th Dep't 1999)).  The benefit "must be both 'specific'

and 'direct.'"  *Snowbridge Advisors LLC* v. *ESO Cap. Partners UK LLP*, 589 F.

Supp. 3d 401, 421 (S.D.N.Y. 2022) (quoting *Regnante* v. *SEC Off.*, 134 F.

Supp.3d 749, 772 (S.D.N.Y. 2015)).

    The SAC contains no allegations of a specific, direct benefit.  Plaintiffs

describe two ways Defendants could have profited from trading on the Protocol.

*First*, users of the Protocol are charged a fee of thirty basis points for each

trade ("User Fees").  (SAC ¶ 74).  Twenty-five points are guaranteed to the

issuer, and Labs reserves the right to receive the remaining five points.  *Id.*  But

the SAC does not allege that Labs ever in fact received any User Fees.  That is

not surprising.  In its Opinion dismissing the FAC, the Court observed that

Plaintiffs appeared to abandon their theory that Labs collected fees for its own

financial gain.  *Risley I*, 690 F. Supp. 3d at 222-23.  Plaintiffs themselves

acknowledged that "while Labs has the option … to turn on a switch to allow a

portion of [User Fees] to be released to Labs itself, that switch has not been

turned on."  *Id.* at 223 n.17.  For these reasons, the Protocol's User Fees do not

support a claim for unjust enrichment against Defendants.

    *Second*, in October 2023, Labs implemented an "interface fee" on trades

executed through the Interface, which at the time of the filing of the SAC was

typically 25 basis points.  (SAC ¶ 81).  But October 2023 is well after the Class

Period, so the SAC cannot plausibly plead that Defendants were unjustly enriched by the interface fee during the relevant time period. (*See id.* ¶ 666 (alleging only that Defendants are "now" profiting from the interface fee)). Unsurprisingly, no Plaintiff alleges that he or she ever paid an interface fee.

Plaintiffs attempt to save their claim by arguing that Defendants "would not have been able to generate as many fees as they did had [Labs] not built up a massive following and encouraged liquidity providers to flock to the Interface to gain fees for themselves (mostly though scam tokens) during the early days of the platform, including during the Class Period." (Pl. Opp. 16). But this "for want of a nail the kingdom was lost" argument is far too causally attenuated to predicate liability for unjust enrichment. *See In re Residential Cap., LLC*, No. 12-12020 (MG), 2016 WL 1254429, at *1 n.3 (Bankr. S.D.N.Y. Mar. 28, 2016) (discussing the proverb). Even were it not, Plaintiffs' allegations in the SAC are entirely conclusory; no serious effort has been undertaken to allege, much less substantiate, a claim that Defendants "played the long game" by touting the Interface to would-be fraudsters in the hopes of one day building a successful platform for legitimate transactions in crypto assets.

Finally, Plaintiffs vaguely state that Labs "charges and has charged other undisclosed fees to users of the Interface," the total of which "is likely substantial." (SAC ¶ 82). This allegation is likewise too conclusory to substantiate Plaintiffs' unjust enrichment claim. As Defendants note (*see* Def. Reply 9), and the Second Circuit has confirmed, "[t]he benefit must be 'specific and direct,' and 'some indirect benefit' will not be enough to support an unjust

enrichment claim." *Rowe Plastic Surgery of N.J., L.L.C.* v. *Aetna Life Ins. Co.*, No. 23-8083, 2024 WL 4315128, at *3 (2d Cir. Sept. 27, 2024) (summary order) (quoting *Kaye*, 202 F.3d at 616); *see also Meka* v. *Deloitte LLP*, No. 25 Civ. 3547 (AKH), 2025 WL 3761874, at *4 (S.D.N.Y. Dec. 30, 2025) (finding allegations that defendant was unjustly enriched by "fulfilling diversity hiring obligations, maintaining H-1B cap numbers, and using and deploying [p]laintiff and his credentials in representations to clients and government entities" to be "too speculative and conclusory to constitute cognizable benefits for the purposes of unjust enrichment" (citing *Kaye*, 202 F.3d at 616)).

In sum, "[i]t is ... axiomatic that for a plaintiff to recover for unjust enrichment, defendants must in fact be enriched." *Litman, Asche & Gioiella, LLP* v. *Chubb Custom Ins. Co.*, 373 F. Supp. 2d 314, 318 (S.D.N.Y. 2005) (internal quotation marks and citation omitted).  Because the SAC alleges no such enrichment, the Court dismisses Count VI.[8]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Court dismisses each of Plaintiffs' claims with prejudice.  The Clerk of

---

[8]    Because the Court holds that the SAC fails to state any claims for relief, it need not reach Defendants' alternative arguments under Section 230 of the Communications Decency Act or Delaware's Personal Participation Doctrine.  (*See* Def. Br. 23-27).

Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    March 2, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge